ORIGINAL

FILED
JUL 11 2005
U.S. COURT OF
FEDERAL CLAIMS

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENVIRONMENTAL TECTONICS CORPORATION,

Plaintiff,

v.

THE UNITED STATES, DEPARTMENT OF THE NAVY

Defendant

No.: 05- 746C

## COMPLAINT

This is an action brought by Plaintiff, Environmental Tectonics Corporation (hereinafter sometimes referred to as "Plaintiff" or "ETC"), against Defendant, The United States, Department of the Navy (hereinafter sometimes referred to as "Defendant", "the Navy" or "the Government"), in the nature of a Contract Disputes Act ("CDA") Appeal of a Contracting Officer's Final Decision of July 22, 2004, which denied ETC's Certified CDA Claim submitted by Plaintiff to Defendant on May 6, 2003, wherein Plaintiff sought an equitable adjustment compensating ETC for additional costs incurred by ETC as a result of certain events or conditions which are more fully set forth at length herein.

This Complaint reflects claim events discussed in ETC's claim of May 6, 2003, and the amendments thereto, dated August 7, 2003, January 6, 2004 and April 28, 2004, together with quantum and factual updates of such claim events. Because the Contract to which this Complaint relates is ongoing, ETC hereby reserves it right to seek recovery at

a later date of additional claim events in the future through the formal claim process under the Contract.

In this Complaint, ETC seeks judgment (1) that the Contract, issued as Fixed Price Contract, is a Cost-Reimbursement Research and Development Contract; (2) for contract reformation based on mutual mistake; (3) for contract reformation based on unilateral mistake and misrepresentation; (4) for ETC's damages in the form of increased costs, together with a reasonable profit thereon, on account of the Government's constructive changes; (5) for ETC's damages in the form of increased costs, together with a reasonable profit thereon, on account of the Government's cardinal changes; (6) for ETC's damages for the Government's breach of duty of Good Faith and Fair Dealing; (7) for ETC's damages for the Government's breach of duty of Disclosure of Superior Knowledge; (8) for ETC's damages for the Government's breach of the Contract; (9) for recovery of liquidated damages; and (9) for attorney's fees and costs.

As and for its Complaint, Plaintiff alleges and states as follows:

## PARTIES AND JURISDICTION

1. The jurisdiction of this Court is based upon the Contract Disputes Act of 1978 ("CDA"), as amended, 41 U.S.C. §601 *et seq.*, and in particular 41 U.S.C. §609(a)(1) thereof, and the Tucker Act, as amended, 28 U.S.C. §1491 *et seq.*, and in particular 28 U.S.C. §§1491(a)(1) – (2) thereof.

2. Plaintiff, Environmental Tectonics Corporation is a corporation which is incorporated and authorized to conduct business in the Commonwealth of Pennsylvania.

3. Defendant is the United States Government, Department of the Navy.

## BACKGROUND

4. On or about March 24, 1998, ETC submitted an offer in response to the Government's Solicitation No. N47408-97-R-1861.

5. On or about September 25, 1998, the Government accepted ETC's offer and awarded Contract No. N47408-98-C-2103 [hereinafter referred to as the "Contract"] to ETC for the design and fabrication of two Submarine Decompression Chamber Segments [hereinafter referred to as "SDC Segments"]. [A true and correct copy of Contract No. N47408-98-C-2103 is attached hereto as Exhibit "A"].

6. The SDC Segments are components of a larger Submarine Decompression System (SDS), which is itself a component of the Submarine Rescue Diving and Recompression System (SRDRS).

7. The purpose of the SDC Segments are to facilitate emergency rescue and decompression operations for disabled submarine crew members.

## Relevant Drawings of The Solicitation Package and Contract

8. The solicitation package drawings, which ETC relied on in submitting its bid, consisted of 46 schematic and layout drawings.

9. The solicitation package specified that the data was provided for the purpose of demonstrating the conceptual feasibility of the Government's design of the SDC Segments, SDC 1 and SDC 2.

10. The solicitation package drawings depicted, among other things, both the internal and external arrangements for SDC1 and SDC 2.

11. With the exception of the Deck Decompression Transfer Lock (DTL) and Modified Transfer Lock (MTL) flange connections, which are mirrored, the drawings depict the piping and control panels for each SDC Segment as being laid out identically.

12. Another solicitation package drawing depicted a manway forging ring nozzle, which is the "neck" between the hyperbaric chamber and the manway door itself, with a 4.38" wall thickness.

13. Based upon the information contained in the solicitation package drawings, ETC's reasonable belief when submitting its offer was that with the exception of the MTL manway location, the SDC 1 and SDC 2 chambers and piping were essentially identical.

14. Accordingly, when ETC submitted its offer it included time in its budget to design a common SDC Segment, with one set of common drawings and one common design package, together with the minor difference in the manway location.

15. In preparing its offer, ETC reasonably relied upon the accuracy of the information presented in the Government's solicitation package drawings.

16. As an example, ETC utilized the information provided in the drawings to determine the required quantity, appropriate size, and costs of valves, gauges and other components for the SDC Segments.

17. Solicitation package drawing No. 7268125 depicted the equipment required for the Environmental Control System.

18. Specifically, it depicted that two Environmental Control Units (ECUs) and four air scrubbers would be required for each SDC segment with a total of four ECUs and eight scrubbers required for the project.

19. Relying upon the accuracy of the information presented in the Government's solicitation package drawing No. 7268125, ETC budgeted for a total of four ECUs and eight scrubbers for the project.

20. Solicitation package drawing No. 7268136, sheet 12 was a representation of a Control Panel with the cover removed.

21. As shown in solicitation package drawing No. 7268136, sheet 12, all piping gauges, filters, mufflers, regulators and other required accessories necessary for the SDC segments, would fit neatly on one surface beneath the Control Panel cover.

22. Solicitation package drawing No. 7268136, sheet 12, of the Control Panel also depicted many components and accessories located above and below the "Human Factors Lines", which are artificial barriers based upon MIL Standards, above and below which it was not permissible to locate equipment for operational and maintenance reasons.

23. Based upon the depictions contained in the Government's solicitation package drawing No. 7268136, ETC believed that the layout of the Control Panel equipment would be reasonably straightforward and uncomplicated.

24. The Government's solicitation package drawings also included drawings and piping schematics, which depicted, among other things, regulators.

25. However, contrary to the specification requirement that all regulators include a gauge on the inlet and outlet, the solicitation package drawings did not depict the required gauges.

26. ETC, in reliance upon the information contained in the Government's solicitation package drawings, did not include regulator inlet and outlet gauges in its budget.

27. The Government's solicitation package drawings also failed to depict gauge calibration valves.

28. Relying upon the accuracy of the information contained in the solicitation package drawings, ETC did not budget for the inclusion of gauge calibration valves when submitting its offer.

29. Solicitation package drawing No. 7268134, was an eight-page drawing that depicted in great detail the Government's medical lock door design for the SDC Segments.

30. Reasonably believing that the medical lock door design depicted in the solicitation package was a functional design to be utilized to meet the Contract's performance requirements, ETC relied upon the accuracy of the information provided and budgeted for the design and fabrication of the door as depicted.

31. Solicitation package drawing No. 7268128, Schematic: SDC Power Generation and Distribution, depicted a quantity of 22 lights inside each SDC segment.

32. Relying upon the accuracy of the information provided in solicitation package drawing No. 7268128, ETC budgeted for a total of 22 lights per SDC Segment when it submitted its bid response.

33. Solicitation package drawing No. 7268123 was a schematic that depicted the Primary and Secondary Air Pressurization systems.

34. As shown on solicitation package drawing No. 7268123, both the Primary and Secondary inlet air entering into the SDC's chambers was through diffuser tubes.

35. Furthermore, solicitation package drawing No. 7268123 depicted an in-line silencer in the Primary Pressurization line as the only required noise reduction equipment.

36. Relying upon the accuracy of the information provided in solicitation package drawing No. 7268123, ETC prepared its offer, budgeting to supply the diffuser tubes and in-line silencers as depicted in the Government's solicitation package drawing.

**Relevant Solicitation Package Specification Provisions**

37. Paragraph 3.2.15.1.b of the solicitation package specification contained detailed information regarding the quantity and type of intercommunication equipment required for the SDC Segments.

38. Specifically, it stated that a total of four communication headsets would be required for both SDC Segments.

39. ETC submitted its offer to the Government in reasonable reliance upon the information contained in the solicitation package specification, budgeting to supply the four required headsets.

**Relevant Express and Implied Contract Provisions**

40. The Contract required that each SDC segment have a maximum weight of 39,000 lbs. [See Exhibit "A" at paragraph 2.2.2.2.b.].

41. The Contract identified SDC 1 as one of a pair of single lock recompression chambers each capable of independent operation. [See Exhibit "A" at paragraph 1.1.3.b.1].

42. The Contract also identified SDC 2 as the second of the pair of single-lock recompression chambers composed of the same systems as SDC 1. [See Exhibit "A" at paragraph 1.1.3.b.2.].

43. While the Contract discusses the specific requirements for the Preliminary Design Package, the Final Design Package, the Drawing Package and all required analyses, nowhere does it mention that separate and distinct design packages would be required for SDC 1 and SDC 2.

44. The Contract also required that pipe and tube flexibility of piping sections which transverse hard mounted structures or equipment which may move relative to one another be demonstrated through flexibility analysis. [See Exhibit "A" at paragraph 3.1.39].

45. The Contract also required that the flexibility analysis be performed in accordance with American Society of Mechanical Engineer's (ASME) Code B31.1. [See Exhibit "A" at paragraph 3.1.39].

46. ASME Code B31.1 states, among other things, that for purposes of the flexibility analysis hand calculations are adequate to demonstrate the piping / tubing system's adequacy.

47. With regard to SDC Vans, the Contract required that they be based on the dimensions of standard ISO containers, that the floors and walls be reinforced to support the SDC internal components and that they have standard ISO connectors. [See Exhibit "A" at paragraph 1.1.3.b.1.b.].

48. The SDV Vans must also support the Submarine Hyperbaric Occupant Transfer System's (SHOTS) Control Van and the Submarine Decompression System's (SDS) Spares Van.

49. Incorporated by reference into the Contract's requirements are MIL STD 1472 and MIL STD 46855 which establish artificial lines called "Human Factors Lines". [See Exhibit "A" at paragraph 2.2.2.4.a.].

50. In an effort to consider the ease of Operation and Maintenance, the MIL standards require that virtually all equipment be placed between the Human Factors Lines.

51. The Contract also requires that hyperbaric piping, valves and components conform to the requirements of ASME B31.1 and PVHO-1. [See Exhibit "A" at paragraph 3.1.1].

52. PVHO-1 requires that all regulators in the applicable systems contain a gauge on the inlet and outlet.

53. The Contract also required that "except when specified otherwise", each gauge used in the SDC segments is to be supplied with a gauge calibration valve.

54. The Contract also required that each SDC Segment have a minimum light level of 50-Foot Candles (FC). [See Exhibit "A" at paragraph 3.2.10].

55. The Contract required that noise levels inside the SDC Segments be limited to 85 decibels or less. [See Exhibit "A" at paragraph 3.2.16.1].

56. The Contract required submission of a Preliminary Design Package and a Final Design Package. [See Exhibit "A" at paragraphs 5.1.11 and 5.1.12].

57. The drawings which were required as part of the design packages were general arrangement drawing and system piping and electrical schematics. [See Exhibit "A" at paragraph 5.1.11.a and b and 5.1.12].

58. The Contract required that pressure gauges utilized for the SDC segments were to be constructed of phosphor bronze or stainless steel material and feature helical coil or bourdon tube sensing elements. [See Exhibit "A" at paragraph 3.1.27.a.1].

## Relevant Post-Award Events

### I. Weight Constraint

#### 1. Thin Walled Chamber

59. Shortly after Contract award, the Government informed ETC that the Government had made an error in the maximum allowable weight.

60. Specifically, the Government had neglected to include the weight of aircraft shipping pallets in its total weight calculation and as a result each SDC Segment's maximum weight had to be reduced by more than 6%.

61. Discussions were held in which a decision was made to reduce the thickness of the chambers to ¼ inch thick to meat the maximum weight requirements.

62. Following discussions with ETC in regard to reducing the SDC Segment's shell thickness, Contract Modification P00001 was issued, lowering the maximum weight of each SDC Segment. [See Contract Modification P00001 attached hereto as Exhibit "B"].

63. The SDC Segments are unique in that they are the first chambers of such a large size to be fabricated with a thin-wall (1/4 inch thick).

64. The SDC Segments now need to be lightweight chambers which also have the strength characteristics necessary to make them capable of being loaded onto an aircraft for rapid transport around the world as intended by the Contract specifications.

65. In the course of the design and construction of these unique and advanced SDC Segments, ETC's costs of performance will exceed its estimated cost by approximately 273% and will exceed the total Contract price by 247%.

66. As a result of the use of thin-walled (1/4") steel for the chamber, ETC has been forced to address numerous manufacturing problems beyond those which could have reasonably been anticipated when Modification P00001 was issued.

67. As a result of the constructing the chamber from ¼ inch thick plate, ETC was forced to modify the overall SDC Segment design in several significant ways.

68. Based upon the Government's solicitation package drawing, the SDC Segments were to be attached to the vans (transport containers) by saddles welded to the bottom of each chamber.

69. Due to the SDC Segment's thin-wall requirements however, ETC's engineering analysis determined that it was necessary to have saddles on both the top and bottom of the chamber in order for the van to provide the chamber with more structural rigidity and prevent the chamber from going out-of-round, or deforming, under its own weight.

70. As a result of the chamber being connected to the van, both the chamber and the van had to act as a single unit, thereby complicating the required Finite Element Analysis (FEA) effort.

71. Specifically, when the chamber was modeled inside the Van FEA model, the number of necessary defined FEA elements increased drastically.

72. As a result, the overall mesh of the model had to be coarsened thereby decreasing the plot's intensity and the FEA's accuracy and leading to an increased number of "hot spots."

73. "Hot spots" are areas of high stress in the overall FEA which had to be addressed by either modifying the design or by further analyzing the areas through the creation of sub-models.

74. As a consequence of the necessity to use solid elements for the sub-models, ETC has incurred additional, unanticipated engineering labor in generating the additional sub-models.

75. In addition, the FEA analyses now involved much more solution, memory and run time than the shell element FEA analyses.

76. As a result of the requirement of the use of the ¼ inch thick chamber shell, ETC also was required to design belly bands on the chamber in the regions where the support saddles were located.

77. A belly band is a ring of thicker support steel which are placed around the circumference of the chamber to give it extra strength in the area where the saddles are connected to the chamber.

78. The belly bands were necessary because the saddles introduced concentrated "punch loads" that could possibly overstress the chamber in the area where the saddle is connected to the chamber.

79. As a result of the requirement of the use of the ¼ inch thick chamber shell, ETC was also required to analyze and subsequently modify the chamber's bunk design.

80. Specifically, ETC had to add an extra leg and support bracket to each bunk in order to dissipate the load concentrations on the ¼ thick chamber shell.

81. The extra leg and support bracket has resulted in additional vendor procurement costs for the reinforced bunk design.

82. Additional manufacturing costs were incurred as the result of the installation of the bunks by having to weld additional buttons and lugs to the chambers and bunks.

83. As another result of the ¼" thick chamber shell, the welding process caused localized flat spots, thereby resulting in problems in meeting the American Society of Mechanical Engine(ASME) roundness tolerance.

84. As a further result of utilizing saddles on the top of the chamber to prevent deformation (i.e, out-of - round), ETC was also required to re-examine the previously performed FEA to determined if the upper saddles connecting the van to the chamber had acceptable stress levels.

85. As a consequence, ETC had to incur additional engineering and manufacturing labor costs to meet the roundness requirement and to ensure that it would be maintained.

86. As a further consequence, the piping and general assembly of the SDC Segments was delayed.

87. As a result of the reduction in the SDC Segments' maximum weight and the need to utilize a thin walled chamber design, ETC has incurred **$428,820.00** in additional, unanticipated engineering and manufacturing costs.

88. As a result of the reduction in the SDC Segment's maximum weight and the need to utilize a thin walled chamber design, ETC had been hindered on its progress on this project.

89. The Contract required the SDC Segments to be subjected to hydrostatic testing. [See Exhibit "A" at paragraph 4.1.21].

**2. <u>Support Structures</u>**

90. Due to the requirement of the ¼ inch thick chamber, ETC believed that filling the chambers with the water required for such testing would cause deformations in the chambers.

91. As a result of the reduction in the SDC Segments' maximum weight and the need to utilize a thin walled chamber design, and the resultant risk of deformations, ETC has incurred **$13,607.00** in additional, unanticipated engineering and manufacturing labor costs, as well as extra material costs, in the design, fabrication and installation of temporary support structures to prevent the SDC Segments' deformation during such testing.

92. As a result of the reduction in the SDC Segment's maximum weight and the need to utilize a thin walled chamber design, and the resultant risk of deformations, the design, fabrication and installation of temporary support structures around the SDC Segments for the purpose of hydrostatic testing, ETC has been delayed in its progress on this project.

**3. <u>Manway Door</u>**

93. In order to meet the Government's reduced weight requirement, ETC was required to design and manufacture a lightweight stamped Manway door.

94. In hyperbaric chambers where weight is not an issue, a Manway door is traditionally manufactured from flat plat or a formed head welded into a ring flat, with an approximate thickness of 1 ¼ inches.

95. The Manway doors for the SDC Segments had to be formed from a stainless steel sheet with an approximate thickness of ½ inch which are stamped into a dome shape with a flat outer ring flange, having the same strength as a thicker flat door.

96. The SDC Segment's formed stainless steel sheet Manway door was more expensive to design and manufacture than the traditional flat plate or formed head manway door.

97. ETC was required to incur the additional design and manufacturing costs of the Manway door to stay within the SDC Segment's reduced weight limits.

98. To prove the structural integrity of the lightweight stamped Manway door design, the Government required that ETC perform a Contact Analysis on the formed Manway door design.

99. The Government then proceeded to question ETC's performance of the Contact Analysis, rejecting ETC's modeling approach, which involved two planes (two dimensional or "2D" model) and insisted that ETC analyze the door using a three plane (three dimensional or "3D" model) approach.

100. After several weeks of unsuccessful attempts to create and merge the Government's desired 3D model into ANSYS software, the Government re-reviewed ETC's data and agreed with ETC's initial 2D modeling approach.

101. Stamping a formed door of ½ inch thickness into the required domed shape with a flat outer ring flange finish is a much more complex process than what would be involved in simply cutting a standard door to the required size.

102. Following weeks of engineering effort to find a vendor capable of fabricating the door in this manner, including several Government-recommended vendors (all of whom declined to bid), ETC was only able to locate one manufacturer in North America who was willing to attempt to fabricate the required Manway door.

103. ETC was required to return the Manway door on two occasions for rework before penetrations could be welded in and final machining could be accomplished.

104. In addition, as result of the difficulty ETC encountered in sourcing a vendor capable of manufacturing the required Manway door, ETC had to begin implementation of contingency plans.

105. The contingency plan was that ETC also had to investigate and analyze alternate designs based on the traditional door design approach.

106. As a result of the reduction in the SDC Segment's maximum weight and the resultant need for a specialized Manway door, ETC has incurred **$54,573.00** in additional engineering and manufacturing costs.

107. As a result of the reduction in the SDC Segment's maximum weight and the resultant need for a specialized Manway door, ETC has been hindered in its progress on the project.

**4. <u>Van</u>**

108. The Contract sets forth the requirements for the SDC Segment's vans. [See Exhibit "A" at paragraph 1.1.3.b.1].

109. When submitting its offer in response to the Government's solicitation, ETC reasonably interpreted Contract specification paragraph 1.1.3.b.1 regarding the vans to mean that the Government required the supply of a standard ISO container with reinforcements in the walls and floors to support the SDC internal components.

110. In accordance with this interpretation of Contract specification paragraph 1.1.3.b.1, ETC budgeted for the purchase and subsequent modification of two standard ISO containers.

111. In accordance with this interpretation of Contract specification paragraph 1.1.3.b.1, following Contract award, ETC contacted several manufacturers regarding the purchase of a standard ISO container.

112. However, after evaluating the performance requirements, it was determined that a standard ISO container, even with appropriate wall and floor reinforcements, would not be adequate.

113. As a result ETC was required to design custom van frames.

114. The design of custom van frames became infinitely more complex when the maximum weight of each SDC Segment was decreased by more than 6% and the thin walled chamber design was incorporated.

115. As a consequence of utilizing a thin walled chamber, ETC was forced to connect the chamber to the van using saddles so that the van would lend structural rigidity to the chamber.

116. The connection of the chamber to the van using saddles so that the van would lend structural rigidity to the chamber complicated the FEA effort.

117. The connection of the chamber to the van using saddles so that the van would lend structural rigidity to the chamber induced added stresses on the van, forcing ETC to bulk up the van design with larger frame members.

118. The connection of the chamber to the van using saddles so that the van would lend structural rigidity to the chamber increased the SDC Segments' overall weight and cost.

119. Furthermore, in the Spring - Summer of 2000 (May through August), the Government decided to assist ETC by having its engineering consultant , Oceaneering, complete the design of the vans to the Government's satisfaction.

120. The Government's redesign was motivated, at least in part, by a desire to obtain a van design with a wave slap capability in excess of the 200 Pounds per Square Foot (PSF) rating required by the specifications of the Contract.

121. As a result of the reduction in the SDC Segment's maximum weight and the need for a new Van design, ETC incurred **$339,749.00** in additional, unanticipated engineering and procurement costs relating to the Vans.

122. As a result of the reduction in the SDC Segment's maximum weight and the need for a new Van design, ETC has been delayed in its completion of the project.

**5. <u>Manway Forging Ring Nozzles</u>**

123. The design depicted in the Government's solicitation package drawing No. 7268144 called for a forging ring with a 4.38 inch wall thickness.

124. When the Government reduced the SDC Segments' maximum weight, ETC was required to modify the design of the manway forging ring nozzles to stay within the reduced weight.

125. Specifically, the wall thickness of the SDC Segment's manway forging ring nozzled was reduced to 1.12 inches.

126. However, when the manways were welded into the chamber the inner portion of the forging ring nozzles deformed.

127. When ETC attempted to mount the manway doors it discovered the deformation in the forging ring nozzles.

128. Specifically, the rings were out-of-round and out-of-flat on the sealing surface.

129. As the result of the deformation, ETC was required to investigate several corrective actions in regard to the forging ring nozzle deformation.

130. The deformation of the forging ring nozzle was a direct result of decreasing the forging ring's wall thickness in an effort to meet the SDC Segment's reduced weight requirement.

131. As a result of the reduction in the SDC Segment's maximum weight and the deformation of the forging ring nozzle, ETC was required to: (1) remove the deformed forging ring nozzles; (2) design a revised means of connecting the forging ring to the chamber; (3) procure new nozzles from its subcontractor; and (4) install the replacement forging ring nozzles in the chamber.

132. As a result of the reduction in the SDC Segment's maximum weight and the deformation of the forging ring nozzle, ETC incurred **$213,067.00** in unanticipated labor and material costs.

133. As a result of the reduction in the SDC Segment's maximum weight and the deformation of the forging ring nozzle, ETC has been hindered in its progress on the project.

## II. Duplicative Design Effort

134. The solicitation package specification and drawings, when viewed together, gave the impression that SDC Segments #1 and #2 were, for all practical purposes virtually identical to one another.

135. Paragraph 1.1.3 of the solicitation provided detailed information regarding the systems and subsystems which the SDC Segments contractor was required to engineer and fabricate.

136. Paragraph 1.1.3.b.1 of the solicitation provided detailed information regarding the systems and subsystem required for SDC Segment #1 and stated, "Submarine

Decompression Chamber #1 (SDC1): One of a pair of single-lock recompression chambers."

137. Paragraph 1.1.3.b.2.of the solicitation provided detailed information regarding the systems and subsystem required for SDC Segment #2 and stated, "Submarine Decompression Chamber #2 (SDC2): SDC2 is the second of the pair of single-lock recompression chambers as described above. Outer lock capability is provided by MTL 2. SDC2 is composed of the same systems as SDC1."

138. The solicitation package specification and drawings also discussed the requirement for the Preliminary Design Package, the Final Design Package, the Drawing Package and all the required analysis.

139. Nowhere in the above did it mention that separate design packages would be required for SDC 1 and SDC 2.

140. Solicitation package drawings 7268136 and 7268138 depicted the external arrangements for SDC 1 and SDC 2.

141. With the exception of the necessary piping for the DTL and MTL flange connections, which are mirrored, the drawings depicted the piping and control panels as being laid out identically.

142. Based upon the information contained in the specification and drawings, and recognizing that the location of the MTL manway differed between SDC 1 and SDC 2, ETC reasonably believed that the SDC 1 and SDC 2 were basically identical to each other.

143. Thus, when ETC submitted its offer, ETC believed that only one set of drawings and one design package would be required for both SDC 1 and SDC 2.

144. In its offer, ETC included time to design a common SDC segment, together with the minor difference in the manway location.

145. Under the Contract, ETC found it was necessary to simultaneously prepare and submit separate design packages for SDC Segment 1 and SDC Segment 2.

146. The requirement to submit separate design packages for SDC Segment 1 and SDC Segment 2 essentially doubled ETC's work effort.

147. In addition, ETC was required to create many detailed layout drawings to scale to ensure there would be no interference, due to space constraints problems, as set forth more fully within.

148. The requirement to create many detailed layout drawings to scale, combined with the fact that the SDC 1 and SDC 2 were neither fully identical nor fully mirrored, required ETC to create such detailed drawings for both SDC 1 and SDC 2.

149. ETC also had to create two separate and distinct Piping Master drawings to check for interference among the different piping systems.

150. The Piping and Tubing Flexibility Analysis, the scope of which was greatly increased at the Government's insistence, also had to be performed twice.

151. In addition, due to the differences in piping runs between SDC 1 and SDC 2, ETC had to separately review and approve many piping and accessory purchases for each SDC Segment.

152. In early April 2001, ETC submitted its Final Design Package for SDC 2 which limited its FEA analysis to the worst case load combinations on the chamber.

153. ETC believed that the limited FEA analyses was justified considering that it had previously submitted a complete analysis to the Government for SDC 1 and therefore

both ETC and the Government were well aware of which load case would produce the worst-case stresses on SDC 2.

154. In early June 2001, the Government stated that the SDC 2 Final Design Package was not satisfactory with regard to the various FEA analyses.

155. The Government demanded that ETC greatly expand the scope of its SDC 2 FEA analyses.

156. Specifically, the Government demanded the following in order to obtain Government approval of the SDC 2 design: (1) expand the Piping Flexibility Analysis for SDC 2 to include all 312 load cases; (2) modify the Harmonic Natural Frequency Analysis to include an analysis for each of the 19 natural frequencies; (3) expand the plots of the PVHO and Van for SDC 2 to include both the high stress sides and the low stress sides; and (4) analyze six specific FEA sub-models for SDC 2.

157. Specification paragraph 5.1.14.c.1 of the Contract required verification of the FEA analysis to verify the design behavior and adequacy.

158. ETC performed strain gauge testing and analysis on SDC-1 which verified the design behavior and adequacy.

159. However, ETC was required to perform a second strain gauge testing and analysis on SDC-2 to again verify the design behavior and adequacy.

160. As a consequence of having to engineer and design two separate and unique SDC segments in lieu of one, and the resulting additional requirements as set forth above, ETC has incurred **$331,488.00** in additional and unanticipated engineering costs.

161. As a consequence of having to engineer, design and build two separate and unique SDC segments in lieu of one, ETC has been hindered in its progress on the project.

## III. Space Constraint Issue

162. As previously stated, the Government's solicitation package included 46 schematic and layout drawings that depicted the Government's desired design for the SDC Segments.

163. ETC relied upon the accuracy of the information presented in these drawings as the primary basis for preparing its bid price.

164. ETC utilized the information provided in these drawings to determine the quantity and approximate size of valves, gauges and other SDC components.

165. Following Contract award, ETC performed the engineering analyses required by the specification, thereby arriving at the required size and quantity of equipment necessary to meet the performance requirements of the Contract.

166. ETC discovered that in numerous cases, the equipment, piping, valves and accessories necessary to meet the performance requirements of the Contract were of a greater size and/or quantity than the Government had depicted in the solicitation package drawings upon which ETC relied in submitting its offer.

167. As a result of the above, ETC has incurred significantly increased material costs, as set forth below.

168. As a result of the above, ETC also expended additional, unanticipated engineering efforts, as set forth below.

169. As a result of the above, ETC has had additional space constraint issues that have arisen as manufacturing proceeds toward as-built status, as set forth below.

178. The overall weight of the External Environmental Control System is approximately 435 pounds heavier per SDC Segment than the two ECUs and four scrubbers depicted in drawing number No. 7268125.

179. The required valves, chamber penetrators, fittings and accessories for the External Environmental Control System were of a larger diameter and therefore heavier than the chamber penetrators, fittings and accessories for the Internal Environmental Internal System depicted in drawing No. 7268125

2. **<u>Forced Convection Flow Analysis</u>**

180. Specification 5.1.14.b.4 of the Contract required a Forced Convection Flow Analysis (FCFA) that would show the internal air distribution of the PCVO chamber.

181. ETC conducted the FCFA using a Computational Fluid Dynamic (CFD) model based upon the information contained in the Government's solicitation package drawing 7268125.

182. ETC determined that six Environmental Control Units (ECUs) and 15 scrubbers would be required for each SDC Segment in order to meet the performance requirements contained in the Contract.

183. With the quantity of ECUs and scrubbers actually required, ETC determined that the only space available to place the ECUs and scrubbers inside the SDC Segments would be under the bunks.

184. However, with this placement ETC's FCFA determined that there would be inadequate circulation.

185. After Contract Modification P00006 was issued, ETC was required to re-do the FCFA to ensure that the new External Environmental System would provide adequate air circulation.

186. As a consequence of having to conduct the FCFA twice, ETC had incurred **$1,780** in additional engineering costs.

187. As a consequence of having to conduct the FCFA twice, ETC has been delayed in its progress on the project.

### 3. Piping and Control Panel Layout

188. In order to meet the specification performance requirements of the Contract, ETC was required to design and fit a very large amount of piping, valves and controls within a very confined space.

189. Specifically, ETC's piping design team was required to spend months attempting to lay out panels and fit piping within the confined space of the SDC Segments.

190. ETC's piping design team was also required to re-engineer piping runs and panel arrangements several times to meet Human Factors and operability requirements of the Contract and to avoid obstructions.

191. The Government's solicitation package drawings misrepresented the amount and size of piping, valves, accessories and other equipment which would be required to be placed within the small confines of the SDC segments

192. Solicitation package drawing No. 7268136, sheet 12 depicted a Control Panel with the cover removed.

1. **<u>Environmental Control System</u>**

170. Solicitation package drawing No. 7268125 depicted the requirements for the Environmental Control System, including ECUs and scubbers.

171. The drawing depicted two ECUs and four scrubbers per SDC Segment for a total of four ECUs and eight scrubbers.

172. As required by the Contract, ETC conducted a Thermal Conductivity Analysis and Forced Air Convection Flow Analysis. [See Exhibit "A" at paragraph 5.1.14.b.].

173. However, contrary to the depictions contained in the Government's solicitation package drawing No. 7268125, the results of ETC's analyses determined that 12 ECUs and 30 scrubbers would be necessary to meet the specification performance requirements of the Contract.

174. In August 2000 Contract Modification P00006 was issued, which replaced the specified internally mounted scrubber and Environmental Control System with an externally mounted type.

175. The Contract Modification compensated ETC for the re-engineering effort involved.

176. However, ETC had incurred **$79,611.00** in unanticipated, additional material cost in the implementation of an Environmental Control System that was compliant with specification performance requirements of the Contract.

177. There was also a significant weight increase with the External Environmental Control System as compared to the Internal Environmental Control System depicted in the Government's schematic drawings.

193. The Control Panel in solicitation package drawing No. 7268136 represented that all required piping, gauges, filters, mufflers, regulators and other required accessories would fit neatly on the one surface beneath the Control Panel cover.

194. ETC submitted its proposal in reliance upon the representations presented in the solicitation package drawings, budgeting a reasonable number of hours to lay out the piping and controls in accordance with the complexity depicted in the drawings.

195. Following contract award, ETC attempted to lay out the gauges, piping and associated equipment required for the Control Panel in accordance with the solicitation package drawing No. 7268136.

196. However, after expending many engineering hours analyzing the Government's layout, ETC determined that it was impossible to place all the equipment required by the specification in the Contract into the area behind the Control Panel.

197. Specifically, ETC discovered that the solicitation package drawing had misrepresented the complexity of the piping and accessories required for the Control Room by failing to depict the required joints, couplings and unions and the incorrect sizing of the pipes and fittings.

198. Solicitation package drawing No. 7268136 also depicted many components and accessories located above the Human Factors lines, which are artificial barriers based on MIL STD 1472 and MIL STD 46855, above and below which ETC was not permitted to locate equipment for operational and maintenance reasons.

199. The piping system layouts depicted in solicitation package drawing No. 7268136 were inconsistent with the specification requirements both in terms of the incorrectly sized and missing components, as well as the Human Factors' requirements.

200. While the size and the configuration of the required piping and associated equipment grew in comparison to what was depicted in solicitation package drawing No. 7268136, the available space in which to place such piping was reduced to 36 square feet.

201. ETC was required to layout more piping and equipment in less area.

202. In addition, in contrast to the representations in solicitation package drawing No. 7268136 which depicted all required Control Panel equipment on one wall, the actual space required for all Control Panel equipment and piping is three walls.

203. Even when mounted on three walls, the resulting Control Panel layout is overly crowded and complex.

204. As a consequence of the misrepresentations contained in the Government's solicitation package drawings regarding the piping and control panel layouts, ETC has incurred **$1,761,822.00** in additional, unanticipated costs in the lay-out, design and construction of the SDC segment's piping and control panels and in costs in regard to material, engineering, drafting and configuration management labor, manufacturing and related manufacturing support labor. Since the Contract is on-going, the amount claimed includes an estimate going forward. ETC reserves the right to adjust the estimated amount in the future.

205. As a consequence of the misrepresentations contained in the Government's solicitation package drawings regarding the piping and the control panel layouts, ETC's completion of the project has been delayed.

**4. <u>Required Gauges on Regulator Inlets/Outlets</u>**

206. The Contract required that the hyperbaric piping, valves and components conform to the requirements of ASME B31.1 and PVHO-1. [See Exhibit "A" at paragraph 3.1.1].

207. PVHO-1 requires that all regulators include a gauge on the inlet and outlet.

208. The Government's solicitation package drawings, however, did not depict the required gauges.

209. ETC submitted its offer based on the Governments' solicitation drawings and therefore, ETC did not budget for the gauges when submitting its proposal.

210. During Contract performance, ETC sought the Government's permission to exclude the regulator inlet and outlet gauges from the design.

211. The Government, however, denied ETC's request and directed ETC to supply the gauges.

212. As a consequence of having to supply the gauges for the regulator inlets and outlets, ETC has experienced additional problems with the weight constraints.

213. As a consequence of having to supply the gauges for the regulator inlets and outlets, ETC has experienced additional problems with space constraints.

214. As a consequence of having to supply the gauges for the regulator inlets and outlets, ETC has incurred **$24,102.00** in additional unanticipated engineering and manufacturing labor and material costs.

215. As a consequence of having to design, supply and install the gauges for the regulator inlets and outlets, ETC has been hindered in its progress on the project.

**5. <u>Gauge Calibration Valves</u>**

216. The Contract required that each gauge be supplied with a gauge calibration valve except when otherwise specified. [See Exhibit "A" at paragraph 3.1.27.a].

217. The Government's solicitation package drawings had not depicted the gauge calibration valves.

218. ETC did not include gauge calibration valves in its offer because ETC reasonably believed that because the gauge calibration valves were not depicted on the drawing, the "except when specified otherwise" provision applied.

219. However, following Contact award, the Government directed ETC to supply the gauge calibration valves.

220. As a result of the Government's failure to include gauge calibration valves in its solicitation package drawings, ETC has incurred **$18,475.00** in additional, unanticipated labor and material costs.

221. As a result of the Government's failure to include gauge calibration valves in its solicitation package drawings, ETC has been hindered in its progress on the project.

**IV. <u>Out of Scope Work</u>**

**1. <u>Review of FEA Load Cases</u>**

222. ETC submitted a Request for Information (RFI) seeking the Government's agreement of the load cases it intended to analyze in order to complete the design in a timely manner and prevent major design revisions following PDR.

223. The Government accepted ETC's proposed load cases.

224. ETC performed the required FEA analyses and included such information in its Preliminary Design Package which it submitted to the Government.

225. Following its review of ETC's Preliminary Design Package, however, the Government's position changed substantially.

226. The Government and ETC spent significant time over a period of months in discussions regarding revisions to the load case for the FEA analyses.

227. As a consequence of the Government's failure to agree to the load cases that were to be analyzed, ETC has incurred **$10,373.00** in unanticipated engineering costs.

228. As a consequence of the Government's failure to agree to the load cases that were to be analyzed, ETC was delayed in its progress on the project.

2. **FEA Modeling Demands**

229. ETC submitted its Preliminary Design Package to the Government which included therein ETC's Preliminary FEA analysis that included a model of the PVHO shell.

230. Although the actual PHVO shell had an overall diameter of 78" and was ¼" thick, ETC created an FEA model with elements located at the inside surface of the shell, thus making the diameter of ETC's FEA model 77.5".

231. The Government rejected ETC's model despite the fact that the margin of error was less than 1% and would have had a negligible impact on the FEA results.

232. The Government demanded that ETC modify the model and repeat the FEA.

233. ETC submitted a second preliminary FEA model of the PVHO shell for Government evaluation.

234. As a result of the Government's rejection of ETC's original FEA model of the PVHO shell, ETC has incurred **$38,221.00** in additional, unanticipated labor costs.

235. As a result of the Government's rejection of ETC's original FEA model of the PVHO shell, ETC was hindered in its performance under the Contract.

**3. Pipe and Tubing Flexibility Analysis**

236. Specification 3.1.39 of the Contract required ETC to perform a flexibility analysis for the sections of piping and tubing that transverse hard mounted structures or equipment.

237. Specification 3.1.39 also required that the flexibility analysis be performed in accordance with ASME B31.1.

238. ASME B31.1 only required hand calculations as a means to demonstrate the piping/tubing system's adequacy.

239. The Government required ETC to perform a flexibility analysis that included virtually all piping and tubing systems of the SDC and that it be performed using Finite Element Analysis.

240. As a consequence ETC was required to model the piping, tubing, elbows, bends, valves, concentric and eccentric reducers, tees, miters, and rigid elements of the various piping systems to evaluate the stresses developed as a result of loads being transferred from the van and the PVHO.

241. In addition, the Government required that the piping flexibility analysis be integrated into the chamber and Van FEA analyses.

242. ETC was required to incorporate eight different piping layouts into the model.

243. ETC was required to create four different databases (with two piping layouts per database), each of which had to be run for all 13 load cases.

244. As a consequence of the Government's requirements regarding the flexibility analysis, ETC has incurred **$22,914.00** in extra, unanticipated labor expenses.

245. As a consequence of the Government's requirements regarding the flexibility analysis, ETC has been delayed in its completion of the project.

4. **<u>SDC Medical/Supply Lock Door</u>**

246. Solicitation package drawing No. 7268134 depicted the medical lock door design the Government required for use in the SDC Segments.

247. In preparing its offer, ETC believed that the PHVO Supply/Medical Lock door design depicted by the Government in solicitation package drawing No. 7268134 was a functional design which would meet the performance requirements of the Contract.

248. As required by the Contract, ETC performed a structural Finite Element Analysis on the Government PHVO Supply/Medical Lock door design.

249. However, the results of ETC's analysis determined that the Government's design was inadequate to meet the performance criteria specified in the Contract.

250. Specifically, the Government's design contained an external O-ring seal that ETC determined would leak due to excessive flexing of the door when subjected to pressure.

251. ETC made several attempts to re-engineer the door, increasing the door's thickness, adding gussets and increasing the strongbacks in an effort to stiffen the door.

252. Each potential design change required ETC to perform further FEA analysis and review of the results.

253. However, after several modifications to the medical lock's door design proved unsuccessful, ETC concluded that the Government's basic overall design was inadequate to meet the performance requirements of the Contract and so notified the Government.

254. In response, the Government recommended that a Commercial Off the Shelf (COTS) medical lock door assembly that would meet the specification's performance

requirements of the Contract be substituted for the Government's design of the PHVO Supply/Medical Lock door design depicted by the Government in solicitation package drawing No. 7268134.

255. As a consequence of the Government's design of the PHVO Supply/Medical Lock door, ETC has incurred **$66,848.00** in extra, unanticipated costs. Since the Contract is on-going, the amount claimed includes an estimate going forward. ETC reserves the right to adjust the estimated amount in the future.

256. As a consequence of the Government's design of the PHVO Supply/Medical Lock door design depicted by the Government in solicitation package drawing No. 7268134, ETC has been delayed in its completion of the project.

**5. Communication System**

257. Specification 3.2.15.1.b of the Contract required four communication stations for each SDC Segment.

258. Solicitation package drawing No. 7268129, Schematic SDS Command and Control, depicted a total of five communication head sets being required for each SDC Segment.

259. Specifically, solicitation package drawing No. 7268129 indicated that an additional headset was required at the MTL flange.

260. ETC's offer included four communication stations.

261. Shortly after Contract award, ETC discovered the above conflict regarding the number of required communication stations.

262. ETC submitted a Request for Information (RFI) to the Government regarding the above conflict.

263. The Government replied to ETC's RFI that it required the additional communication station at the MTL flange.

264. The Government also replied that it would also be necessary for the added communication station to have the ability to connect to, and communicate with the Inter SDS/SRS intercom, a second type of intercom system utilized on the SDC Segments.

265. The Government also replied that ETC also had to supply a Universal Interface to allow the Hyperbaric intercom system, which included the additional communication station at the MTL flange, to communicate with the Inter SDS/SRS Intercom system.

266. As a consequence of having to provide an additional communication station at the MTL flange, ETC incurred **$4,863.00** in additional, unanticipated costs.

267. As a consequence of having to provide an additional communication station at the MTL flange, ETC has been delayed in its progress on the project.

### 6. <u>Performance of Light Study</u>

268. Specification 3.2.10 of the Contract required that the light level within the PVHO chamber be a minimum of 50-foot candles.

269. Solicitation package drawing 7268128 depicted a total quantity of 22 lights inside each PVHO chamber.

270. Shortly after Contract award, the Government supplied ETC with a "Recommended Deviation" in regard to an acceptable model of light for use in the SDC Segments.

271. After further inquiry as to how the Government arrived at a quantity of 22 lights, ETC determined that there was no basis to believe that the lighting arrangement the

Government had specified would actually meet the specification's performance requirements.

272. ETC was required to conduct a lighting analysis to establish that the lighting arrangement set forth in solicitation package drawing 7268128 would not produce the illumination required by the specification.

273. As a consequence of having to perform a Lighting Study, ETC incurred **$16,494.00** in additional, unanticipated costs.

274. As a consequence of having to perform a Lighting Study, ETC has been hindered in its progress on the project.

**7. <u>Primary/Secondary Air Pressurization System</u>**

275. Solicitation package drawing No. 7268123 depicted the Primary and Secondary Air Pressurization systems and showed that both the Primary and Secondary inlet air into the chamber was to enter through the diffuser tubes.

276. The only noise reduction component depicted in solicitation package drawing No. 7268123 was an in-line silencer in the circuit of the Primary Pressurization Line.

277. Specification 3.2.16.1 of the Contract required that noise levels inside the chamber not exceed 85 decibels.

278. ETC prepared and submitted its offer relying upon the accuracy of the information contained in solicitation package drawing No. 7268123.

279. Following Contract award, ETC determined that the limited noise reduction equipment depicted in solicitation package drawing No. 7268123 would fail to meet the required 85 decibel noise limitation.

280. ETC was required to redesign the Primary and Secondary Pressurization inlet lines by replacing the diffuser tubes with headers that extended the full length of the chamber and featured four mufflers per inlet line.

281. As a consequence of having to redesign the Primary and Secondary Pressurization inlet lines, ETC has incurred **$6,169.00** in additional and unanticipated labor costs.

282. As a consequence of having to redesign the Primary and Secondary Pressurization inlet lines, ETC has been delayed in its progress on the project.

**8. <u>Government Demand for Production Drawings</u>**

283. ETC made its first Final Design Presentation to the Government on December 7, 2000.

284. Specification 5.1.12 of the Contract required the Government to review the Final Design Package and return comments within 30 days.

285. The Government failed to return its comments in a timely manner, finally providing comments on February 5, 2001.

286. ETC incorporated the Government's review comments into both the SDC 1 and SDC 2 Final Design Packages.

287. ETC resubmitted a revised SDC 1 Final Design Package and partial SDC 2 Final Design Package in early April 2001.

288. In mid May 2001, ETC received the Government's review comments for the SDC 1 resubmission, most of which ETC believed to be minor.

289. In accordance with this belief, the Government's Contracting Officer's Technical Representative stated that once ETC had made the requested corrections, Government acceptance of the Final Design would be established.

290. However, in early June 2001, the Government indicated that it now realized further information would be needed before the Government could complete its review of ETC's design.

291. Specifically, the Government required ETC to provide production drawings to ensure the design's adequacy.

292. Specifications 5.1.11 and 5.1.12 of the Contract required submission of general arrangement drawings and system piping and electrical schematics with the Final Design Package.

293. Despite the fact that ETC's Final Design Package contained all drawings required under Specifications 5.1.11 and 5.1.12 of the Contract, the Government required that ETC provide highly detailed production drawings.

294. As a consequence of the Government's requirement that ETC produce and submit production drawings in its Final Design Package, ETC has incurred additional, unanticipated labor costs.

295. As a consequence of the Government's requirement that ETC produce and submit production drawings in its Final Design Package, ETC's progress on the project was hindered.

**9. <u>Excessive RFIs</u>**

296. As a consequence of the defects, ambiguities and shortcomings in the Government's specification and drawings, ETC was forced to issue over 180 Request For Information (RFI) documents.

297. An RFI consists of ETC's question(s) to the Government regarding a particular technical issue under the Contract.

298. Each RFI involves engineering time to investigate and prepare the RFI and engineering time to dedicate to the RFI issue following the Government's response thereto.

299. In addition, each RFI involves lost efficiencies due to delays and disruption in the progress of the work.

300. Each RFI also contributes to delays in the project's completion in that each issue on which an RFI is written must be placed on hold while ETC awaits the Government's response.

301. To the best of ETC's knowledge and belief, approximately 70% of the RFIs were necessitated by one of the following: (1) specification conflicts with the drawings; (2) missing information on the Government supplied drawings or in the Government supplied specification; (3) ambiguities within the Government's specification; and (4) RFIs in which the Government's response time had exceeded the agreed 15 day response period.

302. As a consequence of the excessive RFIs, ETC has incurred **$37,216.00** in additional, unexpected engineering costs.

303. As a consequence of the excessive RFIs, ETC has been hindered in it progress on the project.

**10. <u>Additional Design Submittal Review</u>**

304. The specifications of the Contract required only two design submittals, the Preliminary Design Package and the Final Design Package.

305. The Government demanded in mid- March, 2000, that a "75% Design Review" and submittal take place following the Preliminary Design submittal and prior to the Final Design submittal.

306. In addition to preparing the documentation for the "75% Design Review", ETC was also required to respond to additional Government comments.

307. As a consequence of the requirement of the "75% Design Review", ETC incurred **$35,355.00** in extra, unanticipated engineering labor costs.

308. As a consequence of the requirement of the "75% Design Review", ETC has been hindered in its progress on the project.

**11. <u>Internal NAVSEA - NAVSEA CERT Disagreement(s)</u>**

309. Solicitation package drawing No. 7268123 depicted a Cross-Connect Line with one ball valve between the Primary and Secondary Pressurization lines.

310. In accordance with solicitation package drawing No. 7268123, ETC included a ball valve in its design.

311. An internal disagreement later arose between the Naval Sea Systems Command (NAVSEA) and its QA branch, NAVSEA CERT as to whether the ball valves were required in the Cross-Connect line and if so, the proper quantity required.

312. As a result of this internal disagreement, ETC received several directives, forcing it to repetitively modify the configuration.

313. At one point, ETC was directed by the Government to add a second ball valve to the Cross-Connect line which required ETC to modify the drawings and database.

314. Later, ETC was directed by the Government to remove the Cross-Connect line which required ETC to again modify the drawings and database.

315. Solicitation package drawing No. 7268124 for an SDC Built-in Breathing System (BIBS) depicted relief valves that were located inside the PVHO chamber.

316. In accordance with solicitation package drawing No. 7268124, ETC designed the BIBS with the relief valve inside the PVHO chamber.

317. An internal disagreement later arose between NAVSEA and NAVSEA CERT as to whether the relief valve should be located inside or outside the PVHO chambers.

318. This disagreement arose at the monthly CRB meetings.

319. As a result of the above disagreements between NAVSEA and NAVSEA CERT, ETC incurred **$773.00** in extra, unanticipated engineering costs.

320. As a result of the above disagreements between NAVSEA and NAVSEA CERT, ETC has been delayed in its progress on the project.

**12. <u>Van Access Panels</u>**

321. The solicitation package drawings only depicted a van frame without an outer skin.

322. The solicitation package drawings did not depict supplementary access panels in the sides of the van.

323. The Government directed ETC to add supplementary panels to improve access to hull stops.

324. As a consequence of the Government's requirement for supplementary panels, ETC incurred **$23,630.00** in additional, unanticipated labor and material costs.

325. As a consequence of the Government's requirement for supplementary panels, ETC has been delayed in its progress on the project.

## V. Improper Specifications of Components

326. Paragraph 3.1.27a.1 of the Contract requires that the material and operational features required for pressure gauges be made of phosphor bronze or stainless steel, with helical coil or bourdon tube sensing elements unless otherwise specified.

327. Paragraph 3.1.27a.1 of the Contract is ambiguous in that helical coil sensing does not exist.

328. ETC, with the Government's concurrence, interpreted specification 3.1.27a.1 of the Contract to mean that the gauges were required to have a helical coil bourdon tube sensing element made from stainless steel or phosphor bronze.

329. To the best of ETC's knowledge, only 3-D Instruments Company manufactures gauges with helical coil bourdon tube sensing elements.

330. As such, specification 3.1.27a.1 of the Contract essentially required a sole source of supply, 3-D Instruments Company.

331. As a result of the Government's sole source requirement for the pressure gauges, ETC has incurred **$10,019.00** in excess labor and material costs.

332. As a result of the Government's sole source requirement for the pressure gauges, ETC has been delayed its progress on the project.

## VI. Materials and Labor Cost Escalation

333. The completion of the SDC Segments has been delayed by the actions and/or inactions of the Government, as more fully set forth above.

334. As a result of these delays, ETC had incurred **$595,354.00** in unanticipated material, engineering and manufacturing labor costs.

## VII. Extended Project Management

335. An extended time frame to complete the SDC Segments has been required by the actions and/or inactions of the Government, as more fully set forth above.

336. Project Management is an ongoing and necessary function throughout the length of the Contract.

337. As a result of the extended time frame and corresponding need for Project Management, ETC has incurred **$638,789.00** in additional, unanticipated Project Management Costs. Since the Contract is on-going, the amount claimed includes an estimate going forward. ETC reserves the right to adjust the estimated amount in the future.

## VIII. Loss of Efficiency

338. Paragraph G2 of the Contract set forth the requirements for the submittal of invoices by ETC.

339. The Government was required to provide payment of the invoices within a prompt and timely manner.

340. The Government has failed to pay ETC invoices in a prompt and timely manner.

341. The Government has failed to pay the full amount of ETC invoices in a prompt and timely manner.

342. As a consequence of the Government's failure to pay ETC invoices in a prompt and timely manner and failure to pay the full amount of ETC invoices, ETC has experienced cash flow problems.

343. As a consequence of the Government's failure to pay ETC invoices in a prompt and timely manner and failure to pay the full amount of ETC invoices, ETC has been required to curtail major materials purchases.

344. As a consequence of the Government's failure to pay ETC invoices in a prompt and timely manner and failure to pay the full amount of ETC invoices, ETC has experienced interruptions in the manufacture of the SDC Segments.

345. As a consequence of the Government's failure to pay ETC invoices in a prompt and timely manner and failure to pay the full amount of ETC invoices, ETC has been required to divert part of its labor resources to other projects which reduced progress on the SDC Segments.

346. As a consequence of the Government's failure to pay ETC invoices in a prompt and timely manner and failure to pay the full amount of ETC invoices, ETC has experienced a 31% loss of efficiency due to delay and disruption in the General Assembly area of manufacturing.

347. As a result of the loss of efficiency in the General Assembly area of manufacturing, ETC has incurred **$64,731.00** in additional, unanticipated labor costs.

## IX. Lost Profits

348. As a result of the Government's actions/inactions, as set forth above, completion of the SDC Segments has been and will continue to be delayed.

349. As a consequence of the delay in the completion of the SDC Segments, ETC has incurred **$725,826.00** in lost profits.

## X. Cumulative Delay Impacts - Unabsorbed/Unrecovered Overhead

350. The Contract required the completion of the SDC Segments by September 25, 2000. [See Exhibit "A"].

351. As a result of the Government's actions/inactions, as set forth above, completion of the SDC Segments has been and will continue to be delayed.

352. The delay in completion of the SDC Segments has prevented ETC from absorbing its overhead expenses as anticipated when it entered into the Contract.

353. As a consequence of the delay in the completion of the SDC Segments, ETC has incurred **$298,004.00** in net unabsorbed overhead. ETC reserves the right to revisit the Eichlay quantum claim if any portion of ETC's overall claim under the Contract are disallowed by the Government, thereby reducing the claimed Overhead and General and Administrative costs occurring in the delay period.

## XI. Contract Financing Costs

### 1. Financing Cost Related to Claim Items Compensable Under the Contract

354. ETC has been required to finance the additional costs it has incurred in the performance of the Contract.

355. As a consequence of being required to finance the additional cost its has incurred in the performance of the Contract, ETC has incurred **$918,672.00** in financing costs. Costs or damages are calculated through June 30, 2005. ETC reserves the right to update such costs or damages in the future.

### 2. Financing Cost Related to Delayed Payments

356. ETC received the Government's payments of their timely submitted Invoices at a date later than was anticipated under the Contract.

357. As a result of receiving the Government's payments of Invoices at a date later than was anticipated under the Contract, ETC has been required to borrow against its bank credit line.

358. As a result of receiving the Government's payments of invoices at a date later than was anticipated under the Contract, ETC has also lost the time value of such money, thereby increasing financing costs and preventing ETC from reducing its debt and growing the company.

359. As a result of the delayed payment of invoices by the Government, ETC has incurred **$178,841.00** in financing costs.

## XII. Rental Costs of Manufacturing Floor Space During Delay Period

360. The Contract allowed 401 days for the design, manufacturing, assembly, test, teardown, and preparation for shipment of the SDC Segments.

361. Due to the Government's delays as more fully set forth above, additional days were and continue to be necessary for the manufacturing, assembly, test, teardown, and preparation for shipment of the SDC Segments.

362. This increase in manufacturing time is attributable to the Government's failure to properly fund the Contract, as more fully set forth above.

363. This increase in manufacturing time is also attributable to the Government caused delays in the engineering and design process, as more fully set forth above.

364. ETC was required to delay SDC materials purchases and partially divert labor resources to other projects which delayed completion of the SDC Segments.

365. ETC was also required to reserve space on its manufacturing floor for an extended period of time for the expected start-up and completion of work on the SDC Segments.

366. As a result, ETC has incurred **$935,182.00** in costs covering the extended manufacturing period that would be required to complete the SDC Segments and the period of time during which ETC was required to reserve manufacturing floor space for the anticipated start-up and completion of work on the SDC Segments.

## XIII. Liquidated Damages

367. The Government has levied liquidated damages against ETC pursuant to the Liquidated Damages Clause ( FAR 52.211-11 ) of the Contract. [See Exhibit "A" at paragraph F7].

368. Subparagraph (c) of the Liquidated Damages Clause states that the contractor will not be charged with liquidated damages when the delay in delivery or performance arises from causes beyond the control and without the fault and negligence of the contractor. [See Exhibit "A" at paragraph F7(c)].

369. Any alleged delays in the delivery or performance of the within Contract arise from causes beyond the control and without the fault and negligence of ETC.

370. The delays in delivery or performance of the within Contract are attributable to the acts and omissions of the Government that were in excess of its rights and powers under the Contract, as set forth more fully above.

371. As such, the liquidated damages levied against ETC by the Government under the within Contract are improper.

372. Moreover, the purpose of liquidated damages is to establish an amount where there are anticipated actual damages that would be difficult or impossible to ascertain.

373. The Government has incurred no actual damages as the result of any delays in delivery or performance of the within Contract.

374. As a consequence of the Government's improper levy of liquidated damages, ETC has incurred **$1,114,219.50.00** in liquidated damages. Costs or damages are calculated through June 30, 2005. ETC reserves the right to update such costs or damages in the future.

## XIV. Claim Preparation Costs

375. On May 6, 2003, and thereafter amended on August 7, 2003 and April 24, 2004, ETC submitted a certified CDA claim to Defendant wherein Plaintiff sought an equitable adjustment compensating ETC for additional costs incurred by ETC as a result of certain events or conditions which are more fully set forth above.

376. As a consequence of having to file a certified CDA claim, ETC has incurred **$100,030.00** in costs.

## COUNT I

## CONTRACT REFORMATION - MUTUAL MISTAKE

377. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through three hundred seventy six (376) as though fully set forth at length herein.

378. Both the Government and ETC were mistaken in their belief that this was a Fixed Priced Supply Contract as opposed to a Cost-Reimbursement Research and Development Contract effort.

379. All of the changes in the drawings, designs and/or specifications of the Contract as set forth above and below constitute a Cost-Reimbursement Research and Development Contract.

380. All of the changes in the drawings, designs and/or specifications of the Contract as set forth above and below caused an increase in the estimated cost of and the time

required for performance of the Contract, and therefore, constitutes a Cost-Reimbursement Research and Development Contract.

381. The above facts existed at the time of the Contract.

382. Neither ETC or the Government were aware of the above mistaken belief at the time of the Contract.

383. The above mistaken belief of both ETC and the Government constituted a basic assumption underlying the Contract.

384. The above mistaken belief of both ETC and the Government had a material effect on the Contract in that the Government received the benefit of a Fixed Priced Supply Contract.

385. The risk of the above mistake was not assumed by ETC when it entered into the Contract with the Government.

386. Because of their mutual mistake of the above material existing fact, both ETC and the Government entered into a Contract which they would not have entered into but for their mutual mistake.

387. Due to the above mutual mistake of ETC and the Government, ETC is entitled to contract reformation.

388. Reformation of the within Contract would bring the Contract in accord with both ETC and the Government's intentions.

389. Reformation requires that the within Contract be considered a Cost-Reimbursement Research and Development Contract.

390. Under a Cost-Reimbursement Research and Development Contract, the Government is required to make an equitable adjustment in the estimated cost, delivery or

completion schedule, or both, the amount of any fee, and other affected terms and the Contract should be modified accordingly.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant and find that this is a Cost-Reimbursement Research and Development Contract. Plaintiff further requests an equitable adjustment to the Contract in the amount of not less than **$9,109,617.50**, together with interest from and after June 30,2005. Plaintiff further requests that this Court award Plaintiff its costs in this action, including reasonable attorney's fees. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT II

## CONTRACT REFORMATION - MUTUAL MISTAKE

391. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through three hundred ninety (390) as though fully set forth at length herein.

392. Both the Government and ETC were mistaken in their beliefs regarding the following facts:

(a) that the weight limitations for each SDC Segment would not change;

(b) that any change in the weight limitations would not affect the cost of performance of the Contract; and/or

(c) that only one SDC Segments was needed to be designed to meet the Contract's performance requirements.

393. The above facts existed at the time of the Contract.

394. Neither ETC or the Government were aware of the above at the time of the Contract.

395. The above mistaken beliefs of both ETC and the Government constituted a basic assumption underlying the Contract.

396. The above mistaken beliefs of both ETC and the Government had a material effect on the Contract in that the Government received the benefit of ETC's additional engineering and manufacturing efforts.

397. The risks of the additional engineering and manufacturing efforts caused by the reduction on maximum allowable weight, the impact of the reduction on maximum allowable weight or the need to build two separate and unique SDC segments were not assumed by ETC when it entered into the Contract with the Government.

398. In accepting Modification P00001, ETC could not have forseen the complications inherent in the reduction of the weight constraints.

399. Likewise, in seeking a Contract modification to the existing Contract, the Government was indicating its own determination that the risks were relatively minor and reasonably quantifiable.

400. Because of their mutual mistake of the above material existing facts, both ETC and the Government entered into a Contract which they would not have entered into but for their mutual mistake.

401. Due to the mutual mistake of ETC and the Government, ETC is entitled to contract reformation.

402. Reformation of the within Contract would bring the Contract in accord with both ETC and the Government's intentions.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$9,109,617.50**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action, including reasonable attorney's fees. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT III

## CONTRACT REFORMATION - MISREPRESENTATION AND UNILATERAL MISTAKE

403. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through four hundred two (402) as though fully set forth at length herein.

404. ETC made a mistake regarding a basic and material assumption underlying the contract price that the SDC Segments required under the Contract were watercraft.

405. The SDC Segments required under the Contract are in fact aircraft with all the additional requirements thereof.

406. ETC's mistake as set forth above was made at the time of the Contract.

407. ETC's mistake as set forth above was based on a reading of certain specifications in the solicitation package drawings and Contract.

408. ETC's mistake was induced by the Governments' affirmative misrepresentations in the Contract that:

> Submarine Rescue Systems (SRS): Consists of a Submarine Decompression System (SDS) and a Submarine Hyperbaric Occupant Transfer System (SHOTS). SDS is composed of two large Submarine Decompression Chambers and auxiliary equipment used to support disabled submarine (DISSUB) rescue operations. SDS provides recompression and hyperbaric treatment to rescuees who have been evacuated from the DISSUB via the Hyperbaric Transfer Capsule (HTC), a tethered rescue vehicle which can perform Transfer Under Pressure. The

> HTC is part of SHOTS, which also includes HTC support equipment. The SDS may be used alone without SHOTS if the personnel may escape the submarine via free ascent, or to support other fleet rescue assets or perform training exercises.

[See Exhibit "A" at paragraph 1.1.3.a.1.].

409. ETC's mistake as set forth above concerned a basic assumption of the Contract in that ETC based their offer on this mistake and the Government's misrepresentations.

410. ETC would not have entered into this Contract at its offered price and delivery had it known of its mistake.

411. ETC did not assume risk of this mistake.

412. The effect of ETC's mistake makes enforcement of this Contract without reformation unconscionable.

413. The Government knew or should have known of ETC's mistake at the time it accepted ETC's offer based on the bid price as compared to the engineering and manufacturing efforts necessary to build specification compliant SDC Segments.

414. Due to the unilateral mistake of ETC which was based on the Government's misrepresentations, ETC is entitled to contract reformation.

415. Reformation of the within Contract would bring the Contract in accord with both ETC and the Government's intentions.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$9,109,617.50**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action, including reasonable attorney's fees. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT IV

## CONTRACT REFORMATION - MISREPRESENTATION AND UNILATERAL MISTAKE

416. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through four hundred fifteen (415) as though fully set forth at length herein.

417. ETC made a mistake regarding a basic and material assumption underlying the contract price that the amount of engineering and manufacturing effort required to build the SDC Segments as set forth in the solicitation package drawings and contract would be much less than the effort that was ultimately required.

418. ETC's mistake as set forth above was made at the time of the Contract.

419. ETC's mistake as set forth above was based on a misreading of certain specifications in the solicitation package drawings and Contract.

420. ETC's mistake was induced by the Governments' affirmative misrepresentations as follows:

(a) That the weight limitation in the Solicitation Package Drawings was accurate;

(b) That SDC Segment #1 and SDC Segment #2 in the Solicitation Package Drawings and Contract had essentially identical designs;

(c) That the necessary equipment, piping valves and accessories set forth in the Solicitation Package Drawings and the Contract, as well as the amount of space in the chambers in which to place such piping, valves and accessories, were accurate.

421. ETC's mistake as set forth above concerned a basic assumption of the Contract in that ETC based their offered price on this mistake and the Government's misrepresentations.

422. ETC would not have entered into this Contract at its offered price had it known of its mistake.

423. ETC did not assume risk of this mistake.

424. The effect of ETC's mistake makes enforcement of this Contract without reformation unconscionable.

425. The Government knew or should have known of ETC's mistake at the time it accepted ETC's offer based on the bid price as compared to the engineering and manufacturing efforts necessary build specification compliant SDC Segments.

426. Due to the unilateral mistake of ETC which was based on the Government's misrepresentations, ETC is entitled to contract reformation.

427. Reformation of the within Contract would bring the Contract in accord with both ETC and the Government's intentions.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$9,109,617.50**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action, including reasonable attorney's fees. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT V

## BREACH OF CONTRACT - CONSTRUCTIVE CHANGE

428. Plaintiff incorporates by reference the allegations of paragraphs one (1) through four hundred twenty-seven (427) as though fully set forth at length herein.

429. After Contract award in the within matter, the Government has required ETC to perform additional work beyond the Contract requirements either by informal order of the Government or by fault of the Government.

430. Specifically, ETC has been required by the Government to perform additional work beyond the Contract requirements, including but not limited to, the following:

(a) the fabrication of thin-walled chambers;

(b) more expensive manway doors;

(c) a new Van design;

(d) changes to the forging ring nozzle;

(e) a second design for SDC Segment 2;

(f) more expensive Environmental Control System;

(g) a second Forced Air Convection Flow Analysis;

(h) more complex piping and control panel layout;

(i) supply of gauges;

(j) supply of gauge calibration valves;

(k) additional FEA load cases;

(l) more complex flexibility analysis;

(m) additional work on Medical Supply/Lock Door;

(n) additional communications systems;

(o) performance of Light Study;

(p) re-design of Primary/Secondary Air Pressurization System;

(q) additional production drawings;

(r) preparation of additional RFIs;

(s) submission of design for additional review; and

(t) provision of van access panels.

431. ETC believes, and therefore avers, that it was required to perform the additional work beyond the Contract requirement in order to complete the SDC Segments.

432. The person who ordered the above changes had the requisite authority and/or full authority and concurrence of the Contracting Officer to order such changes.

433. Thus, the Government has made constructive changes to the Contract which constitutes a breach of contract.

434. As a result of the Government's constructive changes, ETC has incurred significant increased costs as set forth more fully above.

435. The increased costs incurred by ETC were not foreseeable in light of the information available to ETC at the time of Contract award.

436. The increased costs incurred by ETC as set forth more fully above were the direct and necessary result of the constructive changes to the Contract made by the Government.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$9,109,617.50**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action,

including reasonable attorney's fees. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

**COUNT VI**

**BREACH OF CONTRACT - CARDINAL CHANGE**

437. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through four hundred thirty-six (436) as though fully set forth at length herein.

438. The Government has made changes in the Contract of such magnitude and content that they fall outside the scope of the Contract.

439. The SDC Segments which ETC contracted to design and build in September 1998 and the SDC Segments that were actually designed and built by ETC are substantially and/or materially and/or completely different.

440. ETC was required to perform duties materially different from those bargained for under the Contract.

441. As such, the Government has breached the Contract with ETC for the SDC Segments.

442. As previously described above, as a result of the combined effect of: (1) the reduced weight requirement; (2)) the duplicative design requirement, and (3) the Government's solicitation package deficiencies, the engineering and manufacturing efforts required to design and build the SDC Segments have far exceeded the engineering and manufacturing efforts which would have been required with a design similar to that depicted in the original Contract.

443. Furthermore, the totality of the changes to the design which have resulted from the above issues are significant in terms of magnitude and quality, such that the effect of design issues with respect to one area (e.g., space constraints) had follow-on impacts in

regard to other design issues (e.g., weight constraint) and thereby necessitate that the overall net affect of all the changes be considered as a whole, rather than in separate and distinct categories.

444. In terms of the reduced weight requirement, each SDC Segment was required to be reduced more than 6% of its weight.

445. From both an engineering and manufacturing standpoint, the weight reduction had the following affects:

(a) requirement of thin-walled chambers;

(b) more expensive Manway door;

(c) design of custom van frames; and

(d) changes to the forging ring nozzle.

446. ETC was required by the Government to design two SDC Segments.

447. There were multiple deficiencies in the Government's solicitation package.

448. The Government's solicitation package deficiencies related to both the inadequate depiction of the quantity and size of piping and related equipment and accessories resulted in an increase in engineering, material and installation costs and increased the SDC Segments' weight further complicating the engineering effort to reduce the SDC Segments' weight.

449. From an engineering and manufacturing standpoint, the Government's solicitation package deficiencies had the following effects:

(a) more expensive Environmental Control System;

(b) a second Forced Air Convection Flow Analysis;

(c) more complex piping and control panel layout;

(d) supply of gauges;

(e) supply of gauge calibration valves;

(f) additional FEA load cases;

(g) more complex flexibility analysis;

(h) additional work on Medical Supply/Lock Door;

(i) additional communications systems;

(j) performance of Light Study;

(k) re-design of Primary/Secondary Air Pressurization System;

(l) additional production drawings;

(m) preparation of additional RFIs;

(n) submission of design for additional review; and

(o) provision of van access panels.

450. As a combined result of the above, there was a significant change in the magnitude of work to be performed by ETC.

451. As a combined result of the above ETC was required to design a totally different and/or drastically altered product under the Contract.

452. The costs incurred by ETC as a result of the above greatly exceeds the original Contract price.

453. A cardinal change(s) has occurred in the within Contract.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$9,109,617.50**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action,

including reasonable attorney's fees. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT VII

## BREACH OF DUTY - GOOD FAITH AND FAIR DEALING

454. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through four hundred fifty-three (453) as though fully set forth at length herein..

455. Under the implied duty of good faith and fair dealing in every contract, the Government had an implied duty to disclose to ETC the information fundamental to the preparation of ETC's estimates and contract performance.

456. This implied duty includes the duty to fashion material estimates with reasonable care.

457. The Governmental failed to disclose the following information to ETC which was fundamental to the preparation of ETC's estimates in their bid:

(a) the weight constraints;

(b) the duplicative design effort;

(c) the space constraints;

(d) the work that would be required which was outside of the scope of the Contract.

458. The Government failed to disclose the following information which was fundamental to contract performance:

(a) the weight constraints'

(b) the duplicative design effort;

(c) the space constraints;

(d) the work that would be required which was outside of the scope of the Contract.

459. This information was fundamental to the preparation of estimates and/or contract performance in that it was necessary for ETC to prepare its bid with a reasonable estimate of the amount of engineering and manufacturing effort required to build specification compliant SDC Segments.

460. As a result of the Governments' failure to disclose this information, ETC incurred additional engineering and manufacturing costs as set forth in more detail above.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$9,109,617.50**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action, including reasonable attorney's fees. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT VIII

## BREACH OF DUTY - DISCLOSURE OF SUPERIOR KNOWLEDGE

461. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through four hundred sixty (460) as though fully set forth at length herein..

462. The Government had a duty to disclose any superior knowledge it had which is vital to the performance of the Contract.

463. The Government had superior knowledge in its possession at the time of the Contract that the SDC Segments required under the Contract were aircraft.

464. The above superior knowledge was not shared with ETC and ETC could not have been expected to seek and obtain this knowledge elsewhere.

465. The Government did not disclose the above superior knowledge at the time of the Contract.

466. ETC undertook to perform the requirements of the Contract without knowledge of the above which affected both performance costs and/or duration of the project.

467. The above superior knowledge was vital to the performance of the Contract in that it was necessary for ETC to prepare its bid with a reasonable estimate of the amount of engineering and manufacturing effort required to build specification compliant SDC Segments which were aircraft.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$9,109,617.50**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action, including reasonable attorney's fees. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

**COUNT VIII**

**BREACH OF DUTY - DISCLOSURE OF SUPERIOR KNOWLEDGE**

468. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through four hundred sixty-seven (467) as though fully set forth at length herein..

469. The Government had a duty to disclose any superior knowledge it had which is vital to the performance of the Contract.

470. The Government had the following superior knowledge in its possession at the time of the Contract:

(a) the weight limitations; and

(b) the need for separate designs for SDC Segment 1 and SDC Segment 2;

471. The above superior knowledge was not shared by ETC and ETC could not have been expected to seek and obtain this knowledge elsewhere.

472. The Government did not disclose the above superior knowledge at the time of the Contract.

473. ETC undertook to perform the requirements of the Contract without knowledge of the above which affected both performance costs and/or duration of the project.

474. The above superior knowledge was vital to the performance of the Contract in that it was necessary for ETC to prepare its bid with a reasonable estimate of the amount of engineering and manufacturing effort required to build specification compliant SDC Segments.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$9,109,617.50**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action, including reasonable attorney's fees. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT IX

## BREACH OF CONTRACT - RESTITUTION

475. Plaintiff incorporates by reference the allegations of paragraphs one (1) through four hundred seventy-four (474) as though fully set forth at length herein.

476. The Government's actions and/or inactions as set forth above constitute fundamental and material breaches of the Contract between the Government and ETC.

477. As such, ETC is entitled to restitution of all benefits conferred upon the Government pursuant to the Contract, including, but not limited to, the following:.

(a) additional, unanticipated labor and material costs as more fully set forth above;

(b) extended project management costs as more fully set forth above;

(c) loss of efficiency costs;

(d) loss profits;

(e) unabsorbed/unrecovered overhead costs;

(f) contract financing costs;

(g) rental costs;

(h) liquidated damages; and

(i) claim preparation costs.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$9,109,617.50**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action,

including reasonable attorney's fees. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

**COUNT X**

**BREACH OF CONTRACT - GOVERNMENT DELAY OF WORK**

478. Plaintiff incorporates by reference the allegations of paragraphs one (1) through four hundred seventy-seven (477) as though fully set forth at length herein.

479. The Contract sets forth as follows, in relevant part:

> If the performance of all or any part of the work of this Contract is delayed or interrupted (1) by an act of the Contracting Officer in the administration of this contract that is not expressly or impliedly authorized by the contract, or (2) by a failure of the Contracting Office to action within the time specified in the contract, or within a reasonable time if not specified, and adjustment (excluding profit) shall be made for any increase in the cost of performance of this contract caused by the delay or interruption and the contract shall be modified in writing accordingly. Adjustment shall also be made in the deliver or performance dates and any other contractual term or condition affected by the delay or interruption.

[See Exhibit "A" at F9.].

480. The Government's actions and/or inactions as set forth above constitute fundamental and material breaches of the Contract between the Government and ETC.

481. As such, ETC is entitled to adjust for the additional costs of the performance of this Contract as set forth above.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$9,109,617.50**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action,

including reasonable attorney's fees. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT XI

## ATTORNEY'S FEES AND COSTS

482. Plaintiff incorporates by reference the allegations of paragraphs one (1) through four hundred eighty-one (481) as though fully set forth at length herein.

483. The Government's actions and/or inactions as set forth above constitute fundamental and material breaches of the Contract between the Government and ETC.

484. As a result of that above breaches of the Contract, ETC is entitled to recovery of attorneys' fees and costs pursuant to 28 U.S.C. §2412.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$9,109,617.50**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action, including reasonable attorney's fees. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

PLAKINS, RIEFFEL & RAY, P.C.

Louis A. Rieffel, Esquire
Elizabeth Terri Allison, Esquire
PLAKINS, RIEFFEL & RAY, P.C.
140 East State Street
Doylestown, PA 18901
(215) 345-0801
(215) 340-9530

Dated: 7/8/05

AWD

SOLICITATION, OFFER AND AWARD

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR

RATING | PAGE OF PAGES

DUPLICATE ORIGINAL

| 2. CONTRACT NO. | 3. SOLICITATION NO. | 4. TYPE OF SOLICITATION | 5. DATE ISSUED | 6. REQUISITION/PURCHASE NO. |
|---|---|---|---|---|
| N47408-98-C-2103 | N47408-97-R-1861 | [ ] SEALED BID (IFB) [X] NEGOTIATED (RFP) | DEC 19 1997 | |

7. ISSUED BY CODE

NAVFACCO CONTRACTS OFFICE
OFFSHORE FACILITIES CONTRACTS BRANCH
901 M STREET, S.E., WASH NAVY YARD
WASHINGTON, D.C. 20374-5063

8. ADDRESS OFFER TO *(If other than Item 7)*

SAME AS BLOCK 7.

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".

## SOLICITATION

9. Sealed offers in original and 3 copies for furnishing the supplies or services in the Schedule will be received at the place specified in Item 8, or if handcarried, in the depository located in BLDG. 218 3RD FLOOR until 2:00 *(Hour)* local time 20 JAN 1998 *(Date)*

CAUTION - LATE Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-10. All offers are subject to all terms and conditions contained in this solicitation.

| 10. FOR INFORMATION CALL: | A. NAME | B. TELEPHONE NO. *(Include area code) (NO COLLECT CALLS)* |
|---|---|---|
| | MARGARET SUNDBERG | (202) 433-5312 |

11. TABLE OF CONTENTS


| (✓) | SEC. | DESCRIPTION | PAGE(S) | (✓) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 2 | X | I | CONTRACT CLAUSES | 12 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 4 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 1 | X | J | LIST OF ATTACHMENTS | 46 |
| X | D | PACKAGING AND MARKING | 1 | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 4 | X | K * | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | 20 |
| X | F | DELIVERIES OR PERFORMANCE | 3 | | | | |
| | G | CONTRACT ADMINISTRATION DATA | 2 | X | L * | INSTRS., CONDS., AND NOTICES TO OFFERORS | 11 |
| | H | SPECIAL CONTRACT REQUIREMENTS | 3 | X | M * | EVALUATION FACTORS FOR AWARD | 3 |


## OFFER *(Must be fully completed by offeror)*

*Incorporated by reference

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period.

12. In compliance with the above, the undersigned agrees, if this offer is accepted within ______ calendar days *(60 calendar days unless a different period is inserted by the offeror)* from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

| 13. DISCOUNT FOR PROMPT PAYMENT *(See Section I, Clause No. 52-232-8)* | 10 CALENDAR DAYS | 20 CALENDAR DAYS | 30 CALENDAR DAYS | CALENDAR DAYS |
|---|---|---|---|---|
| | % | % | % | % |

| 14. ACKNOWLEDGMENT OF AMENDMENTS *(The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated:* | AMENDMENT NO. | DATE | AMENDMENT NO. | DATE |
|---|---|---|---|---|
| | 0001 thru 0007 are acknowledged and attached. | | | |

15A. NAME AND ADDRESS OF OFFEROR — CODE 33714 FACILITY

Environmental Tectonics Corporation
County Line Road
Southampton, Pa. 18966

16. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER *(Type or print)*

Richard E. McAdams
Executive Vice President

15B. TELEPHONE NO. *(Include area code)* (215) 355-9100, X213

15C. CHECK IF REMITTANCE ADDRESS IS DIFFERENT FROM ABOVE - ENTER SUCH ADDRESS IN SCHEDULE. [X]

17. SIGNATURE [signature]

18. OFFER DATE 24 Mar 98

## AWARD *(To be completed by Government)*

19. ACCEPTED AS TO ITEMS NUMBERED: CLINs 0001 through ~~0007~~ 32 (od. 4)

20. AMOUNT 3,278,634.58 ~~$839,536.58~~

21. ACCOUNTING AND APPROPRIATION
AA 1781319 84FC 255 SAS91 0 068342 2D 208110
S03940000010 SDN:N0002498RC10614 $839,536.58

22. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:
[ ] 10 U.S.C. 2304(c) ( ) [ ] 41 U.S.C. 253(c) ( )

23. SUBMIT INVOICES TO ADDRESS SHOWN IN *(4 copies unless otherwise specified)* — ITEM #7

24. ADMINISTERED BY *(If other than Item 7)* CODE

Contract Completion Date: April 8, 1999

25. PAYMENT WILL BE MADE BY — CODE N68894

DFAS, Oakland

26. NAME OF CONTRACTING OFFICER *(Type or print)*

RITA D. PALMORE, CONTRACTING OFFICER

27. UNITED STATES OF AMERICA
Rita D. Palmore
*(Signature of Contracting Officer)*

28. AWARD DATE 25 SEP 98

IMPORTANT - Award will be made on this Form, or on Standard Form 26, or by other authorized official written notice.

AWD

PART I - THE SCHEDULE
SECTION B
SUPPLIES OR SERVICES AND PRICES/COSTS

N47408-97-R-1861

**PROJECT: PROCUREMENT OF TWO (2) COMPLETE SUBMARINE DECOMPRESSION CHAMBER SYSTEMS (SDC's) TO BE INCLUDED IN A NEW SUBMARINE RESCUE SYSTEM AT THE EMERGENCY SHIP SALVAGE MATERIALS (ESSM) BASE, US NAVAL COMMUNICATIONS STATION, ROUGH AND READY ISLAND, STOCKTON, CALIFORNIA.**

**B1. CONTRACT TYPE:** This is a Supply Contract with Firm Fixed-Price provisions. The Contractor shall perform work within the parameters of the specifications and drawings in Section C appended hereto as Attachment 1.

**B2. CONTRACT PERFORMANCE PERIOD:** Phase I shall begin (Start Work Date) 15 consecutive calendar days after the award date and shall continue for the following 150 consecutive calendar days. The work under Phase II shall begin no earlier than 166 consecutive calendar days after the "Start Work Date" and continue for the next 30 days. The work under Phase III shall begin no earlier than 181 consecutive calendar days after the "Start Work Date" and continue for the next 30 days. The work under Phase IV shall begin no earlier than 211 consecutive calendar days after the "Start Work Date" and continue for the next 30 days. The work under Phase V shall begin no earlier than 241 consecutive calendar days after the "Start Work Date" and continue for the next 30 days. Phase VI shall be completed 445 days after its execution or after completion of Phase I which ever occurs later.

AWD

PART I - THE SCHEDULE
SECTION B
SUPPLIES OR SERVICES AND PRICE/COSTS

N47408-98-C-2103

**PROJECT: PROCUREMENT OF TWO (2) COMPLETE DECOMPRESSION CHAMBER SYSTEMS (SDC'S) TO BE INCLUDED IN A NEW SUBMARINE RESCUE SYSTEM AT THE EMERGENCY SHIP SALVAGE MATERIALS (ESSM) BASE, US NAVAL COMMUNICATIONS STATION, ROUGH AND READY ISLAND, STOCKTON, CALIFORNIA.**

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| **PHASE I** | | | | | |
| 101817 0001 | Preliminary Design **two (2)** complete Decompression Chamber Systems in accordance with Section C: | 1 | JOB | ~~$757,775.58~~ $795,066.58 | ~~$757,775.58~~ $795,066.58 Mods P-2 & P-3 |

**SCHEDULE OF DATA DELIVERABLES DUE 150 DAYS AFTER START WORK DATE**

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0002 | Preliminary Design Package in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0003 | Quality Assurance Plan in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0004 | Preliminary SDC Segment System Manual Outline in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0005 | Preliminary Manufacturing Plan Outline including, but not limited to, Painting Plan, Hydrostatic Test Plan, and Cleaning Procedures (including gas sampling procedures and locations) in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0006 | Non-destructive Testing (NDT) Plan and Qualifications in accordance with Section C: | 1 | LOT | NSP | NSP |
| **PHASE II** | | | | | |
| SOR ~~101817~~ 101912 0007 | Thirty days (Day 151-180) effort toward Final Design of **two (2)** complete Decompression Chamber Systems in accordance with Section C: | 1 | JOB | $ 81,761.00 | $ 81,761.00 |

AWD

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | **PHASE III** | | | | |
| 0008 | Thirty days (Day 181-210) effort toward Final Design of **two (2)** complete Decompression Chamber Systems in accordance with Section C: | 1 | JOB | $ 81,877.73 | $ 81,877.73 |
| | **PHASE IV** | | | | |
| 0009 | Thirty days (Day 211-240) effort toward Final Design of **two (2)** complete Decompression Chamber Systems in accordance with Section C: | 1 | JOB | $ 68,819.25 | $ 68,819.25 75,852 144,671.25 mod P-5 |
| | **PHASE V** | | | | |
| 0010 | Thirty days (Day 241-270) effort resulting in Completion of Final Design **two (2)** complete Decompression Chamber Systems in accordance with Section C: | 1 | JOB | $ 69,020.38 | $ 69,020.38 |

**SCHEDULE OF DATA DELIVERABLES DUE 270 DAYS AFTER START WORK DATE**

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0011 | Final Design Package in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0012 | 80% SDC Segment System Manual Outline in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0013 | 50% Contractor's Records and Documents in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0014 | 80% Component Database in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0015 | Weld Procedures and Processes, Welders Qualification and Welder Qualification Records in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0016 | Final Manufacturing Plan in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0017 | Report Verifying Conformance to DHBK 1-11 in accordance with Section C: | 1 | LOT | NSP | NSP |

AWD

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | **PHASE VI** | | | | |
| 0018 | Procure, fabricate, assemble, test, ~~install,~~ and deliver **two (2)** complete Decompression Chamber Systems in accordance with Section C: (Mod P-4) | 2 | JOB | $1,091,044.82 | $2,182,089.64<br>26,820.00 Mod P-6<br>2,208,909.64 |
| | **SCHEDULE OF DATA DELIVERABLES DUE 150 DAYS BEFORE CONTRACT COMPLETION DATE** | | | | |
| 0019 | 100% SDC Segment Systems Manual in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0020 | Functional Test Plan in accordance with Section C: | 1 | LOT | NSP | NSP |
| | **SCHEDULE OF DATA DELIVERABLES DUE 30 DAYS BEFORE CONTRACT COMPLETION DATE** | | | | |
| 0021 | Record Drawings in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0022 | 100% Contractor's Records and Documents in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0023 | 100% Component Database in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0024 | Final SDC Segment Systems Manual in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0025 | Cleaning Records (data/clean sheets) and Gas Sample Reports in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0026 | Functional Test Records and Reports in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0027 | List of Special Maintenance Equipment in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0028 | List of Special Mission Support Equipment in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0029 | List of Factory Support Equipment in accordance with Section C: | 1 | LOT | NSP | NSP |

AWD

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0030 | List of Special Transportation Equipment accordance with Section C: | 1 | LOT | NSP | NSP |

**MONTHLY REPORT: EACH MONTHLY SUBMITTAL SHALL BE DELIVERED NO LATER THAN <u>10 DAYS AFTER THE BEGINNING OF EACH MONTH</u> AND SHALL INCLUDE:**

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0031 | Project Schedule in accordance with Section C: | 1 | LOT | NSP | NSP |
| 0032 | Current Progress Report in accordance with Section C: | 1 | LOT | NSP | NSP |

**TOTAL PROPOSED PRICE FOR ALL ITEMS** TYPO → ~~$3,214,343.58~~
$3,241,343.58 (MOD. P-2)
$3,278,634.58 (Mod. P-4)

*****END OF SECTION B*****

AWD

PART I - THE SCHEDULE
SECTION C
DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

**C1. STATEMENT OF WORK**

The work under this contract shall be performed in accordance with the specifications and drawings of Attachment 1, appended hereto.

Phase I of the project, CLINs 0001-0006/0031,0032, shall consist of the following items in Attachment 1:

1.2.6 a Document Submittal Schedule/150 Days after "Start Work Date"
4.2.1 PVHO Design Basis
5.1.10 Quality Assurance Plan
5.1.11 Preliminary Design Package
5.1.13 Drawing Package
5.1.14 List of Analyses
5.1.15 Noise Abatement Plan
5.1.16 Weight Plan

Phase II, CLINs 0007, 0031, & 0032, shall consist of thirty days effort toward completion of Final Design. Progress shall be confirmed by an onsite review by the COTR or his duly appointed representative.

Phase III, CLINs 0008, 0031, & 0032, shall consist of thirty days effort toward completion of Final Design. Progress shall be confirmed by an onsite review by the COTR or his duly appointed representative.

Phase IV, CLINs 0009, 0031, & 0032, shall consist of thirty days effort toward completion of Final Design. Progress shall be confirmed by an onsite review by the COTR or his duly appointed representative.

Phase V of the project, CLINs 0010-0017/0031,0032, shall consist of the following items in Attachment 1:

1.2.6 b Document Submittal Schedule/270 Days after "Start Work Date"
4.2.1 PVHO Design Basis
5.1.12 Final Design Package
5.1.13 Drawing Package
5.1.14 List of Analyses
5.1.15 Noise Abatement Plan
5.1.16 Weight Plan

The remaining requirements of Attachment 1 will constitute Phase VI, CLINS 0018-0032. In the event of any conflict between the Government specification and the Contractor's proposal, the Government specification shall control unless otherwise noted herein.

**C2. CONTRACTOR WORK FORCE RESPONSIBILITY**

It shall be the full responsibility of the contractor to organize, furnish, maintain, supervise, and direct a working force which, within the limitations of the provisions of this contract, is thoroughly capable of effectively performing the work set forth in this contract.

AWD

PART I - THE SCHEDULE
SECTION D
PACKAGING AND MARKING

**D1. PROHIBITED PACKING MATERIALS**: The use of asbestos, excelsior, newspaper, or shredded paper (all types including waxed paper, computer paper, and similar hygroscopic or non-neutral material) is prohibited. In addition, loose fill polystyrene is prohibited for shipboard use.

**D2. HAZARDOUS MATERIAL IDENTIFICATION AND MATERIAL SAFETY DATA**: Hazardous materials to be shipped by any mode or combination of modes of transportation shall be prepared (properly classed, described, packaged, marked, labeled, transport vehicle placarded, etc.) for shipment in accordance with MIL-STD-129 and all applicable Government and carrier regulations in effect at time of shipment.

**D3. PREPARATION FOR DELIVERY (COMMERCIALLY PACKAGED ITEMS):** All material to be delivered hereunder shall be afforded the degree of packaging (preservation and packing) required to prevent deterioration and damages due to the hazards of shipment, handling, and storage. Best commercial practice will be accepted.

*****END OF SECTION D*****

AWD

PART I - THE SCHEDULE
SECTION E
INSPECTION AND ACCEPTANCE

**E1**. Inspection, acceptance, quality assurance and reliability requirements are as specified in Attachment 1 of the solicitation.

**E2**. Final inspection and acceptance shall be made at the destination by the Contracting Officer's authorized representative.

**E3. INSPECTION OF SUPPLIES--FIXED-PRICE (FAR 52.246-2) (AUG 1996)**

(a) Definition. "Supplies," as used in this clause, includes but is not limited to raw materials, components, intermediate assemblies, end products, and lots of supplies.

(b) The Contractor shall provide and maintain an inspection system acceptable to the Government covering supplies under this contract and shall render to the Government for acceptance only supplies that have been inspected in accordance with the inspection system and have been found by the Contractor to be in conformity with contract requirements. As part of the system, the Contractor shall prepare records evidencing all inspections made under the system and the outcome. These records shall be kept complete and made available to the Government during contract performance and for as long afterwards as the contract requires. The Government may perform reviews and evaluations as reasonably necessary to ascertain compliance with this paragraph. These reviews and evaluations shall be conducted in a manner that will not unduly delay the contract work. The right of review, whether exercised or not, does not relieve the Contractor of the obligations under the contract.

(c) The Government has the right to inspect and test all supplies called for by the contract, to the extent practicable, at all places and times, including the period of manufacture, and in any event before acceptance. The Government shall perform inspections and tests in a manner that will not unduly delay the work. The Government assumes no contractual obligation to perform any inspection and test for the benefit of the Contractor unless specifically set forth elsewhere in this contract.

(d) If the Government performs inspection or test on the premises of the Contractor or a subcontractor, the Contractor shall furnish, and shall require subcontractors to furnish, at no increase in contract price, all reasonable facilities and assistance for the safe and convenient performance of these duties. Except as otherwise provided in the contract, the Government shall bear the expense of Government inspections of tests made at other than the Contractor's or subcontractor's premises; *provided*, that in case of rejection, the Government shall not be liable for any reduction in the value of inspection or test samples.

(e) (1) When supplies are not ready at the time specified by the Contractor for inspection of test, the Contracting Officer may charge to the Contractor the additional cost of inspection or test.

(2) The Contracting Officer may also charge the Contractor for any additional cost of inspection or test when prior rejection makes reinspection or retest necessary.

(f) The Government has the right either to reject or to require correction of nonconforming supplies. Supplies are nonconforming when they are defective in material or workmanship or are otherwise not in

AWD

conformity with contract requirements. The Government may reject nonconforming supplies with or without disposition instructions.

(g) The Contractor shall remove supplies rejected or required to be corrected. However, the Contracting Officer may require or permit correction in place, promptly after notice, by and at the expense of the Contractor. The Contractor shall not tender for acceptance corrected or rejected supplies without disclosing the former rejection or requirement for correction, and when required, shall disclose the corrective action taken.

(h) If the Contractor fails to promptly remove, replace, or correct rejected supplies that are required to be removed or to be replaced or corrected, the Government may either (1) by contact or otherwise, remove, replace, or correct the supplies and charge the cost to the Contractor or (2) terminate the contract for default. Unless the Contractor corrects or replaces the supplies within the delivery schedule, the Contracting Officer may require their delivery and make an equitable price reduction. Failure to agree to a price reduction shall be a dispute.

(i)(1) If this contract provides for the performance of Government quality assurance at source, and if requested by the Government, the Contractor shall furnish advance notification of the time (i) when Contractor inspection or tests will be performed in accordance with the terms and conditions of the contract and (ii) when the supplies will be ready for Government inspection.

(2) The Government request shall specify the period and method of the advance notification and the Government representative to whom it shall be furnished. Requests shall not require more than 2 workdays of advance notification if the Government representative is in residence in the Contractor's plant, not more than 7 workdays in other instances.

(j) The Government shall accept or reject supplies as promptly as practicable after delivery, unless otherwise provided in the contract. Government failure to inspect and accept or reject the supplies shall not relieve the Contractor from responsibility, nor impose liability on the Government, for nonconforming supplies.

(k) Inspections and tests by the Government do not relieve the Contractor of responsibility for defects or other failures to meet contract requirements discovered before acceptance. Acceptance shall be conclusive, except for latent defects, fraud, gross mistakes amounting to fraud, or as otherwise provided in the contract.

(l) If acceptance is not conclusive for any of the reasons in paragraph (k) hereof, the Government, in addition to any other rights and remedies provided by law, or under other provisions of this contract, shall have the right to require the Contractor (1) at no increase in contract price, to correct or replace the defective or nonconforming supplies at the original point of delivery or at the Contractor (1) at no increase in contract price, to correct or replace the defective or nonconforming supplies at the original point of delivery or at the Contractor's plant at the Contracting Officer's election, and in accordance with a reasonable delivery schedule as may be agreed upon between the Contractor and the Contracting Officer; provided, that the Contractor fails to meet such delivery schedule, or (2) within a reasonable time after receipt by the Contractor of notice of defects or nonconformance, to repay such portion of the contract as is equitable under the circumstances if the Contracting Officer elects not to require correction or replacement. When supplies are returned to the Contractor, the Contractor shall bear the transportation cost from the original point of

AMD

delivery to the Contractor's plant and return to the original point when that point is not the Contractor's plant. If the Contractor fails to perform or act as required in (1) or (2) above and does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure, the Government shall have the right to contract or otherwise to replace or correct such supplies and charge to the Contractor the cost occasioned the Government thereby. (End of Clause FAR 52.246-2)

**E4. HIGHER-LEVEL CONTRACT QUALITY REQUIREMENT (GOVERNMENT SPECIFICATION) (FAR 52.246-11) (APR 1984)**

(a) Definition. "Contract date," as used in this clause, means the date set for bid opening or, if this is a negotiated contract or a modification, the effective date of this contract or modification.

(AM. 3) (b) The Contractor shall comply with the specification titled ~~MIL-Q-9858,~~ ANSI/ASQC Q9001, ISO 9001 in effect on the contract date, which is hereby incorporated into this contract. (End of Clause FAR 52.246-11)

**E5. RESPONSIBILITY FOR SUPPLIES (FAR 52.246-16) (APR 1984)**

(a) Title to supplies furnished under this contract shall pass to the Government upon formal acceptance, regardless of when or where the Government takes physical possession, unless the contract specifically provides for earlier passage of title.

(b) Unless the contract specifically provides otherwise, risk of loss of or damage to supplies shall remain with the Contractor until, and shall pass to the Government upon-

(1) Delivery of the supplies to a carrier, if transportation is f.o.b. origin; or
(2) Acceptance by the Government or delivery of the supplies to the Government at the destination specified in the contract, whichever is later, if transportation is f.o.b. destination.

(c) Paragraph (b) above shall not apply to supplies that so fail to conform to contract requirements as to give a right of rejection. The risk of loss of or damage to such nonconforming supplies remains with the Contractor until cure or acceptance. After cure or acceptance, paragraph (b) above shall apply.

(d) Under paragraph (b) above, the Contractor shall not be liable for loss of or damage to supplies caused by the negligence of officers, agents, or employees of the Government acting within the scope of their employment. (End of Clause FAR 52.246-16)

**E6. MATERIAL INSPECTION AND RECEIVING REPORT (DFARS 252.246-7000) (DEC 1991)**

At the time of each delivery of supplies or services under this contract, the Contractor shall prepare and furnish to the Government a material inspection and receiving report in the manner and to the extent required by Appendix F, Material Inspection and Receiving Report of the Defense FAR Supplement.
(End of Clause DFARS 252.246-7000)

**E7. SUBMISSION OF DD250 FORM:** A copy of a Material Inspection and Receiving Report form (DD250) is provided as Attachment 12 and is required at the time of delivery for each Contract Line Item

AWD

Number (CLIN) listed in Section B's Schedule. If multiple CLINs are submitted at one time, only one DD250 is to be included with the submittals (i.e. when 0002 through 0006 are provided 150 days after start work date, all data deliverables may be listed on one DD250).

*****END OF SECTION E*****

AwD

PART I - THE SCHEDULE
SECTION F
DELIVERIES OR PERFORMANCE

**F1. PERFORMANCE AND PLACE OF DELIVERY:** Performance and final system testing shall be at the Emergency Ship Salvage Materials (ESSM) Base, US Naval Communications Station, Rough and Ready Island, Stockton, California.

**F2. DELIVERY OF GOVERNMENT FURNISHED EQUIPMENT (GFE):** The GFE shall be furnished as described in Part 1.1.5 of Attachment 1 of the solicitation.

**F3. TIME OF DELIVERY:**

(a) The Government requires delivery to be made according to the schedule in Part 1.1.7 of Attachment 1, and paragraph F4 of this section.

(b) The Government will furnish to the offeror an award or notice of award not later than the day award is dated via ordinary mail and facsimile. Therefore, the offeror should compute the time available for performance beginning with the actual date of award, rather than the date the written notice of award is received from the Contracting Officer through the ordinary mails.

**F4. TIME OF DELIVERY (FAR 52.211-8) (JUN 1997)**

(a) The Government requires delivery to be made according to the following schedule:

REQUIRED DELIVERY SCHEDULE
[*Contracting Officer insert specific details*]

| ITEM NO. | QUANTITY | WITHIN DAYS AFTER DATE OF CONTRACT |
|---|---|---|
| 0001 | 2 | ~~730 DAYS~~ (See Mod P-4) 4/4/01 |

The Government will evaluate equally, as regards time of delivery, offers that propose delivery of each quantity within the applicable delivery period specified above. Offers that propose delivery that will not clearly fall within the applicable required delivery specified above, may be considered nonresponsible. The Government reserves the right to award under either the required delivery schedule or the proposed delivery schedule, when an offeror offers an earlier delivery schedule than required above. If the offeror proposes no other delivery schedule, the required delivery schedule above will apply.

OFFEROR'S PROPOSED DELIVERY SCHEDULE

| ITEM NO. | QUANTITY | DATE OF CONTRACT |
|---|---|---|
| | | |

AWD

(b) Attention is directed to the Contract Award provision of the solicitation that provides that a written award or acceptance of offered mailed, or otherwise furnished to the successful offeror, results in a binding contract. The Government will mail or otherwise furnish to the offeror an award or notice of award not later than the day award is dated. Therefore, the offeror should compute the time available for performance beginning with the actual date of award, rather than the date the written notice of award is received from the Contracting Officer through the ordinary mails. However, the Government will evaluate an offer that proposes delivery based on the Contractor's date of receipt of the contract or notice of award by adding (1) five calendar days for delivery of the award through the ordinary mails, or (2) one working day if the solicitation states that the contract or notice of award will be transmitted electronically. (The term "working day" excludes weekends and U.S. Federal holidays.) If, as so computed, the offered delivery date is later that the required delivery date, the offer will be considered nonresponsive and rejected.
(End of Clause FAR 52.211-8)

**F5. NOTICE TO PROCEED/START WORK DATE:** "Notice to proceed" or "Start Work Date" are defined as the Contracting Officer's notification of bond approval.

**F6. CLAUSES INCORPORATED BY REFERENCE:** The following clauses are incorporated by reference, in accordance with FAR 52.252-2, Clauses Incorporated by Reference (JUN 1988), with the same force and effect as if they were given in full text. Upon request, the Contract Officer will make their full text available.

| Clause Number | Clause Title | Clause Date |
|---|---|---|
| 52.242-15 | Stop-Work Order | AUG 1989 |
| 52.247-34 | F.O.B. Destination | NOV 1991 |

**F7. LIQUIDATED DAMAGES--SUPPLIES, SERVICES, OR RESEARCH AND DEVELOPMENT (FAR 52.211-11) (APR 1984)**

(a) If the contractor fails to deliver the supplies or perform the services within the time specified in this contract, or any extension, the contractor shall, in place of actual damages, pay to the Government as fixed, agreed, and liquidated damages, for each calendar day of delay the sum ________________. *

(b) Alternatively, if delivery or performance is so delayed, the Government may terminate this contract in whole or in part under the Termination for Default-Supplies and Service clause in this contract and in that event, the Contractor shall be liable for fixed, agreed, and liquidated damages accruing until the time the Government may reasonably obtain delivery or performance of similar supplies or services. The liquidated damages shall be in addition to excess costs under the Termination clause.

(c) The contractor shall not be charged with liquidated damages when the delay in delivery or performance arises out of causes beyond the control and without the fault or negligence of the contractor as defined in the Termination for Default-Supplies and Services clause in this contract.
(End of Clause FAR 52.211-11)

**F8. The following table of Liquidated Damages (LD's) is applicable for this contract:**

PWD

Category
100,000 - 500,000 = $200/day

Each Add'l $100K
Add $50/day:

TOT Price
$3,278,635
(500,000)
2,778,635 = 27.78

27.78 x $50 = $1389/day

TOTAL = $1,589/day

$1465
+ 200
$1665

| Project Cost | Estimated LD's Per Per Calendar Day |
|---|---|
| $2,000 - $25,000 | $ 80 |
| $25,000 - $50,000 | $110 |
| $50,000 - $100,000 | $140 |
| $100,000 -$500,000 | $200 |

Each additional $100,000 add $50

***Amount to be determined at award of contract.**

(End of Table)

**F9. GOVERNMENT DELAY OF WORK (FAR 52.242-17) (APRIL 1984)**

(a) If the performance of all or any part of the work of this contract is delayed or interrupted (1) by an act of the Contracting Officer in the administration of this contract that is not expressly or impliedly authorized by the contract, or (2) by a failure of the Contracting Officer to act within the time specified in this contract, or within a reasonable time if not specified, an adjustment (excluding profit) shall be made for any increase in the cost of performance of this contract caused by the delay or interruption and the contract shall be modified in writing accordingly. Adjustment shall also be made in the delivery or performance dates and any other contractual term or condition affected by the delay or interrupted. However, no adjustment shall be made under this clause for any delay or interruption to the extent that performance would have been delayed or interrupted by any other cause, including the fault or negligence of the contractor, or for which an adjustment is provided or excluded under any other term or condition of this contract.

(b) A claim under this clause shall not be allowed (1) for any costs incurred more than 20 days before the contractor shall have notified the Contracting Officer in writing of the act or failure to act involved, and (2) unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of the delay of interruption, but not later than the day of final payment under the contract.
(End of Clause FAR 52.242-17)

*****END OF SECTION F*****

AWD

PART I - THE SCHEDULE
SECTION G
CONTRACT ADMINISTRATION DATA

G1. The Naval Facilities Engineering Command Contracts Office, Offshore Facilities Contracts Office, Washington, D.C. is assigned administrative authority for this contract. After award all contractual matters shall be addressed to:

CONTRACTING OFFICER, CODE 2727
NAVFACENGCOM CONTRACTS OFFICE
BLDG 218, 901 M STREET, SE
WASHINGTON NAVY YARD
WASHINGTON, D.C. 20374-5063

and all technical matters shall be addressed to:

COMMANDING OFFICER
NAVAL FACILITIES ENGINEERING SERVICE CENTER
ECDET, CODE 551DD
BLDG 218, 901 M STREET, SE
WASHINGTON NAVY YARD
WASHINGTON, D.C. 20374-5063

AM. 3 RFP 5 AM. see pg. G1-A

**G2. CONTRACT INVOICING INSTRUCTIONS**: In accordance with Far clause ~~52.232-8~~ -16 (referenced in Section I), the contractor shall submit invoices monthly to the Contracting Officer as the work proceeds. The contractor's request for progress payments shall be accompanied with terms listed in FAR clause 52.232-~~8~~,16 which are needed to substantiate the request. Payment will be based on invoices submitted by the contractor for satisfactorily completed work and receipt of required data deliverables as identified in Section B's schedule. Requests for progress payments shall be submitted on a NAVFACCO Invoice Form, which shall be provided to the contractor after award. AM. 2

**G3. ADDRESS TO WHICH PAYMENTS SHALL BE MAILED**: Offeror shall indicate in the space provided below the address to which payments should be mailed, IF SUCH ADDRESS IS DIFFERENT FROM THAT SHOWN FOR THE OFFEROR IN SECTION 15A 0F SF33.

________________________________________

________________________________________

________________________________________

**G4. POST-AWARD CONFERENCE**

(a) A post-award conference may be conducted within 15 days after the contract award with representatives of the contractor, the technical representatives, and the Contracting Officer. The location will be determined by the Contracting Officer when arrangements for the conference are made between the parties. The

(Amend. 5)

**G2. 5252.232-9000 SUBMISSION OF INVOICES (FIXED PRICE) (ALTERNATE I) (JUL 1992)**
**As perscribed at 5232.908 (a), insert the following clause:**

SUBMISSION OF INVOICES (FIXED PRICE)
(JUL 1992)

(a) "Invoice" as used in this clause does not include contractor's requests for progress payments..

(b) The contractor shall submit original invoices with two (2) copies to the address identified in the solicitation/ contract award form (SF 26-Block 10; SF 33-Block 23; SF 1447-Block 14), unless delivery orders are applicable, in which case invoices will be segregated by individual order and submitted to the address specified in the order (DD 1155-Block 13 or SF 26-Block 10)..

(c) The use of the Material Inspection and Receiving Report (MIRR), DD Form 250, as an invoice is encouraged. DFARS Appendix F-306 provides instructions for such use. Copies of the MIRR used as an invoice are in addition to standard distribution stated in DFARS F-401.

(d) In addition to the requirements of the Prompt Payment clause of this contract, the contractor shall cite on each invoice the contract line item number (CLIN); the contract subline item number (SLIN), if applicable; the accounting classification reference number (ACRN) as identified on the financial accounting data sheets, and the payment terms.

(e) The contractor shall prepare:

__X__ a separate invoice for each activity designated to receive the supplies or services.
_____ a consolidated invoice covering all shipments delivered under an individual order.
_____ either of the above.

(f) If acceptance is at origin, the contractor shall submit the MIRR or other acceptance verification directly to the designated payment office. If acceptance is at destination, the consignee will forward acceptance verification to the designated payment office.
(End of Clause)

**Alternate I (JUL 1992). As perscribed at 5232.908(a), add the following paragraph (g) to the basic clause:**

(g) Submit invoices monthly to the Government representative named in the contract for approval of hours actually expended.

[G1-A]

AWD

Contracting Officer, or designated representative, initiating the conference will designate, or act as, the chairperson.

(b) The requirement for a post-award conference shall in no event constitute grounds for excusable delay by the contractor in performance of any provisions in the contract.

*****END OF SECTION G*****

AWD

PART I - THE SCHEDULE
SECTION H
SPECIAL CONTRACT REQUIREMENTS

**H1. BONDING**

**NOTICE OF BONDING REQUIREMENTS (FAC 5252.228-9305) (JAN 1996)**

Within 10 days after receipt of award, the bidder to whom the award is made shall furnish the following bond(s) each with satisfactory security;

_X_ A Performance Bond (Standard Form 25). The performance bond shall be in a penal sum equal to 100 percent of the contract price.

_X_ A Payment Bond (Standard Form 25A). The payment bond shall be in a penal sum equal to

(1) 50% of the contract price if the contract price is not more than $1 million;
(2) 40% of the contract price if the contract price is more than $1 million but not more than $5 million; or
(3) $2.5 million of the contract price is more than $5 million.

Any surety company holding a certificate of authority from the Secretary of Treasury as an acceptable Surety on Federal bonds will be accepted. Individual sureties will be permitted as prescribed in FAR 28.203 and FAC 5252.228-9300. Alternative types of security in lieu of furnishing sureties on performance and/or payment bonds will be permitted as prescribed in FAR 28.204, and will be held at least one year after the completion of the contract. Additional bond security may be required as prescribed in FAR 52.228-2. Bonds shall be accompanied by a document authenticating the agent's authority to sign bonds for the surety company.

The contract time for purposes of fixing the completion date, default, and liquidated damages shall begin to run 15 days from the date of award, regardless of when performance and payment bonds or deposits in lieu of surety are executed. (End of Clause FAC 5252.228-9305)

(Am. 3)

**H2. REQUIRED INSURANCE (FAR 28.307-2)**

The Contractor shall procure and maintain during the period of his performance under this contract, which occurs on Federal property, the following minimum insurance:

Type of Insurance:

1. Comprehensive General Liability: $500,000 per occurrence.
2. Automobile Liability: $ 200,000 per person; $ 500,000 per occurrence for bodily injury; $20,000 per occurrence for property damage.
3. Workmen's Compensation: As required by Federal and State workers' compensation and occupational disease statutes.
4. Employer's Liability Coverage of at least $100,000 shall be required, except in states with

AWD

(Am. 3)

exclusive or monopolistic funds that do not permit worker's compensation to be written by private carriers.

5. Others as required by State law.

**H3. NOTICE TO CONTRACTOR OF CERTAIN DRUG DETECTION PROCEDURES**

(a) Pursuant to Navy policy applicable to both Government and contractor personnel, measures will be taken to prevent the introduction and utilization of illegal drugs and related paraphernalia into Government work areas.

(b) In furtherance of the Navy's drug control program, unannounced period inspections of the following nature may be conducted by installation authorities:

(1) routine inspection of contractor occupied work spaces;
(2) random inspections of vehicles on entry or exit to eliminate them as a safe haven for storage of or trafficking in illegal drugs;
(3) random inspections of personal possessions on entry or exit from the installation.

(c) When there is a probable cause to believe that a contractor employee on board a naval installation has been engaged in use, possession, or trafficking of drugs, the installation authorities may detain said employee until the employee can be removed from the installation, or can be released to the local authorities having jurisdiction.

(d) Trafficking in illegal drug and drug paraphernalia by contract employees while on a military installation may lead to possible withdrawal or downgrading of security clearance, and/or referral for prosecution by appropriate law enforcement authorities.

(e) The contractor is responsible for the conduct of employees performing work under this contract and is, therefore, responsible to assure that employees are notified of these provisions prior to assignment.

(f) The removal of contract personnel from a Government vessel or installation as a result of the drug offense shall not cause for excusable delay, nor shall such action be deemed a basis for an equitable adjustment to price, delivery, or other provisions prior to assignment.

**H4. HOLIDAYS**

The holidays applicable to this contract and the days of observance are set forth below:

| Name of Holiday | Time of Observance |
|---|---|
| New Year's Day | 1st January |
| Martin Luther King Day | Third Monday in January |
| President's Day | Third Monday in February |
| Memorial Day | Last Monday in May |
| Independence Day | 4th July |
| Labor Day | First Monday in September |

AWD

| | |
|---|---|
| Columbus Day | Second Monday in October |
| Veteren's Day | 11th November |
| Thanksgiving Day | Fourth Thursday in November |
| Christmas Day | 25th December |

**H5. CONTRACTOR'S RESPONSIBILITIES AND REQUIREMENTS**

(a) **Technical Responsibilities**: This statement of work contains technical requirements to which the contractor must adhere; however, it is the contractor's responsibility to confirm by engineering analysis that component sizes cited herein are adequate to perform the requirements cited "Operational and Performance Requirements" in Part 2 of Attachment 1. Other technical issues that are not specified herein are at the discretion of the contractor. The contractor shall site its intentions in these areas in the preliminary design.

(b) **Conformance Requirements**: Omission from the drawings or specifications or the misdescription of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed, shall not relieve the contractor from performing such omitted or misdescribed details of the work, but they shall be performed as if fully and correctly set forth and described in the drawings and specifications.

(AM. 4) H6. The contractor shall include all required provisions/clauses in any contract with team members or subcontractors at any time for other than commercial items and components. This provision is applicable only if no other clause or provision applies.

*****END OF SECTION H*****

AWD

PART II - CONTRACT CLAUSES
SECTION I
CONTRACT CLAUSES (BY REFERENCE)

**I1. CLAUSES INCORPORATED BY REFERENCE (FAR 52.252-2) (JUN 1988)**

THIS CONTRACT INCORPORATES ONE OR MORE CLAUSES BY REFERENCE, WITH THE SAME FORCE AND EFFECT AS IF THEY WERE GIVEN IN FULL TEXT. UPON REQUEST, THE CONTRACTING OFFICER WILL MAKE THEIR FULL TEXT AVAILABLE.
(End of Clause FAR 52.252-2)

**I2. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES BY REFERENCE.**

FAR 52.202-1 Definitions (OCT 1995)
FAR 52.203-3 Gratuities (APR 1984)
FAR 52.203-6 Restrictions on Subcontractor Sales to the Government (JUL 1995)
FAR 52.203-7 Anti-Kickback Procedures (JUL 1995)
FAR 52.203-8 Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity (JAN 1997)
FAR 52.203-10 Price or Fee Adjustment for Illegal or Improper Activity (JAN 1997)
FAR 52.203-12 Limitation on Payments to Influence Certain Federal Transactions (JUN 1997)
FAR 52.204-4 Printing/Copying Double-Sided on Recycled Paper (JUN 1996)
FAR 52.209-6 Protecting the Government's Interest when Subcontracting with Contractors Debarred, Suspended, or Proposed for Debarment (JUL 1995)
FAR 52.211-5 New Material (MAY 1995)
FAR 52.211-7 Other Than New Material, Residual Inventory, and Former Government Surplus Property (MAY 1995)
FAR 52.211-15 Defense Priority and Allocation Requirements (SEP 1990)
FAR 52.215-2 Audit and Records-- Negotiation (AUG 1996)
? delete FAR 52.215-33 Order of Precedence (JAN 1986)
FAR 52.219-8 Utilization of Small, Small Disadvantaged and Women Owned Small Business Concerns (JUN 1997)
FAR 52.219-9 Small, Small Disadvantaged and Women-Owned Small Business Subcontracting Plan (AUG 1996)
FAR 52.219-16 Liquidated Damages--Subcontracting Plan (OCT 1995)
FAR 52.222-1 Notice to the Government of Labor Disputes (FEB 1997)
FAR 52.222-4 Contract Work Hours and Safety Standards Act--Overtime Compensation (JUL 1995)
FAR 52.222-20 Walsh-Healey Public Contracts Act (DEC 1996)
FAR 52.222-24 Preaward On-Site Equal Opportunity Compliance Review (APR 1984)
FAR 52.222-25 Affirmative Action Compliance (APR 1984)
FAR 52.222-26 Equal Opportunity (APR 1984)
FAR 52.222-28 Equal Opportunity Preaward Clearance of Subcontracts (APR 1984)
FAR 52.222-35 Affirmative Action for Special Disabled and Vietnam Era Veterans (APR 1994)
FAR 52.222-36 Affirmative Action for Handicapped Workers (APR 1984)
FAR 52.222-37 Employment Reports on Special Disabled Veterans (JAN 1988)
Amd 2 ~~FAR 52.222-41 Service Contract Act of 1965, As Amended (MAY 1989)~~
FAR 52.223-2 Clean Air and Water (APR 1984)

AMD

FAR 52.223-3 Hazardous Material Identification and Material Safety Data (JAN 1997)
FAR 52.223-5 Pollution Prevention and Right-to-Know Information (MAR 1997)
FAR 52.223-14 Toxic Chemical Release Reporting (OCT 1996)
FAR 52.225-10 Duty-Free Entry (APR 1984)
FAR 52.225-11 Restrictions on Certain Foreign Purchases (OCT 1996)
FAR 52.227-1 Authorization and Consent (JUL 1995)
FAR 52.227-2 Notice and Assistance Regarding Patent and Copyright Infringement (AUG 1996)
FAR 52.227-14 Rights in Data - General (JUN 1987)
FAR 52.228-1 Bid Guarantee (SEP 1996)
FAR 52.228-2 Additional Bond Security (JUN 1996)
FAR 52.228-11 Pledges of Assets (FEB 1992)
FAR 52.228-12 Prospective Subcontractor Requests for Bonds (OCT 1995)
FAR 52.228-14 Irrevocable Letter of Credit (JUN 1996)
FAR 52.229-3 Federal, State and Local Taxes (JAN 1991)
FAR 52.229-5 Taxes-Contracts Performed in U.S. Possessions or Puerto Rico (APR 1984)
FAR 52.232-1 Payments (APR 1984)
FAR 52.232-8 Discounts for Prompt Payment (MAY 1997)
FAR 52.232-9 Limitation on Withholding of Payments (APR 1984)
FAR 52.232-11 Extras (APR 1984)
FAR 52.232-16 Progress Payments (JUL 1991), Alternate I (AUG 1987)
FAR 52.232-17 Interest (JUN 1996)
FAR 52.232-23 Assignment of Claims (JAN 1986)
FAR 52.232-25 Prompt Payment (MAY 1997)
FAR 52.232-33 Mandatory Information for Electronic Funds Transfer Payment (AUG 1996)
FAR 52.233-1 Disputes (OCT 1995), Alternate I (DEC 1991)
FAR 52.233-2 Service of Protest (AUG 1996)
FAR 52.233-3 Protest After Award (AUG 1996)
~~FAR 52.236-2 Differing Site Conditions (APR 1984)~~
FAR 52.236-3 Site Investigation and Conditions Affecting the Work (APR 1984)
(AM. 2) FAR 52.236-7 Permits and Responsibilities (NOV 1991)
FAR 52.236-8 Other Contracts (APR 1984)
FAR 52.236-9 Protection of Existing Vegetation, Structures, Equipment, Utilities, and Improvements (APR 1984)
FAR 52.236-10 Operation and Storage Areas (APR 1984)
(AM. 2) FAR 52.236-12 Cleaning Up (APR 1984)
FAR 52.236-13 Accident Prevention (NOV 1991)
~~FAR 52.236-14 Availability and Use of Utility Services (APR 1984)~~
(AM. 3) ~~FAR 52.237-2 Protection of Government Buildings, Equipment, and Vegetation (APR 1984)~~
FAR 52.242-2 Production Progress Reports (APR 1991)
FAR 52.242-12 Report of Shipment (REPSHIP) (JUL 1995)
FAR 52.242-13 Bankruptcy (JUL 1995)
FAR 52.242-14 Suspension of Work (APR 1984)
FAR 52.243-1 Changes--Fixed Price (AUG 1987)
FAR 52.244-1 Subcontracts (Fixed-Price Contracts) (FEB 1995)
FAR 52.245-1 Property Records (APR 1984)
FAR 52.245-2 Government Property (Fixed-Price Contracts) (FEB 1989)

AWD

FAR 52.248-1 Value Engineering (MAR 1989)
FAR 52.249-2 Termination for Convenience of the Government (Fixed-Price) (SEP 1996)
FAR 52.249-8 Default (Fixed-Price Supply and Services) (APR 1984)
FAR 52.253-1 Computer Generated Forms (JAN 1991)

**I3. DEPARTMENT OF DEFENSE FEDERAL ACQUISITION REGULATION SUPPLEMENT (DFARS) CLAUSES INCORPORATED BY REFERENCE.**

DFARS 252.201-7000 Contracting Officer's Representative (DEC 1991)
DFARS 252.203-7001 Special Prohibition on Employment (NOV 1995)
DFARS 252.203-7002 Display of DOD Hotline Poster (DEC 1991)
DFARS 252.204-7000 Disclosure of Information (DEC 1991)
DFARS 252.204-7003 Control of Government Personnel Work Product (APR 1992)
DFARS 252.205-7000 Provision of Information to Cooperative Agreement Holders (DEC 1991)
DFARS 252.209-7000 Acquisition From Subcontractors Subject To On-Site Inspection Under The Intermediate-Range Nuclear Forces (INF) Treaty (NOV 1995)
DFARS 252.215-7000 Pricing Adjustments (DEC 1991)
DFARS 252.219-7003 Small Business and Small Disadvantaged Business Subcontracting Plan (DoD Contracts) (APR 1996)
DFARS 252.223-7001 Hazard Warning Labels (DEC 1991)
DFARS 252.223-7004 Drug-Free Work Force (SEP 1988)
(AM. 3) ~~DFARS 252.223-7006 Prohibition on Storage and Disposal of Toxic and Hazardous Materials (APR 1993)~~
DFARS 252.225-7001 Buy American Act and The Balance of Payments Program (JAN 1994)
DFARS 252.225-7002 Qualifying Country Sources as Subcontractors (DEC 1991)
DFARS 252.225-7008 Supplies to be Accorded Duty-Free Entry (DEC 1991)
DFARS 252.225-7007 Trade Agreements Act (JUN 1997)
DFARS 252.225-7012 Preference for Certain Domestic Commodities (FEB 1997)
DFARS 252.225-7014 Preference for Domestic Specialty Metals (FEB 1997)
DFARS 252.225-7031 Secondary Arab Boycott of Israel (JUN 1992)
DFARS 252.227-7000 Non-Estoppel (OCT 1966)
DFARS 252.227-7013 Rights in Technical Data and Computer Software (NOV 1995)
DFARS 252.227-7016 Rights in Bid or Proposal Information (JUN 1995)
DFARS 252.227-7022 Government Rights (Unlimited) (MAR 1979)
DFARS 252.227-7030 Technical Data--Withholding of Payment (OCT 1988)
DFARS 252.227-7033 Rights in Shop Drawings (APR 1966)
DFARS 252.227-7036 Certification of Technical Data Conformity (MAY 1987)
DFARS 252.227-7037 Validation of Restrictive Markings on Technical Data (NOV 1995)
DFARS 252.232-7006 Reduction or Suspension of Contract Payments Upon Finding of Fraud (AUG 1992)
DFARS 252.236-7000 Modification Proposals--Price Breakdown (DEC 1991)
DFARS 252.242-7000 Postaward Conference (DEC 1991)
DFARS 252.242-7004 Material Management and Accounting System (SEP 1996)
DFARS 252.243-7000 Engineering Change Proposals (MAY 1994)
DFARS 252.243-7001 Pricing of Contract Modifications (DEC 1991)

AWD

**NOTE TO OFFERORS:** Availability of clauses in full text is contained in Part 7 of Title 32 of the Code of Federal Regulations and can be found in most law libraries. Offerors are cautioned not to delete or add clauses to this solicitation.

**I4. COVENANT AGAINST CONTINGENT FEES FAR 52.203-5) (APR 1984)**

(a) The Contractor warrants that no person or agency has been employed or retained to solicit or obtain this contract upon an agreement or understanding for a contingent fee, except a bona fide employee or agency. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or, in its discretion, to deduct from the contract price or consideration fee, or otherwise recover, the full amount of the contingent fee.

(b) "Bona fide agency," as used in this clause, means an established commercial or selling agency, maintained by a contractor for the purpose of securing business, that neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds itself out as being able to obtain any Government contract or contracts through improper influence.

"Bona fide employee," as used in this clause, means a person, employed by a contractor and subject to the contractor's supervision and control as to time, place, and manner of performance, who neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds out as being able to obtain any Government contract or contracts through improper influence.

"Contingent fee," as used in this clause, means any commission, percentage, brokerage, or other fee that is contingent upon the success that a person or concern has in securing a Government contract.

"Improper influence," as used in this clause, means any influence that induces or tends to induce a Government employee or officer to give consideration or to act regarding a Government contract on any basis other than the merits of the matter. (End of Clause FAR 52.203-5)

**I5. DRUG-FREE WORKPLACE (FAR 52.223-6) (JAN 1997)**

(a) Definitions. As used in this clause--

"Controlled substance" means a controlled substance in schedules I through V of section 202 of the Controlled Substances Act (21 U.S.C. 812) and as further defined in regulation at 21 CFR 1308.11-1308.15. "Conviction" means a finding of guilt (including a plea of nolo contendere) or imposition of sentence, or both by any judicial body charged with the responsibility to determine violations of the Federal or State criminal drug statutes.

"Criminal drug statute" means a Federal or non-Federal criminal statute involving the manufacture, distribution, dispensing, possession or use of any controlled substance.

"Drug-free workplace" means the site(s) for the performance of the work done by the Contractor in connection with a specific contract at which employees of the Contractor are prohibited from engaging in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance.

"Employee" means an employee of a Contractor directly engaged in the performance of work under a Government contract. "Directly engaged" is defined to include all direct cost employees and any other Contractor employee who has other than a minimal impact or involvement in contract performance.

"Individual" means an offeror/contractor that has no more than one employee including the offeror/contractor.

(b) The Contractor, if other than an individual, shall---within 30 days after award (unless a longer period is agreed to in writing for contracts of 30 days or more performance duration), or as soon as possible for contracts of less than 30 days performance duration---

(1) Publish a statement notifying its employees that the unlawful manufacture, distribution, dispensing,

AWD

possession, or use of a controlled substance is prohibited in the Contractor's workplace and specifying the actions that will be taken against employees for violations of such prohibitions;

(2) Establish an ongoing drug-free awareness program to inform such employees about---

(i) The dangers of drug abuse in the workplace;
(ii) The Contractor's policy of maintaining a drug-free workplace;
(iii) Any available drug counseling, rehabilitation, and employee assistance programs; and
(iv) The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;

(3) Provide all employees engaged in performance of the contract with a copy of the statement required by subparagraph (b)(1) of this clause;

(4) Notify such employees in writing in the statement required by subparagraph (b)(1) of this clause that as a condition of continued employment on this contract, the employee will---

(i) Abide by the terms of the statement; and
(ii) Notify the employer in writing of the employee's conviction under a criminal drug statute for a violation occurring in the workplace no later than 5 days after such conviction;

(5) Notify the Contracting Officer in writing within ten (10) days after receiving notice under subdivision (b)(4)(ii) of this clause, from an employee or otherwise receiving actual notice of such conviction. The notice shall include the position title of the employee.

(6) Within 30 days after receiving notice under subparagraph (a)(4)(ii) of this clause of a conviction, take one of the following actions with respect to any employee who is convicted or a drug abuse violation occurring in the workplace:

(i) Take appropriate personnel action against such employee, up to and including termination; or
(ii) Require such employee to satisfactorily participate in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency; and

(7) Make a good faith effort to maintain a drug-free workplace through implementation of subparagraphs (b)(1) through (b)(6) of this clause.

(c) The Contractor, if an individual, agrees by award of the contract or acceptance of a purchase order, not to engage in the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance while performing this contract.

(d) In addition to other remedies available to the Government, the Contractor's failure to comply with the requirements of paragraph (b) or (c) of this clause may, pursuant to FAR 23.506, render the Contractor subject to suspension of contract payments, termination of the contract or default, and suspension or debarment. (End of Provision FAR 52.223-6)

M.3)

~~I6. INSURANCE - WORK ON A GOVERNMENT INSTALLATION (FAR 52.228-5) (JAN 1997)~~

AWD

(AM. 3)

(a) The contractor shall, at its own expense, provide and maintain during the entire performance period of this contract at least the kinds and minimum amounts of insurance required in the schedule or elsewhere in the contract.

(b) Before commencing work under this contract, the Contractor shall notify the Contracting Officer in writing that the required insurance has been obtained. The policies evidencing required insurance shall contain an endorsement to the effect that any cancellation or any material change adversely affecting the Government's interest shall not be effective (1) for such period as the laws of the State in which this contract is to be performed prescribe, or (2) until 30 days after the insurer or the Contractor gives written notice to the Contracting Officer, whichever period is longer.

(c) The Contractor shall insert the substance of this clause, including this paragraph (c), in subcontracts under this contract that require work on a Government installation and shall require subcontractors to provide and maintain the insurance required in the Schedule or elsewhere in the contract. The Contractor shall maintain a copy of all subcontractor's proof of required insurance, and shall make copies available to the Contracting Officer upon request. (End of Clause FAR 52.228-5)

**I7. PERFORMANCE AND PAYMENT BONDS--OTHER THAN CONSTRUCTION (FAR 52.228-16) (SEP 1996)**

(a) *Definitions*. As used in this clause--

"Contract price" means the total amount of the contract for the term of the contract (excluding options, if any) or, for requirements contracts, the price payable for the estimated quantity; or for indefinite-delivery type contracts, the price payable for the specified minimum quantity.

(AM. 3)
* See H1

(b) The Contractor shall furnish a performance bond (Standard Form 1418) for protection of the Government in an amount equal to* **100** percent of the contract price and a payment bond (Standard Form 1416) in an amount equal to* **20** percent of the contract price.

(c) The Contractor shall furnish all executed bonds, including any necessary reinsurance agreements, to the Contracting Officer, within ten **10** days, but in any event, before starting work.

(d) The Government may require additional performance bond protection when the contract price is increased. The Government may secure additional protection by directing the Contractor to increase the penal amount of the existing bond or to obtain an additional bond.

(e) The bonds shall be in the form of firm commitment, supported by corporate sureties whose names appear on the list contained in Treasury Department Circular 570, individual sureties, or by other acceptable security such as postal money order, certified check, cashier's check, irrevocable letter of credit, or, in accordance with Treasury Department regulations, certain bonds or notes of the United States. Treasury Circular 570 is published in the Federal Register, or may be obtained from the U.S. Department of Treasury, Financial Management Service Surety Bond Branch, 401 14th Street, NW., 2nd Floor, West Wing, Washington, DC 20227. (End of Clause FAR 52.228-16)

AWP

**I8. SUBCONTRACTS FOR COMMERCIAL ITEMS AND COMMERCIAL COMPONENTS (FAR 52.244-6) (OCT 1995)**

(a) *Definitions*.

"Commercial item", as used in this clause, has the meaning contained in the clause at FAR 52.202-1, Definitions.

"Subcontract", as used in this clause, includes a transfer of commercial items between divisions, subsidiaries, or affiliates of the Contractor or subcontractor at any tier.

(b) To the maximum extent practicable, the Contractor shall incorporate, and require its subcontractors at all tiers to incorporate, commercial items or nondevelopmental items as components of items to be supplied under this contract.

(c) Notwithstanding any other clause of this contract, the Contractor is not required to include any FAR provision or clause, other than those listed below to the extent they are applicable and as may be required to establish the reasonableness of prices under Part 15, in a subcontract at any tier for commercial items or commercial components:

(1) 52.222-26, Equal Opportunity (E.O. 11246);
(2) 52.222-35, Affirmative Acton for Special Disabled and Vietnam Era Veterans (38 U.S.C. 4212 (a));
(3) 52.222-36, Affirmative Action for Handicapped Workers (29 U.S.C. 793); and
(4) 52.247-64, Preference for Privately-Owned U.S.-Flagged Commercail Vessels (46 U.S.C. 1241) (flow down not required for subcontracts awarded beginning May 1, 1996).

(d) Contractor shall include the terms of this clause, including this paragraph (d), in subcontracts awarded under this contract. (End of Clause FAR 52.244-6)

NOTE: I9 removed by AM. 3 re-instated by AM. 4

**I9. WARRANTY OF SYSTEMS AND EQUIPMENT UNDER PERFORMANCE SPECIFICATIONS OR DESIGN CRITERIA (FAR 52.246-19) (DEC 89)**

(a) *Definitions*. "Acceptance", as used in this clause, means the act of an authorized representative of the Government by which the Government assumes for itself, or as an agent of another, ownership of existing and identified supplies, or approves specific services rendered, as partial or complete performance of the contract.

"Correction", as used in this clause means the elimination of a defect.

"Defect", as used in this clause, means any condition or characteristic in any supplies or services furnished by the Contractor under the contract that is not in compliance with the requirements of the contract.

AWD

"Supplies", as used in this clause, means the end items furnished by the Contractor and related services required under this contract. Except when this contract includes the clause entitled Warranty of Data, supplies also means "data".

(b) *Contractor's obligations.*

(1) The Contractor's warranties under this clause shall apply only to those defects discovered by either the Government or the Contractor within 365 days after acceptance.

(2) If the Contractor becomes aware at any time before acceptance by the Government (whether before or after tender to the Government) that a defect exists in any supplies or services, the Contractor shall (i) promptly correct the defect, or (ii) promptly notify the Contracting Officer, in writing, of the defect, using the same procedures prescribed in paragraph (b)(3) of this clause.

(3) If the Contracting Officer determines that a defect exists in any of the supplies or services accepted by the Government under this contract, the Contracting Officer shall promptly notify the Contractor of the defect, in writing, within **30** days of the discovery of the defect. Upon timely notification of the existence of a defect, or if the Contractor independently discovers a defect in accepted supplies or services, the Contractor shall submit to the Contracting Officer, in writing, within **7** days a recommendation for corrective actions, together with supporting information in sufficient detail for the Contracting Officer to determine what corrective action, if any, shall be undertaken.

(4) The Contractor shall promptly comply with any timely written direction from the Contracting Officer to correct or partially correct a defect, at no increase in the contract price.

(5) The Contractor shall also prepare and furnish to the Contracting Officer data and reports applicable to any correction required under this clause (including revision and updating of all other affected data called for under this contract) at no increase in the contract price.

(6) In the event of timely notice of a decision not to correct or only to partially correct, the Contractor shall submit a technical and cost proposal within **7** days to amend the contract to permit acceptance of the affected supplies or services in accordance with the revised requirement, and an equitable reduction in the contract price shall promptly be negotiated by the parties and be reflected in a supplemental agreement to this contract.

(7) Any supplies or parts thereof corrected or furnished in replacement and any services performed shall also be subject to the conditions of this clause to the same extent as supplies or services initially accepted. The warranty, with respect to these supplies, parts, or services, shall be equal in duration to that set forth in paragraph (b)(1) of this clause, and shall run from the date of delivery of the corrected or replaced supplies.

(8) The Contractor shall not be responsible under this clause for the correction of defects in Government-furnished property, except for defects in installation, unless the Contractor performs, or is obligated to perform, any modifications or other work on such property. In that event, the Contractor shall be responsible for correction of defects that result from the modifications or other work.

(9) If the Government returns supplies to the Contractor for correction or replacement under this clause, the Contractor shall be liable for transportation charges up to an amount equal to the cost of transportation by the usual commercial method of shipment from the place of delivery

AWD

specified in this contract (irrespective of the f.o.b. point or the point of acceptance) to the Contractor's plant and return to the place of delivery specified in this contract. The Contractor shall also bear the responsibility for the supplies while in transit.

(10) All implied warranties of merchantability and "fitness for a particular purpose" are excluded from any obligation under this contract.

(c) *Remedies available to the Government.*

(1) The rights and remedies of the Government provided in this clause --

(i) Shall not be affected in any way by any terms or conditions of this contract concerning the conclusiveness of inspection and acceptance; and
(ii) Are in addition to, and do not limit, any rights afforded to the Government by any other clause of this contract.

(2) Within **14** days after receipt of the Contractor's recommendations for corrective action and adequate supporting information, the Contracting Officer, using sole discretion, shall give the Contractor written notice not to correct any defect, or to correct or partially correct any defect within a reasonable time at the **location of work**.

(3) In no event shall the Government be responsible for any extension or delays in the scheduled deliveries or periods of performance under this contract as a result of the Contractor's obligations to correct defects, nor shall there be any adjustment of the delivery schedule or period of performance as a result of the correction of defects unless provided by a supplemental agreement with adequate consideration.

(4) This clause shall not be construed as obligating the Government to increase the contract price.

(5)(i) The Contracting Officer shall give the Contractor a written notice specifying any failure or refusal of the Contractor to---

(A) Present a detailed recommendations for corrective action as required by paragraph (b)(3) of this clause;
(B) Correct defects as directed under paragraph (b)(4) of this clause; or
(C) Prepare and furnish data and reports as required by paragraph (b)(5) of this clause..

(ii) The notice shall specify a period of time following receipt of the notice by the Contractor in which the Contractor must remedy the failure or refusal specified in the notice.

(6) If the Contractor does not comply with the Contracting Officer's written notice in paragraph (c)(5)(i) of this clause, the Contracting Officer may be contract or otherwise---

(i) Obtain detailed recommendations for corrective action and either --

(A) Correct the supplies or services; or

AWD

(B) Replace the supplies or services, and if the Contractor fails to furnish timely disposition instructions, The Contracting Officer may dispose of the nonconforming supplies for the Contractor's account in a reasonable manner, in which case the Government is entitled to reimbursement from the Contractor, or from the proceeds, for the reasonable expenses of care and disposition, as well as for excess costs incurred or to be incurred;

(ii) Obtain applicable data and reports; and
(iii) Charge the Contractor for the costs incurred by the Government.
(End of Clause FAR 52.246-19)

**I10. THE FOLLOWING ARE NAVAL FACILITIES (FAC) CLAUSES IN FULL TEXT.**

**1. CONTRACTING OFFICER AUTHORITY (FAC 5252.201-9300) (JUN 1994)**

In no event shall any understanding or agreement between the Contractor and any Government employee other than the Contracting Officer on any contract, modification, change order, letter or verbal direction to the Contractor be effective or binding upon the Government. All such actions must be formalized by a proper contractual document executed by an appointed Contracting Officer. The Contractor is hereby put on notice that in the event a Government employee other than the Contracting Officer directs a change in the work to be performed or increases the scope of the work to be performed, it is the Contractor's responsibility to make inquiry of the Contracting Officer before making the deviation. Payments will not be made without being authorized by an appointed Contracting Officer with the legal authority to bind the Government.
(End of Clause FAC 5252.201-9300)

**2. INSPECTION BY REGULATORY AGENCIES (FAC 5252.223-9300) (JUN 1994)**

Work performed under this contract is subject to inspection by State and Federal Government Regulatory agencies including those described below.

Permission has been granted by the Navy permitting Federal and State occuational health and safety officials to enter Navy shore installations, without delay and at reasonable times, to conduct routine safety and health investigations. Permission also extends to safety and health investigations based on reports of unsafe conditions. Occupational Health and Safety Administration (OSHA) officials may also investigate accidents or illnesses involving the Contractor's employees. Inspections may also be carried out by the Department of Labor to inspect for compliance with labor laws.

The Contractor shall cooperate with regulatory agencies and shall provide personnel to accompany the agency inspection or review teams. Contractor personnel shall be knowledgeable concerning the work being inspected, and participate in responding to all requests for information, inspections or review findings by regulatory agencies. (End of Clause FAC 5252.223-9300)

**3. INDIVIDUAL SURETY/SURETIES (FAC 5252.228-9300) (JUN 1994)**

As prescribed in FAR 28.203(a), individual sureties will be permitted. In order for the Contracting Officer to make a determination as to the acceptability of individuals proposed as sureties, as prescribed in FAR 28-203(b), all proposers who submit bonds which are executed by individual sureties are requested to furnish additional information in support of SF-28, Affidavit of Individual Surety, with the bonds. Pursuant to

AUT57

Instruction 3(b) of Standard For 24, the Bond, Standard For 25, the Performance Bond, and the Standard Form 25A, the Payment Bond, the Contracting Officer requests the following information:

(a) Equity Securities (Stock):

(1) State the place(s) of incorporation and address of the principal place of business for each issuing corporation listed.
(2) State whether the security issued was issued by public or private offering and give the place of registration of the security.
(3) State whether the security is presently, actively traded.

(b) Debt Securities (Bonds) and Certificates of Deposit:

(1) List the type of bonds held and their maturity dates.
(2) State the name, address, and telephone number of the issuing agency, firm or individual.
(3) State the complete address(es) where the bonds are held.
(4) State whether the bonds have been pledged as security or have otherwise been encumbered.

(c) Real Property Interests:

(1) Provide complete recording data for the conveyance of each parcel or interest listed to the individual proposed as surety.
(2) State whether the values listed are based upon personal evaluation or evaluation of an experienced real estate appraiser. If available, provide copies of written appraisals.
(3) State the method(s) of valuation upon which appraisal is based.
(4) Provide the assessed value of each property interest listed utilized by the appropriate tax assessor for purposes of property taxation.
(5) Provide the telephone number, including area code, for the tax assessor who performed the most recent tax assessment.
(6) State whether each real property interest listed is currently under lien or in any way encumbered and the dollar amount for each such lien or encumbrance.

(d) Persons Proposed as Individual Sureties:

(1) A current list of all other bonds (bid, performance, and payment) on which the individual is a surety and bonds for which the individual is requesting to be a surety.
(2) A statement as to the percent of completion of projects for which the individual is bound on a performance bond.

This information is necessary to enable the Contracting Officer to evaluate the sufficiency of the surety's net worth in a timely manner. (End of Clause FAC 5252.228-9300)

**4. SUBSTITUTIONS OF KEY PERSONNEL (FAC 5252.237-9301) (JUN 1994)**

The Contractor shall provide complete resumes for proposed substitutes, and any additional information requested by the Contracting Officer. Proposed substitutes should have comparable qualifications to those of

AND

the persons being replaced. The Contracting Officer will notify the Contractor within 15 days after receipt of all required information of the consent on substitutes. No change in fixed unit prices may occur as a result of key personnel substitution. (End of Clause FAR 52.237-9301)

**5. GOVERNMENT REPRESENTATIVES (FAC 5252.242-9300) (OCT 1996)**

(a) The contract will be administered by an authorized representative of the Contracting Officer. In no event, however, will any understanding or agreement, modification, change order, or other matter deviating from the terms of the contract between the Contractor and any person other than the Contracting Officer be effective or binding upon the Government, unless formalized by proper contractual documents executed by the Contracting Officer prior to completion of this contract. The authorized representative as indicated hereinafter:

_X_ (1) The Contracting Officer's Representative (COR) will be designated by the Contracting Officer as the authorized Representative of the Contracting Officer. The COR is responsible for monitoring performance and the technical management of the effort required hereunder, and should be contacted regarding questions or problems of a technical nature.

_X_ (2) The designated Contract Specialist will be the Administrative Contracting Officer's representative on all other contract administrative matters. The Contract Specialist should be contacted regarding all matters pertaining to the contract or task/delivery orders.

_____ (3) The designated Property Administrator is the Administrative Contracting Officer's representative on property matters. The Property Administrator should be contacted regarding all matters pertaining to property administration.
(End of Clause FAC 5252.242-9300)

(AM.4))

6. (See pg. I12-A) attached

**I11. THE FOLLOWING ARE NAVAL FACILITIES (FAC) CLAUSES INCORPORATED BY REFERENCE.**

AM.3)
~~FAC 5252.209-9300 ORGANIZATIONAL CONFLICTS OF INTEREST (JUN 1994)~~
~~FAC 5252.211-9300 COMMERCIAL WARRANTY (JUN 1994)~~
FAC 5252.228-9302 BID GUARANTEE (JAN 1996)

*****END OF SECTION I*****

(AM. 4)

ALSO SEE AM. 7 RE THIS PROVISION

## 6. ORGANIZATIONAL CONFLICT OF INTEREST

This clause provides examples of certain organizational conflicts of interest which are prescribed by Federal Acquisition Regulation Subpart 9.5. The two (2) underlying principles which this clause seeks to avoid are preventing the existence of conflicting roles that might bias a Contractor's judgment and preventing unfair competitive advantage. The following subsections prescribe certain limitations on contracting as the means of avoiding, neutralizing or mitigating organizational conflicts of interest.

(AM. 7) (a) If, under this contract, the Contractor will provide systems engineering and technical direction for a system, ~~but does not have~~ AND HAS overall contractual responsibility for its development, integration, assembly, checkout or production, the Contractor shall not be awarded a subsequent contract to supply the system or any of its major components, or to act as consultant to a supplier of any system, subsystem, or major component utilized for or in connection with any item or other matter that is (directly or indirectly) the subject of the systems engineering and technical direction. The term of this prohibition shall endure for the entire period of this contract and for two (2) years thereafter.

(b) If, under the contract, the Contractor will prepare and furnish complete specifications covering nondevelopmental items, to be used in a competitive acquisition, the Contractor shall not be permitted to furnish these items, either as a Prime or Subcontractor. The term of this prohibition shall endure for the entire period of this contract performance and for either two (2) years thereafter or the duration of the initial production contract whichever is longer. This rule shall not apply to Contractors who furnish specifications or data at Government request or to situations in which Contractors act as Government representatives to help Government agencies prepare, refine or coordinate specifications, provided this assistance is supervised and controlled by Government representatives.

(c) If, under this contract, the Contractor will prepare or assist in preparing a work statement to be used in competitively acquiring a system or services, the Contractor shall not supply the system, its major components, or the service unless the Contractor is the sole source, the Contractor has participated in the development and design work, or more than one Contractor has been involved in preparing the work statement. The term of this prohibition shall endure for four (4) years.

(d) If, under this contract, the Contractor will provide technical evaluation of products or advisory and assistance services, the Contractor shall not provide such services if the services relate to the Contractor's own or a competitor's products or services unless proper safeguards are established to ensure objectivity.

(e) If, under this contract, the Contractor gains access to proprietary or source selection information of other companies in performing advisory assistance services for the Government, the Contractor agrees to protect this information from unauthorized use or disclosure and to refrain from using the information for any purpose other than that for which it was furnished. A separate agreement shall be entered into between the contractor and the company whose proprietary information is the subject of this restriction. A copy of this agreement shall be provided to the Contracting Officer.

[I 12-A]

AWD

PART III-LIST OF DOCUMENTS, EXHIBITS, AND OTHER ATTACHMENTS
SECTION J
LIST OF ATTACHMENTS

| ATTACHMENT NUMBER | TITLE | PAGES |
|---|---|---|
| 1 | Specifications and Drawings (Drawings on CD ROM) | 27 |
| 2 | Standard Form 24 (Rev 1-90) Bid Bond | 1 |
| 3 | Standard Form 1448 (Rev 10-95) Proposal Cover Sheet | 1 |
| 4 | DD Form 2051 (Dec 85) Request Or Assignment Of A Commercial And Government Entity [Cage Code] | 1 |
| 5 | Standard Form 28 (Rev 1-90) Affidavit Of Individual Surety | 1 |
| 6 | Standard Form 1416 (Rev 1-90) Payment Bond For Other | 1 |
| 7 | Standard Form 1418 (Rev 8-96) Performance Bond For Other Than Construction Contracts | 1 |
| 8 | Optional Form 90 (Rev 1-90) Release Of Lien On Real Property | 1 |
| 9 | Optional Form 91 (Rev 1-90) Release Of Personal Property From Escrow | 1 |
| 10 | Standard Form LLL Disclosure Of Lobbying Activities | 1 |
| 11 | Standard Form LLL-A Disclosure Of Lobbying Activities Continuation Sheet | 2 |
| 12 | DD Form 250 Material Inspection And Receiving Report | 2 |
| 13 | Past Performance Questionnaire | 5 |
| 14 | Pre-Proposal Conference Attendance Response Sheet | 1 |

*****END OF SECTION J*****

AWD

NAVAL FACILITIES ENGINEERING COMMAND CONTRACTS OFFICE
CONTRACTOR'S INVOICE FORM

INVOICE DATE: ______________
INVOICE NUMBER: ____________

From: **Environmental Tectonics Corporation**
**County Line Industrial Park**
**125 James Way Road**
**Southampton, PA 18966**

To: Department of the Navy
Naval Facilities Engineering Command Contracts Office
901 M Street, SE, Bldg. 218
Washington, DC 20374-5063

Listed below is a statement of performance under contract number **N47408-98-C-2103 - SUBMARINE DECOMPRESSION CHAMBERS (SDCs) FOR THE SUBMARINE RESCUE DIVING AND RECOMPRESSION SYSTEM (SRDRS)**

A. Total Value of Contract through Modification $______________
B. Percentage of performance complete ______________
C. Value of completed performance $______________
D. **Less: Total of prior invoices approved for payment** $______________
E. Amount of this invoice $______________

Signature:______________________________
Title:______________________________

**FOR GOVERNMENT USE**

From: Contracting Officer
To: DFAS, Oakland

ACCEPTED FOR PAYMENT DATE: ____________

**Payment Approved in Amount of** (not to exceed invoice amount) ______________

**Payment Date Under Prompt Payment Act: ( )14 days; (X) 30 days; ( ) Other (Specify)**______________

**DISCOUNT OFFERED ____________% IF PAID WITHIN ____________DAYS.**

Pursuant to the authority vested in me, I certify that this invoice is correct and proper for payment.

Date:____________________ Signature:______________________________
Name (Print): **ANITA M. NORRIS**
Authorized Certifying Officer

| ACRN | APPN/SUBHEAD | OBJCLS | BURCON | SA | AAA | TT | PAA | COST CODE | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| AA | 1781319 84FC | 255 | SAS91 | 0 | 068342 | 2D | 208110 | S03940000010 | |

PART IV - REPRESENTATIONS AND INSTRUCTIONS
SECTION L
INSTRUCTIONS, CONDITIONS, AND NOTICES TO OFFERORS

## L1. FORMAT FOR SUBMISSION OF PROPOSALS

1. The proposals submitted to the Government for evaluation shall conform to the parameters below:

a. There shall be three proposal volumes submitted by each offeror. One shall be a Cost Proposal, one shall be a Technical Proposal, and the other shall be Past Performance Information. No cost information shall appear in the Technical Proposal.
b. Three separate volumes shall be submitted.
c. An original and two copies of each proposal shall be provided by each offeror.

2. FORMAT FOR SUBMISSION OF TECHNICAL PROPOSAL:

Each offeror's price proposal shall be the total price for satisfactory performance of work required by the solicitation for line items 0001 through 0027 as submitted on SF 1442, SOLICITATION, OFFER AND AWARD and the Schedule of Supplies or Services (Section B). The offeror's price proposal shall show consideration for your technical proposal. The offeror's costt proposal shall be submitted on Standard Form 1448 appended hereto as Attachment 3 (continuation sheets developed by the contractor are permitted). The cost proposal shall include, but is not limited to, a breakdown of the following items: Direct Labor Costs for the **Prime** and **Subcontractors** (breakdown shall identify labor categories, hours, and hourly rates), Overhead Costs, General and Administrative Costs and Profit, and.Direct Material Costs (breakdown shall identify the quantity, type and unit price for materials and components the offeror will use in this project in accordance with Section C appended hereto as Attachment 1. All subcontracting costs shall be included in the detailed breakdoen for labor and material costs. **NO LUMP SUM SUBMISSIONS FOR THE PRIME OR SUBCONTRACTOR'S COSTS WILL BE ACCEPTABLE.** The breakdown should reflect the elements of the specification and offeror's technical proposal.

3. FORMAT FOR SUBMISSION OF TECHNICAL PROPOSAL:

Each offeror's technical proposal should address the non-price (technical) factors and subfactors listed in Clause L2 below.

General Requirements. Technical Proposals shall be precise and complete, and contain a level of detail that allows the Government to evaluate the offeror's proposed approach and qualifications based on the evaluation factors described in Section M. Unnecessarily elaborate brochures or other presentations beyond that sufficient to present a complete and effective proposal are not desired. Elaborate art work, expensive paper and binding, and expensive visual and other presentation aids are neither necessary nor desired.

Specific Requirements. The technical proposal shall consist of the sections described below in Clause L2. Other attachments, appendices, or material will not be evaluated or considered. The Government reserves the right to review and consider any known sources of past performance.

## L2. NON-PRICE (TECHNICAL) FACTOR

The technical proposal shall address each of the following subfactors as they relate to the requirements of the specification, Attachment 1 appended hereto.

(1) TECHNICAL APPROACH SUBFACTOR

Provide a detailed project plan which demonstrates the offeror's in-depth technical understanding of the project requirements for the design, procurement, fabrication, assembly, testing, and delivery of two (2) Submarine Decompression Chamber Systems (SDC's) Segments and subsystems as described in Section C appended hereto as Attachment 1 of this solicitation. The project plan should include a description of the offeror's proposed technical approach to meet the contract requirements identified above, a discussion of issues critical to successful contract performance and any recommendations for improved quality, timeliness, responsiveness, and cost savings. The project plan must contain sufficient detail to indicate the proposed means for complying with all applicable specifications and shall include a complete explanation of the techniques and procedures to be exercised. The project plan should also include a schedule of project milestones.

At a minimum the project plan shall include details of the plan to accomplish the contract requirements at the Emergency Ship Salvage Materials (ESSM) Base, Rough and Ready Island, Stockton, California. This portion of the plan shall include coordination/control of work on-site and subcontractors work on-site. The project plan shall address the proposed technical approach for the design, procurement, fabrication, assembly, testing, and delivery of two complete Submarine Decompression Chamber (SDC's) Segments and subsystems. Details shall also be provided for the offeror's proposed plan to accomplish the required testing and methods of functional testing. At a minimum, the schedule of project milestones shall include provision of the SDC Segments, provision of the SDC Segment system manuals, and the submission of the design, fabrication, and test documents. The project plan and schedule of project milestones shall address coordination and interface with the Emergency Ship Salvage Materials (ESSM) Base via the Contracting Officer's Technical Representative (COTR).

The technical proposal must be sufficiently specific, detailed and complete to clearly demonstrate that the prospective offeror has a thorough understanding of the requirements and the ability to accomplish the effort described in Section C appended hereto as Attachment 1 of this solicitation.

Statements that the prospective offeror understands, can or will comply with all specification, statements paraphrasing the specifications, and phrases such as "standard procedures shall be employed" or "well known techniques will be used," shall be considered insufficient.

(2) PERSONNEL CAPABILITIES SUBFACTOR

The offeror shall demonstrate proposed staff's thorough knowledge of Submarine Decompression Chamber projects to include, but not limited to, design, procurement, fabrication, assembly, testing, and delivery of:

(i) List all labor categories to be assigned to this project, as well as the incumbent persons holding those positions. Please indicate if the labor category will be staffed by individuals currently in your

employment; if it is a labor pool established in your firm; if employment agreements are pending; or, if it is to be provided under subcontract.

(ii) Provide personnel resumes of key individuals who will be involved with the project. Include key individuals from the prime and subcontractor(s). Key individuals shall include at a minimum Program Manager, Project Manager, Noise Engineer, Weight Engineer, Field Supervisor, Shop Supervisor, Procurement (material) Manager, Subcontractor Engineer, QA manager, and key individual related to the design, procurement, fabrication, assembly, testing, and delivery of the two (2) Decompression Chamber Systems and subsystems. Each resume shall cite education, dates of employment, pertinent experience, any professional certifications and licenses held, labor category and organizational position (corporate as well as project). Specify how the continuity of performance would be retained in the absence of the key individuals. Also provide names of vendors who are expected to have an impact on the critical path of the proposed contract.

(3) CORPORATE QUALIFICATIONS (MANAGEMENT) SUBFACTOR

(i) Show the proposed organization for managing the project to include the current workload and provide a description of the responsibilities for each element shown on the organization chart. Identify personnel by name in each element. Show the lines of authority within the organization. If portions of the project are to be subcontracted, identify the subcontracted function, the subcontractor(s), the subcontractor's key personnel, and which element of the contractor's organization shall manage the subcontract.

(ii) Provide information concerning how the prime and subcontracting relevant company experience and technical expertise demonstrated by satisfactory past performance, shall best meet the objectives of the effort described in the Statement of Work. List all projects of similar size, scope, and dollar volume under which performance occurred during the **last three (3) years**. The projects to be provided under the Past Performance Factor should also be included under this requirement keeping in mind that the projects must be provided in the two separate volumes (Technical and Past Performance).

(iii) Provide a plan for subcontract management if any subcontracting is proposed. The plan should describe the extent to which subcontracting is contemplated, the rationale for anticipated degree of subcontracting, and management for oversight of subcontractors. The subcontract plan should also describe: (1) the methods the contractor shall use to ensure compliance with applicable OSHA regulations and (2) the quality control procedures that shall be applied to subcontracted work. Provide a list of subcontractors, their specialties, and their experience relative to the work proposed to be subcontracted, indicating how required levels of expertise will be maintained.

(iv) Provide a description of the purchasing systems to be used in acquiring supplies or components under this contract.

(v) The offeror shall describe the prime and subcontractor's proposed facilities to carry out the key project requirements as identified under Technical Approach above, to include on-site and off-site facilities.

(4) QUALITY ASSURANCE PROGRAM/PROJECT PLAN SUBFACTOR

(i) Provide a description of the corporate quality assurance policies.

(ii) Provide a quality assurance plan in accordance with MIL-Q-9858 specifically for the project work described in Attachment 1of this solicitation to include, but not be limited to, material control and subcontractor monitoring (if applicable). Material Control includes, but is not limited to, material tagging, tracking, part organizing, and indexing of components (from design/to fabrication/testing/delivery). Subcontractor Monitoring (if subcontractors are proposed), and quality control and inspection of Government furnished equipment. Material control includes, but is not limited to, material tagging, tracking, parts organizing, and indexing of components. Subcontractor monitoring shall involve all subcontracting efforts including, but not limited to, cleaning, Non-destructive testing (NDT), and all others. The plan should identify the individuals responsible for enforcing the plan, describe their authority and chain of command. The plan should discuss all applicable systems for tracking, control of costs, and reporting technical progress.

## L3. PAST PERFORMANCE FACTOR

(i) A copy of the questionnaire to be used to solicit past performance information from offerors' references is provided in Attachment 13 of the solicitation. The Government shall evaluate the quality of the offeror's past performance on the basis of the following subfactors as a means of evaluating the relative capability of the offeror and the other competitors:

(a) Quality of Work - assessment of an offeror's compliance with contract requirements, conformance to standards of good workmanship, and technical excellence.

(b) Timeliness of Performance - assessment of an offeror's adherence to contract schedules.

(c) Cost Control - determination if an offeror performed at, below, or above budget and provided current accurate, and complete billings.

(d) Key Personnel - assessment of an offeror's principal individuals selected to manage and perform other key aspects of the contract requirements.

(e) Business Practices - assessment of an offeror's response to Contracting Officer and technical representative inquiries and technical /administrative issues to include, but not limited to, management responsiveness, contract change proposals, and emergency responsiveness.

(f) Customer Satisfaction -- assessment of the end user's satisfaction with the final product/service.

(ii) The Government will evaluate the quality of the offeror's past performance. The assessment of the offeror's past performance will be used as a means of evaluating the relative capability of the offeror and the other competitors. Evaluation of past performance will be a subjective assessment based on a consideration of all relevant facts and circumstances. It will not be based on absolute standards of customer satisfaction and timely delivery of services at fair and reasonable prices. This is a matter of judgment. Offerors may be given an opportunity to address especially unfavorable reports of past performance obtained from references on which the offeror had not had a previous opportunity to comment, and the offeror's response - or lack thereof - will be taken into consideration in accordance with FAR 15.306. In investigating the offeror's past performance, the government will consider references submitted by the offeror and may consider information from other sources.

(iii) List at least three projects which performance occured during the last **three (3) years** and are of similar size and scope to the subject project (prime and subcontractor, if applicable). Projects which are at least 50 percent completed are acceptable. More recent work will receive greater credit. Previous Federal Government experience is preferred. For each separate project, provide the following information limited to no more than two sheets of paper (8 1/2" x 11" single sided) per project:

(a) Project Number, title, location, status

(b) Short description of project and offeror's association with project (prime, subcontractor, etc.) Include the approximate percentage of the project that was your direct responsibility.

(c) Original contract value, final contract value

(d) Award date

(e) Original completion date, final completion date

(f) Major causes for difference in original and final costs and duration

(g) Customer points of contact, titles, and current phone numbers. (Please ensure current telephone numbers are provided and points of contact have first hand knowledge of your performance to include your technical quality and workmanship and your contract administration.)

(iv) A copy of the questionnaire to be used to solicit past performance information from offerors' references are provided at Attachment 13, appended hereto.

**L4. PRE-PROPOSAL CONFERENCE:** A pre-proposal conference is scheduled on 8 January 1998 at 10:00 AM (local time) at the Washington Navy Yard, Washington,D.C. (Building 218, 3rd Floor), 901 M Street, S.E., Washington D.C. 20374-5063 if one or more prospective offerors are interested. If an offeror plans to attend the conference, the attaached Pre-Proposal Site Visit Attendance Response Sheet (see Attachment 14 of Section J) must be faxed no later than 2 January 1998 to the contracting office, attention Margaret Sundberg, on (202) 433-5244. If no Response Sheets are received by the Government by 2 January 1998, a Pre-Proposal Conference shall not be held.

**L5. FAR 52.204-6 CONTRACT IDENTIFICATION NUMBER - DATA UNIVERSAL NUMBERING SYSTEMS (DUNS) NUMBER (DEC 1996)**

(a) "Contractor Identification Number," as used in this provision, means "Data Universal Numbering System (DUNS) number," which is a nine-digit number assigned by Dun and Bradstreet Information Services.

(b) Contractor identification is essential for complying with statutory contract reporting requirements. Therefore, the offeror is requested to enter, in the block with its name and address on the Standard Form 33 or similar document, the annotation "DUNS" followed by the DUNS number which identifies the offeror's name and address exactly as stated in the offer.

(c) If the offeror does not have a DUNS number, it should contact Dun and Bradstreet directly to obtain one. A DUNS number will be provided immediately by telephone at no charge to the offeror. For information on obtaining a DUNS number, the offeror should call Dun and Bradstreet at 1-800-333-0505. The offeror should be prepared to provide the following information:

(1) Company name.
(2) Company address.
(3) Company telephone number.
(4) Line of business.
(5) Chief executive officer/key manager.
(6) Date the company was started.
(7) Number of people employed by the company.
(8) Company affiliation.

(d) Offerors located outside the United States may obtain the location and phone number of the local Dun and Bradstreet Information Services office from the Internet Home Page at http://www.dbisna.com/dbis/customer/custlist.htm. If an offeror is unable to locate a local service center, it may send an e-mail to Dun and Bradstreet at globalinfo@dbisma.com.

**L6. EXPLANATION TO PROSPECTIVE OFFERORS (FAR 52.215-14) (APR 1984)**

Any prospective offeror desiring an explanation or interpretation of the solicitation, drawings, specifications, etc., must request it in writing soon enough to allow a reply to reach all prospective offerors before the submission of their proposals. Oral explanations or instructions given before the award of the contract will not be binding. Any information given to a prospective offeror concerning a solicitation will be furnished promptly to all other prospective offerors as an amendment of the solicitation, if that information is necessary in submitting offers or if the lack of it would be prejudicial to any other prospective offerors. (End of Provision FAR 52.215-14)

**L7. SOLICITATION DEFINITIONS (FAR 52.215-5) (JUL 1987)**

"Government" means United States Government.
"Offer" means "proposal" in negotiation.
"Solicitation" means a request for proposals (RFP) or a request for quotations (RFQ) in negotiation.
(End of Provision FAR 52.215-5)

**L8. ADDITIONAL DEFINITIONS**

Whenever the words directed, required, ordered, designated, prescribed or words of like import are used in the specifications or upon the drawings, it shall be understood that the direction, requirement, order, designation, or prescription of the Contracting Officer is intended. Similarly, the words approved, acceptable, satisfactory, or words of like import shall mean approved by, or acceptable to, or satisfactory to the Contracting Officer, unless otherwise expressly stated. Where as shown, as indicated, as detailed, or words of similar import are used, it shall be understood that the reference is made to the drawings accompanying this solicitation unless stated otherwise. The word, provided, as used herein shall be understood to mean provided complete in place, that is furnished and installed.

**L9. UNNECESSARILY ELABORATE PROPOSALS OR QUOTATIONS (FAR 52.215-7) (APR 1984)**

Unnecessarily elaborate brochures or other presentations beyond those sufficient to present a complete and effective response to this solicitation are not desired and may be construed as an indication of the offeror's or quoter's lack of cost consciousness. Elaborate art work, expensive paper and bindings, and expensive visual and other presentation aids are neither necessary nor wanted.
(End of Provision FAR 52.215-7)

**L10. AMENDMENTS TO SOLICITATIONS (FAR 52.215-8) (DEC 1989)**

(a) If this solicitation is amended, then all terms and conditions which are not modified remain unchanged;

(b) Offerors shall acknowledge receipt of any amendment to this solicitation (1) by signing and returning the amendment; (2) by identifying the amendment number and date in the space provided for this purpose on the form for submitting an offer; or (3) by letter or telegram; (4) facsimile, if facsimile offers are authorized in the solicitation. The Government must receive the acknowledgment by the time specified for receipt of offers. (End of Provision FAR 52.215-8)

**L11. SUBMISSION OF OFFERS (FAR 52.215-9) (MAR 1997)**

(a) Offers and modifications thereof shall be submitted in sealed envelopes or packages (1) addressed to the office specified in the solicitation and (2) showing the time and date specified for receipt, the solicitation number, and the name and address of the offeror.

(b) Offerors using commercial carrier services shall ensure that the proposal is addressed and marked on the outermost envelope or wrapper as prescribed in subparagraphs (a)(1) and (2) of this provision when delivered to the office specified in the solicitation.

(c) Telegraphic offers will not be considered unless authorized by the solicitation; however, offers may be modified by written or telegraphic notice.

(d) Facsimile offers, modifications or withdrawals will not be considered unless authorized by the solicitation.

(e) Offers submitted by electronic commerce shall be considered only if the electronic commerce method was specifically stipulated or permitted by the solicitation.

(f) Item samples, if required, must be submitted within the time specified for receipt of offers. Unless otherwise specified in the solicitation, these samples shall be (1) submitted at no expense to the Government and (2) returned at the sender's request and expense, unless they are destroyed during pre-award testing. (End of Provision FAR 52.215-9)

**L12. LATE SUBMISSIONS, MODIFICATIONS, AND WITHDRAWALS OF PROPOSALS (FAR 52.215-10) (MAY 1997)**

(a) Any proposal received at the office designated in the solicitation after the exact time specified for receipt of offers will not be considered unless it is received before award is made and-

(1) It was sent by registered or certified mail not later than the fifth calendar day before the date specified for receipt of offers (e.g., an offer submitted in response to a solicitation requiring receipt of offers by the 20th of the month must have been mailed by the 15th);

(2) It was sent by mail (or telegram or facsimile, if authorized) or hand-carried (including delivery by a commercial carrier) if it is determined by the Government that the late receipt was due primarily to Government mishandling after receipt at the Government installation;

(3) It was sent by U.S. Postal Service Express Mail Next Day Service-Post Office to Addressee, not later than 5:00 p.m. at the place of mailing two working days prior to the date specified for receipt of proposals. The term "working days" excludes weekends and U.S. Federal

holidays;

(4) It was transmitted through an electronic commerce method authorized by the solicitation and was received at the initial point of entry to the Government infrastructure not later than 5:00 p.m. one working day prior to the date specified for receipt of proposals; or

(5) There is acceptable evidence to establish that it was received at the activity designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers, and the Contracting Officer determines that accepting the late offer would not unduly delay the procurement; or

(6) It is the only proposal received.

(b) Any modification of a proposal or quotation, including a modification resulting from the Contracting Officer's request for "best and final" offer, is subject to the same conditions as in subparagraphs (a)(1) through (a)(5) of this provision.

(c) The only acceptable evidence of date of mailing of a late proposal or modification sent either by U.S. Postal Service registered or certified mail is the U.S. or Canadian Postal Service postmark on the envelope or wrapper and on the original receipt from the U.S. or Canadian Postal Service. Both postmarks must show a legible date or the proposal, quotation, or modification shall be processed as if mailed late. "Postmark" means a printed, stamped, or otherwise placed impression (exclusive of a postage meter machine impression) that is readily identifiable without further action as having been supplied and affixed by employees of the U.S. or Canadian Postal Service on the date of mailing. Therefore, offerors or quoters should request the postal clerks to place a hand cancellation bull's-eye postmark on both the receipt and the envelope or wrapper.

(d) Acceptable evidence to establish the time of receipt at the Government installation includes the time/date stamp of that installation on the proposal wrapper, other documentary evidence of receipt maintained by the installation, or oral testimony or statements of Government personnel.

(e) The only acceptable evidence to establish the date of mailing of a late offer, modification or withdrawal cent by Express Mail Next Day Service-Post Office to Addressee is the date entered by the post office receiving clerk on the "Express Mail Next Day Service-Post Office to Addressee" label and the postmark on both the envelope or wrapper and on the original receipt from the U.S. Postal Service. "Postmark" has the same meaning as defined in paragraph (d) of this provision, excluding postmarks of the Canadian Postal Service. Therefore, offerors or quoters should request the postal clerk to place a legible hand cancellation bull's eye postmark on both the receipt and the envelope or wrapper.

(f) Notwithstanding paragraph (a) above, a late modification of an otherwise successful proposal that makes its terms more favorable to the Government will be considered at any time it is received and may be accepted.

(g) Proposals may be withdrawn by written notice or telegram (including mailgram) received at any time before award. Proposals may be withdrawn in person by an offeror or an authorized representative, if the representative's identify is made known and the representative signs a receipt for the proposal before award.

(h) If an emergency or unanticipated event interrupts normal Government processes so that proposals cannot be received at the office designated for receipt of proposals by the exact time specified in the solicitation, and urgent Government requirements preclude amendment of the solicitation or other notice of an extension of the closing date, the time specified for receipt of proposals will be deemed to be extended to the same time of day specified in the solicitation on the first work day on which normal Government processes resume. If no time is specified in the solicitation, the time for receipt is 4:30 p.m., local time, for the designated Government office. (End of Provision FAR 52.215-10)

**L13. AVAILABILITY OF FEDERAL SPECIFICATIONS AND STANDARDS**

The Index of Federal Specifications and Standards may be purchased from the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402.

**L14. AVAILABILITY OF SPECIFICATIONS AND STANDARDS NOT LISTED IN DODISS, DATA ITEM DESCRIPTIONS NOT LISTED IN TD-3 AND PLANS, DRAWINGS AND OTHER PERTINENT DOCUMENTS:**

The specifications, standards, plans, drawings, descriptions and other pertinent documents cited in this solicitation may be examined at the office where proposals are to be submitted.

**L15. AVAILABILITY OF SPECIFICATIONS LISTED IN THE DOD INDEX OF SPECIFICATIONS AND STANDARDS (DODISS) (FAR 52.211-2) (MAR 1994)**

Single copies of specifications cited in this solicitation may be obtained by submitting a written request to the supply point listed below. The request must contain the title of the specification, its number, date, applicable amendment(s), and the solicitation or contract number. A telephone order entry system is available with the use of a touch tone telephone. A Customer Number is required to use this system and may be obtained by written request to the address listed below or by telephone (215-697-2179). In case of urgency, telegraphic requests are acceptable. Voluntary standards, which are not available to offerors and contractors from Government sources, may be obtained from the organization responsible for their preparation, maintenance, or publication.
Standardization Document
Order Desk, Building 4, Section D
700 Robbins Avenue

Philadelphia, PA 19111-5094
Facsimile No. 215-697-2978
Telephone Order Entry System (TOES) Numbers
215-697-1187 through and including 215-697-1197
(End of Provision 52.211-2)

**L16. NOTICE OF PRIORITY RATING FOR NATIONAL DEFENSE USE (FAR 52.211-14) (SEP 1990)**

Any contract awarded as a result of this solicitation will be a ( ) DX rated order; ( X) DO rated order certified for national defense use under the Defense Priorities and Allocations System (DPAS) (15 CFR

700), and the Contractor will be required to follow all of the requirements of this regulation.
(End of Provision FAR 52.211-14)

**L17. FAILURE TO SUBMIT OFFER (FAR 52.215-15) (MAY 1997)**

Recipients of this solicitation not responding with an offer should not return this solicitation, unless it specifies otherwise. Instead, for paper transactions, they should advise the issuing office by letter, postcard, or established electronic commerce methods, whether they want to receive future solicitations for similar requirements. Electronic solicitations do not require notification of desire to receive future solicitations, since these solicitations will be openly available to any interested party. If a recipient does not submit an offer and does not notify the issuing office that future solicitations are desired, the recipient's name may be removed from the applicable mailing list. (End of Provision FAR 52.215-15)

**L18. TYPE OF CONTRACT (FAR 52.216-1) (APR 1984)**

The government contemplates award of a firm fixed-price contract resulting from this solicitation. (End of Provision FAR 52.216-1)

**L19. SERVICE OF PROTEST (FAR 52.233-2) (AUG 1996)**

(a) Protests, as defined in section 33.101 of the Federal Acquisition Regulation, that are filed directly with an agency, and copies of any protests that are filed with the General Accounting Office (GAO), shall be served on the Contracting Officer (addressed as follows) by obtaining written and dated acknowledgment of receipt from:

CONTRACTING OFFICER, CODE 2727
NAVFACENGCOM CONTRACTS OFFICE
BLDG 218, 901 M Street, SE
WASHINGTON NAVY YARD
WASHINGTON, D.C. 20374-5063

(b) The copy of any protest shall be received in the office designated above within one day of filing a protest with the GAO. (End of Provision 52.233-2)

**L20. ACCEPTABILITY OF INDIVIDUAL SURETIES**

Acceptability of individual sureties shall be determined in accordance with Federal Acquisition Regulation 28.203.

**L21. GOALS FOR SMALL DISADVANTAGED BUSINESS**

As prescribed in DFARS 219.705-4, if this acquisition results in award to a large business, and a subcontracting plan is required, the small disadvantaged set-aside goals in the plan shall not be less than 5 percent.

**L22. SOLICITATION PROVISIONS INCORPORATED BY REFERENCE (FAR 52.252-1) (JUN 1988)**

This solicitation incorporates one or more solicitation provisions by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. (End of Provision FAR 52.252-1)

**L23. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) SOLICITATION PROVISIONS.**

FAR 52.214-34 SUBMISSION OF OFFERS IN THE ENGLISH LANGUAGE (APR 1991)
FAR 52.214-35 SUBMISSION OF OFFERS IN U.S. CURRENCY (APR 1991)
FAR 52.215-12 RESTRICTION ON DISCLOSURE AND USE OF DATA (APR 1984)
FAR 52.215-13 PREPARATION OF OFFERS (APR 1984)
FAR 52.215-30 FACILITIES CAPITAL COST OF MONEY (SEP 1987)
FAR 52.237-1 SITE VISIT (APR 1984)

**L24. BID GUARENTEE (FAC 5252.228-9302) (JAN 1996)**

Each bidder shall submit with its bid a guarantee bond (Standard Form 24) executed by a surety company holding a certificate of authority from the Secretary of the Treasury as an acceptable surety, or other security as provided in FAR Clause 52.228-1. "Bid Guarantee". Security shall be in the sum of 20 percent of the largest amount for which award can be made under the bid submitted, but in no case to exceed $3,000,000. The bid guarantee bond shall be accompanied by a copy of the agent's authority to sign bonds for the surety company. (End of Provision FAC 5252.228-9302)

**L25. COMPLETION OF SOLICITATION DOCUMENT**

The offeror shall complete the following sections of the solicitation as part of its proposal submission.

(a) Section B

Schedule of Supplies or Services and Prices/Costs (page B2). The offeror shall specify the total estimated cost for the quantity of one-job (1JOB) for Contract Line Item Numbers (CLIN) 0001in the space provided.

(b) Section K.

The offeror shall complete all representations, certifications, and other statements required in Section K.

(c) SF 1448

See clause L1 herein for specific guidance on completion of SF 1448

**L26. ESTIMATED EFFECTIVE AWARD DATE**

For proposal purposes, the estimated effective date of contract award is May 1998.

*****END OF SECTION L*****

PART IV--REPRESENTATIONS AND INSTRUCTIONS
SECTION M
EVALUATION FACTORS FOR AWARD

**M1. CONTRACT AWARD (FAR 52.215-16) (OCT 1995) ALTERNATE II (OCT 1995)**

(a) The Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, cost or price and other factors, specified elsewhere in this solicitation, considered.

(b) The Government may (1) reject any or all offers is such action is in the public interest, (2) accept other than the lowest offer, and (3) waive informalities and minor irregularities in offers received.

(c) The Government intends to evaluate proposals and award a contract without discussions with offerors (except communications conducted for the purpose of minor clarification). Therefore, each initial offer should contain the offeror's best terms from a cost or price and technical standpoint. However, the Government reserves the right to conduct discussions if later determined by the Contracting Officer to be necessary.

(d) The Governement may accept any item or group of items of an offer, unless the offeror qualifies the offer by specific limitations. *Unless otherwise provided in the Schedule, offers may be submitted for quantities less than those specified. The Government reserves the right to make an award on any item for a quantity less than the quantity offered, at the unit cost or prices offered, unless the offeror specifies otherwise in the offer.*

(e) A written award or acceptance of offer mailed or otherwise furnished to the successful offeror within the time for acceptance specified in the offer shall result in a binding contract without further action by either party. Before the offer's specified expiration time, the Government may accept an offer (or part of an offer, as provided in paragraph (d) above), whether or not there are negotiations after its receipt, unless a written notice of withdrawl is received before award. Negotiations conducted after receipt of an offer do not constitute a rejection or counteroffer by the Government.

(f) Neither financial data submitted with an offer, nor representations concerning facilities or financing, will form a part of the resulting contract. However, if the resulting contract contains a clause providing for price reduction for defective cost or pricing data, the contract price will be subject to reduction if cost or pricing data furnished is incomplete, inaccurate, or not current.

(g) The Government may determine that an offer is unacceptable if the prices proposed are materially unbalanced between line items or subline items. An offer is materially unbalanced when it is based on prices significantly less than cost for some work and prices which are significantly overstated in relation to cost for other work, and if there is a reasonable doubt that the offer will result in the lowest overall cost to the Government, even though it may be the low eveluated offer, or it is so unbalanced as to be tantamount to allowing an advance payment.

(h) The Government may disclose the following information in post-award debriefings to other offerors: (1) the overall evaluated cost or price and technical rating of the successful offeror; (2) the overall ranking of all offerors, when any ranking was developed by the agency during source selection;

(3) a summary of the rationale for award; and (4) for acquisitions of commercial end items, the make and model of the item to be delivered by the successful offeror.

**M2. EVALUATION FACTORS**

Responses to the Request for Proposal will be evaluated using the following factors: Price, Non-Price (Technical), and Past Performance. The Price and Non-Price (Technical) have approximately equal importance and the Past Performance Factor has approximately half the importance of each of the Price and other Non-Price (Technical) Factors.

(a) PRICE
(b) NON-PRICE FACTORS
(c) PAST PERFORMANCE FACTOR

(1) Price: Price will be considered in the overall integrated assessment in determining which proposal is in the best interest of the Government based on completeness, realism, and reasonableness. The Government will perform an evaluation of the proposed Government benefits, determine the reasonableness of the financial and pricing arrangements/methods and identify the associated risks

(2) Non-Price (Technical) Factors: The technical proposal will be evaluated to determine whether the offeror possesses the capability required to successfully perform the requirements of the solicitation. Evaluation factors are discussed in the following paragraphs. The Technical Approach Subfactor has more importance than the other technical subfactors. The Personnel Capabilities and Corporate Qualifications (Management) Subfactors have equal importance, but have more importance than the QA Program/Plan Subfactor. The degree of risk to the Government, as related to deficiencies, weaknesses, or strengths noted in the source selection evaluation process will be considered when determining the best value to the Government.

Technical Approach Subfactor - Evaluation of the offeror's technical approach will be based upon the extent to which the offeror clearly demonstrates an understanding of all the contracting requirements in Section C appended hereto as Attachment 1 and the knowledge of how to approach them efficiently.

Personnel Capabilities Subfactor - The offeror shall be evaluated on the quality and quantity of staffing proposed for performance under this contract. The offeror shall be evaluated on how well proposed "key" personnel meet or exceed the government's education and/or experience requirements as specified in Section C appended hereto as Attachment 1. The offeror shall be evaluated on the identification of vendors who are expected to supply the offeror with components which impact the critical path of the proposed contract.

Corporate Qualifications (Management) Subfactor - The evaluation of corporate qualifications will be based on the extent to which the offeror's proposal demonstrates sound business practices, and how well the information provided in response to the requirements in Section L demonstrates existing management controls which adequately support the requirements of this proposed contract. Relevant experience, management organization, subcontracting controls, purchasing systems, cost controls, facilities proposed will be considered and current workload as it relates to an offeror's ability to meet contract schedules.

QA Program/Plan Subfactor - The evaluation of quality assurance will be based on the extent to which the offeror's proposal demonstrates an effective quality assurance program and how well the information provided in response to the requirements in Section L demonstrates an existing corporate quality assurance program which adequately supports the requirements specified in Section C appended hereto as Attachment (1). Personnel performing quality functions, their authority and their organizational freedom to identify and evaluate quality problems and to initiate, recommend or provide solutions will be considered, as well as the systems to support this effort.

(3) Past Performance Factor - Based on the information provided in response to the requirements in Section L and through information gathered from other sources, the Government will evaluate each of the following subfactors to determine the degree to which the offeror's past performance record demonstrates its ability to meet the requirements of this solicitation. The subfactors are approximately equal in importance to each other.

(a) Quality of Work - assessment of an offeror's compliance with contract requirements, conformance to standards of good workmanship, and technical excellence.

(b) Timeliness of Performance - assessment of an offeror's adherence to contract schedules.

(c) Cost Control - determination if an offeror performed at, below, or above budget and provided current accurate, and complete billings.

(d) Key Personnel - Assessment of an offeror's principal individual selected to manage and perform other key aspects of the contract requirements.

(e) Business Practices - assessment of an offeror's response to Contracting Officer and technical representative inquiries and technical /construction/administrative issues.

(f) Customer Satisfaction - assessment of the end user's satisfaction with the final product/service.

*****END OF SECTION M*****

*********END OF SOLICITATION*********

A



PART I - THE SCHEDULE
SECTION C
DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

## C1. STATEMENT OF WORK

The work under this contract shall be performed in accordance with the specifications and drawings of Attachment 1, appended hereto.

Phase I of the project, CLINs 0001-0006/0031,0032, shall consist of the following items in Attachment 1:

1.2.6 a Document Submittal Schedule/150 Days after "Start Work Date"
4.2.1 PVHO Design Basis
5.1.10 Quality Assurance Plan
5.1.11 Preliminary Design Package
5.1.13 Drawing Package
5.1.14 List of Analyses
5.1.15 Noise Abatement Plan
5.1.16 Weight Plan

Phase II, CLINs 0007, 0031, & 0032, shall consist of thirty days effort toward completion of Final Design. Progress shall be confirmed by an onsite review by the COTR or his duly appointed representative.

Phase III, CLINs 0008, 0031, & 0032, shall consist of thirty days effort toward completion of Final Design. Progress shall be confirmed by an onsite review by the COTR or his duly appointed representative.

Phase IV, CLINs 0009, 0031, & 0032, shall consist of thirty days effort toward completion of Final Design. Progress shall be confirmed by an onsite review by the COTR or his duly appointed representative.

Phase V of the project, CLINs 0010-0017/0031,0032, shall consist of the following items in Attachment 1:

1.2.6 b Document Submittal Schedule/270 Days after "Start Work Date"
4.2.1 PVHO Design Basis
5.1.12 Final Design Package
5.1.13 Drawing Package
5.1.14 List of Analyses
5.1.15 Noise Abatement Plan
5.1.16 Weight Plan

The remaining requirements of Attachment 1 will constitute Phase VI, CLINS 0018-0032. In the event of any conflict between the Government specification and the Contractor's proposal, the Government specification shall control unless otherwise noted herein.

## C2. CONTRACTOR WORK FORCE RESPONSIBILITY

It shall be the full responsibility of the contractor to organize, furnish, maintain, supervise, and direct a working force which, within the limitations of the provisions of this contract, is thoroughly capable of effectively performing the work set forth in this contract.

1098 / 7

B

Section C

"OFFICIAL VERSION"
NOTE: CONTAINS ALL REVISIONS AS OF 9/25/98.
NO OTHER VERSION MAY BE USED

Specification

Contract No. N47408-97-R-1861

Submarine Decompression Chambers (SDCs)

10/5/98

for the

Submarine Rescue Diving and Recompression System (SRDRS)

| Revisions: | Mod # | Date |
|---|---|---|
| | P00001 | 4/6/99 |

Atch 1

1. GENERAL PARAGRAPHS

1.1 GENERAL:

1.1.1 INTENTION: It is the declared and acknowledged intention and meaning to procure two Submarine Decompression Chamber (SDC) Segments as described herein. The SDC Segments are components of a larger Submarine Decompression System (SDS) which is itself a component of the Submarine Rescue Diving and Recompression System (SRDRS). The contractor shall be responsible for all work specified herein. The SDC Segments shall be complete and useable upon completion of the work.

1.1.2 DESCRIPTION OF WORK: The contractor shall provide all labor and materials for the design, procurement, fabrication, assembly, test, and delivery of the described SDC Segments. Further, the contractor shall prepare and submit all documents, records, and manuals specified herein. The work consists of:

a. Provision of SDC Segments as described herein.
b. Provision of SDC Segment system manuals.
c. Submission of the design, fabrication, and test documents.

1.1.3 DESCRIPTION OF THE SYSTEM:

a. This paragraph is intended to give the contractor a better understanding of how the SDC Segments will be incorporated into the entire SRDRS. An illustrative drawing showing SRDRS is found on NAVSEA Drawing Number 7268149. SRDRS is composed of the following systems and subsystems.

1. Submarine Rescue Systems (SRS): Consists of a Submarine Decompression System (SDS) and a Submarine Hyperbaric Occupant Transfer System (SHOTS). SDS is composed of two large Submarine Decompression Chambers and auxiliary equipment used to support disabled submarine (DISSUB) rescue operations. SDS provides recompression and hyperbaric treatment to rescuees who have been evacuated from the DISSUB via the Hyperbaric Transfer Capsule (HTC), a tethered rescue vehicle which can perform Transfer Under Pressure. The HTC is a part of SHOTS, which is also includes HTC support equipment. The SDS may be used alone without SHOTS if the personnel may escape the submarine via free ascent, or to support other fleet rescue assets or perform training exercises. This contract does not require any work to be done by the contractor for SHOTS.

   SDS is designed to respond to worldwide emergency DISSUB alerts. SDS is to be air and road transportable; operated from a single Vessel Of Opportunity (VOO); and capable of operating from a range of VOOs.

2. Rapid Assessment/Underwater Work Systems (AUWS): Consists of an atmospheric diving suit and associated subsystems. This contract does not require any work to be done by the contractor for this part of SRDRS.

b. The SDC Segments being procured under this contract, and which the contractor is required to provide work for, are composed of the following systems and subsystems. The Drawing Package included in this solicitation contains drawings and schematics of the SDC Segments. Part C1.1.4 contains details of the GFI. Part C1.1.5 contains details of the GFE. The SDC Segment contractor shall provide work for the following items:

1. Submarine Decompression Chamber #1 (SDC1): One of a pair of single-lock recompression chambers each capable of independent operation. For normal operations, the two SDCs are configured to be used together. The SDC outer lock capability is provided by the Modified Transfer Lock (MTL). The SDC transfer interface to SHOTS is provided by the Deck Decompression Transfer Lock (DTL). The contractor is not

required by this contract to provide any work for the MTL or DTL except for interface requirements.

a. SDC Pressure Vessel for Human Occupancy (PVHO)

b. SDC Van: Based on the dimensions of a standard ISO container, the floor and walls are reinforced to support the SDC internal components and has standard ISO connectors. The SDC Vans also act to support the SHOTS Control Van and the SDS Spares Van.

c. SDC Control Station: Located inside the SDC Van; includes consoles and displays for the monitoring and control of:

1. SDC Life Support
2. Gas Analysis
3. Medical/Supply Lock
4. Electrical Systems
5. Video Communications (TV cameras inside the PVHOs.)
6. Audio Communications (Electronic Intercom and Sound Powered Phones)
7. SDC Power Distribution
8. Press and Depress
9. BIBS Supply and Exhaust

d. SDC Primary and Secondary Pressure Control Assemblies

e. SDC Built-In Breathing System (BIBS) Assemblies: There are two BIBS assemblies in each SDC.

1. Oxygen BIBS
2. Air BIBS

f. SDC PVHO Environmental Control Assemblies:

1. Atmosphere Heat Exchangers
2. $CO_2$ Scrubbers
3. Chamber Ventilation Heat Exchanger
4. Oxygen Injection Assembly
5. Atmosphere Monitoring Assembly

g. SDC PVHO Gas Analysis Assemblies:

1. PVHO Oxygen Analyzers
2. PVHO Carbon Dioxide Analyzers

h. Potable Water and Sanitary Assemblies

i. Fire Safety Equipment

j. SDS Lighting Assemblies: Provides lighting for:

1. External Shipboard Deck Activities
2. Operator's Compartment
3. SDC PVHO Compartments

k. SDC Van HVAC Assemblies

l. SDC Furniture Assemblies

2. Submarine Decompression Chamber #2 (SDC2): SDC2 is the second of the pair of single-lock recompression chambers, as described above. Outer lock capability is provided by MTL2. SDC2 is composed of the same systems as SDC1.

The contractor shall provide work for SDC1 and SDC2 and for those interface requirements identified within this statement of work. The contractor is

not required to provide any work for SHOTS other than meeting the interface requirements SDC1 and SDC2 have with SHOTS.

1.1.4 GOVERNMENT FURNISHED INFORMATION: There is no government furnished information.

1.1.5 GOVERNMENT FURNISHED EQUIPMENT: One NATO Standard Mating Flange adapter shall be provided to the contractor 365 days after contract award.

1.1.6 GOVERNMENT LOANED EQUIPMENT: There is no government loaned equipment to be listed as a part of the SDC Segments.

1.1.7 **TIME AND PLACE OF DELIVERY:** The work under Phase I shall begin 15 ("Start Work Date") consecutive calendar days after the "Award Date" and shall continue for the following 150 calendar days. The contract completion date for Phase I shall be 165 consecutive calendar days after the "Award Date". The "Award Date is shown in Section A, block 28 of this contract. The work under Phase II shall begin no earlier than 166 consecutive calendar days after the "Start Work Date" and continue for the next 30 days. The work under Phase III shall begin no earlier than 181 consecutive calendar days after the "Start Work Date" and continue for the next 30 days. The work under Phase IV shall begin no earlier than 211 consecutive calendar days after the "Start Work Date" and continue for the next 30 days. The work under Phase V shall begin no earlier than 241 consecutive calendar days after the "Start Work Date" and continue for the next 30 days. The contractor shall make no component nor material procurement until after the preliminary design has been submitted and Phase VI has been executed, unless approval is received from the Contracting Officer. Phase VI shall be completed 445 days after its execution or after completion of Phases I - V which ever occurs later. The final product, SDC Segments, shall be delivered to:

Work Date")
ntinue for the
tion date is
ward Date" is
shall make no
y design has
ing Officer.

Emergency Ship Salvage Materials (ESSM) Base
US Naval Communications Station
Rough and Ready Island
Stockton, CA 95203

1.1.8 LIQUIDATED DAMAGES: Refer to Section F of this contract for "Liquidated Damages."

1.2 ADDITIONAL PARAGRAPHS:

1.2.1 SPECIAL PERFORMANCE REQUIREMENTS DUE TO HAZARDS TO PERSONNEL: Attention of prospective bidders is called to the fact that this contract calls for the fabrication of life sensitive support systems. The manufacturer of the PVHOs must have and maintain a current U1 or U2 certificate throughout performance. A copy of the U1 or U2 certificate, whichever is applicable, shall be provided to the Contracting Officer. Failure to adhere to the highest standards of metallurgy, welding and workmanship will create severe hazards to persons working on or near these systems when they are pressurized. Failure to meet these requirements may be cause for termination for default, and in any event will be cause for Contracting Officer rejection of components. If ASME Section VIII, Div 1 is used, proof must be shown that weight requirements are being met.

1.2.2 CONTRACTOR'S TECHNICAL RESPONSIBILITY: This statement of work contains technical requirements to which the contractor must adhere; however, it is the contractor's responsibility to confirm by engineering analysis that component sizes cited herein are adequate to perform the "Operational and Performance Requirements" cited in Part C2. Typical of such items are piping, ventilation, and atmospheric controls. Data has been provided herein to demonstrate the conceptual feasibility of such an item. Other technical issues that are not specified herein are at the discretion of the contractor. The contractor shall cite its intentions in these areas in the preliminary design.

1.2.3 CONFORMANCE REQUIREMENTS: Omission from the drawings or specifications or the misdescription of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed, shall not relieve the contractor from performing such omitted or misdescribed details of the work, but they shall be performed as if fully and correctly set forth and described in the drawings and specifications.

1.2.4 CONTRACTOR'S SPECIFICATION CHECK: The contractor shall check all drawings and specifications furnished to him upon their receipt and shall promptly notify the Contracting Officer of any discrepancies. Numbers marked on drawings shall in general be followed in preference to scale measurements.

Large scale drawings shall, in general, govern small scale drawings. The contractor shall compare all drawings and verify the data before laying out the work and will be responsible for any errors which might have been avoided thereby.

1.2.5 STANDARD PRODUCTS: Whenever practical, use will be made of materials and equipment that are standard catalog products of manufacturers regularly engaged in the production of such materials and equipment and shall be the manufacturer's latest standard design that complies with the specification requirements. Where two or more products of similar type are used, they will be products of the same manufacturer. Where two or more products are of a similar type that the same manufacturer's model number can be used, all of the products shall be identical. Where standard products are available which have been proven successful for hyperbaric application, they shall be used. Each component used in this item will be clearly marked so that the manufacturer, model, serial number, and the principal characteristics of the item can be readily determined.

1.2.6 DOCUMENT SUBMITTAL SCHEDULE: The following is a summary of the documents that are required to be submitted to the Contracting Officer. Five copies of each document shall be submitted. Document descriptions are in Part C5, "Quality Assurance." Piecemeal submittal of documents is unacceptable; such submittals shall be returned. Submittals shall be completed and delivered no later than the dates listed below:

a. 150 Days After "Start Work Date:"

NOTE See Mods P-2 & P-3 Schedule changes

1. Preliminary Design Package.
2. Quality Assurance Plan.
3. Preliminary SDC Segment System Manual Outline.
4. Preliminary Manufacturing Plan Outline including, but not limited to, Painting Plan, Hydrostatic Test Plan, and Cleaning Procedures (including gas sampling procedures and locations).
5. NDT Plan and Qualifications.

b. 270 Days After "Start Work Date:"

1. Final Design Package.
2. 80% SDC Segment System Manual Outline.
3. 50% Contractor's Records and Documents.
4. 80% Component Database.
5. Weld Procedures and Processes, Welders Qualification and Welder Qualification Records.
6. Final Manufacturing Plan.
7. Report Verifying Conformance to DHBK 1-11.

c. 150 Days Before Contract Completion Date:

1. 100% SDC Segment Systems Manual.
2. Functional Test Plan.

d. 30 Days Before Contract Completion Date:

1. Record Drawings.
2. 100% Contractor's Records and Documents.
3. 100% Component Database.
4. Final SDC Segment Systems Manual.
5. Cleaning Records (data/clean sheets) and Gas Sample Reports.
6. Functional Test Records & Reports.
7. List of Special Maintenance Equipment.
8. List of Special Mission Support Equipment.
9. List of Factory Support Equipment.
10. List of Special Transportation Equipment.

e. Monthly Report: Each Monthly Submittal shall be delivered no later than 10 days after the beginning of each month and shall include:

1. Project Schedule.

2. Current Progress Report.

1.2.7 HYPERBARIC CODES AND STANDARDS: The contractor's designs and all other work provided under this contract must assure in all instances that the finished hyperbaric facility conforms to the codes and standards listed below. Areas of conflict shall be brought to the attention of the Contracting Officer. The issue of the respective code to be used for this contract is the effective code at the time of signing of the contract.

a. Government Specifications, Standards, and Handbooks: The following government specifications, standards, and handbooks form a part of this specification to the extent specified herein.

| | | |
|---|---|---|
| 1. | DOD-D-1000 | *Military Specification - Drawings, Engineering, and Related Lists* |
| 2. | MIL-A-8625 | *Anodic Coatings for Aluminum and Aluminum Alloys* |
| 3. | MIL-C-26074 | *Requirements for Coatings, Electroless Nickel* |
| 4. | MIL-C-24643 | *General Specification for Cable and Cord, Electrical, Low Smoke, for Shipboard Use* |
| 5. | MIL-C-5015 | *General Specification for Connectors, Electrical, Circular, Threaded, AN Type* |
| 6. | MIL-C-915 | *General Specification for Cable and Cord, Electrical, For Shipboard Use* |
| 7. | MIL-R-83248 | *Rubber, Flourocarbon Elastomer, High Temperature Fluid and Compression* |
| 8. | MIL-STD-100 | *Engineering Drawing Practices* |
| 9. | MIL-STD-1330 | *Standard Practice for Precision Cleaning and Testing of Shipboard Oxygen, Helium, Helium-Oxygen, Nitrogen, and Hydrogen Systems* |
| 10. | MIL-STD-1472 | *Human Engineering Design Criteria for Military Systems, Equipment, and Facilities* |
| 11. | MIL-STD-16142 | *Standard Dimensions for Boss, Gasket, Seal, Straight Thread Tube Fittings* |
| 12. | MIL-STD-167 | *Mechanical Vibration of Shipboard Equipment* |
| 13. | MIL-STD-278 | *Welding and Casting Standard for Piping, Machinery, and Pressure Vessels* |
| 14. | MIL-STD-130 | *Identification Markings of U.S. Military Property* |
| 15. | MIL-STD-33649 | *Fluid Systems Components Design Standards, Boss* |
| 16. | MIL-STD-46855 | *Human Engineering Requirements for Military Systems, Equipment, and Facilities* |
| 17. | MIL-STD-810 | *Environmental Test Methods and Engineering Guidelines* |
| 18. | MIL-V-24109 | *Valves* |
| 19. | MIL-V-24578 | *Valves, Globe, Pressure Instrument, Stem Test Connection, Union End* |
| 20. | MIL-W-16878 | *Wire, Electrical, Insulated, General Specification For* |
| * | | |

b. Other Government Documents, Drawings, and Publications: The following government documents, drawings, and publications form a part of this specification to the extent specified herein. The SDC Segments shall interface and operate in conjunction with the VOO, the accompanying SDS assets, and SHOTS. SDC Segment components shall be designed in accordance with the Interface Control Drawings (ICDs) listed below.

| | | |
|---|---|---|
| 1. | NAVSEA 0994-LP-001-9010 | *U.S. Navy Diving Manual, Volume 1, Air Diving* |
| 2. | NAVSEA 59086-H7-STM-010 | Chapter 262, *Lubricating Oils, Greases, Specialty Lubricants, and Lubrication Systems* |
| 3. | NAVSEA S6430-AE-TED-010 | *Piping Devices, Flexible Hose Assemblies, Volume 1* |
| 4. | NAVSEA SS521-AA-MAN-010 | *U.S. Navy Diving and Manned Hyperbaric Systems Safety Certification Manual* |

AMEND. #6)

* 21. MIL-STD-1399 INTERFACE Standard, etc

22. MIL-STD-882 SYSTEM SAFETY Program RQMTS

5. NSMRL 83-3 — *Anthropometric Indices Among U.S. Navy Divers*
6. NSMRL 1135 — *Anthropometric Indices Among U.S. Navy Submariners*
7. NAVSEAINST 10560.2C — *Authorized for Navy Use (ANU) List*
8. OSHA STD #1910.95 — *Occupational Noise Exposure*
9. Interface Control Documents (ICDs), NAVSEA:

   7268140 ICD, SDC 1/SRS, Electrical Interfaces
   7268141 ICD, SDC 2/SRS, Electrical Interfaces
   7268142 ICD, SDC 1/SRS, Piping Interfaces
   7268143 ICD, SDC 2/SRS, Piping Interfaces
   7268144 ICD, SDC/DTL, Structural Interfaces
   7268145 ICD, SDC Vans/Deck Templates
   7268146 ICD, SDC1/SHOTS Control Van
   7268147 ICD, SDC2/Spares Van
   7268148 SDC Vans/Upper Vans, ISO Corners and ISO Attachment Mechanisms

10. Schematics, NAVSEA:

    Life Support:
    7268122 SDS Gas Compression Storage and Distribution
    7268123 SDC Pressure Control
    7268124 SDC Built-In Breathing System
    7268125 SDC Environmental Control
    7268126 SDC Gas Analysis
    7268127 SDC Waste Water/Sanitary/Fire Safety

    Electrical:
    7268128 SDS Power Generation and Distribution
    7268129 SDS Command and Control

c. Non-Government Publications: The following documents form a part of this specification to the extent specified herein.

1. American National Standards Institute (ANSI): The following cited documents are from ANSI:

   J1926 *Specification for Straight Thread O-Ring Boss Port*
   Q9001 *Quality Systems-Model for Quality Assurance in Design, Development, Production, Installation and Servicing (ISO 9001)*
   Y14.5M *Dimensioning and Tolerancing*
   Z450-1 *Calibration Laboratories and Test Equipment*

2. American Society of Mechanical Engineers (ASME): The following cited documents are from ASME:

   Boiler and Pressure Vessel Code (BPVC) Section II, Section V, Section VIII (Division 1 & 2), Section IX

   PVHO-1 *Safety Standard for Pressure Vessels for Human Occupancy*
   B16 *Valves, Flanges, Fittings and Gaskets*
   B31.1 *Power Piping*

3. Institute of Electrical and Electronic Engineers (IEEE): The following cited documents are from IEEE:

   IEEE STD 45 *Recommended Practice for Electric Installations on Shipboard*

4. Institute for Interconnecting and Packaging Electronic Circuits (IPC): The following cited documents are from IPC:

   J-STD-001B *Requirements for Soldered Electrical and Electronic Assemblies*

| | |
|---|---|
| IPC-D-275 | *Design Standard for Rigid Printed Boards and Rigid Printed Board Assemblies* |
| IPC-A-610B | *Acceptability of Electronic Assemblies* |
| IPC-A-600E | *Acceptability of Printed Boards* |
| IPC-R-700C | *Suggested Guidelines for Modification, Rework, and Repair of Printed Boards and Assemblies* |

5. American Welding Society (AWS): The following cited documents are from AWS:

| | |
|---|---|
| Specification D1.1 | *Structure Welding Code for Steel* |
| Specification D1.2 | *Structure Welding Code for Aluminum* |

6. Electronic Industries Association (EIA): The following cited documents are from EIA:

| | |
|---|---|
| STANDARD RS232 | *Standard for Serial Digital Communication* |
| STANDARD RS422 | *Electrical Characteristics of Balanced Voltage Digital Interface Circuits* |
| STANDARD RS485 | *Electrical Characteristics of Generators or Receivers for use in Balanced Digital Receivers* |

7. Steel Structures Painting Council (SSPC): The following cited documents are from SSPC:

SSPC-SP-10 *Near White Metal Blast Cleaning*

8. Association of Diving Contractors (ADC): The following cited documents are from ADC:

*Code of Practice for the Safe Use of Electricity Under Water*

1.2.8 REFERENCE CODES AND STANDARDS: The following codes and standards are cited in this SOW but are presented for guidance only. The issue of the respective code to be used for this contract is the effective code at the time of signing of the contract.

a. Government Specifications, Standards, and Handbooks: The following government specifications, standards, and handbooks form a part of this specification to the extent specified herein.

| | | |
|---|---|---|
| 1. | DHBK 1-11 | *U.S. Air Force Air Transportability Design Handbook* |
| 2. | A-A-50271 | *Plate, Identification* |

b. Other Government Documents, Drawings, and Publications: The following government documents, drawings, and publications form a part of this specification to the extent specified herein.

1. Drawings, NAVSEA, Fittings:

803-1385884 Fittings, O-ring face seal

2. Drawings, NAVSEA:

| | |
|---|---|
| 7268115 | Cover Sheet |
| 7268116 | SDC Drawing Tree |
| 7268117 | List of Drawings |
| 7268118 | List of Abbreviations |
| 7268119 | List of Symbols |
| 7268120 | List of Conventions |
| 7268121 | SDS Deck Layout |
| 7268130 | SDC No. 1 PVHO General Arrangement |
| 7268131 | SDC No. 2 PVHO General Arrangement |
| 7268132 | SDC PVHO Window Assembly |
| 7268133 | SDC PVHO Door Assembly |
| 7268134 | SDC PVHO Supply Lock Assembly |

| | |
|---|---|
| 7268135 | SDC PVHO Penetrator Assemblies |
| 7268136 | SDC No. 1 External Arrangement |
| 7268137 | SDC No. 1 Internal Arrangement |
| 7268138 | SDC No. 2 External Arrangement |
| 7268139 | SDC No. 2 Internal Arrangement |
| 7268149 | SRS General Arrangements, Deck |

c. Non-Government Publications: The following documents form a part of this specification as to the extent specified herein.

1. American Society for Testing and Materials (ASTM): The following cited documents are from ASTM:

| | |
|---|---|
| A269 | *Seamless and Welded Austenitic Stainless Steel Tubing for General Service* |
| A312 | *Seamless and Welded Austenitic Stainless Steel Pipes* |
| A403 | *Wrought Austenitic Stainless Steel Piping Fittings* |
| G63 | *Standard Guide for Evaluating Nonmetalic Materials for Oxygen Service* |
| G88 | *Standard Guide for Designing Systems for Oxygen Service* |
| G94 | *Standard Guide for Evaluating Metals for Oxygen Service* |
| SA182 | *Forged or Rolled Alloy-Steel Pipe Flanges, Forged Fittings, and Valves and Parts for High-Temperature Service* |
| SA240 | *Heat-Resisting Chromium and Chromium-Nickel Stainless Steel Plate, Sheet, and Strip for Pressure Vessels* |
| SA516 | *Pressure Vessel Plates, Carbon Steel, For Moderate- and Lower-Temperature Service* |
| SA537 | *Pressure Vessel Plates, Heat-Treated, Carbon-Manganese-Silicon Steel* |

2. Compressed Gas Association (CGA): The following cited documents are from CGA:

| | |
|---|---|
| CGA G-4.4 | *Industrial Practices for Gaseous Oxygen Transmission and Distribution Piping Systems* |

1.2.9 REFERENCES SOURCES: Reference publications are cited throughout this specification. The addresses of the sponsoring organizations are listed below. If the source of the publications is different from the address of the sponsoring organization, that information is also provided.

a. Military Standards (MIL-STD-, MIL-V-, MIL-Q-, etc.) can be ordered from the following address:

Defense Automated Printing Service
Building 4 D
700 Robbins Ave
Philadelphia, PA 19111
Attn: Customer Service

b. Navy/NAVSEA Publications:

Defense Distribution Depot
Susquehanna Pennsylvania
Building 05
5450 Carlisle Pike
Mechanicsburg, PA 17055-0789

c. American National Standards Institute (ANSI)
11 West 42nd Street
New York, NY 10036

d. American Society for Testing and Materials (ASTM)
100 Barr Harbor Drive
West Conshohocken, PA 19428-2959

e. American Society of Mechanical Engineers (ASME)
22 Law Drive
PO Box 2900
Fairfield, NJ 07007-2900

f. Compressed Gas Association, Inc. (CGA)
1725 Jefferson Davis Highway, Suite 1004
Arlington, VA 22202-4100

g. Institute of Electrical and Electronic Engineers (IEEE)
Customer Service
445 Hoes Lane
PO Box 1331
Piscataway, NJ 08855-1331

h. Institute for Interconnecting and Packaging Electronic Circuits (IPC)
2215 Snaders Road
Northbrook, IL 60062-6135

i. American Welding Society (AWS)
550 N.W. LeJeune Road
Miami, FL 33135

j. Electronic Industries Association (EIA)
2500 Wilson Blvd.
Arlington, VA 22201

k. Steel Structures Painting Council (SSPC)
40 24th Street, 6th Floor
Pittsburgh, PA 15222

l. Association of Diving Contractors
2611 FM 1960 West
Suite F-204
Houston, TX 77068

1.2.10 SECURITY REQUIREMENTS: No employee or representative of the contractor will be permitted on Government property unless they furnish satisfactory proof that they are a citizen of the United States or are specifically authorized admittance by the Government.

1.2.11 INTERFACE CONTROL DRAWING MODIFICATIONS: The contractor shall not make changes to the Interface Control Drawings (ICDs) or the drawings issued as part of the contract information package. ICD changes may only be made after authorization is received from the Contracting Officer. The contractor shall generate all design and fabrication drawings on new format, with new drawing numbers as indicated by the Contracting Officer. Markups or other use of the ICDs or other contract information package drawings shall not be acceptable in the performance of this SOW.

1.2.12 SCHEMATIC DIAGRAM DRAWING MODIFICATIONS: The final design shall reflect the operational and component arrangements depicted in the piping and electrical schematics issued in the contract information package. The contractor shall not make changes to the piping and electrical design without the consent of the Contracting Officer.

END OF SECTION

## 2. OPERATIONAL AND PERFORMANCE REQUIREMENTS

### 2.1 REQUIRED STATES AND MODES:

2.1.1 OPERATIONAL MODE DEFINITION: SDC Segments are set up on ship or shoreside, the components are connected, and the system is ready for, or in the process of, treatment.

2.1.2 NON-OPERATIONAL MODE DEFINITIONS:

2.1.2.1 Transportation Mode: SDC Segments are non-operational, disassembled, and placed in a configuration for road, or air transportation.

2.1.2.2 Storage Mode: SDC Segments are non-operational, disassembled, and configured for long term storage in a state of readiness for deployment.

### 2.2 OPERATIONAL REQUIREMENTS:

2.2.1 GENERAL OPERATIONAL REQUIREMENTS: All equipment covered by this SOW shall be designed to meet all of the following operational requirements.

a. Outside Air Temperature Range, Operational Mode: -17.8°C (0°F) to 43.3°C (109.9°F) inclusive

b. Outside Air Temperature Range, Non-operational Mode: -17.8°C (0°F) to 65.6°C (150.0°F) inclusive

c. Internally Maintained Temperature Range: 21.1°C (70.0°F) to 29.4°C (85.0°F)

d. Internally Maintained Humidity Range: 50% to 80%

e. Sea State, Operational Mode, Secured: 6 [significant wave height = 4.0 - 6.0 m (13.1 - 19.7 ft)]

f. Sea State, Operational Mode, Treatment: 5 [significant wave height = 2.5 - 4.0 m (8.2 - 13.1 ft)]

g. Sea State, Operational Mode, Transfer Under Pressure: 4 [significant wave height = 1.25 - 2.5 m (4.1 - 8.2 ft)]

h. Maximum Rainfall Rate: 2.54 cm/hr (1 in/hr)

i. Maximum Snow and Ice Load: 48.82 kg/m$^2$ (10 lbs/ft$^2$)

j. Maximum Continuous Solar Radiation Exposure: 1.10 kwhr/m$^2$/hr @ 40°C (350 BTU/ft$^2$/hr @ 104.0°F)

k. Transportation LOADS ~~Shock~~:
- Horizontal (fore and aft) [redacted] ± 3 ~~6~~.0 g
- Lateral ± 1.5 g
- Up ± 2.0 g
- Down ± 4.5 g

(Amend. 3)

l. Operational LOADS ~~Shock~~:
- Horizontal (fore and aft) ± 0.4 ~~1.5~~ g
- Lateral (side to side) ± ~~2.5~~ g 0.9
- Up (up & down) ~~4.5~~ g
- Down ~~0.5~~ g 1g ± 1g

m. VOO Transit Vibration: Per MIL-STD-167, Type I inputs up to 33 Hertz.

n. Transport Vibration Loading: As derived in MIL-STD-810E, Figures 514.4-1, 514.4-2 and 514.4-3 based on 18,530 km (10,000 miles) total transport distance, and Figure 5.14.4-15.

o. Vessel of Opportunity (VOO): For the purposes of baseline design, the baseline VOO shall be the U.S. Navy T-ATF.

(AMEND. 3) p. See pg. 12-A

2.2.2 q. SPECIFIC OPERATIONAL REQUIREMENTS:

2.2.2.1 **SDC Segments Operational Requirements:** The SDC segments shall be designed to perform the following operations.

2.2.2.1.1 **SDC, PVHO:**

a. ASME maximum allowable working pressure: ~~6.8 atm (100 psig)~~ 5.4 atm (80 psig) Mod. P.

b. Nominal Dimensions:

| | |
|---|---|
| Approximate length of the PVHO: | 9.8 m (33.5 ft) (including elliptical heads) |
| Outer Diameter: | 2.0 m (6.5 ft) |
| End Pieces: | Elliptical heads, 2:1 ratio of major to minor axis |

c. Personnel Capacity — 33 (31 rescued submariners plus 2 seated inside tenders)

2.2.2.1.2 **Chamber Hyperbaric Systems:** The outfitted PVHOs shall be capable of performing as specified below:

a. U.S. Navy Air Treatment Tables 4, 5, 6, 6a, and 7, complete with oxygen treatment, NAVSEA 0994-LP-001-9010.

b. Chamber Ventilation Rates: In accordance with NAVSEA 0994-LP-001-9010 at equivalent depths of 18.3 msw (60 fsw) or less. At depths greater than 18.3 msw (60 fsw), ventilation shall be supplemented with carbon dioxide scrubbers.

c. Treatment Depth Capability Range: — 1 ATA to 50.3 msw (14.7 psia to 165 fsw)

d. Maximum Long Term Carbon Dioxide Levels: — 0.005 ATA (0.074 psia) (0.5% surface equivalent value)

e. Maximum Short Term Carbon Dioxide Levels — Per NAVSEA 0994-LP-001-9010, Chapter 12, Section 12.14

(AMEND. 3)

f. ~~Maximum~~ RANGE OF Individual Metabolic Oxygen Consumption Rate: ~~2.0 standard l/min (0.07 standard ft$^3$/min)~~ 0.4 to 2.0 Std. l/MIN (0.015 to 0.07 Std. feet^3/MIN)

g. ~~Maximum~~ RANGE OF Individual Lung Respiratory Volume: 9.1 to 45 actual l/min (0.34 to 1.6 actual ~~ft$^3$/min~~ feet^3/MIN)

h. Oxygen Treatment Header Pressure Range: — 8.54 to 11.9 atm (125 to 175 psig)

2.2.2.2 **SDC Vans Operational Requirements:** The SDC Vans shall be capable of performing as specified below.

a. Maximum Wave Slap Loading: 976.4 kg/m$^2$ (200 lbs/ft$^2$)

2) Add new 2.2.1 (p):

(p) Anticipated Deck Deflections: The peak deflection imposed on the bottom of the SDC's due to the ships deck deflection are:

Torsional:

| | Forward | Middle | Aft |
|---|---|---|---|
| Inboard | 0.000" | -0.015" | -0.008" |
| Outboard | 0.000" | +0.008" | +0.022" |

Longitudinal Bending:

| Forward | Middle | Aft |
|---|---|---|
| 0.000" | 0.064" | 0.000" |

These deflections will be sinusoidal in nature with a period of 4.6 seconds and will occur for the purpose of fatigue analysis for 30 days.

3) Add new 2.2.1(q): PVHO cycle life - The anticipated full range pressure cycles of the PVHO's is less than 1000 cy

b. Dimensions and Weights:

SDC1 Van

| | |
|---|---|
| Maximum Length: | 12.2 m (40.0 ft) |
| Maximum Width: | 2.4 m (8.0 ft) |
| Maximum Height: | 2.4 m (8.0 ft) |
| Maximum Weight: | 17,706 kg (39,000 lbs) |
| Location of Center of Gravity | |
| Longitudinal: | 508 to 762 cm (200 to 300 in) from either end of van |
| Lateral: | ±15.24 cm (±6.0 in) from center |
| Height: | Below center line |

SDC2 Van

| | |
|---|---|
| Maximum Length: | 12.2 m (40.0 ft) |
| Maximum Width: | 2.4 m (8.0 ft) |
| Maximum Height: | 2.4 m (8.0 ft) |
| Maximum Weight: | 17,706 kg (39,000 lbs) |
| Location of Center of Gravity | |
| Longitudinal: | 508 to 762 cm (200 to 300 in) from either end of van |
| Lateral: | ±15.24 cm (±6.0 in) from center |
| Height: | Below center line |

c. Maximum Over Road Load Dimensions:

| | |
|---|---|
| Height: | 2.4 m (8.0 ft) |
| Width: | 2.4 m (8.0 ft) |
| Length: | 12.2 m (40.0 ft) |
| Weight: | ~~17,706~~ kg (~~39,000~~ lbs) 16,581 36,523 |

Mod P-1

d. Maximum Aircraft Load Dimensions:

| | |
|---|---|
| Height: | 2.4 m (8.0 ft) |
| Width: | 2.4 m (8.0 ft) (without pallet-to-rail interface tabs) |
| Length: | 12.2 m (40.0 ft) |
| Weight: | 17,706 kg (39,000 lbs) |

2.2.2.3 Medical/Supply Lock Operational Requirements: The medical/supply lock shall be capable of performing as specified below.

a. Medical/Supply Lock Dimensions: Shall pass an object with a diameter of 45.7 cm (18.0 in) and a length of 55.9 cm (22.0 in).

2.2.2.4 Human Factor Engineering:

a. General Design Criteria: Except as specified otherwise herein, the SDC PVHOs shall be designed in accordance with MIL-STD-1472 and MIL-STD-46855. The available cubic space inside the PVHOs necessary for each chamber occupant is not required to meet the requirements listed above, however these requirements shall be used as a guideline.

b. Accommodation Of 5th to 95th Percentile Submariner: All hatches, seating, manways, controls, bunking, displays, and other accommodations, and those accommodations and accesses required to perform necessary consumables replacement and field and depot preventive maintenance shall be designed to accommodate the expected range of physical characteristics of the 5th to 95th percentile submariner per NSMRL 1135.

c. Accommodation Of Stretcher Patients: The SDC PVHO hatches, access ways, interiors, and passages shall be able to pass a 95th percentile submariner while bound to a stretcher. For purposes of design, the stretcher dimensions shall be that of the standard "Miller Board," 172.7 cm (68.0 in) long by 35.6 cm (14.0 in) wide by 7.62 cm (3.0 in) high. Submariner dimensions are as listed above.

d. Sizing Of Controls And Access: The SDC Segments controls, maintenance accesses, and operator seats and passages shall be designed in accordance with NSMRL 83-3.

END OF SECTION

## 3 TECHNICAL REQUIREMENTS

### 3.1 GENERAL REQUIREMENTS:

3.1.1 "POWER PIPING:" Hyperbaric piping, valves and components shall conform to the requirements of ASME B31.1 and PVHO-1. This specification refers to paragraphs in ASME B31.1; the referenced ASME B31.1 paragraph numbers are followed by an asterisk for identification purposes (example: "Paragraph 100.1.1*"). The piping, valves and components shall conform to the following additional requirements.

3.1.2 PIPING: Paragraph 100.1.1* Scope-After: "This code prescribes minimum requirements for the design, material, fabrication, erection, test and inspection of . . ." add, "Hyperbaric Facilities." "Piping" is defined in paragraph 100.1.1*; piping includes tubing.

3.1.3 PROVEN COMPONENTS: Pressure-containing components normally covered by ASME B31.1 shall be in accordance with paragraph 104.7*, therein "components shall be used that have been proven satisfactory by successful performance under comparable U.S. Navy service conditions." Components for a hyperbaric facility must have proven experience in existing hyperbaric facilities for high pressure air, oxygen and water service. Pressure vessels (other than the PVHOs) shall meet the requirements of ASME BPVC, Section VIII, Division 1 or as specified.

3.1.4 MATERIAL AND COMPONENTS, GENERAL:

a. Material, components and equipment installed in the piping systems shall be as specified and suitable for the gasses and liquids contained and for the maximum operating temperature and pressure.
b. All valves shall be placed so that they can be easily reached and operated by a person without the aid of special equipment, such as ladders, or they shall be provided with other means of mechanical operation.
c. Valves shall be placed so that accompanying gauges, or their displays, are easily read. Pipe and tubing shall be protected from abuse and accidents and placed for ease of operation, maintenance and replacement.
d. Valves located in inaccessible or difficult-to-reach places shall be operable via reach rods. The reach rod system shall be properly anchored and secured and shall not disengage when subject to axial compression or tension. The reach rod shall operate the valve over the full range of the valve operation without binding, lockup, or the requirement of undue force or special tools.
e. When placing the system in the operational mode, all mechanical joints required for system assembly shall be readily accessible with standard tools and shall not present alignment problems.

3.1.5 CALIBRATION: All measuring instruments, gauges, relief valves, process control transmitters, indicators, etc. shall be calibrated. All these items requiring calibration shall be calibrated at least 120 days prior to delivery (18 month calibration required). The contractor shall maintain a calibration program in accordance with ANSI/NCSL Z450-1 or an equivalent procedure.

3.1.6 MATERIAL PROTECTION: Equipment and materials shall be properly stored, adequately protected and carefully handled to prevent contamination or damage before and during installation. Equipment and materials shall be installed, handled, stored and protected in accordance with the manufacturer's recommendations.

3.1.7 MANUFACTURER INSTRUCTIONS: Where installation procedures, or any part thereof, are required to be in accordance with the recommendations of the manufacturer of the material being installed, printed copies of these recommendations shall be furnished. Installation of the product shall not be allowed to proceed until the recommendations are received. Failure to furnish their recommendations can be cause for rejection of the material.

3.1.8 O-RING SEALS: All piping components such as valves, check valves, relief valves, reducers, and similar equipment shall be installed with Viton o-ring seal unions. All o-rings shall be made of Viton per MIL-R-83248 unless Viton is incompatible with the fluid.

3.1.9 CHASES: All piping and electrical conduit shall run in chases. The chases shall be located so they do not interfere with operations or maintenance. In hyperbaric operating spaces the piping, conduit and chases shall be run so as to be of minimal presence to the operators and chamber occupants. The contractors design shall conform to component manufacturers' requirements.

3.1.10 PIPING, GENERAL: There shall be adequate joints for disassembly, cleaning and inspection. Single lengths of piping shall not exceed 4.5 m (15.0 ft) between unions.

3.1.11 PIPING SIZE: Piping shall be sized to a maximum gas velocity of 0.8 Mach or less as required to meet noise requirements herein.

3.1.12 WELDED PIPING AND FITTINGS: Piping, unless otherwise specified, shall be seamless annealed stainless steel conforming to ASTM A312, Type 304L or 316L. All tubing, unless otherwise specified, shall be seamless annealed stainless steel conforming to ASTM A269, Type 304L or 316L. All fittings shall conform to ASTM A403, Type 304L or 316L and shall be seamless. All piping (pipe, tube, and fittings) located in areas external to the van shall be 316L.

3.1.13 PIPE AND TUBE JOINTS: All pipe and tube joints shall be made with welded fittings. Pipe and tube shall not be threaded.

Amend. 3

3.1.14 ~~PIPE~~ MATERIAL CERTIFICATIONS: ~~The contractor shall submit material certifications for all pipe, tube, and fittings used in this contract. The material certifications include, but are not limited to, chemical, physical and strength properties, shall ensure the pipe and fittings meet all specification requirements.~~ See pg. 16-A

3.1.15 END CONNECTIONS: The following paragraphs list the acceptable joining techniques between components and fittings and between components and piping or tubing. Also included are applicable restrictions with regards to materials, service, pressure, and component location. Connections other than those listed below shall be acceptable only when specifically justified by the contractor and accepted by the Contracting Officer.

a. Unions: All union connections shall be of the flat-face o-ring seal type. To avoid galling, union nuts of field take down joints shall be chrome plated or of a different material than the threadpiece or a difference in hardness between the union nut and the thread piece of at least 5 Rockwell B. Unions which are required to be disconnected during mobilization and/or system operation shall be provided with suitable closure devices for each exposed connection to prevent entrance of foreign materials when the system integrity is broken and to protect the sealing surfaces of the union. When not in use, closure devices shall be stored in a way which prevents contamination. Union tailpieces shall be attached to adjoining pipe or tube by means of welding and attached to adjoining fittings or components in accordance with this section.

b. Socket Weld Components: Socket weld components shall be capable of being removed from the line in which they are installed without the need to disassemble any other components.

c. Straight Threaded Connections: All straight thread connections shall be of the o-ring seal type. Female ports shall have dimensions in accordance with MIL-STD-16142C, MIL-STD-33649C, or an equivalent specification. Male ports shall be compatible with the boss dimensions of the associated female port. Straight thread connections shall be acceptable for components as long as the component can be removed from its line for service without the need to disassemble any other

4) Change paragraph 3.1.14 from PIPE MATERIAL CERTIFICATIONS: to MATERIAL CERTIFICATIONS. Rep the existing paragraph with the following new paragraph:

3.1.14 MATERIAL CERTIFICATIONS: The contractor shall submit material certifications for all pipe and used in this contract. The material certifications include, but are not limited to, chemical, physical ai strength properties and shall ensure that the pipe and tube meet all specification requirements. The contractor shall submit certificates of conformance (C of C's) for all fittings that are standard manufacturer's products. For all fittings that are specially manufactured for this project, material certifica as described above, are required to be submitted by the contractor. The contractor shall submit chem material certifications for all welding filler metals.

components. To avoid galling, where straight threads are to be used between mating stainless steel parts, the female part shall be chrome plated or there shall be a hardness difference between the two materials of at least 5 Rockwell B and the female side shall be the harder.

d. Flanges: Flanged connections shall be acceptable in lines equal to or larger than 3.81 cm (1.5 in) NPS and shall be sealed by an o-ring or gasket. Flanges shall be attached to adjoining pipe or tube by means of socket or butt welding, and attached to adjoining fittings or components in accordance with this section. Flanges shall not be used in areas of significant flexure or vibration.

e. Pipe Threads: Pipe thread connections shall not be used on pressurized piping systems associated with the PVHO pressure boundary, with the exception of the hollow bolt penetrations. (Amend. 6)

3.1.16 FLEXIBLE HOSE: When a flexible hose is to be subjected to considerable vibration or flexing, sufficient slack shall be provided to avoid mechanical loading. Flexible hose burst pressure shall be four times operating pressure. Flexible hoses shall be installed so operators for the equipment are not endangered. All flexible hoses installed shall be labeled with a metal information tag according to the requirements in NAVSEA SS521-AA-MAN-010. All flex hoses shall have an independent identification number etched on the metal identification tag and on one of the end fittings. This identification number shall correspond to all documentation related to the respective flex hose (hydrotest, cleaning, etc.). All flexible hoses shall be subjected to a hydraulic proof test equal to twice the rated working pressure of the hose (see NAVSEA S6430-AE-TED-010). All flexible hoses shall be covered with non-corrosive stainless steel wire braid. Flexible hose fittings shall conform to the materials stated herein. Unions shall be installed in the piping at each end of the flexible hoses to facilitate removal and maintenance of components. All piping between SDC van walls and chamber piping systems shall be outfitted with flexible hoses to prevent stress on the piping systems when shimming or adjusting the PVHOs, as described in C4.2.14.

3.1.17 FITTINGS INNER DIAMETER: The inside diameter of elbows, tees and other fittings shall be equal to or greater than the pipe to which they are attached.

3.1.18 PIPING IDENTIFICATION: Identify piping in accordance with Table B-3, NAVSEA SS521-AA-MAN-010. Identification shall apply to piping on each segment of pipe between fittings. All valve handles, operator controls and gauge outer rings shall have color coding applied.

3.1.19 COMPONENT TAGS: All components shall be tagged with identification plates of plastic laminate measuring approximately 1.27 cm (0.5 in) high by 3.81 cm (1.5 in) long minimum by 0.32 cm (0.125 in) thick, firmly attached by contact adhesive or by other means acceptable to the Contracting Officer. These plates shall be marked by engraving with 0.64 cm (0.25 in) high block type identification letters/numbers, and shall be color coded as appropriate. Tags must not come loose as a result of the environment, and must not corrode or become illegible with age.

3.1.20 COMPONENT IDENTIFICATION (ID) PLATES: Refer to NAVSEA Drawing 7268120 for instructions on accepted symbols and arrangement of symbols on identification plates.

3.1.21 PANEL ID TAGS: All panels internal to the van and major subsystems shall be identified with an ID plate. These plates shall be made of plastic laminate, 5.1 cm (2 in) high and at least 15.2 cm (6 in) long by 0.32 cm (0.125 in) thick. The plates shall be marked by engraving with 1.9 cm (0.75 in) high block type identification letters/numbers and shall be color coded as appropriate. All piping entering/leaving a panel shall be identified. These plates shall be made of plastic laminate, 3.8 cm (1.5 in) high and at least 10.2 cm (4 in) long by 0.32 cm (0.125 in) thick. The plates shall be marked by engraving with 1.3 cm (0.5 in) high block type identification letters/numbers and shall be color coded as appropriate.

These labels shall be firmly attached by contact adhesive or by other means acceptable to the Contracting Officer. ID tag index shall be provided with the Preliminary Design. Tags must not come loose as a result of the environment, and must not corrode or become illegible with age.

3.1.22 THROTTLE VALVES: All valves regulating flow (other than on-off function), oxygen service valves, and high pressure valves (except for those remotely actuated) are considered throttle valves. They shall be globe or needle valves and shall conform to MIL-V-24109. Throttle valves which are larger than those meeting the requirements of MIL-V-24109, 7.5 cm (3.0 in) or greater, shall conform to MIL-V-24109 with respect to control of flow and pressure.

3.1.23 SHUTOFF VALVES: All hand operated valves, other than throttling valves, shall be ball valves. They shall be two-way (bi-directional) flow, three piece swing-out construction valves conforming to ASME/ANSI B-16.34, utilizing a soft sealing surface. Socket weld end connections shall conform to ANSI B-16.11. Butt weld end connections shall conform to ANSI B-16.25. The construction materials shall be compatible with air and oxygen service. All valves shall be rated at a working pressure equal to or greater than the maximum possible system pressure.

3.1.24 COMPONENT SEATS: Breathing gas components shall have seats and seals that are suitable for oxygen service.

3.1.25 LUBRICANTS: Provision shall be made for lubrication of running parts. Lubrication zercs shall be made of 316 stainless steel. Lubricants shall be as specified on the drawings, and shall conform to the requirements of NAVSEA 59086-H7-STM-010, Chapter 262, Section 7.

3.1.26 CHECK VALVES: All check valves shall utilize a soft sealing surface poppet or disc and spring.

3.1.27 PRESSURE GAUGES:

a. Mechanical Pressure Gauges: Except as otherwise specified, mechanical pressure gauges shall meet the following criteria:

1. Unless otherwise specified, shall be made with phosphor bronze or stainless steel, with helical coil or bourdon tube sensing elements.
2. Unless otherwise specified, gauges used for gas supply line pressures shall have a minimum 6.35 cm (2.5 in) diameter face.
3. Unless otherwise specified, gauges used for depth shall have a 21.6 cm (8.5 in) diameter face.
4. The case shall be made of acrylonitrile butadiene styrene plastic and shall have a blowout relief device.
5. Oxygen gauges shall be cleaned and marked for oxygen service.
6. Oxygen gauges shall have a green outside case.
7. Each gauge shall be capable of isolation from the system by a gauge calibration valve, which meets the requirements of MIL-V-24578, and snubber assembly.
8. They shall have an accuracy of ±1% of the full scale of the gauge unless otherwise specified.
9. The full range of the pressure gauge shall be 130% to 150% of the maximum chamber operational range.

b. Electronic Pressure Gauges: Electronic pressure gauges shall meet the following criteria:

1. Unless otherwise specified, transducers shall be made with phosphor bronze or stainless steel.
2. Unless otherwise specified, displays used for gas supply line pressures shall show readings in 1.5 to 2.0 cm (0.6 to 0.8 in) high numerals.
3. Unless otherwise specified, displays of depth shall show readings in numerals of 2.5 to 3.5 cm (1.0 to 1.4 in) high.

4. The electronic pressure gauge shall have a single display and electronics case shall be of stainless steel or acrylonitrile butadiene styrene plastic or other plastic of equivalent or greater impact resistance, durability, and resistance to solvents, oils, cleaning fluids, sunlight and ozone.
5. Transducers used in oxygen lines shall be cleaned and marked for oxygen service.
6. Oxygen pressure displays shall have a green outside case.
7. Each transducer shall be capable of isolation from the system by a gauge calibration valve, which meets the requirements of MIL-V-24578, and snubber assembly.
8. They shall have an accuracy of ±0.25% of the actual depth unless otherwise specified.
9. The full range of the transducer and display shall be 130% to 150% of the maximum chamber operational range.
10. The sensor shall have a single cable connection to the display, and shall draw all needed power and signals from the display.
11. The display shall operate from a single 12 ±2 volt power supply.
12. The display shall be either liquid crystal display (LCD) or light emitting diode (LED) display.
13. Transducer output signal shall be 4 to 20 milliamps.

3.1.28 VENT LINES: Vent lines shall be independent of each other and of other lines. All vent lines shall exhaust outside the van and shall be configured to prevent ingress of weather or debris.

3.1.29 RELIEF VALVES: Relief valves installed on PVHOs shall conform to and be marked and stamped in accordance with ASME BPVC Section VIII, Division 1. Relief valves shall be located so that the vented gas shall be directed away from operators. Relief valves for piping greater than 2.54 cm (1.0 in) NPT and for oxygen shall be piped outside the van.

3.1.30 PIPING CLEANING: Piping shall be installed to facilitate cleaning. All high points shall be ventable; low points shall be drainable.

3.1.31 FILTERS: Filters shall be capable of changing the filter element without removing the filter body from the line. It shall be capable of removing particulate larger than 10 microns unless otherwise specified. Filters shall be sized so that the pressure drop across a clean filter is not more than 2.5% for LP systems [defined as systems with operating pressures of 34.0 atm (500 psi) or less] of the specified minimum inlet pressure to the regulator at maximum flow rate specified for the regulator.

3.1.32 END CAPS: All end fittings providing temporary connections, including, but not limited to, BIBS quick-disconnects, gas and fluid connections to SDC vans, gas calibration ports, and pressure gauge valves, shall be fitted with mating blanks to cap fittings when not in use. Mating blanks shall be made of identical material as the end fitting and be secured to the fitting by a lanyard so as not to interfere with the operation or access of the fitting. Mating blank pressure rating shall be that of the end fitting.

3.1.33 CONSOLES: The surfaces of consoles that are viewed by operators shall be non-reflective. Mounting points supporting the console structure must be adjustable, and allow for movement when shimming or adjusting the PVHOs, as described in C4.2.14.

3.1.34 GENERAL REQUIREMENTS FOR FASTENERS:

a. Structural Fasteners: All structural fastener hardware shall be shown, via analysis, to be appropriate for the application. Unless justified by the contractor and approved in writing by the Contracting Officer, no fastener greater than a grade 8 shall be used.

b. Light-Duty Fasteners: For "non-structural" applications where fasteners are not highly stressed, corrosion resistant 316L stainless steel fastener materials may be used in lieu of requirements herein for structural bolts, screws, and nuts. The contractor shall not use these

materials in applications where stress corrosion cracking problems are likely to occur.

c. Fastener Types: The contractor shall use ANSI, ASE, and/or DIN standard fastener types.

d. Fasteners used in the weather shall be of material compatible with an ocean environment and not likely to succumb to stress corrosion cracking and galvanic corrosion.

3.1.35 **WELD JOINT INTERIOR:** Paragraph 111*, Welded Joints: The finished interior surface of butt welded pipe joints shall be smooth inside the piping. Backing rings, if used, shall be removed. There shall be no excess reinforcement on the inside of pipe joints caused by the welding process. Machine welding or consumable inserts shall be used in the welding process to avoid any excess reinforcing of the weld. The contractor shall provide a detail description of the weld process in the preliminary design.

3.1.36 **WELDING QUALIFICATIONS:** Paragraph 127.5*, Qualification: All welders and welding procedures shall be qualified by the contractor prior to welding on this project. Qualification by a previous employer is unacceptable. The following documents shall be submitted by the contractor:

a. QW-482 Welding Procedure Specification
b. QW-483 Procedure Qualification Record
c. QW-484 Welder or Welding Operator Qualification Test

3.1.37 **WELD IDENTIFICATION:** All piping and instrumentation welds shall have weld identification symbols etched on the pipe base metal adjacent to the respective weld. All etched weld numbers shall correspond to the welder log and Joint Identification Drawing (JID). The welder log and JID shall be submitted by the contractor. The welder log and JID shall contain sufficient information to cross reference between all welding qualifications, welding records, Non-Destructive Testing (NDT) qualifications, and NDT records. The welder log form shall be submitted by the contractor and shall contain the following information:

a. Joint Identification Number (JID)
b. Joint design type
c. Base metal type with heat and lot number
d. Filler metal type with heat and lot number
e. Fit up and inspection results
f. Welding procedure number
g. Heat treatment if required
h. Welder number
i. Type of inspection and results
j. Disposition of joint (pass/fail)
k. Any repairs of joint conducted
l. Inspection procedure number
m. NDT inspection number
n. Signature and date

3.1.38 **COMPONENT SUPPORTS:** Pipe and/or tubing shall be adequately supported, at a minimum, at intervals listed in NAVSEA SS521-AA-MAN-010, Table B-1, and in both directions at elbows. Components (valves, regulators, etc.) shall be supported so the force required to operate the component or other normal operational load does not cause visual deflection, rotation or vibration. Piping and tubing shall be supported in accordance with section B-9 and Table B-1 of NAVSEA SS521-AA-MAN-010.

a. Independent Supports: In no case shall the force required to operate a component cause a line deflection in excess of 0.08 cm (0.032 in) measured at 30.48 cm (12 in) from the component centerline. Piping and components shall not be supported by brackets which would put any stress on other piping or components.

b. Vibration Isolation: To the maximum extent practicable, all components shall be supported from the same fixed, rigid structure as their

adjoining piping or tubing. Where it is necessary to support adjacent components and pipe or tube from structures which may vibrate relative to one another, a suitable means of vibration isolation shall be employed. This may be achieved through the use of flexible component mounting equipment, rigid piping or tubing sections with adequate flexibility, or the use of flexible hose.

c. Support Locations: All components, piping, and tubing shall be supported in a manor that allows for movement when shimming or adjusting the PVHOs, as described in C4.2.14.

3.1.39 **STRESS/FLEXIBILITY ANALYSIS:** Pipe and tube flexibility of piping sections which transverse hard mounted structures or equipment which may move relative to one another shall be demonstrated through flexibility analysis calculations in accordance with ASME B31.1 for all pipe larger than 0.95 cm (0.375 in) OD and all tube larger than 1.27 cm (0.5 in) OD. Stress analysis calculations shall be in accordance with ASME B31.1 and shall demonstrate the adequacy of the piping system to withstand all anticipated loading conditions, including those calculated in the piping flexibility analysis.

3.1.40 **STRESS CATEGORIES:** The following categories shall be considered in the stress analysis:

a. Primary Stress: Primary stress is that required to maintain equilibrium with the applied loads, and shall be considered in the stress analysis.

b. Secondary Stress: Secondary stress is that developed by constraint of adjacent parts, and shall be considered in the stress analysis.

c. Peak Stress: Peak stress is the maximum combined stress at any point in the structure, and shall be considered in the stress analysis.

3.1.41 **ALLOWABLE STRESSES:** The following are allowable stress limits for the stress/flexibility analysis.

a. Ferrous Materials: For ferrous materials, allowable operating stress ($S_m$) shall be the lesser of $^2/_3$ of minimum yield strength or $^1/_3$ of minimum tensile strength.

b. Nonferrous Materials: For nonferrous materials, $S_m$ shall be the lesser of $^2/_3$ of minimum yield strength or $^1/_4$ of minimum tensile strength.

c. General Membrane Stress: General membrane stress shall not exceed $S_m$.

d. Local Membrane Stress: Local membrane stress shall not exceed $1^1/_2S_m$.

e. Combined Membrane Stress: Highest combination of membrane primary and secondary stresses shall not exceed $1^1/_2S_m$.

f. Combined Primary and Secondary Stresses: Highest combination of primary and secondary stresses shall not exceed $3S_m$.

g. Peak Stress Fatigue: Fatigue considerations for peak stresses shall take into account the nature of the forces involved in the determination of the peak stresses in the context of normal system operating conditions.

h. Transport Induced Loads: Transport induced loads shall be assumed as applied independently while the system is unpressurized.

i. Ship Motion Induced Loads: Loads due to ship motion shall be assumed as applied independently while the system is pressurized.

j. Wave Slap Loads: Wave slap loads shall be assumed as applied while the system is pressurized.

3.1.42 CONTAMINATION: Precautions shall be taken during fabrication to prevent construction dirt from entering pipe in storage or partially completed piping systems.

3.1.43 OXYGEN SYSTEMS: "Oxygen enriched mixtures" shall be defined as those gas mixtures whose oxygen concentration is greater than or equal to 25% by volume. For the purposes of this SOW, all lines and components whose process wetted materials come into contact with oxygen enriched mixtures shall be considered "oxygen service." Oxygen piping shall conform to the requirements of CGA G-4.4. ^ Included in the Prelim. Design Calc. submission, the contractor shall provide the piping size versus flow rate calcs. to ensure the flow rate rqmts. of CGA are met. The following are noted:

(Amend. 3)

a. Pipe and fittings shall be stainless steel ASTM 316L.

b. All valves, regulators, filter elements, and other non-welded components shall be copper based alloy. All oxygen system valves shall meet the requirements for throttle valves as specified in C3.1.22.

c. Piping joints shall have butt welded or socket end connections.

d. Vent lines shall be independent of other lines and shall vent outdoors. Vent lines for oxygen shall be cleaned as required by this SOW.

e. Oxygen vents shall be properly isolated from weather, combustibles, personnel, other systems and air compressor intakes.

f. Components for oxygen systems shall not react with oxygen nor fluorinated compounds in any way that might cause generation of heat or loss of oxygen to the surrounding atmosphere. Such components shall utilize polytetra flouroethylene (Teflon), polychlorotrifluorethylene (Kel-F), or vinylidene fluoride hexafluoropropylene tetra fluoroethylene (Viton) seals and gaskets.

g. Gauge and sampling piping provided in oxygen systems which are 0.64 cm (0.25 in) ID tube may have pipe joints which are socket welded. Gauge and sampling piping lengths and the amount of socket weld fittings shall be kept to a minimum.

h. Safety Evaluation: Prior to the design review, all oxygen service lines and components shall be evaluated for safety in their intended service (gas composition, pressure, flow, temperature), orientation, and location in accordance with ASTM G88.

3.1.44 NON-DESTRUCTIVE EXAMINATION: Mandatory minimum non-destructive examination of welds shall conform to the requirements of Table 136.4 and the following:

| WELD TYPE | EXAMINATION |
|---|---|
| Butt Weld | RT |
| Welded branch connections | RT for 2 inches and over.<br>MT or PT for less than 2 inches. |
| Fillet, socket welds | MT or PT for all sizes |

NOTES:

a. Welds shall be given a visual examination in addition to the examination specified above. Acceptance standards for visual examination shall be those of AWS D1.1, paragraph 8.15.1.

b. RT = Radiographic Examination (paragraph 136.4.5*)

c. PT = Liquid Penetrant Exam (paragraph 135.4.4*)

d. MT = Magnetic Particle Exam (paragraph 135.4.3*)

3.1.45 SYSTEM CLEANING: Pipe containing gases breathed by humans shall be cleaned.

a. The contractor shall be responsible for cleaning all piping, components and interior of the PVHOs.

b. The contractor shall submit a cleaning procedure to the Contracting Officer. Procedures for cleaning both the air and oxygen piping systems shall be in accordance with MIL-STD-1330. Quantitative analysis for hydrocarbons in the final flush and the particulate level of the final rinse shall be included in the procedures. The contractor's cleaning procedure shall specify equipment to be used in the cleaning process and identify the manufacturer and model number of the equipment used. Note: Work required herein shall be treated as a non-critical application as described in MIL-STD-1330, paragraph 3.11.

c. The interior of the PVHOs shall be cleaned by vacuuming all loose debris and completely washing down the interior surfaces with Navy Oxygen Cleaner (NOC) or non-ionic detergent (NID). All washed surfaces must be thoroughly rinsed and dried. Cleaning solution must not come in contact with PVHO acrylic viewports. Verification of PVHO cleanliness must also include, as a minimum, black light, white light and gas samples.

d. Air Supply lines shall be pressurized and an air gas sample shall be taken from the discharge of each set of air supply lines which carry air to be breathed by humans. The total amount of gas samples taken shall ensure the analysis of the entire system. The contractor's cleaning procedure shall specify sampling procedures and sample locations. An additional sample shall be taken at the air source used to pressurize the system for the testing in addition to a reading confirming the dewpoint of the supply air is less than -40.0°C (-40.0°F). Samples shall be taken after hydrotesting, cleaning and assembly. Air purity shall meet or exceed the standards set in NAVSEA 0994-LP-001-9010, Table L-1. All laboratory air sample reports shall be submitted to the Contracting Officer 30 days prior to completion of contract.

e. Oxygen supply lines shall be pressurized using dry nitrogen and a nitrogen gas sample shall be taken from the discharge of each oxygen header which carry oxygen to be breathed by humans. The total number of gas samples taken shall ensure the analysis of the entire system. The contractor's cleaning procedure shall specify sampling procedures and sample locations. An additional sample shall be taken at the gas source used to pressurize the system for the testing in addition to a reading confirming the dewpoint of the supply gas is less than -40.0°C (-40.0°F). Samples shall be taken after hydrotesting, cleaning and assembly. Gas purity shall meet or exceed the standards set in NAVSEA 0994-LP-001-9010, Table L-2. All laboratory oxygen sample reports shall be submitted to the Contracting Officer 30 days prior to completion of contract.

f. The contractor's cleaning procedures shall indicate positive controls to maintain cleanliness in the event the system is re-entered after gas samples have been taken. Cleaning procedures must also address how to verify whether there has been inadvertent contamination of already cleaned piping and components and how to recover from such contamination.

g. The results of the cleaning process shall be fully documented. The cleaning of each component, subassembly, section or subsystem must be traceable to a Data Sheet (Clean Sheet) that clearly indicates system cleaning requirements have been met. The information to be documented is summarized below:

  a. Item(s) cleaned: Part Number, Quantity, System Service
  b. Date of cleaning
  c. Precleaning and cleaning agents used
  d. Verification of cleaning agent removal
  e. Hydrocarbon analyses: Method used and results
  f. Particulate analyses: Method used and results
  g. Software replacement: List of all software, Manufacturer's Part Number, Cleaning Agent and Cleaning Analysis Method used

h. Signature of person(s) performing the above operations
i. For flushes the following information shall be recorded on the data sheets:

1. Flushing solution entry and exit points and direction of flow through each circuit or leg
2. Velocity of flushing solution
3. Placement of all blanks, jumpers and flush plugs.

3.1.46 HYDROSTATIC TEST: Paragraph 137*, Leak Test: Piping shall be hydrostatically strength tested to $1^1/_2$ design pressure.

3.1.47 GAS LEAK TEST: A gaseous leak test (drop test) of all piping systems shall be accomplished in accordance with MIL-STD-1330 after the hydrostatic strength test. All valves shall be seat tightness tested per MIL-STD-1330. The test medium will be air or nitrogen for the air system and nitrogen or helium for the oxygen system. Test results for system drop tests and all seat tightness tests shall be documented and submitted to the Contracting Officer.

3.2 SPECIFIC TO PROJECT

3.2.1 BREATHING GAS AND ATMOSPHERIC MAINTENANCE:

a. Air Purity: Breathing air stored and supplied for use in the SDC PVHOs shall be in accordance with NAVSEA 0994-LP-001-9010, Appendix L. All air introduced into the PVHO from compressed sources during construction or test of the system shall also be in accordance with this SOW. The SDC piping systems shall be designed to maintain this quality.

b. Oxygen Purity: Treatment and metabolic makeup oxygen stored and supplied for use in treatment in the SDC PVHOs shall be in accordance with NAVSEA 0994-LP-001-9010, Appendix L. All oxygen introduced into the PVHO from compressed sources during construction or test of the system shall also be in accordance with this SOW. The SDC piping systems shall be designed to maintain this quality.

c. Atmosphere Purity: Except as specified otherwise herein, the atmosphere purity, including, but not limited to, contaminants, oxygen content and carbon monoxide content in the manned pressurized spaces, breathing loops and systems shall be maintained in accordance with NAVSEA 0994-LP-001-9010, Chapter 8, Section 8-15, and Section L.

d. Use of Scrubbers: Selection of scrubbers is limited to those devices reviewed and approved for use by the U.S. Navy, and to a calcium hydroxide absorbent of a manufacturer and type approved for use by the U.S. Navy.

e. Carbon Dioxide Levels - Maximum Limits: Short term exposures to elevated levels of $CO_2$ shall be in accordance with NAVSEA 0994-LP-001-9010, Chapter 12, Section 12.14.

3.2.2 ATMOSPHERE CONTROL AND MONITORING:

a. Primary Control: Primary pressurization, depressurization and ventilation of SDC PVHOs shall be controlled by a set of remotely actuated, piloted control valves. The piloting valves, which control the remotely actuated control valves, shall be located on the operator's control panel. The piloting valves shall be positioned for operation while standing, and be grouped with other primary system controls.

b. Primary Monitoring: The oxygen and carbon dioxide levels of the SDC PVHOs shall be continuously electronically monitored. Pressure shall be monitored continuously via a 30.0 cm (12.0 in) diameter mechanical pressure gage and an electronic pressure gauge. The depth of the chamber shall be measured and sent in ASCII code via RS422 to the SHOTS control van. The contractor shall provide a standard RS422 9 pin D

connector in the SDC operator's compartment over which this information is transmitted.

c. Secondary Control: Secondary pressurization, depressurization, and ventilation of the SDC PVHOs shall be controlled by a set of manually operated globe valves. The globe valves shall be located on the operator's control panel, positioned for operation while standing and grouped with other secondary system controls.

d. Secondary Monitoring: The SDC PVHOs shall be equipped to sample and test oxygen, carbon dioxide and carbon monoxide. Pressure shall be monitored continuously via a 21.25 cm (8.5 in) diameter mechanical pressure gauge. Equipment to draw and analyze bomb samples shall be provided for unmanned atmospheric analysis per NAVSEA SS521-AA-MAN-010, Appendix F.

e. Sampling Lines: Each SDC PVHO shall be equipped with a sampling line which permits the drawing of chamber atmosphere samples from all areas of the chamber. The sampling lines shall terminate in the operators' compartment and shall be provided with a sampling panel which permits the chamber operator to control sample flow.

f. Oxygen Injection: In the event of a loss of ventilation, metabolic oxygen make-up to the PVHO atmosphere shall be maintained by oxygen injection into the PVHO. Oxygen flow rate into the PVHO shall be controlled by a flow meter mounted on the operator control panel, grouped with other secondary system controls.

3.2.3 ENVIRONMENTAL CONTROL:

a. Temperature: Short term exposure shall be in accordance with NAVSEA 0994-LP-001-9010, Table 8-4.

b. Control and Monitoring: Temperature and humidity within the chamber shall be monitored and displayed to the operators at the operator's control panel. Control of heating and cooling shall be accomplished through the use of adjustable throttle valves. After stabilization, the inside chamber temperature must be maintained within 3 degrees of the desired internal temperature between a temperature range of 21.1°C (70.0°F) to 29.4°C (85.0°F).

c. Use of Cooling Fluids: All pressurized spaces shall be heated and cooled through the use of non-toxic water/propylene glycol solutions. Freon and toxic substances shall not be plumbed into the pressurized spaces. For the purposes of design, engineering, and testing of this system, chilled and heated fluids will be supplied to the chamber at 0.0 °C (32.0 °F) and 60.0°C (140 °F) respectively, with a flow rate of 38 liters (40.3 gallons) per minute at 8.7 atm (127.6 psi).

d. Heating and Cooling of Treatment Space: The treatment space shall be provided with a minimum of two hyperbaric rated cooling units capable of hot/cold cycle dehumidifying and cooling the treatment space with a capacity capable of offsetting the heat load of the lighting, internal equipment, and occupants, and the moisture output of the gas ventilation, occupants, and other sources located in the treatment spaces.

e. Primary air supply temperature *

(AMEND. 6)

* e. Primary air supply temperature: Provisions for heating and cooling of the chamber air supply shall be accomplished by an inline heat exchanger. The heat exchanger shall be sized to work in conjunction with the internal chamber ECS system. Inlet air temperature will be supplied from 110 degrees F to 65 degrees F. Inlet air pressure dew point shall be -40 degrees F @ 110 psig.

3.2.4 MEDICAL ARRANGEMENTS:

a. IV Bag, Monitor, and Hand Rail Support: Two handrails shall be provided, one on either side of the chamber's dorsal center line, spaced sufficiently off line as not to present a hazard to personnel walking down the centerline. These handrails will also be able to serve as a means of hanging medical IV bags and portable medical monitors.

b. Overboard Exhaust Header: An overboard exhaust header shall be provided for the purpose of serving medical suction equipment. This header shall

consist of a[illegible]op valve, backpressure regulat[illegible] and 0.64 cm (0.25 in) suction lines. A total of four quick disconnects shall be provided.

3.2.5 TREATMENT O2 CONTROL AND DISTRIBUTION:

a. Primary Control: Pressure reduction regulators for treatment oxygen supply shall be located on the operator control panel, grouped with other primary system controls. Pressure regulators shall incorporate inlet and outlet pressure gages.

b. Primary Distribution: Each PVHO shall have a pair of permanently mounted internal supply oxygen headers running down each side of the chamber. Each header shall be equipped with 18 quick disconnects spaced evenly along the length of each header of the chamber, to which individually worn ~~closed circuit~~ oxygen treatment packs ~~or open circuit treatment masks or hoods~~ may be attached, for a total of 36 quick disconnects. * The quick disconnects for this oxygen treatment pack shall not accept the connections for the SDC emergency air BIBS. Quick disconnects shall incorporate a ball/check shutoff and gas-tight metal caps to insure oxygen does not flow when the connection is removed. The quick disconnects must be easily accessible and located appropriately for use by the full compliment of personnel in the chamber. Masks, hoods, and treatment packs are equipped with a 1.83 m (6.0 ft) connection line maximum. Piping running inside the PVHO shall not interfere with the comfort of the rescuees when sitting and/or lying down, or when standing between the rows of seats.

(AMEND. 6)

* The oxygen treatment packs will be individually worn, closed-circuit rebreathers, with $O_2$ and $CO_2$ removal capabilities. An independent BIBS dump system will not be required

c. Secondary Control: In the event of a primary pressure regulator failure, the primary regulator shall be able to be isolated and a single secondary pressure regulator be immediately brought into service. The secondary pressure regulator shall have a dedicated oxygen supply, and be located on the operator control panel, grouped with other secondary system controls.

d. Secondary Distribution: A secondary means to supply oxygen to the distribution headers shall be provided.

3.2.6 EMERGENCY AIR BIBS: Each SDC PVHO shall be equipped with an emergency Built In Breathing System (BIBS) to provide air to each occupant of the PVHO in the event the chamber atmosphere is rendered unbreathable. This Air BIBS shall be a separate system from the Treatment Oxygen Control and Distribution System of section C3.2.5 herein. The BIBS must operate unaffected by the loss of one supply pressure regulator or distribution header air supply. The Emergency Air BIBS shall be provided with an oral/nasal mask for each chamber occupant (33 total). The masks shall be Authorized for Navy Use (ANU). Masks shall attach to a low pressure air supply header equipped with ball/check quick disconnects to permit easy attachment, removal, and replacement of the masks. The quick disconnects shall be coordinated with the Treatment Oxygen Header of section C3.2.5 to prevent the accidental attachment of the air BIBS masks to the oxygen treatment header, or the Oxygen Treatment Pack into the air BIBS. There shall be 3 spare mask assemblies in the chamber, and a total of 3 additional spare quick disconnects on the air headers spaced evenly around the chamber. Controls for BIBS shall be located on the operator control panel, grouped with other secondary system controls.

3.2.7 SANITATION: Each SDC PVHO shall be equipped with a toilet and sink for sanitation purposes. The toilet shall be plumbed externally to remove the need to lock waste products through the medical/supply lock. The toilet plumbing shall be equipped with mechanical safety interlocks to insure the flush mechanism cannot be activated while a person is seated on the toilet. The sanitation system shall be equipped with a pressurized holding tank for the flush, of a minimum of 0.057 $m^3$ (2.0 $ft^3$), and shall be equipped with level sensors to inform the SDC operators of the current status of the tank, in a minimum of $^1/_8$ths of the level of the tank, from empty to full. An activated charcoal odor filter shall be affixed to each end of the holding tank vent line. The odor filter shall be commercially available

and refillable. Mounting of the sanitation system holding tank must allow for movement when shimming or adjusting the PVHOs, as described in C4.2.14.

3.2.8 FIRE FIGHTING EQUIPMENT: The contractor shall provide the following:

3.2.8.1 **Materials and Parts For Fire Extinguishers:** The contractor shall provide two fire extinguishers inside each SDC PVHO. One fire extinguisher shall be located via suitable brackets in each end of the chamber. Two $CO_2$ style fire extinguishers of not less than 11.35 kg (25.0 lbs) content shall be located in the operator's compartment of each SDC Segment, one next to each operator's position. Fire extinguishers shall be equipped with mountings securing them from movement due to shipboard or transport motion. PVHO fire extinguishers shall be chosen from the ANU list per NAVSEAINST 10560.2C Serial 00C/0175.

3.2.8.2 **Operator Self-Contained Emergency Breathing Apparatus:** The contractor shall provide four self-contained Emergency Breathing Apparatuses (EBAs) with full-face masks and back-packs for use in fire fighting. Two units shall be mounted within easy access of the operators in each of the two SDC Segment operator areas. The contractor shall also provide suitable, accessible, and secure storage space for these appliances within each SDC Segment (exterior to the PVHOs but in the interior of the vans). The units shall be clearly labeled, "Fire fighting Use Only, Not For Underwater Use."

3.2.9 VIDEO MONITORING: Each PVHO of the SDC Segments shall be equipped with two in-air hyperbaric rated video cameras. Video monitors shall be provided in the operator's compartment, and the ability to send camera feeds to remote monitors shall be provided. The cameras shall be mounted and oriented to provide the operators with a view of all sections of the SDC PVHO interior. Each camera shall be mounted on a detachable mount and provided with an umbilical of at least 4.57 m (15.0 ft) length to permit attendants inside the PVHO to detach the camera from its mount and aim it by hand on one of the rescuees to provide medical officers outside the chamber a close-up view of a person under treatment. The camera shall have, as a minimum, a focus adjustment range from 0.3 m (0.98 ft) to infinity. Pan and tilt capabilities are required. Zoom capability is required only if such is indicated to support the focus range of the camera. Cameras and monitors shall be color, National Television Standard Code (NTSC) standard with a minimum of 525 lines of resolution. Monitors shall be a minimum of 22.86 cm (9.0 in) to a maximum of 33.02 cm (13.0 in) in diagonal viewing cross section.

3.2.10 HYPERBARIC LIGHTING: Hyperbaric treatment spaces shall be lighted with a minimum of 538.0 lux (50.0 foot candles), with the ability to lower levels to within the range of 54.0 to 108.0 lux (5.0 to 10.0 foot candles) for sleep. An emergency lighting circuit shall also be provided for the treatment chambers of a level of 108.0 lux (10.0 foot candles) minimum. The lighting fixtures used in providing the lighting shall reside in the chamber, and shall be of a wide flood version of the DeepSea Power and Multi-SeaLight model ML-12, of appropriate wattage. Lights approved for use inside hyperbaric chambers as listed in the ANU list may be substituted. Alternate designs shall be submitted to the Contracting Officer and shall be subject to approval. Light piping, where the bulb and wiring are external to the chamber, shall not be permitted in this design.

3.2.11 ELECTRICAL EQUIPMENT:

3.2.11.1 **General Specifications:** Unless otherwise specified herein, all cabling used in the design and fabrication of the SDC Segments shall be consistent with IEEE STD 45.

3.2.11.2 **Marine Environment:** Cables which are mounted external to the SDC van shall be flexible, waterproof, nonwicking cables in accordance with MIL-C-915F or MIL-C-24643.

3.2.11.3 **Pressurized Manned Spaces:** Wiring internal to the PVHO shall be MIL-C-24643A Low Smoke Cable or MIL-W-16878 wire. Insulation on all cables shall be non-toxic and non-flammable in oxygen enriched environments, and shall conform to the section herein on Hazardous Materials. Use of PVC (polyvinyl chloride) insulation is prohibited.

3.2.11.4 **General Requirements For Connectors:** The minimum voltage rating for all connectors used throughout the system shall be equal to at least twice the expected peak operating voltage. Contact current ratings shall equal or exceed the applicable IEEE STD 45 maximum cable current carrying capacities or wiring ampacity (Tables A6, A21, and A24) for the size of cable or wire being terminated. Standard AWG sized contacts shall be used.

a. Marine Environment: Connectors mounted externally to the SDC van shall be UL listed, corrosion resistant, dust tight, and watertight when submerged to a depth of 10.67 msw (35.0 fsw). Connectors shall be in accordance with the materials and performance standards of MIL-C-5015, including salt-spray resistance. All external plugs and receptacles shall be equipped with weather resistant caps.

b. Interior Spaces (Non-PVHO): All connectors used interior to the van and exterior to the PVHO shall be UL listed for the application for which they are employed as rated by the National Electric Code. Connectors carrying DC and AC power shall be in accordance with the materials and performance standards of MIL-C-5015, including salt-spray resistance.

c. PVHO Applications: All connectors used inside the PVHO shall be of metal backshell construction equipped with strain reliefs and employing materials conforming to the section herein on Hazardous Materials. Connectors shall be UL listed for dust-ignition proof environments. Connectors do not have to meet requirements for explosive shock.

3.2.11.5 **Electrical Penetrators, PVHO:** Electrical penetrators used to cross the pressure boundaries shall be configured to seat with pressure. Penetrators do not have to meet requirements for explosive shock.

3.2.11.6 **Switch Gear:** All power switchboards shall conform to the requirements of IEEE STD 45, Section 17. The power distribution panels, load distribution panels, and power junction boxes containing distribution or branch circuit breakers shall conform to the requirements of IEEE STD 45, Section 21, and Section 23.

3.2.11.7 **Transformers:** The transformers for the SDC Segments 120 VAC power transformers shall conform to the requirements of IEEE STD 45, Section 44.

3.2.11.8 **Spare Outlets:** In addition to outlets required to operate equipment in the SDC Segments, the SDC Segments shall be designed and equipped with 6 spare 120 volt, 15 ampere electrical outlets. The outlets shall be easily accessible, and the 120 volt outlets shall be spaced in at least three different spots within the operator's compartment.

3.2.11.9 **Power Distribution:** The SDC Segments shall be designed and equipped with a power distribution panel with breakers and transformers as required to power and operate the SDC Segments.

3.2.11.10 **UPS Sets:** All components used in the UPS sets shall be UL listed for safety and shall be in accordance with ANSI/IEEE requirements for surge suppression and lightning protection. Monitoring interfaces shall conform to EIA standard RS232 or RS485. UPS sets shall comply with FCC Class A standards for electromagnetic interference.

3.2.11.11 **DC Power Supplies:** The DC power supplies used within the SDC Segments shall be in accordance with requirements for COTS/NDI equipment herein. The power supplies shall be UL listed for safety. DC power supplies shall be in accordance with FCC Class A standards for electromagnetic interference.

3.2.11.12 **Electrical Workmanship and Inspection:** Soldering processes, materials and procedures shall conform to J-STD-001B for soldering techniques. "Embedded equipment" containing soldered assemblies shall employ fabrication practices consistent with best commercial practices. New printed circuit board designs developed for the SDC Segments shall conform to IPC-D-275, level 2. All electronic assemblies shall meet the requirements of IPC-A-610B, level 2. All electronic circuit boards shall meet the requirements of IPC-A-600E, level 2. All modifications and rework shall conform to IPC-R-700C.

3.2.11.13 **Electrical Enclosures:** Enclosures shall be used for electrical equipment not already enclosed and/or designed for operation in the environments as described below:

| Condition | Necessary NEMA Rating |
|---|---|
| Exposed on open deck | NEMA 4X |
| Inside shelter, power distribution and switching equipment | NEMA 2, 4, 13 |

All enclosures shall have a hinge-mounted cover for access on one side. All NEMA 2, 4, 4X, and 13 enclosure covers shall be easy to open using only a screwdriver.

3.2.11.14 **Electrical Testing:** Upon completion of the system, and prior to acceptance, the contractor will submit Electrical Test Plan for approval. The contractor will perform the following electrical tests, as a minimum:

a. All wiring requires point to point continuity checks verified to drawing package.
b. Ground fault check on all equipment.
c. Operational check on all equipment.
d. Complete test of emergency power system, minimum 12 hour test at full load with recharge.
e. All power wiring shall require an insulation check, as well as ground fault tests.

3.2.12 **ELECTROMAGNETIC RADIATION:** The equipment shall operate in a shipboard environment. Its performance shall not be impacted by the normal operation of commercial shipboard navigation radar, marine radios (VHF) and power generation equipment. (VHF hand held radios will interact directly and compatibly with VHF marine radio systems).

The equipment shall not emit radiation which will affect the operation of normal ship navigation systems including GPS (Global Positioning System), LORAN, and Omega systems. The equipment shall be compatible with commercial VHF marine radio systems.

3.2.13 **FURNISHINGS:** Each SDC PVHO shall be equipped with bench type seating, with back rests, for the entire compliment of 33 personnel. The bench seats shall be cushioned and designed to operate as bunks for up to 12 reclining persons in the treatment chamber at one time. When bunks are deployed, seating may be traded off at a rate of 2 bunks per 4 seated, effectively reducing chamber capacity by 2 persons for each 2 bunks deployed. Seating shall include lap type personal restraint devices, for use by all occupants either seated or bunked. Restraint devices shall be quickly replaceable without the use of tools. Attachment points shall not impinge on occupant comfort or the use of an independent closed circuit rebreather system. The SDC treatment chamber shall be equipped with a flat floor which is easily removed for cleaning of the floor and chamber, but will not rattle or come loose during transit, transportation, or high sea states.

All equipment located inside the PVHOs shall be composed of materials compatible with the environment. The equipment shall be capable of disassembly for removal through the doors of the chamber (removal while under pressure is not required). The equipment shall not have sharp edges or surfaces that present a hazard to personnel. The materials shall minimize the buildup of electric charge. Materials shall be fireproof per NAVSEA 0994-LP-001-9010, Appendix D.

3.2.14 AIR TRANSPORTABILITY:

a. Transportability Requirements: Each SDC Segment shall be designed for transport per DHBK 1-11.

b. Baseline Aircraft for Transportation: As a minimum, each SDC Segment shall be designed to be transported via C-5, C-141, C-17, and/or C-130. Components shall be able to fit in and be flown in all of the aircraft. The contractor shall submit a report verifying conformance to DHBK 1-11. This report is ~~due with the Preliminary Design submittal~~* The contractor is not responsible for providing SDC securing mechanisms.

(Amend. 6) *due "270 days after project start"

3.2.15 DESIGN AND CONSTRUCTION:

3.2.15.1 Physical Characteristics:

a. Sound Powered Phone Handset: Each SDC Segment shall be equipped with five sound powered phones to permit communications between the occupants of the chamber and the operators of the chamber in the operator compartment in the event of failure of the electronic intercom. Three shall be externally located, one beside each mating flange (two total) and one beside the medical lock. Two shall be internally located, one at each end of the PVHO.

b. Intercom: The SDC PVHO interior and the SDC operator compartment shall be equipped with an electronic intercom that permits intercommunication between the PVHO occupants and the operators in the operator's compartment. A second intercom shall establish communications between the two SDC Segments and other components within the SDS and SRS. The intercoms shall be composed of the following equipment:

Hyperbaric Intercom

| Component | Qty/Van | Total |
|---|---|---|
| Double Lock Chamber Communication System (Entertainment Model) Amron 2820-4003E | 1 | 2 |
| Operator Headset Amron 2401-28 | 1 | 2 |
| Internal Chamber Headset Amron 2401-31R | 2 | 4 |
| Hand Held Microphone Amron 2405-28 | 1 | 2 |
| Entertainment Speaker Amron 3130 | 2 | 4 |
| Sound Powered Phone (operator) Amron H203-U | 1 | 2 |
| Inner Lock Combo Box (includes electronic intercom and sound powered phone for in-chamber use) Amron 3125 | 2 | 4 |

Inter SDS/SRS Intercom

| Component | Qty/Van | Total |
|---|---|---|
| Intercom with operator's headset Clear-Com MS-200 | 1 | 2 |

Note: Systems shall be delivered in working condition with brackets, cables, junction boxes, etc. as required, but not necessarily listed here.

3.2.16 SAFETY:

3.2.16.1 Noise: All SDC Segment equipment, piping, mufflers, pressurization and control systems shall be designed so that sound levels within the PVHO and operator's areas, and in all areas on deck, shall conform to U.S. OSHA Standard Number 1910.95 regulations for prolonged and short term noise exposures without the use of hearing protection. Continuous noise levels inside the treatment chamber shall not exceed 85 dBA* Treatment of the chamber walls may be required to reduce reverberation. The contractor shall be responsible for performing and submitting to the Contracting Officer for review and approval an interior noise analysis which takes into account all interior noise sources to demonstrate the design and selected components will meet the required noise levels. The analysis must take into account the reverberant nature of the chamber.

(Amend. 3)

*except during initial pressurization to depth.

3.2.16.2 Electrical: The SDC Segments shall be designed in accordance with the provisions of IEEE STD 45 and ADC consensus standard "Code of Practice for the Safe Use of Electricity Under Water," to prevent shock to personnel.

3.2.17 LOGISTIC SUPPORT SYSTEM:

3.2.17.1 Maintenance:

a. Design for Maintenance: Valves, equipment, and components shall be arranged to insure they may be accessed for maintenance consistent with the required maximum time to repair or replace. Placement of items so that extensive disassembly, or breaking of certification boundaries, of other equipment to access and maintain the target item shall not be allowed. Control Panels and/or coverings shall be segmented as required to insure a single person working in depot or on ship during deployment can remove and replace the panel without assistance from materials handling devices or other personnel. Requests for deviation must be submitted to the Contracting Officer for approval. During design, use of mockups or three dimension computer models shall be employed to permit the review of the layouts at all phases of design.

b. Operational Mode: Equipment shall be designed to limit preventive maintenance during operations to the lubrication of hatch seals, washing of salt-spray wetted surfaces, replacement of scrubber materials, gasses and human consumables. The equipment shall be designed to allow access for corrective maintenance in the field. In-situ maintenance shall be limited to the module level for electronic components. For all additional systems, corrective maintenance shall be performed on a level appropriate for the system operational considerations and limitations of at-sea sparing limitations. The contractor shall maintain a list of all repair and test equipment, tooling, and special jigs or other specialized test equipment necessary to perform maintenance and/or repair tasks in the field, or maintenance depot.

c. Transportation Mode: The equipment shall be designed to eliminate preventive maintenance during transportation.

d. Storage Mode: In-depot maintenance shall be minimized to maintain the system in a ready state for deployment as defined by section C2.1.2.2. Vans and similar structures shall be designed with access panels to allow for inspection, repair, and removal of large items such as generator sets, external scrubbers or environmental control units, piping, valves, batteries, transformers, or other similar items while in depot. The contractor shall maintain a list of all repair and test equipment, tooling, and special jigs or other specialized test equipment necessary to perform maintenance and/or repair tasks at depot.

3.2.17.2 **Maintainability:** The maximum time to repair or replace any single-point-failure in the SDC Segments shall be 6 manhours, excluding structural members and PVHOs.

3.2.17.3 COTS and NDI Equipment:

a. General Requirements for COTS and NDI Equipment: Commercial-Off-The-Shelf (COTS) and Non-Developmental Items (NDI) equipment shall not contain devices that are explosive, flammable, or radioactive. They shall not contain lithium, mercury or asbestos. Equipment housings shall not project sharp edges or points which may cause injury to an operator. All conductive equipment housings shall be equipped with a safety case ground to safely draw off short circuit currents to assembly ground.

Equipment that cannot survive or operate in the marine or pressure environments specified herein for the intended application shall be placed in a suitable housing.

b. COTS and NDI Equipment for PVHO Use: COTS and NDI equipment located in the PVHOs shall not use materials producing toxic gases under the temperature of 93.3°C (200.0°F). The use of PVC (polyvinyl chloride), PCBs, mercury, lithium, asbestos, cadmium, are expressly prohibited.

If electrical components are susceptible to damage by high pressure atmospheres, then these components shall be protected by pressure vessels rated for 1½ times the full operational depth or modified so that they will not sustain damage. Any pressure vessels inside the PVHOs must have pressure relief devices to prevent explosive forces rupturing the container upon external depressurization.

Electrical equipment used in the pressurized spaces shall not require supply or signal voltages in excess of 28 VDC.

Electrical equipment used in the pressurized spaces shall not generate voltages in excess of 28 VDC that could be accessible outside a grounded exterior case.

Electrical equipment shall not generate sparks or arcing during any states of operation, standby, or stowage.

3.2.18 **NON-PVHO AND NON-POWER PIPING WELDS:** Welding and non-destructive testing of SDC Segment frames and support structures shall be in accordance with MIL-STD-278. Records shall be in accordance with paragraph C3.1.37 herein. All other welding shall be welded to the best commercial practice standards, the AWS Specification D1.1 or D1.2, as applicable, shall be used as a guide.

3.2.18.1 **Welding Procedures:** For all welding, the contractor shall prepare written welding procedures detailing the processes and documentation procedures to be used in welding equipment and structures. These welding procedures shall be submitted to, and subject to the approval of, an AWS Certified Welding Inspector. Prior to submission of the welding procedures to the AWS Certified Welding Inspector, the qualifications of the Certified Welding Inspector shall be submitted to, and subject to the approval of, the Contracting Officer.

3.3 **INTERFACES:** SDC Segment components shall be designed in accordance with the Interface Control Drawings (ICDs) listed in C1.2.7.

3.3.1 **SDC EXTERNAL INTERFACES:** During mobilization and operation, the SDC Segments shall be capable of interfacing with air and road transport assets, installation equipment, the VOO, the SHOTS, and the TRCS as described below.

(Amend. 6) C-17 and/or C-130

3.3.2 AIR TRANSPORT INTERFACES: Air Transportation Interfaces shall be as called out for the C-5 and C-141 aircraft in DHBK 1-11. The system components shall be capable of being loaded onto the aircraft via the use of a standard 40K loader. ~~Transportation must not require modification of the~~ equipment.

3.3.3 ROAD TRANSPORT INTERFACES: Design shall employ trailer tie-downs for truck transportation and shall consist of commercially available attachment straps, chains, cables, clamps, etc. The system components shall be transportable via standard flatbed trucks without modification. Transportation must not require modification of the equipment.

3.3.4 INSTALLATION INTERFACES: Crane operations shall utilize frame lift points, shackles, slings, and a universal spreader bar.

3.3.5 VESSEL OF OPPORTUNITY (VOO) INTERFACES:

a. Structural: SDC Segments shall interface to the SDS Mounting Templates per the ICDs listed herein. The templates shall be responsible for structural interface to the VOO, and are not the responsibility of the SDC Segments contractor.

b. Potable Water: SDC Segments shall provide a means to supply each rescuee and attendant of the SDC PVHOs with potable water. Water shall be drawn from the VOO potable water supply and may be supplied by passing bottled supplies through the chamber medical/supply lock. The SDC chamber sink shall have water for washing via a gravity feed plumbing arrangement, complete with hangers and flow control, using the bottled water supply.

c. Sanitary Waste Disposal: SDC PVHOs shall provide sanitary facilities. Each SDC PVHO shall provide a 15.24 m (50.0 ft) long, 5.08 cm (2.0 in) inside diameter drain line to interface with the sanitary holding tank of the VOO. The drain line must be capable of being pressurized to 0.04 atm (75.0 psi). Multiple adapters shall be provided to adjust to various interfaces on the VOO.

d. Electrical Power:

1. Primary Power: SDC Segments shall not draw more than 35 Kilowatts total at 240 VAC. Power shall be provided to the SDC Segments as 240 VAC, and each SDC Segment shall be designed to condition the power as required to operate the systems internal to the SDC Segment.

2. Battery Power: Each SDC Segment shall be provided with an uninterruptable Power Supply (UPS) with sufficient battery power to operate the following items for 12 hours:

Lighting within the PVHO and Operator's Station in the SDC van
$CO_2$ scrubbers
Circulation Fans (If Applicable)
$O_2$ and $CO_2$ monitors
Intercom
Any critical controls required to sustain the breathing atmosphere of the PVHO

Note: Heating and cooling control system and the ventilation compressors shall not be operable from the UPS.

3.3.6 SHOTS INTERFACES:

a. Mechanical and Physical Interfaces: The structural interface between SHOTS and SDS shall be as called out in the SRS Interface Control Drawings listed herein.

b. Mechanical Support of SHOTS Equipment: SDS SDC1 shall provide mechanical support for SHOTS Control Van per section C1.2.7 herein.

c. Transmission of Data: Each SDC Segment shall be equipped with an RS232 stand alone multiplex unit which has 8 RS232 inputs (25 pin standard D connectors) and 1 RS232 output (25 pin standard D connector), which shall operate in full duplex, bi-directional mode. This unit shall be provided with RS232 output signals from the chamber electronic depth gauge, oxygen, carbon dioxide, temperature, and humidity monitors, and the RS232 data stream, where it will be multiplexed and output on the single RS232 line. (This shall employ a maximum of 6 of the 8 multiplex ports. The remaining 2 or more ports shall be retained as spares.) The unit shall be located to provide easy access for the connection of an RS232 signal cable which will be run to the SHOTS Control Van when the system is deployed.

3.3.7 MODIFIED TRCS INTERFACES: Each of the SDC Segments shall interface to the Modified TRCS Transfer Lock (MTL) NATO Standard Mating Flange. Each SDC PVHO shall be equipped with fittings to provide the MTL with the required gasses for operation and communications with the SDC operators. A single NATO Standard Mating Flange adapter will be government furnished. The contractor is required to interface it into the SDC Vans.

3.3.8 SDC INTERNAL INTERFACES: Specific interconnections between items of the SDC shall depend on the final design of the system, and as such are left to the contractor.

3.3.9 MECHANICAL AND PHYSICAL INTERFACES: The SDC Segments shall interface to the SDS in accordance with the interfaces listed herein.

3.3.10 MECHANICAL SUPPORT FOR SDS EQUIPMENT: SDC1 and SDC2 shall provide structural support for the SDS spares van and control van in accordance with the ICDs listed herein.

3.4 SDC VAN

3.4.1 ENVIRONMENTAL CONTROL:

a. Control and Monitoring: Temperature and humidity within the operator's compartment shall be monitored and displayed to the operators at the operator's control panel. Controls for temperature and humidity shall reside in the operator's compartment.

b. Heating and Cooling of Van: The spaces in and around the PVHO located between the PVHO and the Van wall shall be heated and cooled to remove the ambient heat and cooling load from the PVHO treatment space heating and cooling units by means of ruggedized self-contained systems mounted in the walls of the SDC van. Temperature shall be monitored and displayed during SDC PVHO operation in the operator's compartment.

c. Heating and Cooling of Operator Space: The operator space shall be partitioned from the rest of the spaces between the PVHO and the Van and provided a separate self contained heating and cooling unit mounted to the wall of the van and which may be set by the operators to control the temperature and humidity within the operating space independent of the other van spaces and treatment spaces. The heating and cooling unit must be capable of operating in salt air and sea spray on the exhaust side of the unit.

d. Transportation and Storage Configuration: For transportation and storage of the SDC Segments, metal blanking plates shall be bolted in place of the heating and cooling units to achieve a weather tight seal.

3.4.2 VISUAL MONITORING: Monitoring of Auxiliary and Generator Vans: The contractor shall provide a space for a panel, visible and accessible to the operators, 48.26 cm (19.0 in) wide by 60.96 cm (24.0 in) high by 22.86 cm (9.0 in) deep, which will be added later to provide for the monitoring of the equipment in the Auxiliary and Generator Vans.

3.4.3 LIGHTING:

a. Interior Spaces: SDC operator's control spaces shall be provided with lighting of a level consistent with the provisions of section C3.2.10 herein. Lighting levels shall be sufficient for general work, and shall be reasonable and comfortable for operation of the PVHOs.

b. Emergency Lighting: An emergency lighting circuit shall be provided for the operator's space of each SDC Segment of a level of 108.0 lux (10.0 ft candle) minimum.

c. Lighting of Deck Activities: SDC Segments shall be designed with lighting fixtures mounted in the SDC vans which provide illumination of the MTL work areas and the general deck spaces inboard to a level of at least 538.0 lux (50.0 ft candle). These fixtures will be either flush, or designed with quick bayonet mountings to permit assembly once the system is installed on the VOO. Control of the lights shall be from the operator's compartment.

3.4.4 FURNISHINGS: Each SDC Van shall be designed and equipped with two floor-secured operator's chairs, equipped with height adjustment, armrests, headrests, padding, and harnesses to insure the comfort and safety of the operators during high sea states.

3.4.5 DESIGN AND CONSTRUCTION:

3.4.5.1 Physical Characteristics:

a. Ladders: A ladder and catwalk required to access the SDS Spares Van and SHOTS Control Van shall be designed as a part of the SDC vans. Any ladder over 1.83 m (6.0 ft) shall be of an enclosed type to prevent injury to personnel during high sea states. Ladder manway guards (cages) shall be removable from the ladder and shall pass through the entrance locks and shall secure in the chamber for transportation and storage. Cages longer than 1.22 m (4 ft) shall be sectioned into pieces no longer than 1.22 m (4 ft). Catwalks shall be provided safety rails. All rungs and walk areas shall be treated with antiskid paints or applications. The ladder shall be designed for easy installation and removal via pin fittings or quick connects, and shall be designed to be stowed in the SDC PVHO. The SDC PVHO shall be designed with fittings to secure the ladder during transit. The ladder shall be designed to pass through the medical/supply lock when the SDC PVHO is unpressurized and both doors of the medical/supply lock may be opened.

b. SDC Van Doors: SDC Vans shall be equipped with a shipboard watertight door with a tempered safety glass window of a size no smaller than 15.24 cm (6.0 in) wide by 22.86 cm (9.0 in) tall. The window shall be equipped with an interior shade that may be drawn to block sunlight from entering the operator compartment, but may be moved aside by the operators inside the compartment to view the deck. The SDC van end opposite the operator's compartment shall be equipped with double doors permitting the entire end of the van to be opened. The double doors shall be equipped with air and watertight seals preventing the exchange of air or entry of water in the form of rain or wave action. The double doors shall also be equipped with lever actuated dual locking bars that permit operation by a single person.

c. Handrails: The SDC vans shall be equipped with removable handrail assemblies, located on top of each respective van. The handrails must interface with the ladders and be of adequate height and configuration for a safe walking platform for personnel on top of the SDC vans. The safe walking platform area shall include the space from the ladder to the doors of the equipment and spares vans and shall provide for a method of attaching the handrail to the upper vans, when installed. The handrails shall be designed to be collapsible for shipping, and shall be designed for easy installation and removal.

3.4.6 **SDC VAN EXTERIOR PAINTING:** The SDC Van exterior shall be painted as follows:

a. The van surface shall be prepared by sandblasting to SSP-10 using an equivalent blast grit.

b. The abraded surface shall then be blown free of grit and residue using oil-free, filtered dry air or nitrogen.

c. The surface shall be given an initial prime coat using organic zinc-rich primer resulting in a coat 3.0 to 4.0 mils (0.003 to 0.004 in) thick and permitted to dry under heat lamps for 24 hours.

d. The surface shall be given a second primer coat 3.0 to 4.0 mils (0.003 to 0.004 in) thick of recoatable epoxy primer and permitted to dry under heat lamps for 24 hours.

e. The surface shall be given a final white top coat 3.0 to 4.0 mils (0.003 to 0.004 in) thick using a hi-solids polyurethane and permitted to dry under heat lamps for 24 hours.

END OF SECTION

# 4 PRESSURE VESSEL FOR HUMAN OCCUPANCY (PVHO) REQUIREMENTS:

## 4.1 GENERAL REQUIREMENTS:

4.1.1 ASME: Pressure Vessels for Human Occupancy (PVHO) shall conform to the requirements of ASME PVHO-1 and ASME BPVC, Section VIII, Division 1 or Division 2. The PVHO shall be stamped. There are references to paragraphs in ASME BPVC, Section VIII, Division 2 in this specification. Those references are indicated by an exclamation mark following the paragraph number (example: "Paragraph AG 301.1!").

4.1.2 NATIONAL BOARD REGISTRATION: Each PVHO shall be registered with the National Board of Pressure Vessel Inspectors.

4.1.3, CHAMBER MATERIAL:

4.1.3.1 Material Type: Plate material shall be SA516, Gr70 or SA537 type 1. Forging material shall be SA182, type 304L (hatch ring reinforcements, viewport forgings, etc.). Door (manways and medical/supply lock hatches) material shall be SA240, type 304L or 316L. Materials in table AQT-1 may not be used. All fittings shall be of seamless construction and shall conform to ASTM A403 Type 304L.

4.1.3.2 Material Records: Each record shall be uniquely traceable to the specific material used. Vendor inspection or mill certificate records may fulfill the requirements of this section for the portion of the required information contained herein.

a. Plate Quality Inspection: These records shall contain the following:

1. Receipts inspection records.
2. Contract number or facility identification.
3. Ultrasonic soundness findings.
4. Ultrasonic thickness gage measurements.
5. Micrometer edge thickness measurements.
6. Chemical and physical properties (including toughness - Charpy impact values).
7. Record of visual inspection with notation on the size and location of any defects to be repaired.
8. Location of plate in pressure envelope and of all components which are fabricated from plate and which are welded into and become and integral part of the pressure envelope. This includes inserts, penetrators, and patches.

b. Bars and Rolled or Extruded Shapes. These records shall include the following:

1. Receipt inspection records.
2. Contract number or facility identification.
3. Heat and/or slab number (mill source).
4. Record of visual inspection with the notation of the size and location of any defects to be repaired.
5. Chemistry and physical properties (including toughness - Charpy impact values).
6. Dimensions (shapes only).
7. Soundness (Ultrasonic Test (UT)) and/or Dye Penetrant (PT)).
8. Location in pressure envelope.
9. Date of inspection and signature of inspector(s).

c. Forgings. These records shall include the following:

1. Receipt inspection records.
2. Contract number or facility identification.
3. Heat and/or casting serial number (must be a unique identification).
4. Soundness (Radiological Test (RT), PT, and/or UT).

5. Chemical and physical properties (including toughness - Charpy impact values).
6. Dimensional inspection.
7. Location, size and orientation of any repairs.
8. Location of all cast or forges components which are welded into ~~and become an integral part of the pressure envelope.~~
9. Date of inspection and signature of inspector(s).

(AMEND-3) d. FILLER METALS: These records SHALL include the following: Chemical CERTS.

4.1.4 PROHIBITED DETAILS: The following types of details shall not be used (paragraph AD 160!).

a. Pad type reinforcements other than those used on the saddle detail.

b. Resistance welded studs.

c. Castings.

d. Stud bolt attachments.

e. The use of brazing.

f. The use of magnesium and its alloys.

4.1.5 PRODUCTION IMPACT TESTS: Production impact test(s) of shell material base plate shall be conducted for all vessels for all thicknesses of vessel plate. The production impact test(s) shall test the base material, welds and heat affected zones in accordance with paragraph AT-203!. Should only one thickness of vessel plate be used (cylinder, hemispheres, etc.), the test coupon shall be attached to the termination point of the cylinder longitudinal weld.

mod. P-1 4.1.6 CORROSION ALLOWANCE: No corrosion allowance shall be included in the design ~~The design shall include a corrosion allowance of not less than $^{1}/_{6}$th of calculated required plate thickness.~~

4.1.7 LUGS: Lugs with bolt holes shall be welded to the interior and exterior surfaces of the hull so that equipment grids can be bolted to the lugs. The lugs shall be located on a square grid. Sixty lugs shall be provided on the interior, and forty lugs on the exterior. The preferred location of lugs shall be provided by the contractor as a part of the Preliminary Design. The size of the lugs shall be 3.8 cm (1.5 in) in height by 3.8 cm (1.5 in) wide with a 1.27 cm (0.5 in) hole and rounded edges. The use of low profile buttons, as shown in NAVSEA drawing 7268130 and 7268131, is acceptable.

4.1.8 HATCHES: Each SDC PVHO shall be equipped with two manways equipped with forging rings with tapped holes for a standard mating flange in accordance with the ICD per section C1.2.7 herein. The manways shall be equipped with hatches which open inward into the SDC PVHO. These two manways shall be used for the attachment of the DTL and MTL. The DTL manway shall be located in accordance with the ICD per section C1.2.7 herein. The reinforcement and design of the SDC PVHO forging rings shall include the anticipated forces applied to the forging rings from the future integration of the PVHO with the DTL through pressurized manways. The anticipated forces applied to the SDC PVHO manway forging rings are as follows:

| | |
|---|---|
| Punch Loading: | 99.0 kN (22,264.0 lbs) of force |
| Shear Loading: | 65.4 kN (14,708.0 lbs) of force |
| Torsional Loading (axial): | 98,479.0 kN-mm (871.5 Kip-inches) |

The MTL manway shall be located to support the general deck layouts listed in section C1.2.7, the exact location shall be as determined by the contractor, with final location of the manway subject to the approval of the Contracting Officer.

4.1.9 VIEWPORTS: Acrylic viewports shall be in accordance with ASME PVHO-1. Each viewport lens shall be hydrostatically tested prior to assembly into the PVHO. The test pressure shall be $1^{1}/_{2}$ times the design pressure of the

PVHO. The test pressure shall be raised to maximum test pressure and held for 15 minutes. The test pressure shall then be reduced to design pressure and held for 2 hours and measurements shall be taken of the motion of the lens relative to the frame every 15 minutes. Flat plate viewports shall be tested from both sides.

The SDC Segments shall be designed with a minimum of six 200 mm (8.0 in) viewing diameter viewports in each PVHO. Three shall be located at the end of the chamber resident in the operator's compartment, and shall be positioned to give the operators an unobstructed view of the occupants. The other three shall be at the opposite end of the chamber and shall be accessible via doors or access panels in the van wall.

4.1.10 **VIEWPORT GASKETS:** Flat viewports shall have flat rubber gaskets. The bearing stress on the rubber shall not exceed 17.0 atm (250.0 psi), including preloading. The coefficient of friction and the gasket thickness at the bearing surface shall be suitable to prevent extrusion of the gasket.

4.1.11 **LUBRICANTS:** Provision shall be made for lubrication of running parts. Lubrication zercs shall be made of non corrosive ASTM A312 316L stainless steel. Lubricants shall conform to the requirements of NAVSEA S9086-H7-STM-010 Chapter 262, Section 7.

4.1.12 PAINTING:

a. Manned Spaces: The finish of the PVHO shall be phenolic or polyamide paint system. Finishes to be used on the interiors of the operator compartments and of the PVHO shall conform to the following and a finishing procedure shall be submitted to the Contracting Officer with the Preliminary Design:

b. Non-Toxic: The paint system shall be free of toxic contaminants when cured.

c. Out-gassing Free: The paint finish shall have completed out-gassing prior to acceptance of the PVHO.

d. Flammability: Under localized fire conditions, the paint system shall not contribute to the spread of flames. The products of combustion shall not be toxic.

e. Thickness: Each coat shall be applied in accordance with manufacturer's dry film thickness. Volume solids (mixed) shall be greater than 45% (the paint shall not be thinned if the percentage of solids would fall below 45%.)

f. Paint Cure: The contractor shall cure each coat by means of forced ventilation and heat in accordance with the manufacturer's specifications. Curing time and conditions shall be recorded for each coat. Upon completion of the final cure and pressurization for leak testing, a gas sample shall be taken to verify that off gassing is complete. Material Safety Data Sheets shall be submitted for all constituents used in the paint system.

g. Steel Equipment: All steel surfaces shall be primed and painted with an epoxy, phenolic or polyamide paint system.

h. Aluminum Coatings: Hardcoat anodizing shall be performed per MIL-A-8625, Type 3 and chromate sealed. Anodizing shall be nominally 50.8 micrometers (2.0 mils) thick. Unpainted hard-coated surfaces shall be Teflon-impregnated using Dupont Vydax or equivalent.

i. Plating: All sealing surfaces of carbon steel parts shall be treated in accordance with MIL-C-26074E grade A. Surface finish roughness and tolerances of the resultant sealing surfaces shall be appropriate for the intended seal type (o-ring, lip-seal, gasket, etc.). Cadmium

plating of any surface is prohibited. Zinc plating of bolts is prohibited.

4.1.13 CORRODIBLE SURFACES: There shall be no corrodible surfaces on the exterior nor the interior of the PVHO. All surfaces shall be painted, stainless steel with a polished finish, or plated.

4.1.14 SURFACES & EDGES: Rough mill scale shall be removed from plate. Welds shall be dressed as appropriate to prevent any sharp or unsightly joints. Corners and edges shall be deburred, radiused or chamfered as specified in the contract drawings. Non-functional sharp edges or projecting points are not permitted. Grit blast to white metal per SSPC-SP-10.

4.1.15 WELD CONFIGURATION: All pressure retaining butt welds in the pressure vessel shall be full penetration double V-groove welds in accordance with paragraph AF 221!. All corner welds in the pressure vessel shall be full penetration double bevel groove welds in accordance with paragraph AF 223!. All welds to and in the pressure vessel shall be full penetration welds.

4.1.16 NOZZLE WELDS, OTHER: Nozzle welds shall be full penetration corner welds in accordance with paragraph AF 223! and paragraph AD-610!.

4.1.17 EXAMINATION OF WELDS: Full penetration corner welds in accordance with paragraph AF-223! shall be UT examined after welding is completed. In addition to and after the requirements of AF 231! are met, the metal at the base of weld metal first deposited shall be examined by MT or PT on each side.

4.1.18 WELDING PROHIBITION: No welding, hot work or other actions affecting the chamber shell shall be permitted after the PVHO has been ASME stamped.

4.1.19 WELD RECORDS: All materials welded to the pressure vessels, including welding rod, shall be documented to verify compliance with the Bill of Materials and applicable specifications. Weld records shall consist of a chamber weldment joint identification drawing for each piping system, chamber pressure shell, chamber support saddle, and chamber foundation (floor of van and the load path to the ISO support points). All chamber joint welds shall be shown and a joint identification number assigned to each weld and a chamber welder log form for each welded joint, including non-pressure retaining joints and bracket, shall be prepared. The welder log form shall contain the following information:

a. Joint Identification Number (JID)
b. Joint design type
c. Base metal type with heat and lot number
d. Filler metal type with heat and lot number
e. Fit up and inspection results
f. Welding procedure number
g. Heat treatment if required
h. Welder number
i. Type of inspection and results
j. Disposition of joint (pass/fail)
k. Any repairs of joint conducted
l. Inspection procedure number
m. NDT inspection number
n. Signature and date

A drawing showing the location of all welded joints with the applicable JID numbers shall be prepared and submitted to the Contracting Officer for both the pressure vessels and piping welds. Copies of the procedures and records shall be submitted for all heat treatments as required in herein for chamber materials.

4.1.20 CHAMBER DOORS: The exterior side of each door shall have two handles made of round bar. The interior shall have one. In addition, a grab bar type handle shall be mounted on both sides above the door.

a. Door Seals: Door seals shall be o-ring type with dovetail grooves machined into the door. All double bevel sealing surfaces shall be flat to within 0.008 cm (0.003 in); surface finish shall be equal or less than 0.80 micrometers (32 microinches rms) or as otherwise specified.

4.1.21 HYDROSTATIC TESTING: The PVHO shall be subjected to hydrostatic strength testing. The tests shall be conducted with the PVHO in all possible pressure resistant configurations. The contractor shall submit a plan for each test. The plans shall include safety precautions to be used during testing.

4.1.22 LEAK TESTING: A gaseous leak test shall be conducted after the hydrostatic strength test. The test shall be conducted with air unless otherwise specified. The maximum test pressure shall be design pressure. The gas pressure shall be permitted to stabilize as a result of temperature change. Then, the maximum test pressure shall be held for 3 hours; the pressure shall not drop more than 0.7 atm (10 psi). The pressure shall be reduced to 0.3 atm (5 psi) and held for 1 hour; the pressure shall not drop more than 0 atm (0 psi).

4.1.23 COMPONENT GROUNDING: All internal items in the chamber (bunks, table, etc.) shall be grounded.

4.1.24 HARDWARE MATERIAL: All chamber hardware/internal fittings, including but not limited to braces, chains, nuts, bolts, screws, etc., shall be fabricated of 304 or 316 grade stainless steel. All chamber bunks shall be fabricated of 304 or 316 stainless or aluminum.

4.1.25 VIEWPORT COVERS: Each viewport shall be covered with a clear plastic plexiglass cover. The cover shall be attached to the exterior viewport housing with appropriate fasteners.

4.2 SPECIFIC TO PROJECT:

4.2.1 PVHO DESIGN BASIS: All PVHOs shall be designed using Finite Element Analysis methods. The analyses shall address stresses and deflections associated with the worst case combination of inaccuracies in manufacturing within the tolerances specified on the contract drawings. Stresses resulting from shipboard motion, deck flexure, and connecting of the MTLs and the DTL must also be considered.

(Amend. 3)

4.2.2 O-RINGS: All o-rings shall be Viton (fluorocarbon) unless approved in writing, in advance, by the Contracting Officer. All o-rings not in installed position shall be bagged and tagged with part number, AND assembly number, ~~and expiration date.~~

4.2.3 GENERAL LUBRICANTS AND SEALING COMPOUNDS: Lubricants and sealing compounds shall be rated by the manufacturer for use with the fluid for which it will be employed. Lubricants used in air systems shall be per NAVSEA 59086-H7-STM-010 Chapter 262.

4.2.4 DOORS AND HATCHES:

a. Hinge Assemblies: All door and hatch hinge designs shall provide adequate means of adjustment to permit centering on the associated opening and ensure uniform contact of the mating sealing surfaces. Adjustment details shall permit the mechanisms to be "locked down" once adjusted. The hinge assemblies shall be designed to positively prevent inadvertent and/or vibration induced loosening of attachments from occurring.

b. Restraints and Bumpers: Restraints shall be provided for all hatches and doors such that they can be readily secured in both full open and full closed positions. Restraints for closed positions shall be designed to release prior to the development of a hazardous energy level in the event that the door/hatch becomes inadvertently reverse pressurized. Restraints for shipping shall be capable of withstanding a

force equal to at least three times the weight of the hatch, regardless of direction of the load vector, with a factor of safety of at least two relative to material yield strength. The pressure vessel shall be fitted with neoprene bumpers that protect the vessel from damage due to impact of hatches/doors.

c. Medical/Supply Lock Analysis: The SDC PVHO design shall take into account Fatigue Stresses in accordance with ASME BPVC Section VIII, Division 2, per NAVSEA SS521-AA-MAN-010, paragraph B-2.1, for the 1,000 pressure cycles anticipated during the life of the system.

d. Hatch Sealing Characteristics: With the exception of the medical/supply lock outer door, all hatches shall be designed to seal with pressure.

4.2.5 MEDICAL/SUPPLY LOCK: Each SDC PVHOs shall be equipped with a small lock-in/lock-out compartment sized to permit easy transfer of the oxygen treatment packs, medical supplies, food, and fluids. The lock shall be able to pass a solid object having a diameter of 45.7 cm (18.0 in) and a length of 55.9 cm (22.0 in). The medical lock outer door shall have an over center cam style door mechanism, with a strong back and hinge assembly which meets the quick acting closure requirements of ASME. The pressurization of the medical lock shall not be possible without the outer door cam fully pressurized. Opening and closing of the door shall not cause the door to scrape, pinch, or cause abrasion to the o-ring surface. The entire assembly shall meet all the requirements for ASME Section VIII for quick opening closures. Documentation must be provided for all materials used in fabrication. All medical lock closing surfaces shall be fabricated of 304 stainless steel. The inner medical lock shall be flat plate type with o-ring groove. Two clip type attachments shall be provided to hold the inner door in the closed position. A détente type attachment shall be provided to hold the inner door in the open position. The medical lock door assemblies shall be fabricated of 304 grade stainless steel. The lock pressurization and depressurization controls shall be located in the operator's compartment.

4.2.6 PVHO COLOR: The internal and external surfaces of the PVHO shall be painted a semi-gloss white.

(Amend.3)

4.2.7 FACTORS OF SAFETY: For portions of the SDC van structure not specifically covered by ASME PVI the contractor shall apply a factor of safety of 1.8 to yield and 2.0 to ultimate, which ever is more conservativ The transportation load and operational load cases for the van structure shall be considered and analyzed ~~sepa~~ separately

4.2.8 IDENTIFICATION: The chambers shall be identified in accordance with MIL-STD-130. The marking shall be applied to the chamber on an identification plate conforming to A-A-50271. The plate(s) shall be attached to the PVHO by welding. Hollow-bolt penetrators shall be marked with manufacturer's abbreviation, National Board number and a sequential number.

4.2.9 PENETRATORS:

a. General: Penetrator location must permit easy access for inspection, maintenance and repair. Penetrator type and location is subject to review and approval of the Contracting Officer. Spare penetrators should be distributed over the two hemispherical ends and located such that later use will not interfere with existing controls, furnishings, or fittings.

b. Hollow-Bolt Fluid Penetrators: Penetrators for fluid service up to and including 5.1 cm (2.0 in) tube size shall be of the hollow-bolt type consisting of a shouldered bolt with external straight threads interfacing with a nut that secures the bolt within a faced integral reinforcement. The bolt shall be designed such that it is inserted into the reinforcement from within the pressure vessel so that the force due to pressure is carried by the head of the bolt. The bolt shall be bored and provided with a boss and threads to accept straight-thread o-ring

sealed tube fittings manufactured in accordance with SAE J1926. The underside of the head of the bolt shall be furnished with an o-ring groove to seal against the face of the reinforcement. The nut of the assembly shall thread onto the bolt from the exterior of the vessel and shall be fitted with a device to provide positive protection against loosening due to vibration.

c. Sanitation Studding Outlet Penetrators: Studding outlet penetrations shall be provided for all sanitation penetrations of greater than 5.1 cm (2.0 in) nominal tube size. The penetration design shall be machined from the specified forging material to facilitate use of type 1 butt weld between penetration and the vessel shell/head.

d. Electrical Penetrations: Design of pressure boundary penetrations reinforcement for installation of electrical penetrators shall be of similar design to hollow-bolt fluid penetrations. Electrical penetrations shall be of a sealed-pin type. Stuffing tubes shall not be permitted.

e. Spare Penetrators: At least 10 spare hollow-bolt type penetrations, of the following clear bore diameter, in each manned compartment shall be provided: 1) 30.0 mm (1.2 in) diameter - 4 penetrators, 2) 40.0 mm (1.6 in) diameter - 4 penetrators, 3) 60.0 mm (2.4 in) diameter - 2 penetrators.

4.2.10 **MATING CAPABILITY - EVACUATION ASSETS:** The SDC PVHOs shall be equipped with the Government Furnished NATO Standard Mating Flange adapter capable of mating with the U.S. Navy Transportable Recompression Chamber System (TRCS) for the purpose of evacuation of personnel under pressure to other medical facilities, and to permit a modified TRCS Transfer Lock to serve as an outer access lock.

4.2.11 **FLOOR PLATES:** Floor plates shall be provided for the chamber interiors. Floor plates shall be fabricated from non-corrosive materials. Each floor plate shall be secured to the floor plate support by quarter turn release type fasteners. Finger holes shall be provided on each end or each floor plate to assist personnel in lifting/removing the plates. Each floor plate shall weigh no more than 15.75 kg (35 lbs).

4.2.12 **GAS SAMPLE:** Ambient gas samples taken inside of the chamber shall be provided. Samples shall be taken after all welding, painting and testing has been completed, and the chamber is ready for delivery. The ambient samples shall analyze the entire interior of the chamber, and shall be taken after a 12 hour soak time at 9.1 msw (30 fsw). Samples shall be taken * ~~near 1.0 atm (14.7 psi)~~ and at maximum chamber depth. A 24 hour system leak test must also be completed after gas samples have been taken.

(Amend. 3)
* AT 9.1 MSW (30 FSW)

4.2.13 **MEDICAL MONITORING PORTS:** Each SDC PVHO shall be equipped with a minimum of four medical monitoring ports positioned near the bunks closest to the operator's end of the chamber. The preferred location for the monitoring ports is close to the overhead handrail which will support the portable medical monitors. Final placement of these ports shall be subject to review and approval of the Contracting Officer. These ports shall consist of 4-wire RS232 connections in the 9-pin D connector standard. The ports shall terminate at a monitoring board in the operator's compartment. The monitoring board shall have 4 connectors corresponding in numbering to the 4 RS232 ports within the chamber.

4.2.14 **SADDLE SUPPORTS:** Each SDC PVHO shall be supported by saddles. The final size, number, location, and configuration of the saddles shall be determined during detailed design. Special precautions shall be taken when locating the PVHO within the van structure, to conform to the requirements as indicated on NAVSEA drawing 7268144. Additionally, the saddles shall be designed to allow adjusting and shimming of the PVHO in the following planes of movement:

Longitudinal adjustment: ±1.27 cm (0.5 in)

| | |
|---|---|
| Side adjustment: | ±1.27 cm (0.5 in) |
| Vertical adjustment: | +2.54 cm (1.0 in) |

END OF SECTION

# 5 QUALITY ASSURANCE

## 5.1 GENERAL REQUIREMENTS:

5.1.1 APPROVAL FOR DEVIATIONS: All work performed shall be in accordance with and to the standards and specifications cited in each section of the solicitation and submitted to the Contracting Officer. Approval of the Contracting Officer must be obtained prior to change or implementation.

5.1.2 DESIGN REVIEW MEETINGS: Design and fabrication review meetings shall be held by the contractor at the contractors facility, at time intervals no greater than six weeks. Two weeks advance written notice shall be furnished to the Contracting Officer prior to each meeting.

5.1.3 CONTRACT ADHERENCE: The contractor shall rigidly adhere to the requirements for qualification, certification, test, examination and inspection required by the various contract documents.

5.1.4 SUBCONTRACTORS: Subcontractors shall be monitored by the contractor to assure timely and adequate performance and adherence to approved specifications. Copies of all certifications/qualifications required for the subcontractor to perform its work shall be submitted by the contractor to the Contracting Officer.

5.1.5 SUBMISSION NUMBER: All submissions and submittals required by this contract shall include one (1) original and four (4) copies of the submission.

5.1.6 DISK COPIES: Systems manuals shall be prepared using a commercially available word processing program. All drawings shall be prepared on a commercially available computer aided design program. The component database shall be prepared on a commercially available spreadsheet design program. All submissions of systems manuals and component database shall include floppy disk copies of the system manuals and component database formatted for Windows/MS-DOS (IBM compatible). All submissions of drawings shall include CD copies of the drawings. Final disk submission of systems manuals, drawings, and component database shall be marked "As built." Final disk submissions of drawings shall include the names of all signers present and the date of signature. Complete files must be in a format which can be used by Microsoft Word version 6.0, AutoCAD release 12 or 13, Excel version 5.0 or dBase III plus.

5.1.7 NOTIFICATION OF TESTING: The contractor shall provide the Contracting Officer with written notification of all testing. This notification shall be received by the Contracting Officer a minimum of 15 working days prior to the date of the test.

5.1.8 CONTRACTOR'S RECORDS AND DOCUMENTS: The contractor shall submit copies of all records and documents required by this contract and the codes and specifications cited herein. One (1) original and four (4) copies shall be submitted.

5.1.9 PIECEMEAL SUBMITTAL: Piecemeal submittal of any submittals required by this specification is unacceptable, and such submittals will be returned without review.

5.1.10 QUALITY ASSURANCE PLAN: The contractor's Quality Assurance Plan shall be in accordance with ANSI/ASQC Q9001, ISO 9001. As a minimum content, the program plan shall disclose the contractor's planned approach for fulfilling the requirements of ANSI/ASQC Q9001-1994, Section 4. A description of the organization fulfilling the quality program requirements for this project with a definition of the responsibility and authority of each functional element shall be included. All of the contractor's documented policies or procedures which implement the quality program shall be identified in appropriate places within the plan. A summary of the objective or purpose of each procedure shall be given. The plan must delineate, by flowchart or similar technique, where inspection, audit and

other controls are applied to assure compliance with the contract quality requirements and must identify each assembly, process and inspection instructions applicable to the contract hardware and show where it is applied. The plan shall describe the method by which the plan will be applied to subcontractors.

Records are the major form of Objective Quality Evidence (OQE) to verify compliance with contract requirements. Records shall be complete, signed, dated and made available to the Contracting Officer for review. The Quality Assurance Program shall result in recorded data related, but not limited to:

a. Configuration management and drawing control. The contractor shall implement an internal configuration management system for the control of design drawings, design documentation and production specifications related to manufacturing of the system. Production specifications include process control procedures and work instructions. The configuration management procedures shall include a clearly defined and documented system of change and revision.

b. Material control. The material control program shall document that materials and components installed in the system are the same as specified in the system drawings. Material control shall include, but not be limited to, receipt inspections and material tracking during fabrication and assembly.

c. Fabrication and manufacturing control. The contractor's quality program shall result in production records as required by system drawings and invoked manufacturing specifications.

d. Cleaning, cleanliness control and atmospheric analyses (refer to paragraph C3.1.45).

e. Testing (refer to paragraphs C5.1.21 and C5.1.22).

f. Deficiencies waivers, and deviations. All design/material deficiencies, waivers, and deviations shall be logged and tracked to verify their final disposition.

5.1.11 **PRELIMINARY DESIGN PACKAGE:** Documents in this package shall be of sufficient detail to demonstrate the contractor's plan for the work described in this contract is in conformance with this contract as well as demonstrating the technical and functional feasibility of the contractor's plan. All elements of the design shall be in strict conformance with the cited codes and standards. It shall clearly indicate where equipment, components and piping runs are intended to be located. Pragmatic issues of installation and maintenance shall be addressed. Drawings shall be in accordance with MIL-STD-100. Drawings shall be 11 inches by 17 inches, LEVEL 2 drawings. A CD-ROM containing electronic media of the drawings shall also be submitted with the preliminary design package hard copy. The Contracting Officer will respond to the Preliminary Design submittal within 30 days of receipt. The preliminary package shall consist, as a minimum, of the following:

a. General arrangement drawings.
b. System piping and electrical schematics.
c. Calculations, Analyses and Engineering Data.

1. Oxygen BIBS Header Gas Flow Rates
2. Air BIBS Header Gas Flow Rates Analysis
3. Pressurization and Depressurization Line Gas Flow and Blow Down Rates Analysis
4. Piping and Tubing Flexibility Analysis
5. Sanitation Piping System Flow Analysis
6. Thermal Conductivity Analysis To Size Heating, Cooling, and Dehumidification Unit of the Operator Compartment
7. Thermal Conductivity Analysis to Size Heating and Cooling Unit of SDC Van Dead Space

8. Thermal Conductivity Analysis to Size Hyperbaric Heating, Cooling, Dehumidification Unit
9. Forced Air and Convection Flow Study to Layout SDC Chamber Air Ducting
10. Structural Analysis on SDC PVHO Design
11. Structural Analysis on SDC Medical/Supply Lock Design
12. Structural Analysis (FEA) on SDC Hatch Stresses at DTL and MTL Interfaces
13. Structural Analysis (FEA) on SDC Support Saddles
14. Structural Analysis (FEA) on SDC Van Frame for PVHO and SRS Van Support
15. Alignment Analysis to confirm SDC to DTL Interface Tolerances
16. Hazard Analysis
17. Weight Analysis
18. Human Factors Analysis
19. PVHO Materials and Weight Analysis
20. Pressure Vessel Calculation Package
21. Certification Analysis
22. Van Analysis

d. Proposed material and manufacturing specifications and qualifications.
e. Preliminary component manufacturer's design data.
f. Subcontractors identification.
g. Panel ID tags.
h. Test plans.
i. Material Safety Data Sheets.

5.1.12 **FINAL DESIGN PACKAGE:** The Final Design shall be the final versions of the elements of the Preliminary Design Package. Should the contractor find an alternative Final design item, but that differs from the Preliminary Design submission for the respective item, the details of this alternative design item shall be fully documented in the Final Design package. The alternative Final design items shall be a distinct and separate part of the Final Design Package. The contractor shall provide details on why the change is recommended and any benefits to the Contracting Officer in making this change. The Contracting Officer shall have the right to accept this alternative Final Design item, or to require the contractor to proceed in accordance with the Preliminary Design for the respective item. Should the Contracting Officer choose to accept the alternate Final Design item, it shall be at no additional cost or time to the Contracting Officer. The Contracting Officer will respond to the Final Design submittal within 30 days of receipt.

5.1.13 **DRAWING PACKAGE:** At a minimum the drawing package shall be prepared and contain information equivalent to the information required by DOD-D-1000, level 2 drawings. Dimensioning and tolerancing shall be metric, and shall be in accordance with ANSI Y14.5M. Drawing preparation and conventions shall be in accordance with MIL-STD-100 (latest edition).

a. Title Page: The title page shall contain the contractor's name and address, the contract name, location and number, the Naval Facilities Engineering Service Center East Coast Detachment (NFESC ECDET) name and address, and any other pertinent information identified.

b. Drawing Tree: The drawing tree shall start with a "Top Drawing," with subsequent drawings developing from subsystems to elements to components, etc. Elements of a subsystem shall be numbered as sub drawings of the subsystem, etc. (see d. below).

c. General Arrangement Schematic: A single overall schematic drawing of the entire system shall be provided. This drawing shall be organized to provide easy understanding of the capabilities and configuration of the entire system. It shall show where each component is located.

d. Drawing Numbers: Drawing format and numbers shall be in NAVSEA format with assigned NAVSEA numbers. Each drawing (each drawing sheet) shall be given an independent and unique drawing number. Drawings shall be sequential in number. Where there are multiple layers of one drawing

for fabrication details (panels, etc.), there drawings can have numbers with the unique drawing number followed by -1, -2, -3, etc. (i.e. 23456-1, 23456-2, etc.). A single drawing number for the entire drawing package is not acceptable.

5.1.14 **LIST OF ANALYSES:** The following analyses shall be performed by the contractor and submitted to the Contracting Officer for review. The analyses shall be subject to approval by the Contracting Officer and the results of the analyses employed in the design of the SDC Segments.

a. Piping Size and Flow Analyses:

1. Oxygen BIBS Header Gas Flow Rates Analysis: An analysis of the final piping configuration shall be performed and will examine flow demand, flow capability, pressure drops, and flow rates in the system. The analysis shall verify the system is adequate for the application. Piping, valve, bend, junction, and component sizes shall be confirmed.

2. Air BIBS Header Gas Flow Rates Analysis: An analysis of the final piping configuration shall be performed and will examine flow demand, flow capability, pressure drops, exhaust (if overboard dump is used) and flow rates in the system. The analysis shall verify the system is adequate for the application. Piping, valve, bend, junction, and component sizes shall be confirmed.

3. Pressurization and Depressurization Line Gas Flow And Blow Down Rates Analysis: An analysis of the final piping configuration for pressurization and depressurization shall be performed and will examine flow capability, pressure drops, and flow rates in the system. The analysis shall verify the system is adequate for the application. Piping, valve, bend, junction, and component sizes shall be confirmed.

4. Piping and Tubing Flexibility Analysis: Pipe and tube flexibility of sections transversing hard mounted structures or equipment which may move relative to one another shall be demonstrated through flexibility analysis calculations in accordance with ASME B31.1 for all pipe larger than 0.95 cm (0.375 in) and all tube larger than 0.21 cm (0.083 in). Impact of transportation accelerations and loads, sea state induced acceleration and loads, and installation shock shall be included in the analysis. Stress analysis calculations shall be in accordance with ASME B31.1 and shall demonstrate the adequacy of the piping system to withstand all anticipated loading conditions, including those calculated in the piping flexibility analysis.

5. Sanitation Piping System Flow Analysis: An analysis of the sanitation piping system shall be performed to verify adequacy for the application and to confirm the system presents no safety hazards to the operators or users.

b. Environmental Control System Analyses: (Note: Due to the interdependence of these areas, these may be performed as a single master analysis in which the resultant data for all four analyses may be separated as detailed below.)

1. Thermal Conductivity Analysis To Size Heating, Cooling, and Dehumidification Unit of the Operator Compartment: Analysis will include thermal contributions of PVHO, dead space thermal conditioning, operating equipment (including but not limited to analyzers, transformers, UPS, intercoms and television monitors), two operators and an observer, medical/supply lock cycling, moderate use of the van door, and external heat and cooling loads impressed by the environment. Effects of the van wall conductivity, insulation, and convection must be considered. Steady state ~~and transient~~ analyses will be performed.

(Amend. 6)

2. Thermal Conductivity Analysis To Size Heating and Cooling Unit of SDC Van Dead Space: Analysis will include thermal contributions of outside environment, PVHO as occupied steady state for an occupancy range of empty to full, PVHO pressurization and depressurization transients, dehumidification demands, and other contributors identified as the design matures. Effects of van wall conductivity, insulation, and convection must be considered. Steady state ~~and transient~~ analyses will be performed. (Amend. 6)

3. Thermal Conductivity Analysis To Size Hyperbaric Heating, Cooling, Dehumidification Unit: Analysis will include thermal contributions of van dead space heating and cooling, outside environment as conducted through the exposed hatch areas, occupants, scrubbers, cameras, lights, monitors, fans, medical/supply lock cycling, PVHO pressurization and depressurization transients, dehumidification demands, and other contributors identified as design matures. Effects of van wall conductivity, insulation, and convection must be considered. Steady state and transient analyses will be performed.

4. Forced Air and Convection Flow Study to Layout SDC Chamber Air Ducting: An analysis shall be performed to predict the convection flows and impact of forced air distribution of the chamber when occupied, for the occupancy range of empty to full, to demonstrate the adequacy of the system. If ducting of the forced air heating/cooling/dehumidification units is indicated, such will be included in the design and the analysis updated as required to demonstrate the adequacy of the design.

c. Structural Analyses:

1. Structural Analysis on SDC PVHO Design: All PVHOs shall be designed using Finite Element Analysis (FEA) methods. The analyses shall address stresses and deflections associated with the worst case combination of inaccuracies in manufacturing within the tolerances specified on the contract drawings. Analysis to predict the response of strain gauge testing of the PVHO shall be performed. Strain gauge testing shall be performed by the contractor, and the results compared with predictions and the analysis updated to verify the design behavior and adequacy.

2. Structural Analysis on SDC Medical/Supply Lock Design: All PVHOs shall be designed using FEA methods. The analyses shall address stresses and deflections associated with the worst case combination of inaccuracies in manufacturing within the tolerances specified on the contract drawings.

3. Structural Analysis (FEA) on SDC PVHO Hatch Stresses at DTL and MTL Interfaces: An analysis of the forces on the forging ring of the SDC PVHO using the inputs given in the SDC/DTL Interface Control Drawing shall be performed. This analysis shall guide the design of the hatch itself, its flange, coaming, attachment to the PVHO, and the surrounding PVHO structure. The analysis shall also confirm the adequacy of said design. The forces expressed on the SDC hatch and surrounding structure as a result of the attachment to the DTL and MTL shall also be calculated in the analysis. The anticipated forces applied to the SDC forging rings are as outlined in section C4.1.8. Impact of forces on the overall structure and transmission of the forces through the support saddles and van structure shall be included. This analysis may be performed as a part of Analysis 1 above.

4. Structural Analysis (FEA) on SDC Segment Support Saddles: An analysis shall be performed to guide the design of, and confirm the adequacy of the design of, the saddles which support the PVHO chamber within the SDC Van. Impact of the forces determined in the FEA Structural Analysis on SDC PVHO Hatch Stresses at DTL and MTL

Interfaces shall be included. Transportation shock and sea state impact shall be included.

5. Structural Analysis (FEA) on SDC Van Frame for PVHO and SRS Van Support: An analysis shall be performed to guide the design of, and confirm the adequacy of the design of, the SDC Van structure and its ability to support the PVHO and the SRS Control Van and Spares Van above. The forces on the ISO van attachments and their adequacy shall be included. Impact of the forces determined in the FEA Structural Analysis on SDC PVHO Hatch Stresses at DTL and MTL Interfaces shall be included. Transportation shock and sea state and wave impact shall be included.

6. Alignment Analysis to confirm SDC Segments to DTL Interface Tolerances: A tolerance stackup analysis of the permissible design tolerances on the PVHO, hatch flanges, saddles, van structure, and installation and assembly procedures shall be performed to insure the SDC PVHO hatch structures which mate to the DTL and MTL hatches are positioned with sufficient accuracy to conform to the governing ICDs.

7. Pressure Vessel Calculation Package: A complete pressure vessel calculation package in accordance with ASME BPVC Section VIII Division I * and ASME PVHO-1, shall be performed. The package shall include, as a minimum,:

(Amend. 3)
* or Division II

   a. Head and Shell thickness calculations
   b. Minimum reinforcement of openings
   c. Minimum weld thicknesses
   d. Saddle support and placement calculations
   e. Viewport calculations as outlined in ASME PVHO-1
   f. PVHO view port enclosure forms

8. Van Analysis: An complete structural calculation analysis package shall be prepared establishing the conformance of the design to the SOW requirements. This analysis shall be established and reviewed in an analytical form. This analysis shall draw together many of the previously listed analyses and some additional analyses and shall include the following:

   a. Structural loading of the vans in all modes of transportation and operational use.
   b. Transient loading of the van structure due to worst case conditions as created from air and ground transportation, shipping and rigging, placement, sea state conditions on the VOO with the structured burdened by the Spares and Control Vans where appropriate.
   c. Report of the structural choices selected to fabricate the van structure, including materials selected, size and shape of structural members, minimum requirements for fasteners, weld sizes and thicknesses.

d. Hazard Analysis: A comprehensive Hazard Analysis shall be performed by the contractor to identify areas of the design presenting potential dangers to the occupants, operators, and/or bystanders. The environmental impact of the storage, transportation, use and disposal of materials employed in the system shall be included. The hazard analyses will be performed in accordance with MIL-STD-882. The following tasks are required:

Task 101 System Safety Program Plan
Task 102 Integration/Management of Associate Contractors, Subcontractors and Architect and Engineering Firms
Task 105 Hazard Tracking and Risk Resolution
Task 202 Preliminary Hazard Analysis
Task 203 Subsystem Hazard Analysis
Task 204 System Hazard Analysis

e. Human Factors Analysis: A Human Factors Analysis shall be performed prior to each design review to demonstrate the design meets accessibility and operability requirements of the SOW.

f. PVHO Materials and Weight Analysis: An analysis shall be performed to determine the selection of the materials used in the PVHO. The selection of materials shall be driven by the fundamental design objective of minimum weight. The study shall include corrosion resistance allowance in areas such as saddle supports, o-ring groves, and long term maintenance of mating surfaces.

g. Certification Analysis: An analysis establishing the conformance of the design to the SOW requirements shall be established and reviewed in an analytical form, and shall be certified by a Professional Engineer. This analysis shall draw together many of the previously listed analyses and some additional analyses and shall include the following calculations to determine:

a. Required pressurization rates, ventilation rates, and the conditions under which those rates are to be maintained.
b. Required valve and line sizing.
c. Breathing gas outlet sizing.
d. Required $CO_2$ removal system, size, required consumables, and required redundancy when the chamber is subject to full occupancy under worst case conditions.
e. Sizing of the chamber's environmental control system. These shall include as a minimum valve, piping, coil, and component sizing under full occupancy under worst case conditions and under minimal occupancy with worst case conditions.

5.1.15 NOISE ABATEMENT PLAN: The contractor shall prepare and submit a Noise Plan to the Contracting Officer. This plan shall identify the design precautions, plans, and procedures undertaken to insure the piping, valving, and appliances in the SDC chamber and operator's compartment will meet the noise specifications of paragraph C3.2.16.1 herein. The plan shall include, but not be limited to: 1) the determination of gas velocity in all piping, fixtures, and bends; 2) the impact of piping layout; 3) the summation of all noise sources such as piping, fans, scrubbers, recirculators, cooling \and heating apparatus, piping, and oxygen treatment header flows; 4) the identification of areas of noise risk; and 5) the means to reduce anticipated noise risks. A preliminary copy of the plan shall be due with the Preliminary Design package. Updates of the plan shall be submitted with the Final Design package and again prior to start of fabrication. (Amend. 3) Verification of Chbr. noise levels shall be measured inside the SDC's with all operational eqpt. running, at full Chbr. vent on the surface, with doors open

5.1.16 WEIGHT PLAN: The contractor shall prepare and submit a weight plan to the Contracting Officer. This weight plan shall identify the design precautions, plans, and procedures undertaken to insure the SDC chamber, van, outfittings, furnishings, plumbing, piping, valving, appliances will meet the weight specifications of paragraph C2.2 herein. The plan shall include, but not be limited to: 1) the provision of an expected weight for the design, as determined in the Weight Analysis; 2) identification of the center of gravity of the SDC PVHO, and concurrence of the location of the center of gravity is consistent with the specifications of paragraph C2.2.2.2 herein; 3) identify areas of risk the design presents to meeting the weight requirements, including major weight contributors; 4) identification and detailing of risk mitigation means and approaches to address the risk areas arising as the system is designed and fabricated. A preliminary copy of the plan shall be due with the preliminary design package. Updates of the plan shall be submitted with the final design package and again prior to start of fabrication.

5.1.17 RECORD DRAWINGS AND DOCUMENTATION: The contents shall show the work as it was actually performed.` One drawing set shall be provided with original signatures, and shall be "D" size. The blue line drawings shall be 17 inches by 22 inches, or a drawing size acceptable to the Contracting Officer. All submissions of drawings shall include electronic AutoCAD copies of the drawings in CD format. It shall consist of:

a. As built drawings for all drawings provided.
b. A serialized group of all component catalogues that are delivered with the components. They usually contain operation, maintenance, exploded view, replacement part numbers, etc.
c. Weld Maps/JIDs.

5.1.18 **SYSTEMS MANUAL:** The contractor shall provide Systems Manuals. The contractor is responsible for providing all sections for systems provided under this contract. The manual shall consist of the following:

a. General System Description: The Contracting Officer will furnish information to be included in this section.
b. System Certification: The Contracting Officer will furnish the information to be included in this section.
c. There shall be a section addressing each of the Hyperbaric Systems. The following data shall be provided by the Contractor for each system:

1. System Operational Capabilities, Limitations and Set Points.
2. System Narrative Description.
3. System Piping and Electrical Schematics.
4. System Operating Instructions.
5. System Maintenance Instructions.
6. System Design Computations.
7. System Spare Parts Data.
8. Component List.
9. System Functional Test.

also see 5.1.6

5.1.19 **CONTRACTOR'S RECORDS AND DOCUMENTS:** Contractor's records and documents shall include all records and documents required by this specification. These shall include, but are not limited to:

a. Test Reports
b. Inspection Reports
c. Test Plans
d. Travelers/Route Sheets
e. Mill Certs/Material reports
f. Procedures
g. Qualifications
h. Records
i. Working drawings
j. Radiographs
k. Material Data Sheets
l. Pressure Vessel Records
m. Deficiency Reports
n. Records of all waivers and deviations

5.1.20 **COMPONENT DATABASE:** The Component Database provides design, procurement and manufacturer's data about the components. It shall be in the form of a loose leaf book. It is observed that the database requirement can best be met by the use of a personal computer and any one of several commercially available database software computer programs. The database fields (columns) shall be:

a. Component Identification Tag number.
b. Design data:
    1. Type Component.
    2. Size.
    3. Drawing Number used on.
    4. Required Psi.
    5. Material Body and Seat.
    6. End Connection Type and Material.
    7. Required Voltage (nominal, acceptable range)
    8. Required Power (average, peak)
    9. Hazardous Materials
c. Manufacturer's Data:
    1. Manufacturer's name.
    2. Manufacturer's address, telephone number.

3. Manufacturer's CAGE
4. Model Number.
5. Federal Stock Number.

d. Maintenance Data:
1. Part number and price of consumables.
2. Frequency of maintenance.
3. Manufacturer's Recommended Spare Parts.
4. Time to repair and/or replace.
5. Production lead times.

5.1.21 **FUNCTIONAL TEST PLAN:** The contractor shall submit a functional test plan for the complete test of all hardware provided as part of this specification. The functional test plan shall be integrated and hierarchical, beginning at the assembly/subsystem level and include system level testing. The functional testing shall include valve line up, functional testing procedures, pass/fail criteria and shut down of the system being tested. There shall be initial blocks for all steps of the functional test plan. There shall be final signature blocks for both the contractor's completion and the Contracting Officer's witnessing of successful functional test. The test plan shall contain, as a minimum, the following data:

a. Test purpose/objectives.
b. Identify each assembly to be tested.
c. Describe test set up at each level of test, including diagrams and sketches to illustrate the test set-up.
d. Describe or identify all test equipment required. Calibration of test equipment.
e. Describe all test procedures, including test sequence, test parameters, participants, and pass/fail criteria.
f. Provide sample test data sheets to illustrate test data to be documented and delivered at each level of test.
g. Establish criteria for acceptance at each level of test and describe the procures to be followed in the event of malfunction or failure.
h. Identify critical or unusual tests or test conditions.
i. Overall test schedule.

5.1.22 **SYSTEM FUNCTIONAL TEST:** The contractor shall be required to demonstrate by testing that all piping, instrumentation and systems are capable of meeting all the criteria contained in this SOW. The functional test shall not be conducted until all other required testing has been completed, gas analysis reports have been received, and final as built drawings have been submitted to the Contracting Officer. The contractor shall prepare a test plan and a test report.

5.1.23 **MAINTENANCE EQUIPMENT:** The contractor shall identify any special maintenance equipment required for the operation and/or maintenance of the SDC Segments and provide any procurement information related to the special maintenance equipment.

5.1.24 **MISSION SUPPORT EQUIPMENT:** The contractor shall identify any special mission support equipment required for the operation and/or maintenance of the SDC Segments and provide any procurement information related to the special mission support equipment.

5.1.25 **FACTORY SUPPORT EQUIPMENT:** The contractor shall identify any factory support equipment required for the operation and/or maintenance of the SDC Segments and provide any procurement information related to the factory support equipment.

5.1.26 **TRAINING SYSTEM:** The system shall not require extensive training for personnel familiar with U.S. Navy hyperbaric operations. The system shall be able to support imbedded training scenarios. The contractor shall provide three days of user indoctrination of the SDC Segments. The user indoctrination shall consist of the following: Walk through of the facility systems including system capabilities; limitations and set points;

system description; system operating instructions, and, system maintenance and overhaul. The operation and maintenance manuals shall be reviewed.

5.1.27 **TRANSPORTATION SUPPORT SYSTEM:** The contractor shall identify any special transportation support equipment required for the operation and/or maintenance of the SDC Segments and provide any procurement information related to the transportation support equipment.

5.1.28 **PROJECT SCHEDULE:** The contractor shall prepare a contract progress schedule that clearly defines the tasks necessary to accomplish the work. The schedule shall be a Gantt chart or CPM chart. The schedule shall be composed of defined and documented Milestones and Tasks (M&T). Milestones are defined as having no time duration; whereas, Tasks have time duration. The schedule shall show the order and interdependence of M&T and the sequence of M&T execution necessary to complete the contract. The schedule shall show the M&T which comprise the critical path. It shall show the float for those M&T not on the critical path. Procurement and subcontracting tasks may cite total individual procurement or subcontract cost. Copies of M&T documents whose work was completed during an invoicing period shall be submitted with the invoice for that period. The M&T documents shall be signed by the contractor to indicate certified completion of the Task. The monthly update of the contract schedule shall contain the date of effect of that update and a list of the revision dates of the schedule. The following shall be included in the schedule as either milestones or tasks, as a minimum, in addition to others necessary to describe the work:

a. Work Tasks.
b. Contractual execution date requirements milestones.
c. Government furnished information and/or equipment milestones.
d. Contractual submittal date requirements milestones.
e. Procurement activities including major equipment tasks.
f. Subcontract activities tasks.
g. Quality Control checks.

5.1.29 **MONTHLY REPORTS:** The contractor shall provide a monthly report which shall include updates of the Project Schedule. The revised documents shall reflect any changes occurring since the last updating. It shall also include a current Progress Report containing a summary of all work performed and any problems and their solutions encountered during the reporting period, and a statement of the overall status of the project.

END OF SECTION

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE: (j)
PAGE 1 OF PAGES 4

2. AMENDMENT/MODIFICATION NO.: P00001
3. EFFECTIVE DATE: See Block 16C
4. REQUISITION/PURCHASE REQ. NO.: Not Applicable
5. PROJECT NO. (if applicable):

6. ISSUED BY — CODE: N47408

NAVFACCO, Code 2727
Offshore Facilities Contracts Branch
Washington Navy Yard
1435 Pendellton Ave., S.E. Bldg. 218, Suite 3000
Washington, DC 20374-5063

7. ADMINISTERED BY (If other than Item 6) — CODE:

**DUPLICATE ORIGINAL**

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

Environmental Tectonics Corporation
County Line Industrial Park
125 James Way Road
Southhampton, PA 18966

CODE — FACILITY CODE

(✓) 9A. AMENDMENT OF SOLICITATION NO.:

9B. DATED (see item 11):

X 10A. MODIFICATION OF CONTRACT/ORDER NO.: N47408-98-C-2103

10B. DATED (see item 13): 25 September 1998

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
N/A

## 13. THIS ITEM APPLIES ONLY TO MODIFICATION OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

(✓) A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGE SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

X C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
FAR 52.243-1 CHANGES – FIXED PRICE

D. OTHER (Specify type of modification and authority)

E. **IMPORTANT:** Contractor ☐ is not, ☒ is required to sign this document and return **two** copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section heading, including solicitation/contract subject matter where feasible).

The purpose of this modification is to execute nomenclature changes to the drawing and specifications as follows:

------Continued on Page 2-------

99-05-07P01:22 CFMD

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)
Richard E. McAdams, Executive Vice President

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
RITA D. PALMORE
Ordering Officer

15B. CONTRACTOR/OFFEROR
(Signature of person authorized to sign)

15C. DATE SIGNED: 4/6/99

16B. UNITED STATES OF AMERICA
BY Rita D. Palmore
(Signature of Contracting Officer)

16C. DATE SIGNED: 4/6/99

## SECTION C DESCRIPTION/SPECIFICATIONS

### C.1 Statement of Work:

1. Change Specification Paragraph 2.2.2.1.1 SDC, PVHO, (a), from "6.8 atm (100 psig)" to "5.44 atm (80 psig)".

2. Change Specification paragraph 4.1.6, CORROSION ALLOWANCE, to read "No corrosion allowance shall be included in the design".

3. Change Specification paragraph 2.2.2.2, SDC VANS OPERATION REQUIREMENTS, from " Maximum Weight: 17,706 kg (39,000 lbs)" to "Maximum Weight: 16,581 kg (36,523 lbs)".

4. Change drawing 7268120 as follows:

   a. Revise Note 3 to read as follows:

SEQUENTIAL NUMBER: USED FOR SDS ONLY.
2 DIGIT CODE DENOTING THE SEQUENTIAL NUMBER OF THE COMPONENT FOR THE SAME SERVICE. SERVICE ABBREVIATIONS ARE LISTED IN NOTE 6.

   b. Change Note 4 to Note 5 and revise to read as follows:

REPETITION NUMBER: USED FOR SDS ONLY.
WHEN GROUPS OF IDENTICAL COMPONENTS ARE REPEATED FOR THE SAME SERVICE AND HAVE IDENTIAL FUNCTIONS, THEY MAY UTILIZE REPETITION NUMBERS. REPETITION NUMBERS APPLY TO COMPONENT LABELING ON THE DRAWING ONLY. REPETITION NUMBERS SHALL NOT BE USED FOR PHYSICAL IDENTIFICATION PLATES.

   c. Change Note 5 to Note 6.

   d. Change Note 6 to Note 7 and revise to read as follows:

5. SERVICE DESCRIPTION:

1 TO 3 CHARACTER CODE REFERRING TO A PARTICULAR FLUID TYPE, FLUID SERVICE OR ELECTRICAL SIGNAL AS FOLLOWS:

| SERVICE | SERVICE ABBREVIATION |
|---|---|
| **OXYGEN** | **OX** |
| **EXHAUST** | **EXH** |
| **AIR (LOW PRESSURE)** | **ALP** |
| **AIR (HIGH PRESSURE)** | **AHP** |
| **CHILLED WATER** | **CW** |
| **HOT WATER** | **HW** |
| **POTABLE WATER** | **PW** |
| **FIRE FIGHTING MATERIAL** | **FP** |
| **COMMAND & CONTROL SIGNAL** | **CC** |
| **ELECTRICAL POWER** | **EP** |
| **SEA WATER** | **SW** |
| **ENVIRONMENTAL CONTROL FLUID** | **ECF** |
| **PLUMBING DRAINS** | **PL** |

6. Insert/add new note 4 as follows:

SDC NUMBER: USED FOR SDC ONLY

1 DIGIT CODE INDICATING WHICH SDC THE COMPONENT IS ASSOCIATED WITH.

Component Numbering:

Revise component numbering as follows:

1 Component Identifier________________
7 Service Abbreviation________________
3 Sequential Number________________
4 SDC Number (SDC Only)________________
5 Repetition Number ________________

(Optional), drawing only)

7. (a) As requested of you under our request for proposal submitted to you under "NAVFACCO letter, serial 4281, 2727-3, of November 2, 1998", make the changes to the ICD Electrical Wires/pin Connectors drawings (See enclosure (1) under stated request).
(b) As requested of you under our request for proposal submitted to you under "NAVFACCO letter, serial 4281, 2727-3, of November 2, 1998", replace the existing SDC Deck Template drawing with the drawings that were provided in enclosure (2).
© As requested of you under our request for proposal submitted to you under "NAVFACCO letter, serial 4281, 2727-3, of November 2, 1998", change the specific interconnect fluid penetrators.

9. The contract completion date remains unchanged at this time by reason of the modification.

10. The changes above are within the provisions of the contract as cited in FAR Part 43, and as such are at no additional cost to the government.

11. Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money and for any and all costs, impact, effect, and for delays and disruptions arising out of, or incidental to the work as herein revised.

Distribution:
CONTRACTOR (DUP ORIG)
CODE 2727 (ORIG)
CODE 551 DD
CO, NAVFACENGSERCTR, CODE 13 (RMS), 1100 23RD AVENUE, PORT HUENEME, CA 93043-4370
DFAS—Oakland, California

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE: (j)
PAGE 1 OF 4 PAGES

2. AMENDMENT/MODIFICATION NO.: P00002
3. EFFECTIVE DATE: See Block 16C
4. REQUISITION/PURCHASE REQ. NO.: Not Applicable
5. PROJECT NO. (if applicable):

6. ISSUED BY — CODE: N47408

NAVFACCO, Code 2727
Offshore Facilities Contracts Branch
Washington Navy Yard
1435 Pendellton Ave., S.E. Bldg. 218, Suite 3000
Washington, DC 20374-5063

7. ADMINISTERED BY (If other than Item 6) — CODE:

**DUPLICATE ORIGINAL**

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

Environmental Tectonics Corporation
County Line Industrial Park
125 James Way Road
Southhampton, PA 18966

CODE | FACILITY CODE

(✓) 9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (see item 11)
X 10A. MODIFICATION OF CONTRACT/ORDER NO.: N47408-98-C-2103
10B. DATED (see item 13): 25 September 1998

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
AA1781319 84FC 255 SAS91 0 068342 2D 208110 SO3940000010 — $37,291.00

13. THIS ITEM APPLIES ONLY TO MODIFICATION OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

(✓) A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGE SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

X C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
FAR 52.243-1 CHANGES – FIXED PRICE

D. OTHER (Specify type of modification and authority)

**E. IMPORTANT:** Contractor ☐ is not, ☒ is required to sign this document and return two copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section heading, including solicitation/contract subject matter where feasible.)

As a modification to the subject contract, funding is being provided for the Contractor's efforts on behalf of the Government to prepare A cost estimate for the Wave Slap loading. This was to increase the loading capacity to the SDC Vans.

——Continued on Page 2——

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print): Richard E. McAdams, Executive Vice President
16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print): RITA D. PALMORE, Ordering Officer

15B. CONTRACTOR/OFFEROR: [signature] (Signature of person authorized to sign)
15C. DATE SIGNED: 13 Apr 99
16B. UNITED STATES OF AMERICA BY [signature] (Signature of Contracting Officer)
16C. DATE SIGNED: 4/13/99



LA ccd 5/13/99

Code 2727
N4740898C2103
Page 2 of 4

Section B of the basic contract **Total Proposed Price For All Items** is hereby corrected to read **$3,241,343.58** is lieu of $3,214,343.58.

The contract price is hereby INCREASED in the amount of THIRTY -SEVEN THOUSAND TWO HUNDRED NINETY ONE ($37,291.00) AND NO/100 from a contract total of $ 839,536.58 to $876,827.58.

Mod P0003 = Price increase applies To CLIN 0001 only

The contract completion date is extended 180 days from a completion date of 8 April 1999 to and including 13 October 1999.

Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money and for any and all costs, impact, effect, and for delays and disruptions arising out of, or incidental to the work as herein revised.

This modification is issued against document number N0002498RC10614 dated 1/06/97.

Distribution:
CONTRACTOR (DUP ORIG)
CODE 2727 (ORIG)
CODE 551 DD
CO, NAVFACENGSERCTR, CODE 13 (RMS), 1100 23RD AVENUE, PORT HUENEME, CA 93043-4370
DFAS—Oakland, California

OPTIONAL FORM 99 (7-90)

**FAX TRANSMITTAL** # of pages ▸ 2

| | |
|---|---|
| To Mr. McAdams | From Sydney |
| Dept./Agency | Phone # (202) 433-5008 |
| Fax # (215) 357-4000 | Fax # |

NSN 7540-01-317-7368 5099-101 GENERAL SERVICES ADMINISTRATION

101817-1

MAY27 AM 9:59

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE: (j)
PAGE 1 OF PAGES 2

2. AMENDMENT/MODIFICATION NO.: P00003
3. EFFECTIVE DATE: See Block 16C
4. REQUISITION/PURCHASE REQ. NO.: Not Applicable
5. PROJECT NO. (if applicable):

6. ISSUED BY CODE N47408

NAVFACCO, Code 2727
Offshore Facilities Contracts Branch
Washington Navy Yard
1435 Pendellton Ave., S.E. Bldg. 218, Suite 3000
Washington, DC 20374-5063

7. ADMINISTERED BY (If other than Item 6) CODE

DUPLICATE ORIGINAL

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

Environmental Tectonics Corporation
County Line Industrial Park
125 James Way Road
Southhampton, PA 18966

CODE
FACILITY CODE

(✓) 9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (see item 11)
X 10A. MODIFICATION OF CONTRACT/ORDER NO.: N47408-98-C-2103
10B. DATED (see item 13): 25 September 1998

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

N/A

13. THIS ITEM APPLIES ONLY TO MODIFICATION OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

(✓) A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGE SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

X B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
FAR 52.243-1 CHANGES – FIXED PRICE

D. OTHER (Specify type of modification and authority)

E. **IMPORTANT:** Contractor [X] is not, ☐ is required to sign this document and return copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section heading, including solicitation/contract subject matter where feasible).

As an administrative modification to P00002 dated 4/13/99 of the subject contract, the price increase of $37,291.00 is attributed to CLIN 0001.

The contract amount and completion date remain unchanged by reason of this modification.

----------------**Continued on page 2.**--------------------

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A as heretofore changed, remains unchanged and in full force and effect.

15A NAME AND TITLE OF SIGNER (Type or print)

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
RITA D. PALMORE
Ordering Officer

15B. CONTRACTOR/OFFEROR

(Signature of person authorized to sign)

15C. DATE SIGNED

16B. UNITED STATES OF AMERICA
BY Rita D. Palmore
(Signature of Contracting Officer)

16C. DATE SIGNED 4/15/99

Distribution:
CONTRACTOR (DUP ORIG)
CODE 2727 (ORIG)
CODE 551 DD
CO, NAVFACENGSERCTR, CODE 13 (RMS), 1100 23RD AVENUE, PORT HUENEME, CA 93043-4370
DFAS—Oakland, California

MAY-12-1999 16:02 2712 NAVFACCO 202 433 5244 P.04/06
MAY-12-1999 11:47 2712 NAVFACCO 202 433 5244 P.02/04

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

1. CONTRACT ID CODE: (j)
PAGE 1 OF 2 PAGES

2. AMENDMENT/MODIFICATION NO.: P00004
3. EFFECTIVE DATE: See Block 16C
4. REQUISITION/PURCHASE REQ. NO.: Not Applicable
5. PROJECT NO. (if applicable)

6. ISSUED BY — CODE: N47408

NAVFACCO, Code 2727
Offshore Facilities Contracts Branch
Washington Navy Yard
1435 Pendellton Ave., S.E. Bldg. 218, Suite 3000
Washington, DC 20374-5063

7. ADMINISTERED BY (If other than Item 6) — CODE

ORIGINAL

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

Environmental Tectonics Corporation
County Line Industrial Park
125 James Way Road
Southhampton, PA 18966

CODE — FACILITY CODE

(✓) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (See Item 11)

X 10A. MODIFICATION OF CONTRACT/ORDER NO.: N47408-98-C-2103

10B. DATED (See Item 13): 25 September 1998

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
SEE PAGE 2 OF 2

**13. THIS ITEM APPLIES ONLY TO MODIFICATION OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

(✓) A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGE SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
FAR 52.217-7 OPTION FOR INCREASED QUANTITY—SEPARATELY PRICED LINE ITEM

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor ☐ is not, X is required to sign this document and return 2 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section heading, including solicitation/contract subject matter where feasible.)

1. The purpose of this modification is to delete "Install" from CLIN 0018 in its entirety. There is no installation in the contract.

———Continued on page 2.———

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)
Richard E. McAdams, Exec. Vice President

15B. CONTRACTOR/OFFEROR
[signature]
(Signature of person authorized to sign)

15C. DATE SIGNED: 5/12/99

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
RITA D. PALMORE
Ordering Officer

16B. UNITED STATES OF AMERICA
BY Rita D. Palmore
(Signature of Contracting Officer)

16C. DATE SIGNED: 5/12/99

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE
30-105
STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

2. The purpose of the following clause is to allow the government to exercise the phases as established under the basic contract.

## 52.217-7 Option for Increased Quantity--Separately Priced Line Item.

Option for Increased Quantity--Separately Priced Line Item (Mar 1989)

The Government may require the delivery of the numbered line item, identified in the Schedule as an option item, in the quantity and at the price stated in the Schedule. The Contracting Officer may exercise the option by written notice to the Contractor within [insert in the clause the period of time in which the Contracting Officer has to exercise the option]. Delivery of added items shall continue at the same rate that like items are called for under the contract, unless the parties otherwise agree.

(End of clause)

3. By the signatures attached hereto CLIN(s) 0008 through CLIN(s) 0032 are hereby exercised for a total contract value as follows:

| From: | By: | To: |
|---|---|---|
| $876,827.58 | $2,401,807.00 | $3,278,634.58 |

4. Modification P00002 increased the contract as follows:

| From: | By: | To: |
|---|---|---|
| $839,536.58 | $37,291.00.00 | $876,827.58 |

5. **ACCOUNTING AND APPROPRIATIONS DATA FOR CLIN(S) 0008 THROUGH 0032 ARE AS FOLLOWS:**

AA 1781319 84FC 255 SAS91 0 068342 2D 208110 S03940000010 (SDN: N0002499RC10614) $ 23,172.42
AB 1791319 84FC 255 SAS91 0 068342 2D 208110 S03940000010 (SDN: N0002499RC10598) $ 2,340,343.58
AC97x4930 NH5A 252 77777 0 068894 2D 000000 00099RC55001 (SDN: N6921899RC55001) $ 38,291.00

6. Standard Form 33, solicitation, offer and award, Block 19 is hereby changed to read CLIN(s) 0001 through 0032

7. Standard Form 33, solicitation, offer and award, Block 20 is hereby changed to read $3,278,634.58.

8. Attachment one (1), Submarine Decompressions Chambers Revised Delivery Schedule—Phases I-VI is hereby incorporated into the basic contract.

9. All other terms and conditions except as provided herein remain unchanged.

Distribution:
CONTRACTOR (DUP ORIG)
CODE 83 (ORIG)
CODE 551 DD
CO, NAVFACENGSERCTR, CODE 13 (RMS), 1100 23RD AVENUE, PORT HUENEME, CA 93043-4370
CO, NAVAL SEA SYSTEMS COMMAND, 2531 JEFFERSON DAVIS HIGHWAY, CODE (SEA 011), ARLINGTON, VA 22242-5160, ATTN: TINA SLOPER
DFAS—OAKLAND, CALIFORNIA

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE J
PAGE 1 OF PAGES 3

2. AMENDMENT/MODIFICATION NO.: P00005
3. EFFECTIVE DATE: See Block 16C
4. REQUISITION/PURCHASE REQ. NO.: N6921800RC55011
5. PROJECT NO. (if applicable):

6. ISSUED BY CODE N47408

NAVFACCO, Code 2727
Offshore Facilities Contracts Branch
Washington Navy Yard
1435 Pendellton Ave., S.E. Bldg. 218, Suite 3000
Washington, DC 20374-5063

7. ADMINISTERED BY (If other than Item 6) CODE

SAME AS BLOCK 6

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)

Environmental Tectonics Corporation
County Line Industrial Park
125 James Way Road
Southhampton, PA 18966

CODE A87969 FACILITY CODE

(✓) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (see item 11)

X 10A. MODIFICATION OF CONTRACT/ORDER NO.: N47408-98-C-2103

10B. DATED (see item 13): 25 September 1998

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
SEE PAGE 2 OF 2

13. THIS ITEM APPLIES ONLY TO MODIFICATION OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

(✓) A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGE SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
FAR 52.217-7 OPTION FOR INCREASED QUANTITY—SEPARATELY PRICED LINE ITEM

D. OTHER (Specify type of modification and authority)

E. **IMPORTANT:** Contractor ☐ is not, ☒ is required to sign this document and return 2 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section heading, including solicitation/contract subject matter where feasible).

1. The purpose of this modification is increase the level of effort associated with Phase IV for Corrosion allowances on SDC Van, Aft End Revision, and Potable & Waste System for the Submarine Decompression Chambers as presented in the Contractor's Requests for Information, numbers 75, 76, and 77, dated 05 Nov 1999.

--------------**Continued on page 2.**--------------

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)
Richard E. McAdams
Executive Vice President

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
Peggy L. Hake
Contracting Officer

15B. CONTRACTOR/OFFEROR
(Signature of person authorized to sign)

15C. DATE SIGNED: 30 December 1999

16B. UNITED STATES OF AMERICA
BY Peggy L. Hake
(Signature of Contracting Officer)

16C. DATE SIGNED: 1/3/00

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE
30-105
STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

2. **The purpose of the following clause is to allow the government to exercise the phases as established under the basic contract.**

## 52.217-7 Option for Increased Quantity--Separately Priced Line Item.

**Option for Increased Quantity--Separately Priced Line Item (Mar 1989)**

The Government may require the delivery of the numbered line item, identified in the Schedule as an option item, in the quantity and at the price stated in the Schedule. The Contracting Officer may exercise the option by written notice to the Contractor within [insert in the clause the period of time in which the Contracting Officer has to exercise the option]. Delivery of added items shall continue at the same rate that like items are called for under the contract, unless the parties otherwise agree.

(End of clause)

3. **By the signatures attached herein a total corrected contract value as follows:**

| From: | By: | To: |
|---|---|---|
| $3,278,634.58 | $75,852.00 | $3,354,486.58 |

4. **Modification P00004 increased the contract as follows:**

| From: | By: | To: |
|---|---|---|
| $876,827.58 | $2,401,807.00 | $3,278,634.58 |

5. **ACCOUNTING AND APPROPRIATIONS DATA FOR CLIN(S) 0008 THROUGH 0032 ARE AS FOLLOWS:**

| | | | |
|---|---|---|---|
| AA 1781319 84FC 255 SAS91 0 068342 2D 208110 S03940000010 | (SDN: N0002499RC10614) | $ 900,000.00 | |
| AB 1791319 84FC 255 SAS91 0 068342 2D 208110 S03940000010 | (SDN: N0002499RC10598) | $2,340,343.58 | |
| AC 97X4930 NH5A 252 77777 0 068894 2D 000000 00099RC55001 | (SDN: N6921899RC55001) | $ 38,291.00 | mod P-2 |
| AD 97X4930 NH5A 252 77777 0 068894 2F 000000 00000RC55011 | (SDN: N6921800RC55011) | $ 75,852.00 | Mod P-5 |

6. The contractor will complete Phase IV, in accordance the attached RFI and will ensure

a. That the Van Skin thickness will be .032 inches and
b. That for the van support structure, there shall be no skin surface that is in length of four feet or greater than is not supported by the van structure.
c. 75 Design Review at ETC - 15 March 00
d. Final Design Submission - 15 May 00

7. As result of this additional effort the Contract Completion Date is extended to 31 May 01

8. Standard Form 33, solicitation, offer and award, Block 20 is hereby changed to read **$3,354,486.58**

9. Attachment one (1), Requests for Information numbers 75,76, and 77, Submarine Decompressions Chambers Subject Corrosion allowances on SDC Van, Aft End Revision, and Potable & Waste System Design, and dated 05 Nov 1999 are hereby incorporated into the basic contract.

10. **ALL OTHER TERMS AND CONDITIONS EXCEPT AS PROVIDED HEREIN REMAIN UNCHANGED.**

Distribution:
CONTRACTOR (DUP ORIG)
CODE 83 (ORIG)
CODE 551 DD
CO, NAVFACENGSERCTR, CODE 13 (RMS), 1100 23RD AVENUE, PORT HUENEME, CA 93043-4370
CO, NAVAL SEA SYSTEMS COMMAND, 2531 JEFFERSON DAVIS HIGHWAY, CODE (SEA 011), ARLINGTON, VA 22242-5160, ATTN: TINA SLOPER.
DFAS—OAKLAND, CALIFORNIA

AUG-16-2000 07:09 12 NAVFACCO 202 433 5244 P.01/02
AUG-15-2000 13:39 12 NAVFACCO 202 433 5244 P.02/02

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE: J
PAGE OF PAGES: 1 OF 1

2. AMENDMENT/MODIFICATION NO.: P00006
3. EFFECTIVE DATE: 8 AUG 00
4. REQUISITION/PURCHASE REQ. NO.: N6921800RC55061
5. PROJECT NO. (If applicable):

6. ISSUED BY CODE N47408
NAVFACCO CODE 81
Offshore Facilities Contracts Branch
1435 10th Street, S.E. Bldg 218, Suite 3000
Washington, DC 20374-5063
POC: Naomi Melendez, 202-433-5311

7. ADMINISTERED BY (If other than Item 6) CODE
SEE BLOCK #6

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)
Environmental Tectonics Corporation
County Line Industrial Park
125 James Way Road
Southhampton, PA 18966

CODE ONY44 FACILITY CODE

(✓) 9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (See Item 11)
X 10A. MODIFICATION OF CONTRACT/ORDER NO.: N47408-98-C-2103
10B. DATED (See Item 13): 25 Sep 1998

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning ________ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or Letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
AE 97X4930 NH5A 252 77777 P 068894 2F 000000 00000RC55061 INCREASE $26,820.00

13. THIS ITEM APPLIES ONLY TO MODIFICATION OF CONTRACTS/ORDERS,
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

(✓) A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGE SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, Appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

X C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
FAR 52.243-1, Changes-Fixed Price

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor ☐ is not, [X] is required to sign this document and return 2 Copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section heading, including solicitation/contract subject matter where feasible).

1. This modification increases the level of effort; extends the period of performance for Phase V, Final Design, through 29 December 2000; and extends the contract period of performance through 15 May 2002. As a result, the total amount of the contract is increased from $3,354,486.58 by $26,820.00 to $3,381,306.58. Additional funding is provided as shown in Block 12 above. RFI 084 is incorporated herein by reference.
2. All other terms and conditions remain unchanged.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print): Richard E. McAdams Exec. Vice President
15B. CONTRACTOR/OFFEROR: [signature] (Signature of person authorized to sign)
15C. DATE SIGNED: 8/15/00

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print): NAOMI MELENDEZ/CONTRACTS
16B. UNITED STATES OF AMERICA BY Naomi Melendez (Signature of Contracting Officer)
16C. DATE SIGNED: 8/15/00

NSN 754-01-152-8070
PREVIOUS EDITIONS UNUSABLE

STANDARD FORM 30 (REV. 10-83
Prescribed by GSA
FAR (48 CFR) 53.243

TOTAL P.02

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE: J
PAGE 1 OF 2 PAGES

2. AMENDMENT/MODIFICATION NO.: P00007
3. EFFECTIVE DATE: 07-May-2002
4. REQUISITION/PURCHASE REQ. NO.:
5. PROJECT NO. (If applicable):

6. ISSUED BY CODE N47408
NAVAL FACILITIES ENGINEERING COMMAND
CONTRACTS OFFICE, NF21,
720 KENNON STREET SE
SUITE 333, WASH NAVY YARD
WASHINGTON DC 20374-5063

7. ADMINISTERED BY (If other than item 6) CODE
See Item 6

8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code)
ENVIRONMENTAL TECTONICS CORPORATION
COUNTY LINE ROAD
SOUTHAMPTON PA 18966

9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (SEE ITEM 11)
X 10A. MOD. OF CONTRACT/ORDER NO. N47408-98-C-2103
X 10B. DATED (SEE ITEM 13) 14-Oct-1999

CODE 33714 FACILITY CODE

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer ☐ is extended, ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS.
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B).

X C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: FAR 52.243-1

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

1. This modification is issued, without any change in the total amount of the contract, to extend the period of performance through 18 February 2003 to allow sufficient time for completion. Additional time is required due to time delays resulting from engineering changes and data reviews.
2. All other terms and conditions remain unchanged.

NOTE - UNSIGNED by ETC See Emailed to 60 7/17/02

OPTIONAL FORM 99 (7-90)
**FAX TRANSMIT**
To Dick McAdams
Dept./Agency
Fax # 215-357-4000
NSN 7540-01-317-7368 5099-101

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
NAOMI M. MELENDEZ / CONTRACT SPECIALIST

15B. CONTRACTOR/OFFEROR
(Signature of person authorized to sign)

15C. DATE SIGNED

16B. UNITED STATES OF AMERICA
BY Naomi Melendez
(Signature of Contracting Officer)

16C. DATE SIGNED 07-May-2002

SECTION SF 30 BLOCK 14 CONTINUATION PAGE

SUMMARY OF CHANGES

Changes in Section B

CLIN 0018

The period of performance end date has changed from 08-Apr-1999 to 18-Feb-2003

Changes in Section G

Summary for the Payment Office

The total funded amount of the contract remains unchanged.

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE | PAGE OF PAGES 1 2

2. AMENDMENT/MODIFICATION NO. P00008

3. EFFECTIVE DATE 09-Jul-2002

4. REQUISITION/PURCHASE REQ. NO.

5. PROJECT NO.(If applicable)

6. ISSUED BY CODE N47408
NAVAL FACILITIES ENGINEERING COMMAND
CONTRACTS OFFICE, NF21,
720 KENNON STREET SE
SUITE 333, WASH NAVY YARD
WASHINGTON DC 20374-5063

7. ADMINISTERED BY (If other than item 6) CODE
See Item 6

8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code)
ENVIRONMENTAL TECTONICS CORPORATION
COUNTY LINE ROAD
SOUTHAMPTON PA 18966

CODE 33714 | FACILITY CODE

9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

X 10A. MOD. OF CONTRACT/ORDER NO. N47408-98-C-2103

X 10B. DATED (SEE ITEM 13) 14-Oct-1999

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer ☐ is extended, ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods: (a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS.
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
FAR 52.243-1

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

1. This modification is issued for clarification of the "no cost" time extension, as stated by RFI 167, and to incorporate the SDC time extension milestone dates. The current delivery schedule (milestone 3) is 23 August 2002. As each milestone is met, the delivery schedule is extended through the date of the next milestone upon acceptance by the Navy's COTR for this project. SDC equipment shall be tested and shipped by no later than 30 December 2002, with completion of all final contract documentation by 18 February 2003. The contractor and the government reserve the right for future equitable adjustments related to this modification.
2. All other terms and conditions remain unchanged.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)
Richard E. McAdams, Exec. Vice Pres.

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
NAOMI M. MELENDEZ / CONTRACT SPECIALIST

15B. CONTRACTOR/OFFEROR
[signature]
(Signature of person authorized to sign)

15C. DATE SIGNED
7/15/02

16B. UNITED STATES OF AMERICA
BY Naomi Melendez
(Signature of Contracting Officer)

16C. DATE SIGNED
09-Jul-2002

EXCEPTION TO SF 30
APPROVED BY OIRM 11-84

30-105-04

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

SECTION SF 30 BLOCK 14 CONTINUATION PAGE

SUMMARY OF CHANGES

Changes in Section F

F.1 MILESTONE SCHEDULE

SDC Schedule: Time extension milestone dates

This modification provides for options to extend based on accomplishment of the following milestones. As each milestone is met, the delivery schedule is extended through the next milestone upon acceptance by the Navy's COTR for this project.

1. Milestone 1 - 6 May - SDC-1 Van frame mid construction-SDC-2 frame fit up- final design SDC-1 complete

2. Milestone 2 - 14 June - SDC Van 1 and 2 - complete-final Inspection-DTL manway into SDC-1 and SDC-2

3. Milestone 3 - Aug 23 - Chamber general assemblies and dirty piping mid construction

4. Milestone 4 - 2 Oct - all piping ready for cleaning. Chambers ready for painting. Chamber pressure testing complete

5. Milestone 5 - 30 Oct - Chambers painted. Van wiring complete. Van Piping cleaned. Van sandblasting started.

6. Milestone 6 - 12 December - Van painting complete. Components cleaned. Assemblies complete.

7. Milestone 7 - 27 December - Chambers shipped.

8. Milestone 8 – 18 Feb 03 - Final Submittal / Approval of data items.

.Changes in Section G

Summary for the Payment Office

The total funded amount of the contract remains unchanged.

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE: J

PAGE OF PAGES: 1 3

2. AMENDMENT/MODIFICATION NO.: P00009

3. EFFECTIVE DATE: 31-Dec-2002

4. REQUISITION/PURCHASE REQ. NO.:

5. PROJECT NO. (If applicable):

6. ISSUED BY CODE N47408
NAVAL FACILITIES ENGINEERING COMMAND
CONTRACTS OFFICE, NF21,
720 KENNON STREET SE
SUITE 333, WASH NAVY YARD
WASHINGTON DC 20374-5063

7. ADMINISTERED BY (If other than item 6) CODE
**See Item 6**

8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code)
ENVIRONMENTAL TECTONICS CORPORATION
COUNTY LINE ROAD
SOUTHAMPTON PA 18966

9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

X 10A. MOD. OF CONTRACT/ORDER NO. N47408-98-C-2103

X 10B. DATED (SEE ITEM 13) 14-Oct-1999

CODE 33714 FACILITY CODE

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer ☐ is extended, ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)
**See Schedule**

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

☐ A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

☐ B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B).

X C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
FAR 52.243-1

☐ D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

1. This modification is issued to incorporate RFI 157 and to extend the period of performance through 31 August 2003 to allow sufficient time for completion and close out. This results in an increase in the total amount of the contract by $49,997.58. The basic contract Standard Form 33, Block 25, is revised to update the DFAS payment office name and address. Section H is revised to add Clause H.6 to incorporate the names of the Contracting Offcer's representatives under DFARS 252.201-7000, Contracting Officer's Representative. See the Changes Summary herein.
2. All other terms and conditions remain unchanged.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)
Richard E. McAdams Exec. Vice President

15B. CONTRACTOR/OFFEROR
[signature]
(Signature of person authorized to sign)

15C. DATE SIGNED
2/20/03

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
NAOMI M. MELENDEZ / CONTRACT SPECIALIST

16B. UNITED STATES OF AMERICA
BY Naomi Melendez
(Signature of Contracting Officer)

16C. DATE SIGNED
14-Feb-2003

SECTION SF 30 BLOCK 14 CONTINUATION PAGE

SUMMARY OF CHANGES

Changes in Solicitation/Contract/Order Form

The 'Payment will be made by' organization has changed from
DFAS OAKLAND
7TH & MARITIME STREET
BLDG 311-4, CODE FVP
OAKLAND, CA 94625-5000
to
DFAS SAN DIEGO VENDOR PAY
P. O. BOX 429100
SAN DIEGO, CA 92142-9100
The total cost has increased from $3,381,306.58 by $49,997.58 to $3,431,304.16

Changes in Section B

CLIN 0018

The total CLIN cost has increased from $2,182,089.64 by $49,997.58 to $2,232,087.22
The period of performance end date has changed from 18-Feb-2003 to 31-Aug-2003
The ceiling price has increased from $0.00 by $2,232,087.22 to $2,232,087.22
The unit price amount has increased from $1,091,044.82 by $24,998.79 to $1,116,043.61

Changes in Section G

Summary for the Payment Office

As a result of this modification, the total funded amount of the contract is increased by $49,997.58 from $3,381,306.58 to $3,431,304.16

(Contract Level Funding)
AG: 1731319 84FC 253 SASOC 0 068342 2D 002060 S03940000010
is increased by $49,997.58 from $0.00 to $49,997.58

Changes in Section H

H.1 DESIGNATION OF CONTRACTING OFFICER'S REPRESENTATIVES

(a) The Contracting Officer hereby appoints the following individuals as the Contracting Officer's Technical Representative (COR or COTR), project engineer for this contract:

NAME: Mr. Alin Schmutz
ADDRESS: Naval Facilities Engineering Service Center
720 Kennon Street, Bldg 36, Suite 333
Washington Navy Yard
Washington, DC 20374-5063
PHONE: 202-433-5479

(b) It is emphasized that only the Contracting Officer has the authority to modify the terms of the contract: therefore, in no event will any understanding, agreement, modification, change order, or other matter deviating from the terms of the basic contract between the contractor or any other person be effective or binding on the Government. When, in the opinion of the contractor, an effort outside the scope of the contract is requested, the contractor shall promptly notify the Contracting Officer in writing. No action must be taken by the contractor unless the Contracting Officer has issued a contractual change.

(c) In the absence of the COR named above, all responsibilities and functions assigned to the COR shall be the responsibility of the Alternate COR acting in behalf of the COR. The Contracting Officer hereby appoints the following individual as the Alternate COR.

NAME: Charles (Chuck) Thompson
PHONE: 202-433-5478
ADDRESS: (Same as above)

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE: R
PAGE OF PAGES: 1 | 3

2. AMENDMENT/MODIFICATION NO.: P00010
3. EFFECTIVE DATE: 08-Aug-2003
4. REQUISITION/PURCHASE REQ. NO.:
5. PROJECT NO. (If applicable):

6. ISSUED BY — CODE: N47408
NAVAL FACILITIES ENGINEERING COMMAND
CONTRACTS OFFICE, NF21,
720 KENNON STREET SE
SUITE 333, WASH NAVY YARD
WASHINGTON DC 20374-5063

7. ADMINISTERED BY (If other than item 6) — CODE:
See Item 6

8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code)
ENVIRONMENTAL TECTONICS CORPORATION
125 JAMES WAY, COUNTY LINE INDUSTRIAL
PARK
SOUTHAMPTON PA 18966

CODE 33714 | FACILITY CODE

9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (SEE ITEM 11)
X 10A. MOD. OF CONTRACT/ORDER NO. N47408-98-C-2103
X 10B. DATED (SEE ITEM 13) 14-Oct-1999

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offer ☐ is extended, ☐ is not extended.

Offer must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended by one of the following methods: (a) By completing Items 8 and 15, and returning ____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
FAR 52.243-1

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return 1 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

This modification incorporates RFI 192 into the basic contract. The Contracts Office, shown in Block 6 above, and the contractor's address, shown in Block 8 above, are updated in the government's procurement system. See RFI 192 attached hereto.
All other terms and conditions remain unchanged.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
NAOMI M. MELENDEZ / CONTRACT SPECIALIST

15B. CONTRACTOR/OFFEROR
(Signature of person authorized to sign)

15C. DATE SIGNED

16B. UNITED STATES OF AMERICA
BY Naomi Melendez
(Signature of Contracting Officer)

16C. DATE SIGNED
08-Aug-2003

EXCEPTION TO SF 30
APPROVED BY OIRM 11-84

30-105-04

STANDARD FORM 30 (Rev. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

#1363 P.001/004
NFESCDET WASH DC
202 433 2280

SECTION SF 30 BLOCK 14 CONTINUATION PAGE

SUMMARY OF CHANGES

Changes in Solicitation/Contract/Order Form

The issued by organization has changed from
NAVAL FACILITIES ENGINEERING COMMAND
CONTRACTS OFFICE, 83
1435 PENDLETON AVE., SUITE 3000
WASHINGTON NAVY YARD
WASHINGTON, DC 20374-5063
to
NAVAL FACILITIES ENGINEERING COMMAND
CONTRACTS OFFICE, NF21,
720 KENNON STREET SE
SUITE 333, WASH NAVY YARD
WASHINGTON, DC 20374-5063
The contractor organization has changed from
ENVIRONMENTAL TECTONICS CORPORATION
COUNTY LINE ROAD
SOUTHAMPTON, PA 18966
to
ENVIRONMENTAL TECTONICS CORPORATION
125 JAMES WAY, COUNTY LINE INDUSTRIAL PARK
SOUTHAMPTON, PA 18966
The facility code 33714 has been added.

Changes in Section G

Summary for the Payment Office

The total funded amount of the contract remains unchanged.