# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENVIRONMENTAL TECTONICS CORPORATION,<br>Plaintiff,<br>v.<br>THE UNITED STATES, DEPARTMENT OF THE NAVY<br>Defendant | : | No.: 05-746C |

## AMENDED COMPLAINT

Pursuant to this Court's order entered May 8, 2006, the plaintiff submits this Amended Complaint ("Complaint"). This is an action brought by Plaintiff, Environmental Tectonics Corporation (hereinafter sometimes referred to as "Plaintiff" or "ETC"), against Defendant, The United States, Department of the Navy (hereinafter sometimes referred to as "Defendant", "the Navy" or "the Government"), in the nature of a Contract Disputes Act ("CDA") Appeal of a Contracting Officer's Final Decision of July 22, 2004, which denied ETC's Certified CDA Claim submitted by Plaintiff to Defendant on May 6, 2003, wherein Plaintiff sought an equitable adjustment compensating ETC for additional costs incurred by ETC as a result of certain events or conditions which are more fully set forth at length herein.

This Complaint reflects claim events discussed in ETC's claim of May 6, 2003, and the amendments thereto, dated August 7, 2003, January 6, 2004, and April 28, 2004, together with quantum and factual updates of such claim events. Because the Contract to which this Complaint relates is ongoing, ETC hereby reserves it right to seek recovery at

a later date of additional claim events in the future through the formal claim process under the Contract.

In this Complaint, ETC seeks judgment (1) that the Contract, issued as Fixed Price Contract, is a Cost-Reimbursement Research and Development Contract; (2) for contract reformation based on mutual mistake; (3) for contract reformation based on unilateral mistake and misrepresentation; (4) for ETC's damages in the form of increased costs, together with a reasonable profit thereon, on account of the Government's constructive changes; (5) for ETC's damages in the form of increased costs, together with a reasonable profit thereon, on account of the Government's cardinal changes; (6) for ETC's damages for the Government's breach of duty of Good Faith and Fair Dealing; (7) for ETC's damages for the Government's breach of duty of Disclosure of Superior Knowledge; (8) for ETC's damages for the Government's breach of the Contract; (9) for recovery of liquidated damages; and (9) for attorney's fees and costs.

As and for its Complaint, Plaintiff alleges and states as follows:

**PARTIES AND JURISDICTION**

1. The jurisdiction of this Court is based upon the Contract Disputes Act of 1978 ("CDA"), as amended, 41 U.S.C. §601 *et seq*., and in particular 41 U.S.C. §609(a)(1) thereof, and the Tucker Act, as amended, 28 U.S.C. §1491 *et seq*., and in particular 28 U.S.C. §§1491(a)(1) – (2) thereof.

2. Plaintiff, Environmental Tectonics Corporation is a corporation which is incorporated and authorized to conduct business in the Commonwealth of Pennsylvania.

3. Defendant is the United States Government, Department of the Navy.

## BACKGROUND

4. On or about March 24, 1998, ETC submitted an offer in response to the Government's Solicitation No. N47408-97-R-1861.

5. On or about September 25, 1998, the Government accepted ETC's offer and awarded Contract No. N47408-98-C-2103 [hereinafter referred to as the "Contract"] to ETC for the design and fabrication of two Submarine Decompression Chamber Segments [hereinafter referred to as "SDC Segments"]. [A true and correct copy of Contract No. N47408-98-C-2103 is attached hereto as Exhibit "A"].

6. The SDC Segments are components of a larger Submarine Decompression System (SDS), which is itself a component of the Submarine Rescue Diving and Recompression System (SRDRS).

7. The purpose of the SDC Segments are to facilitate emergency rescue and decompression operations for disabled submarine crew members.

## Relevant Drawings of The Solicitation Package and Contract

8. The solicitation package drawings, which ETC relied on in submitting its bid, consisted of 46 schematic and layout drawings.

9. The solicitation package specified that the data was provided for the purpose of demonstrating the conceptual feasibility of the Government's design of the SDC Segments, SDC 1 and SDC 2.

10. The solicitation package drawings depicted, among other things, both the internal and external arrangements for SDC1 and SDC 2.

11. With the exception of the Deck Decompression Transfer Lock (DTL) and Modified Transfer Lock (MTL) flange connections, which are mirrored, the drawings depict the piping and control panels for each SDC Segment as being laid out identically.

12. Another solicitation package drawing depicted a manway forging ring nozzle, which is the “neck” between the hyperbaric chamber and the manway door itself, with a 4.38” wall thickness.

13. Based upon the information contained in the solicitation package drawings, ETC’s reasonable belief when submitting its offer was that with the exception of the MTL manway location, the SDC 1 and SDC 2 chambers and piping were essentially identical.

14. Accordingly, when ETC submitted its offer it included time in its budget to design a common SDC Segment, with one set of common drawings and one common design package, together with the minor difference in the manway location.

15. In preparing its offer, ETC reasonably relied upon the accuracy of the information presented in the Government’s solicitation package drawings.

16. As an example, ETC utilized the information provided in the drawings to determine the required quantity, appropriate size, and costs of valves, gauges and other components for the SDC Segments.

17. Solicitation package drawing No. 7268125 depicted the equipment required for the Environmental Control System.

18. Specifically, it depicted that two Environmental Control Units (ECUs) and four air scrubbers would be required for each SDC segment with a total of four ECUs and eight scrubbers required for the project.

19. Relying upon the accuracy of the information presented in the Government's solicitation package drawing No. 7268125, ETC budgeted for a total of four ECUs and eight scrubbers for the project.

20. Solicitation package drawing No. 7268136, sheet 12 was a representation of a Control Panel with the cover removed.

21. As shown in solicitation package drawing No. 7268136, sheet 12, all piping gauges, filters, mufflers, regulators and other required accessories necessary for the SDC segments, would fit neatly on one surface beneath the Control Panel cover.

22. Solicitation package drawing No. 7268136, sheet 12, of the Control Panel also depicted many components and accessories located above and below the "Human Factors Lines", which are artificial barriers based upon MIL Standards, above and below which it was not permissible to locate equipment for operational and maintenance reasons.

23. Based upon the depictions contained in the Government's solicitation package drawing No. 7268136, ETC believed that the layout of the Control Panel equipment would be reasonably straightforward and uncomplicated.

24. The Government's solicitation package drawings also included drawings and piping schematics, which depicted, among other things, regulators.

25. However, contrary to the specification requirement that all regulators include a gauge on the inlet and outlet, the solicitation package drawings did not depict the required gauges.

26. ETC, in reliance upon the information contained in the Government's solicitation package drawings, did not include regulator inlet and outlet gauges in its budget.

27. The Government's solicitation package drawings also failed to depict gauge calibration valves.

28. Relying upon the accuracy of the information contained in the solicitation package drawings, ETC did not budget for the inclusion of gauge calibration valves when submitting its offer.

29. Solicitation package drawing No. 7268134, was an eight-page drawing that depicted in great detail the Government's medical lock door design for the SDC Segments.

30. Reasonably believing that the medical lock door design depicted in the solicitation package was a functional design to be utilized to meet the Contract's performance requirements, ETC relied upon the accuracy of the information provided and budgeted for the design and fabrication of the door as depicted.

31. Solicitation package drawing No. 7268128, Schematic: SDC Power Generation and Distribution, depicted a quantity of 22 lights inside each SDC segment.

32. Relying upon the accuracy of the information provided in solicitation package drawing No. 7268128, ETC budgeted for a total of 22 lights per SDC Segment when it submitted its bid response.

33. Solicitation package drawing No. 7268123 was a schematic that depicted the Primary and Secondary Air Pressurization systems.

34. As shown on solicitation package drawing No. 7268123, both the Primary and Secondary inlet air entering into the SDC's chambers was through diffuser tubes.

35. Furthermore, solicitation package drawing No. 7268123 depicted an in-line silencer in the Primary Pressurization line as the only required noise reduction equipment.

36. Relying upon the accuracy of the information provided in solicitation package drawing No. 7268123, ETC prepared its offer, budgeting to supply the diffuser tubes and in-line silencers as depicted in the Government's solicitation package drawing.

**Relevant Solicitation Package Specification Provisions**

37. Paragraph 3.2.15.1.b of the solicitation package specification contained detailed information regarding the quantity and type of intercommunication equipment required for the SDC Segments.

38. Specifically, it stated that a total of four communication headsets would be required for both SDC Segments.

39. ETC submitted its offer to the Government in reasonable reliance upon the information contained in the solicitation package specification, budgeting to supply the four required headsets.

**Relevant Express and Implied Contract Provisions**

40. The Contract required that each SDC segment have a maximum weight of 39,000 lbs. [See Exhibit "A" at paragraph 2.2.2.2.b.].

41. The Contract identified SDC 1 as one of a pair of single lock recompression chambers each capable of independent operation. [See Exhibit "A" at paragraph 1.1.3.b.1].

42. The Contract also identified SDC 2 as the second of the pair of single-lock recompression chambers composed of the same systems as SDC 1. [See Exhibit "A" at paragraph 1.1.3.b.2.].

43. While the Contract discusses the specific requirements for the Preliminary Design Package, the Final Design Package, the Drawing Package and all required analyses, nowhere does it mention that separate and distinct design packages would be required for SDC 1 and SDC 2.

44. The Contract also required that pipe and tube flexibility of piping sections which transverse hard mounted structures or equipment which may move relative to one another be demonstrated through flexibility analysis. [See Exhibit “A” at paragraph 3.1.39].

45. The Contract also required that the flexibility analysis be performed in accordance with American Society of Mechanical Engineer’s (ASME) Code B31.1. [See Exhibit “A” at paragraph 3.1.39].

46. ASME Code B31.1 states, among other things, that for purposes of the flexibility analysis hand calculations are adequate to demonstrate the piping / tubing system’s adequacy.

47. With regard to SDC Vans, the Contract required that they be based on the dimensions of standard ISO containers, that the floors and walls be reinforced to support the SDC internal components and that they have standard ISO connectors. [See Exhibit “A” at paragraph 1.1.3.b.1.b.].

48. The SDV Vans must also support the Submarine Hyperbaric Occupant Transfer System’s (SHOTS) Control Van and the Submarine Decompression System’s (SDS) Spares Van.

49. Incorporated by reference into the Contract’s requirements are MIL STD 1472 and MIL STD 46855 which establish artificial lines called “Human Factors Lines”. [See Exhibit “A” at paragraph 2.2.2.4.a.].

50. In an effort to consider the ease of Operation and Maintenance, the MIL standards require that virtually all equipment be placed between the Human Factors Lines.

51. The Contract also requires that hyperbaric piping, valves and components conform to the requirements of ASME B31.1 and PVHO-1. [See Exhibit "A" at paragraph 3.1.1].

52. PVHO-1 requires that all regulators in the applicable systems contain a gauge on the inlet and outlet.

53. The Contract also required that "except when specified otherwise", each gauge used in the SDC segments is to be supplied with a gauge calibration valve.

54. The Contract also required that each SDC Segment have a minimum light level of 50-Foot Candles (FC). [See Exhibit "A" at paragraph 3.2.10].

55. The Contract required that noise levels inside the SDC Segments be limited to 85 decibels or less. [See Exhibit "A" at paragraph 3.2.16.1].

56. The Contract required submission of a Preliminary Design Package and a Final Design Package. [See Exhibit "A" at paragraphs 5.1.11 and 5.1.12].

57. The drawings which were required as part of the design packages were general arrangement drawing and system piping and electrical schematics. [See Exhibit "A" at paragraph 5.1.11.a and b and 5.1.12].

58. The Contract required that pressure gauges utilized for the SDC segments were to be constructed of phosphor bronze or stainless steel material and feature helical coil or bourdon tube sensing elements. [See Exhibit "A" at paragraph 3.1.27.a.1].

## Relevant Post-Award Events

## I. Weight Constraint

### 1. Thin Walled Chamber

59. Shortly after Contract award, the Government informed ETC that the Government had made an error in the maximum allowable weight.

60. Specifically, the Government had neglected to include the weight of aircraft shipping pallets in its total weight calculation and as a result each SDC Segment's maximum weight had to be reduced by more than 6%.

61. Discussions were held in which a decision was made to reduce the thickness of the chambers to ¼ inch thick to meat the maximum weight requirements.

62. Following discussions with ETC in regard to reducing the SDC Segment's shell thickness, Contract Modification P00001 was issued, lowering the maximum weight of each SDC Segment. [See Contract Modification P00001 attached hereto as Exhibit "B"].

63. The SDC Segments are unique in that they are the first chambers of such a large size to be fabricated with a thin-wall (1/4 inch thick).

64. The SDC Segments now need to be lightweight chambers which also have the strength characteristics necessary to make them capable of being loaded onto an aircraft for rapid transport around the world as intended by the Contract specifications.

65. In the course of the design and construction of these unique and advanced SDC Segments, ETC's costs of performance will exceed its estimated cost by approximately 273% and will exceed the total Contract price by 247%.

66. As a result of the use of thin-walled (1/4") steel for the chamber, ETC has been forced to address numerous manufacturing problems beyond those which could have reasonably been anticipated when Modification P00001 was issued.

67. As a result of the constructing the chamber from ¼ inch thick plate, ETC was forced to modify the overall SDC Segment design in several significant ways.

68. Based upon the Government's solicitation package drawing, the SDC Segments were to be attached to the vans (transport containers) by saddles welded to the bottom of each chamber.

69. Due to the SDC Segment's thin-wall requirements however, ETC's engineering analysis determined that it was necessary to have saddles on both the top and bottom of the chamber in order for the van to provide the chamber with more structural rigidity and prevent the chamber from going out-of-round, or deforming, under its own weight.

70. As a result of the chamber being connected to the van, both the chamber and the van had to act as a single unit, thereby complicating the required Finite Element Analysis (FEA) effort.

71. Specifically, when the chamber was modeled inside the Van FEA model, the number of necessary defined FEA elements increased drastically.

72. As a result, the overall mesh of the model had to be coarsened thereby decreasing the plot's intensity and the FEA's accuracy and leading to an increased number of "hot spots."

73. "Hot spots" are areas of high stress in the overall FEA which had to be addressed by either modifying the design or by further analyzing the areas through the creation of sub-models.

74. As a consequence of the necessity to use solid elements for the sub-models, ETC has incurred additional, unanticipated engineering labor in generating the additional sub-models.

75. In addition, the FEA analyses now involved much more solution, memory and run time than the shell element FEA analyses.

76. As a result of the requirement of the use of the ¼ inch thick chamber shell, ETC also was required to design belly bands on the chamber in the regions where the support saddles were located.

77. A belly band is a ring of thicker support steel which are placed around the circumference of the chamber to give it extra strength in the area where the saddles are connected to the chamber.

78. The belly bands were necessary because the saddles introduced concentrated “punch loads” that could possibly overstress the chamber in the area where the saddle is connected to the chamber.

79. As a result of the requirement of the use of the ¼ inch thick chamber shell, ETC was also required to analyze and subsequently modify the chamber’s bunk design.

80. Specifically, ETC had to add an extra leg and support bracket to each bunk in order to dissipate the load concentrations on the ¼ thick chamber shell.

81. The extra leg and support bracket has resulted in additional vendor procurement costs for the reinforced bunk design.

82. Additional manufacturing costs were incurred as the result of the installation of the bunks by having to weld additional buttons and lugs to the chambers and bunks.

83. As another result of the ¼" thick chamber shell, the welding process caused localized flat spots, thereby resulting in problems in meeting the American Society of Mechanical Engine(ASME) roundness tolerance.

84. As a further result of utilizing saddles on the top of the chamber to prevent deformation (i.e, out-of - round), ETC was also required to re-examine the previously performed FEA to determined if the upper saddles connecting the van to the chamber had acceptable stress levels.

85. As a consequence, ETC had to incur additional engineering and manufacturing labor costs to meet the roundness requirement and to ensure that it would be maintained.

86. As a further consequence, the piping and general assembly of the SDC Segments was delayed.

87. As a result of the reduction in the SDC Segments' maximum weight and the need to utilize a thin walled chamber design, ETC has incurred **$428,820.00** in additional, unanticipated engineering and manufacturing costs.

88. As a result of the reduction in the SDC Segment's maximum weight and the need to utilize a thin walled chamber design, ETC had been hindered on its progress on this project.

89. The Contract required the SDC Segments to be subjected to hydrostatic testing. [See Exhibit "A" at paragraph 4.1.21].

**2**. **Support Structures**

90. Due to the requirement of the ¼ inch thick chamber, ETC believed that filling the chambers with the water required for such testing would cause deformations in the chambers.

91. As a result of the reduction in the SDC Segments' maximum weight and the need to utilize a thin walled chamber design, and the resultant risk of deformations, ETC has incurred **$13,607.00** in additional, unanticipated engineering and manufacturing labor costs, as well as extra material costs, in the design, fabrication and installation of temporary support structures to prevent the SDC Segments' deformation during such testing.

92. As a result of the reduction in the SDC Segment's maximum weight and the need to utilize a thin walled chamber design, and the resultant risk of deformations, the design, fabrication and installation of temporary support structures around the SDC Segments for the purpose of hydrostatic testing, ETC has been delayed in its progress on this project.

**3. Manway Door**

93. In order to meet the Government's reduced weight requirement, ETC was required to design and manufacture a lightweight stamped Manway door.

94. In hyperbaric chambers where weight is not an issue, a Manway door is traditionally manufactured from flat plat or a formed head welded into a ring flat, with an approximate thickness of 1 ¼ inches.

95. The Manway doors for the SDC Segments had to be formed from a stainless steel sheet with an approximate thickness of ½ inch which are stamped into a dome shape with a flat outer ring flange, having the same strength as a thicker flat door.

96. The SDC Segment's formed stainless steel sheet Manway door was more expensive to design and manufacture than the traditional flat plate or formed head manway door.

97. ETC was required to incur the additional design and manufacturing costs of the Manway door to stay within the SDC Segment's reduced weight limits.

98. To prove the structural integrity of the lightweight stamped Manway door design, the Government required that ETC perform a Contact Analysis on the formed Manway door design.

99. The Government then proceeded to question ETC's performance of the Contact Analysis, rejecting ETC's modeling approach, which involved two planes (two dimensional or "2D" model) and insisted that ETC analyze the door using a three plane (three dimensional or "3D" model) approach.

100. After several weeks of unsuccessful attempts to create and merge the Government's desired 3D model into ANSYS software, the Government re-reviewed ETC's data and agreed with ETC's initial 2D modeling approach.

101. Stamping a formed door of ½ inch thickness into the required domed shape with a flat outer ring flange finish is a much more complex process than what would be involved in simply cutting a standard door to the required size.

102. Following weeks of engineering effort to find a vendor capable of fabricating the door in this manner, including several Government-recommended vendors (all of whom declined to bid), ETC was only able to locate one manufacturer in North America who was willing to attempt to fabricate the required Manway door.

103. ETC was required to return the Manway door on two occasions for rework before penetrations could be welded in and final machining could be accomplished.

104. In addition, as result of the difficulty ETC encountered in sourcing a vendor capable of manufacturing the required Manway door, ETC had to begin implementation of contingency plans.

105. The contingency plan was that ETC also had to investigate and analyze alternate designs based on the traditional door design approach.

106. As a result of the reduction in the SDC Segment's maximum weight and the resultant need for a specialized Manway door, ETC has incurred **$54,573.00** in additional engineering and manufacturing costs.

107. As a result of the reduction in the SDC Segment's maximum weight and the resultant need for a specialized Manway door, ETC has been hindered in its progress on the project.

**4. Van**

108. The Contract sets forth the requirements for the SDC Segment's vans. [See Exhibit "A" at paragraph 1.1.3.b.1].

109. When submitting its offer in response to the Government's solicitation, ETC reasonably interpreted Contract specification paragraph 1.1.3.b.1 regarding the vans to mean that the Government required the supply of a standard ISO container with reinforcements in the walls and floors to support the SDC internal components.

110. In accordance with this interpretation of Contract specification paragraph 1.1.3.b.1, ETC budgeted for the purchase and subsequent modification of two standard ISO containers.

111. In accordance with this interpretation of Contract specification paragraph 1.1.3.b.1, following Contract award, ETC contacted several manufacturers regarding the purchase of a standard ISO container.

112. However, after evaluating the performance requirements, it was determined that a standard ISO container, even with appropriate wall and floor reinforcements, would not be adequate.

113. As a result ETC was required to design custom van frames.

114. The design of custom van frames became infinitely more complex when the maximum weight of each SDC Segment was decreased by more than 6% and the thin walled chamber design was incorporated.

115. As a consequence of utilizing a thin walled chamber, ETC was forced to connect the chamber to the van using saddles so that the van would lend structural rigidity to the chamber.

116. The connection of the chamber to the van using saddles so that the van would lend structural rigidity to the chamber complicated the FEA effort.

117. The connection of the chamber to the van using saddles so that the van would lend structural rigidity to the chamber induced added stresses on the van, forcing ETC to bulk up the van design with larger frame members.

118. The connection of the chamber to the van using saddles so that the van would lend structural rigidity to the chamber increased the SDC Segments' overall weight and cost.

119. Furthermore, in the Spring - Summer of 2000 (May through August), the Government decided to assist ETC by having its engineering consultant , Oceaneering, complete the design of the vans to the Government's satisfaction.

120. The Government's redesign was motivated, at least in part, by a desire to obtain a van design with a wave slap capability in excess of the 200 Pounds per Square Foot (PSF) rating required by the specifications of the Contract.

121. As a result of the reduction in the SDC Segment's maximum weight and the need for a new Van design, ETC incurred **$339,749.00** in additional, unanticipated engineering and procurement costs relating to the Vans.

122. As a result of the reduction in the SDC Segment's maximum weight and the need for a new Van design, ETC has been delayed in its completion of the project.

**5. <u>Manway Forging Ring Nozzles</u>**

123. The design depicted in the Government's solicitation package drawing No. 7268144 called for a forging ring with a 4.38 inch wall thickness.

124. When the Government reduced the SDC Segments' maximum weight, ETC was required to modify the design of the manway forging ring nozzles to stay within the reduced weight.

125. Specifically, the wall thickness of the SDC Segment's manway forging ring nozzled was reduced to 1.12 inches.

126. However, when the manways were welded into the chamber the inner portion of the forging ring nozzles deformed.

127. When ETC attempted to mount the manway doors it discovered the deformation in the forging ring nozzles.

128. Specifically, the rings were out-of-round and out-of-flat on the sealing surface.

129. As the result of the deformation, ETC was required to investigate several corrective actions in regard to the forging ring nozzle deformation.

130. The deformation of the forging ring nozzle was a direct result of decreasing the forging ring's wall thickness in an effort to meet the SDC Segment's reduced weight requirement.

131. As a result of the reduction in the SDC Segment's maximum weight and the deformation of the forging ring nozzle, ETC was required to: (1) remove the deformed forging ring nozzles; (2) design a revised means of connecting the forging ring to the chamber; (3) procure new nozzles from its subcontractor; and (4) install the replacement forging ring nozzles in the chamber.

132. As a result of the reduction in the SDC Segment's maximum weight and the deformation of the forging ring nozzle, ETC incurred **$213,067.00** in unanticipated labor and material costs.

133. As a result of the reduction in the SDC Segment's maximum weight and the deformation of the forging ring nozzle, ETC has been hindered in its progress on the project.

## II. Duplicative Design Effort

134. The solicitation package specification and drawings, when viewed together, gave the impression that SDC Segments #1 and #2 were, for all practical purposes virtually identical to one another.

135. Paragraph 1.1.3 of the solicitation provided detailed information regarding the systems and subsystems which the SDC Segments contractor was required to engineer and fabricate.

136. Paragraph 1.1.3.b.1 of the solicitation provided detailed information regarding the systems and subsystem required for SDC Segment #1 and stated, "Submarine

Decompression Chamber #1 (SDC1): One of a pair of single-lock recompression chambers."

137. Paragraph 1.1.3.b.2.of the solicitation provided detailed information regarding the systems and subsystem required for SDC Segment #2 and stated, "Submarine Decompression Chamber #2 (SDC2): SDC2 is the second of the pair of single-lock recompression chambers as described above. Outer lock capability is provided by MTL 2. SDC2 is composed of the same systems as SDC1."

138. The solicitation package specification and drawings also discussed the requirement for the Preliminary Design Package, the Final Design Package, the Drawing Package and all the required analysis.

139. Nowhere in the above did it mention that separate design packages would be required for SDC 1 and SDC 2.

140. Solicitation package drawings 7268136 and 7268138 depicted the external arrangements for SDC 1 and SDC 2.

141. With the exception of the necessary piping for the DTL and MTL flange connections, which are mirrored, the drawings depicted the piping and control panels as being laid out identically.

142. Based upon the information contained in the specification and drawings, and recognizing that the location of the MTL manway differed between SDC 1 and SDC 2, ETC reasonably believed that the SDC 1 and SDC 2 were basically identical to each other.

143. Thus, when ETC submitted its offer, ETC believed that only one set of drawings and one design package would be required for both SDC 1 and SDC 2.

144. In its offer, ETC included time to design a common SDC segment, together with the minor difference in the manway location.

145. Under the Contract, ETC found it was necessary to simultaneously prepare and submit separate design packages for SDC Segment 1 and SDC Segment 2.

146. The requirement to submit separate design packages for SDC Segment 1 and SDC Segment 2 essentially doubled ETC's work effort.

147. In addition, ETC was required to create many detailed layout drawings to scale to ensure there would be no interference, due to space constraints problems, as set forth more fully within.

148. The requirement to create many detailed layout drawings to scale, combined with the fact that the SDC 1 and SDC 2 were neither fully identical nor fully mirrored, required ETC to create such detailed drawings for both SDC 1 and SDC 2.

149. ETC also had to create two separate and distinct Piping Master drawings to check for interference among the different piping systems.

150. The Piping and Tubing Flexibility Analysis, the scope of which was greatly increased at the Government's insistence, also had to be performed twice.

151. In addition, due to the differences in piping runs between SDC 1 and SDC 2, ETC had to separately review and approve many piping and accessory purchases for each SDC Segment.

152. In early April 2001, ETC submitted its Final Design Package for SDC 2 which limited its FEA analysis to the worst case load combinations on the chamber.

153. ETC believed that the limited FEA analyses was justified considering that it had previously submitted a complete analysis to the Government for SDC 1 and therefore

both ETC and the Government were well aware of which load case would produce the worst-case stresses on SDC 2.

154. In early June 2001, the Government stated that the SDC 2 Final Design Package was not satisfactory with regard to the various FEA analyses.

155. The Government demanded that ETC greatly expand the scope of its SDC 2 FEA analyses.

156. Specifically, the Government demanded the following in order to obtain Government approval of the SDC 2 design: (1) expand the Piping Flexibility Analysis for SDC 2 to include all 312 load cases; (2) modify the Harmonic Natural Frequency Analysis to include an analysis for each of the 19 natural frequencies; (3) expand the plots of the PVHO and Van for SDC 2 to include both the high stress sides and the low stress sides; and (4) analyze six specific FEA sub-models for SDC 2.

157. Specification paragraph 5.1.14.c.1 of the Contract required verification of the FEA analysis to verify the design behavior and adequacy.

158. ETC performed strain gauge testing and analysis on SDC-1 which verified the design behavior and adequacy.

159. However, ETC was required to perform a second strain gauge testing and analysis on SDC-2 to again verify the design behavior and adequacy.

160. As a consequence of having to engineer and design two separate and unique SDC segments in lieu of one, and the resulting additional requirements as set forth above, ETC has incurred **$331,488.00** in additional and unanticipated engineering costs.

161. As a consequence of having to engineer, design and build two separate and unique SDC segments in lieu of one, ETC has been hindered in its progress on the project.

## III. Space Constraint Issue

162. As previously stated, the Government's solicitation package included 46 schematic and layout drawings that depicted the Government's desired design for the SDC Segments.

163. ETC relied upon the accuracy of the information presented in these drawings as the primary basis for preparing its bid price.

164. ETC utilized the information provided in these drawings to determine the quantity and approximate size of valves, gauges and other SDC components.

165. Following Contract award, ETC performed the engineering analyses required by the specification, thereby arriving at the required size and quantity of equipment necessary to meet the performance requirements of the Contract.

166. ETC discovered that in numerous cases, the equipment, piping, valves and accessories necessary to meet the performance requirements of the Contract were of a greater size and/or quantity than the Government had depicted in the solicitation package drawings upon which ETC relied in submitting its offer.

167. As a result of the above, ETC has incurred significantly increased material costs, as set forth below.

168. As a result of the above, ETC also expended additional, unanticipated engineering efforts, as set forth below.

169. As a result of the above, ETC has had additional space constraint issues that have arisen as manufacturing proceeds toward as-built status, as set forth below.

**1. <u>Environmental Control System</u>**

170. Solicitation package drawing No. 7268125 depicted the requirements for the Environmental Control System, including ECUs and scubbers.

171. The drawing depicted two ECUs and four scrubbers per SDC Segment for a total of four ECUs and eight scrubbers.

172. As required by the Contract, ETC conducted a Thermal Conductivity Analysis and Forced Air Convection Flow Analysis. [See Exhibit “A” at paragraph 5.1.14.b.].

173. However, contrary to the depictions contained in the Government’s solicitation package drawing No. 7268125, the results of ETC’s analyses determined that 12 ECUs and 30 scrubbers would be necessary to meet the specification performance requirements of the Contract.

174. In August 2000 Contract Modification P00006 was issued, which replaced the specified internally mounted scrubber and Environmental Control System with an externally mounted type.

175. The Contract Modification compensated ETC for the re-engineering effort involved.

176. However, ETC had incurred **$79,611.00** in unanticipated, additional material cost in the implementation of an Environmental Control System that was compliant with specification performance requirements of the Contract.

177. There was also a significant weight increase with the External Environmental Control System as compared to the Internal Environmental Control System depicted in the Government’s schematic drawings.

178. The overall weight of the External Environmental Control System is approximately 435 pounds heavier per SDC Segment than the two ECUs and four scrubbers depicted in drawing number No. 7268125.

179. The required valves, chamber penetrators, fittings and accessories for the External Environmental Control System were of a larger diameter and therefore heavier than the chamber penetrators, fittings and accessories for the Internal Environmental Internal System depicted in drawing No. 7268125

**2. <u>Forced Convection Flow Analysis</u>**

180. Specification 5.1.14.b.4 of the Contract required a Forced Convection Flow Analysis (FCFA) that would show the internal air distribution of the PCVO chamber.

181. ETC conducted the FCFA using a Computational Fluid Dynamic (CFD) model based upon the information contained in the Government's solicitation package drawing 7268125.

182. ETC determined that six Environmental Control Units (ECUs) and 15 scrubbers would be required for each SDC Segment in order to meet the performance requirements contained in the Contract.

183. With the quantity of ECUs and scrubbers actually required, ETC determined that the only space available to place the ECUs and scrubbers inside the SDC Segments would be under the bunks.

184. However, with this placement ETC's FCFA determined that there would be inadequate circulation.

185. After Contract Modification P00006 was issued, ETC was required to re-do the FCFA to ensure that the new External Environmental System would provide adequate air circulation.

186. As a consequence of having to conduct the FCFA twice, ETC had incurred **$1,780** in additional engineering costs.

187. As a consequence of having to conduct the FCFA twice, ETC has been delayed in its progress on the project.

### 3. <u>Piping and Control Panel Layout</u>

188. In order to meet the specification performance requirements of the Contract, ETC was required to design and fit a very large amount of piping, valves and controls within a very confined space.

189. Specifically, ETC's piping design team was required to spend months attempting to lay out panels and fit piping within the confined space of the SDC Segments.

190. ETC's piping design team was also required to re-engineer piping runs and panel arrangements several times to meet Human Factors and operability requirements of the Contract and to avoid obstructions.

191. The Government's solicitation package drawings misrepresented the amount and size of piping, valves, accessories and other equipment which would be required to be placed within the small confines of the SDC segments

192. Solicitation package drawing No. 7268136, sheet 12 depicted a Control Panel with the cover removed.

193. The Control Panel in solicitation package drawing No. 7268136 represented that all required piping, gauges, filters, mufflers, regulators and other required accessories would fit neatly on the one surface beneath the Control Panel cover.

194. ETC submitted its proposal in reliance upon the representations presented in the solicitation package drawings, budgeting a reasonable number of hours to lay out the piping and controls in accordance with the complexity depicted in the drawings.

195. Following contract award, ETC attempted to lay out the gauges, piping and associated equipment required for the Control Panel in accordance with the solicitation package drawing No. 7268136.

196. However, after expending many engineering hours analyzing the Government's layout, ETC determined that it was impossible to place all the equipment required by the specification in the Contract into the area behind the Control Panel.

197. Specifically, ETC discovered that the solicitation package drawing had misrepresented the complexity of the piping and accessories required for the Control Room by failing to depict the required joints, couplings and unions and the incorrect sizing of the pipes and fittings.

198. Solicitation package drawing No. 7268136 also depicted many components and accessories located above the Human Factors lines, which are artificial barriers based on MIL STD 1472 and MIL STD 46855, above and below which ETC was not permitted to locate equipment for operational and maintenance reasons.

199. The piping system layouts depicted in solicitation package drawing No. 7268136 were inconsistent with the specification requirements both in terms of the incorrectly sized and missing components, as well as the Human Factors' requirements.

200. While the size and the configuration of the required piping and associated equipment grew in comparison to what was depicted in solicitation package drawing No. 7268136, the available space in which to place such piping was reduced to 36 square feet.

201. ETC was required to layout more piping and equipment in less area.

202. In addition, in contrast to the representations in solicitation package drawing No. 7268136 which depicted all required Control Panel equipment on one wall, the actual space required for all Control Panel equipment and piping is three walls.

203. Even when mounted on three walls, the resulting Control Panel layout is overly crowded and complex.

204. As a consequence of the misrepresentations contained in the Government's solicitation package drawings regarding the piping and control panel layouts, ETC has incurred **$1,761,822.00** in additional, unanticipated costs in the lay-out, design and construction of the SDC segment's piping and control panels and in costs in regard to material, engineering, drafting and configuration management labor, manufacturing and related manufacturing support labor. Since the Contract is on-going, the amount claimed includes an estimate going forward. ETC reserves the right to adjust the estimated amount in the future.

205. As a consequence of the misrepresentations contained in the Government's solicitation package drawings regarding the piping and the control panel layouts, ETC's completion of the project has been delayed.

**4. <u>Required Gauges on Regulator Inlets/Outlets</u>**

206. The Contract required that the hyperbaric piping, valves and components conform to the requirements of ASME B31.1 and PVHO-1. [See Exhibit "A" at paragraph 3.1.1].

207. PVHO-1 requires that all regulators include a gauge on the inlet and outlet.

208. The Government's solicitation package drawings, however, did not depict the required gauges.

209. ETC submitted its offer based on the Governments' solicitation drawings and therefore, ETC did not budget for the gauges when submitting its proposal.

210. During Contract performance, ETC sought the Government's permission to exclude the regulator inlet and outlet gauges from the design.

211. The Government, however, denied ETC's request and directed ETC to supply the gauges.

212. As a consequence of having to supply the gauges for the regulator inlets and outlets, ETC has experienced additional problems with the weight constraints.

213. As a consequence of having to supply the gauges for the regulator inlets and outlets, ETC has experienced additional problems with space constraints.

214. As a consequence of having to supply the gauges for the regulator inlets and outlets, ETC has incurred **$24,102.00** in additional unanticipated engineering and manufacturing labor and material costs.

215. As a consequence of having to design, supply and install the gauges for the regulator inlets and outlets, ETC has been hindered in its progress on the project.

**5. <u>Gauge Calibration Valves</u>**

216. The Contract required that each gauge be supplied with a gauge calibration valve except when otherwise specified. [See Exhibit "A" at paragraph 3.1.27.a].

217. The Government's solicitation package drawings had not depicted the gauge calibration valves.

218. ETC did not include gauge calibration valves in its offer because ETC reasonably believed that because the gauge calibration valves were not depicted on the drawing, the "except when specified otherwise" provision applied.

219. However, following Contact award, the Government directed ETC to supply the gauge calibration valves.

220. As a result of the Government's failure to include gauge calibration valves in its solicitation package drawings, ETC has incurred **$18,475.00** in additional, unanticipated labor and material costs.

221. As a result of the Government's failure to include gauge calibration valves in its solicitation package drawings, ETC has been hindered in its progress on the project.

## IV. Out of Scope Work

### 1. Review of FEA Load Cases

222. ETC submitted a Request for Information (RFI) seeking the Government's agreement of the load cases it intended to analyze in order to complete the design in a timely manner and prevent major design revisions following PDR.

223. The Government accepted ETC's proposed load cases.

224. ETC performed the required FEA analyses and included such information in its Preliminary Design Package which it submitted to the Government.

225. Following its review of ETC's Preliminary Design Package, however, the Government's position changed substantially.

226. The Government and ETC spent significant time over a period of months in discussions regarding revisions to the load case for the FEA analyses.

227. As a consequence of the Government's failure to agree to the load cases that were to be analyzed, ETC has incurred **$10,373.00** in unanticipated engineering costs.

228. As a consequence of the Government's failure to agree to the load cases that were to be analyzed, ETC was delayed in its progress on the project.

**2. <u>FEA Modeling Demands</u>**

229. ETC submitted its Preliminary Design Package to the Government which included therein ETC's Preliminary FEA analysis that included a model of the PVHO shell.

230. Although the actual PHVO shell had an overall diameter of 78" and was ¼" thick, ETC created an FEA model with elements located at the inside surface of the shell, thus making the diameter of ETC's FEA model 77.5".

231. The Government rejected ETC's model despite the fact that the margin of error was less than 1% and would have had a negligible impact on the FEA results.

232. The Government demanded that ETC modify the model and repeat the FEA.

233. ETC submitted a second preliminary FEA model of the PVHO shell for Government evaluation.

234. As a result of the Government's rejection of ETC's original FEA model of the PVHO shell, ETC has incurred **$38,221.00** in additional, unanticipated labor costs.

235. As a result of the Government's rejection of ETC's original FEA model of the PVHO shell, ETC was hindered in its performance under the Contract.

### 3. <u>Pipe and Tubing Flexibility Analysis</u>

236. Specification 3.1.39 of the Contract required ETC to perform a flexibility analysis for the sections of piping and tubing that transverse hard mounted structures or equipment.

237. Specification 3.1.39 also required that the flexibility analysis be performed in accordance with ASME B31.1.

238. ASME B31.1 only required hand calculations as a means to demonstrate the piping/tubing system's adequacy.

239. The Government required ETC to perform a flexibility analysis that included virtually all piping and tubing systems of the SDC and that it be performed using Finite Element Analysis.

240. As a consequence ETC was required to model the piping, tubing, elbows, bends, valves, concentric and eccentric reducers, tees, miters, and rigid elements of the various piping systems to evaluate the stresses developed as a result of loads being transferred from the van and the PVHO.

241. In addition, the Government required that the piping flexibility analysis be integrated into the chamber and Van FEA analyses.

242. ETC was required to incorporate eight different piping layouts into the model.

243. ETC was required to create four different databases (with two piping layouts per database), each of which had to be run for all 13 load cases.

244. As a consequence of the Government's requirements regarding the flexibility analysis, ETC has incurred **$22,914.00** in extra, unanticipated labor expenses.

245. As a consequence of the Government's requirements regarding the flexibility analysis, ETC has been delayed in its completion of the project.

**4. <u>SDC Medical/Supply Lock Door</u>**

246. Solicitation package drawing No. 7268134 depicted the medical lock door design the Government required for use in the SDC Segments.

247. In preparing its offer, ETC believed that the PHVO Supply/Medical Lock door design depicted by the Government in solicitation package drawing No. 7268134 was a functional design which would meet the performance requirements of the Contract.

248. As required by the Contract, ETC performed a structural Finite Element Analysis on the Government PHVO Supply/Medical Lock door design.

249. However, the results of ETC's analysis determined that the Government's design was inadequate to meet the performance criteria specified in the Contract.

250. Specifically, the Government's design contained an external O-ring seal that ETC determined would leak due to excessive flexing of the door when subjected to pressure.

251. ETC made several attempts to re-engineer the door, increasing the door's thickness, adding gussets and increasing the strongbacks in an effort to stiffen the door.

252. Each potential design change required ETC to perform further FEA analysis and review of the results.

253. However, after several modifications to the medical lock's door design proved unsuccessful, ETC concluded that the Government's basic overall design was inadequate to meet the performance requirements of the Contract and so notified the Government.

254. In response, the Government recommended that a Commercial Off the Shelf (COTS) medical lock door assembly that would meet the specification's performance

requirements of the Contract be substituted for the Government's design of the PHVO Supply/Medical Lock door design depicted by the Government in solicitation package drawing No. 7268134.

255. As a consequence of the Government's design of the PHVO Supply/Medical Lock door, ETC has incurred **$66,848.00** in extra, unanticipated costs. Since the Contract is on-going, the amount claimed includes an estimate going forward. ETC reserves the right to adjust the estimated amount in the future.

256. As a consequence of the Government's design of the PHVO Supply/Medical Lock door design depicted by the Government in solicitation package drawing No. 7268134, ETC has been delayed in its completion of the project.

**5. Communication System**

257. Specification 3.2.15.1.b of the Contract required four communication stations for each SDC Segment.

258. Solicitation package drawing No. 7268129, Schematic SDS Command and Control, depicted a total of five communication head sets being required for each SDC Segment.

259. Specifically, solicitation package drawing No. 7268129 indicated that an additional headset was required at the MTL flange.

260. ETC's offer included four communication stations.

261. Shortly after Contract award, ETC discovered the above conflict regarding the number of required communication stations.

262. ETC submitted a Request for Information (RFI) to the Government regarding the above conflict.

263. The Government replied to ETC's RFI that it required the additional communication station at the MTL flange.

264. The Government also replied that it would also be necessary for the added communication station to have the ability to connect to, and communicate with the Inter SDS/SRS intercom, a second type of intercom system utilized on the SDC Segments.

265. The Government also replied that ETC also had to supply a Universal Interface to allow the Hyperbaric intercom system, which included the additional communication station at the MTL flange, to communicate with the Inter SDS/SRS Intercom system.

266. As a consequence of having to provide an additional communication station at the MTL flange, ETC incurred **$4,863.00** in additional, unanticipated costs.

267. As a consequence of having to provide an additional communication station at the MTL flange, ETC has been delayed in its progress on the project.

**6. <u>Performance of Light Study</u>**

268. Specification 3.2.10 of the Contract required that the light level within the PVHO chamber be a minimum of 50-foot candles.

269. Solicitation package drawing 7268128 depicted a total quantity of 22 lights inside each PVHO chamber.

270. Shortly after Contract award, the Government supplied ETC with a "Recommended Deviation" in regard to an acceptable model of light for use in the SDC Segments.

271. After further inquiry as to how the Government arrived at a quantity of 22 lights, ETC determined that there was no basis to believe that the lighting arrangement the

Government had specified would actually meet the specification's performance requirements.

272. ETC was required to conduct a lighting analysis to establish that the lighting arrangement set forth in solicitation package drawing 7268128 would not produce the illumination required by the specification.

273. As a consequence of having to perform a Lighting Study, ETC incurred **$16,494.00** in additional, unanticipated costs.

274. As a consequence of having to perform a Lighting Study, ETC has been hindered in its progress on the project.

**7. Primary/Secondary Air Pressurization System**

275. Solicitation package drawing No. 7268123 depicted the Primary and Secondary Air Pressurization systems and showed that both the Primary and Secondary inlet air into the chamber was to enter through the diffuser tubes.

276. The only noise reduction component depicted in solicitation package drawing No. 7268123 was an in-line silencer in the circuit of the Primary Pressurization Line.

277. Specification 3.2.16.1 of the Contract required that noise levels inside the chamber not exceed 85 decibels.

278. ETC prepared and submitted its offer relying upon the accuracy of the information contained in solicitation package drawing No. 7268123.

279. Following Contract award, ETC determined that the limited noise reduction equipment depicted in solicitation package drawing No. 7268123 would fail to meet the required 85 decibel noise limitation.

280. ETC was required to redesign the Primary and Secondary Pressurization inlet lines by replacing the diffuser tubes with headers that extended the full length of the chamber and featured four mufflers per inlet line.

281. As a consequence of having to redesign the Primary and Secondary Pressurization inlet lines, ETC has incurred **$6,169.00** in additional and unanticipated labor costs.

282. As a consequence of having to redesign the Primary and Secondary Pressurization inlet lines, ETC has been delayed in its progress on the project.

**8. <u>Government Demand for Production Drawings</u>**

283. ETC made its first Final Design Presentation to the Government on December 7, 2000.

284. Specification 5.1.12 of the Contract required the Government to review the Final Design Package and return comments within 30 days.

285. The Government failed to return its comments in a timely manner, finally providing comments on February 5, 2001.

286. ETC incorporated the Government's review comments into both the SDC 1 and SDC 2 Final Design Packages.

287. ETC resubmitted a revised SDC 1 Final Design Package and partial SDC 2 Final Design Package in early April 2001.

288. In mid May 2001, ETC received the Government's review comments for the SDC 1 resubmission, most of which ETC believed to be minor.

289. In accordance with this belief, the Government's Contracting Officer's Technical Representative stated that once ETC had made the requested corrections, Government acceptance of the Final Design would be established.

290. However, in early June 2001, the Government indicated that it now realized further information would be needed before the Government could complete its review of ETC's design.

291. Specifically, the Government required ETC to provide production drawings to ensure the design's adequacy.

292. Specifications 5.1.11 and 5.1.12 of the Contract required submission of general arrangement drawings and system piping and electrical schematics with the Final Design Package.

293. Despite the fact that ETC's Final Design Package contained all drawings required under Specifications 5.1.11 and 5.1.12 of the Contract, the Government required that ETC provide highly detailed production drawings.

294. As a consequence of the Government's requirement that ETC produce and submit production drawings in its Final Design Package, ETC has incurred additional, unanticipated labor costs.

295. As a consequence of the Government's requirement that ETC produce and submit production drawings in its Final Design Package, ETC's progress on the project was hindered.

**9. <u>Excessive RFIs</u>**

296. As a consequence of the defects, ambiguities and shortcomings in the Government's specification and drawings, ETC was forced to issue over 180 Request For Information (RFI) documents.

297. An RFI consists of ETC's question(s) to the Government regarding a particular technical issue under the Contract.

298. Each RFI involves engineering time to investigate and prepare the RFI and engineering time to dedicate to the RFI issue following the Government's response thereto.

299. In addition, each RFI involves lost efficiencies due to delays and disruption in the progress of the work.

300. Each RFI also contributes to delays in the project's completion in that each issue on which an RFI is written must be placed on hold while ETC awaits the Government's response.

301. To the best of ETC's knowledge and belief, approximately 70% of the RFIs were necessitated by one of the following: (1) specification conflicts with the drawings; (2) missing information on the Government supplied drawings or in the Government supplied specification; (3) ambiguities within the Government's specification; and (4) RFIs in which the Government's response time had exceeded the agreed 15 day response period.

302. As a consequence of the excessive RFIs, ETC has incurred **$37,216.00** in additional, unexpected engineering costs.

303. As a consequence of the excessive RFIs, ETC has been hindered in it progress on the project.

**10. <u>Additional Design Submittal Review</u>**

304. The specifications of the Contract required only two design submittals, the Preliminary Design Package and the Final Design Package.

305. The Government demanded in mid- March, 2000, that a “75% Design Review” and submittal take place following the Preliminary Design submittal and prior to the Final Design submittal.

306. In addition to preparing the documentation for the “75% Design Review”, ETC was also required to respond to additional Government comments.

307. As a consequence of the requirement of the “75% Design Review”, ETC incurred **$35,355.00** in extra, unanticipated engineering labor costs.

308. As a consequence of the requirement of the “75% Design Review”, ETC has been hindered in its progress on the project.

**11. <u>Internal NAVSEA - NAVSEA CERT Disagreement(s)</u>**

309. Solicitation package drawing No. 7268123 depicted a Cross-Connect Line with one ball valve between the Primary and Secondary Pressurization lines.

310. In accordance with solicitation package drawing No. 7268123, ETC included a ball valve in its design.

311. An internal disagreement later arose between the Naval Sea Systems Command (NAVSEA) and its QA branch, NAVSEA CERT as to whether the ball valves were required in the Cross-Connect line and if so, the proper quantity required.

312. As a result of this internal disagreement, ETC received several directives, forcing it to repetitively modify the configuration.

313. At one point, ETC was directed by the Government to add a second ball valve to the Cross-Connect line which required ETC to modify the drawings and database.

314. Later, ETC was directed by the Government to remove the Cross-Connect line which required ETC to again modify the drawings and database.

315. Solicitation package drawing No. 7268124 for an SDC Built-in Breathing System (BIBS) depicted relief valves that were located inside the PVHO chamber.

316. In accordance with solicitation package drawing No. 7268124, ETC designed the BIBS with the relief valve inside the PVHO chamber.

317. An internal disagreement later arose between NAVSEA and NAVSEA CERT as to whether the relief valve should be located inside or outside the PVHO chambers.

318. This disagreement arose at the monthly CRB meetings.

319. As a result of the above disagreements between NAVSEA and NAVSEA CERT, ETC incurred **$773.00** in extra, unanticipated engineering costs.

320. As a result of the above disagreements between NAVSEA and NAVSEA CERT, ETC has been delayed in its progress on the project.

**12. <u>Van Access Panels</u>**

321. The solicitation package drawings only depicted a van frame without an outer skin.

322. The solicitation package drawings did not depict supplementary access panels in the sides of the van.

323. The Government directed ETC to add supplementary panels to improve access to hull stops.

324. As a consequence of the Government's requirement for supplementary panels, ETC incurred **$23,630.00** in additional, unanticipated labor and material costs.

325. As a consequence of the Government's requirement for supplementary panels, ETC has been delayed in its progress on the project.

## V. Improper Specifications of Components

326. Paragraph 3.1.27a.1 of the Contract requires that the material and operational features required for pressure gauges be made of phosphor bronze or stainless steel, with helical coil or bourdon tube sensing elements unless otherwise specified.

327. Paragraph 3.1.27a.1 of the Contract is ambiguous in that helical coil sensing does not exist.

328. ETC, with the Government's concurrence, interpreted specification 3.1.27a.1 of the Contract to mean that the gauges were required to have a helical coil bourdon tube sensing element made from stainless steel or phosphor bronze.

329. To the best of ETC's knowledge, only 3-D Instruments Company manufactures gauges with helical coil bourdon tube sensing elements.

330. As such, specification 3.1.27a.1 of the Contract essentially required a sole source of supply, 3-D Instruments Company.

331. As a result of the Government's sole source requirement for the pressure gauges, ETC has incurred **$10,019.00** in excess labor and material costs.

332. As a result of the Government's sole source requirement for the pressure gauges, ETC has been delayed its progress on the project.

## VI. Materials and Labor Cost Escalation

333. The completion of the SDC Segments has been delayed by the actions and/or inactions of the Government, as more fully set forth above.

334. As a result of these delays, ETC had incurred **$595,354.00** in unanticipated material, engineering and manufacturing labor costs.

## VII. Extended Project Management

335. An extended time frame to complete the SDC Segments has been required by the actions and/or inactions of the Government, as more fully set forth above.

336. Project Management is an ongoing and necessary function throughout the length of the Contract.

337. As a result of the extended time frame and corresponding need for Project Management, ETC has incurred **$638,789.00** in additional, unanticipated Project Management Costs. Since the Contract is on-going, the amount claimed includes an estimate going forward. ETC reserves the right to adjust the estimated amount in the future.

## VIII. Loss of Efficiency

338. Paragraph G2 of the Contract set forth the requirements for the submittal of invoices by ETC.

339. The Government was required to provide payment of the invoices within a prompt and timely manner.

340. The Government has failed to pay ETC invoices in a prompt and timely manner.

341. The Government has failed to pay the full amount of ETC invoices in a prompt and timely manner.

342. As a consequence of the Government's failure to pay ETC invoices in a prompt and timely manner and failure to pay the full amount of ETC invoices, ETC has experienced cash flow problems.

343. As a consequence of the Government's failure to pay ETC invoices in a prompt and timely manner and failure to pay the full amount of ETC invoices, ETC has been required to curtail major materials purchases.

344. As a consequence of the Government's failure to pay ETC invoices in a prompt and timely manner and failure to pay the full amount of ETC invoices, ETC has experienced interruptions in the manufacture of the SDC Segments.

345. As a consequence of the Government's failure to pay ETC invoices in a prompt and timely manner and failure to pay the full amount of ETC invoices, ETC has been required to divert part of its labor resources to other projects which reduced progress on the SDC Segments.

346. As a consequence of the Government's failure to pay ETC invoices in a prompt and timely manner and failure to pay the full amount of ETC invoices, ETC has experienced a 31% loss of efficiency due to delay and disruption in the General Assembly area of manufacturing.

347. As a result of the loss of efficiency in the General Assembly area of manufacturing, ETC has incurred **$64,731.00** in additional, unanticipated labor costs.

## IX. Lost Profits

348. As a result of the Government's actions/inactions, as set forth above, completion of the SDC Segments has been and will continue to be delayed.

349. As a consequence of the delay in the completion of the SDC Segments, ETC has incurred **$725,826.00** in lost profits.

## X. Cumulative Delay Impacts - Unabsorbed/Unrecovered Overhead

350. The Contract required the completion of the SDC Segments by September 25, 2000. [See Exhibit "A"].

351. As a result of the Government's actions/inactions, as set forth above, completion of the SDC Segments has been and will continue to be delayed.

352. The delay in completion of the SDC Segments has prevented ETC from absorbing its overhead expenses as anticipated when it entered into the Contract.

353. As a consequence of the delay in the completion of the SDC Segments, ETC has incurred **$298,004.00** in net unabsorbed overhead. ETC reserves the right to revisit the Eichleay quantum claim if any portion of ETC's overall claim under the Contract are disallowed by the Government, thereby reducing the claimed Overhead and General and Administrative costs occurring in the delay period.

## XI. Contract Financing Costs

### 1. Financing Cost Related to Claim Items Compensable Under the Contract

354. ETC has been required to finance the additional costs it has incurred in the performance of the Contract.

355. As a consequence of being required to finance the additional cost its has incurred in the performance of the Contract, ETC has incurred **$918,672.00** in financing costs. Costs or damages are calculated through June 30, 2005. ETC reserves the right to update such costs or damages in the future.

### 2. Financing Cost Related to Delayed Payments

356. ETC received the Government's payments of their timely submitted Invoices at a date later than was anticipated under the Contract.

357. As a result of receiving the Government's payments of Invoices at a date later than was anticipated under the Contract, ETC has been required to borrow against its bank credit line.

358. As a result of receiving the Government's payments of invoices at a date later than was anticipated under the Contract, ETC has also lost the time value of such money, thereby increasing financing costs and preventing ETC from reducing its debt and growing the company.

359. As a result of the delayed payment of invoices by the Government, ETC has incurred **$178,841.00** in financing costs.

## XII. Rental Costs of Manufacturing Floor Space During Delay Period

360. The Contract allowed 401 days for the design, manufacturing, assembly, test, teardown, and preparation for shipment of the SDC Segments.

361. Due to the Government's delays as more fully set forth above, additional days were and continue to be necessary for the manufacturing, assembly, test, teardown, and preparation for shipment of the SDC Segments.

362. This increase in manufacturing time is attributable to the Government's failure to properly fund the Contract, as more fully set forth above.

363. This increase in manufacturing time is also attributable to the Government caused delays in the engineering and design process, as more fully set forth above.

364. ETC was required to delay SDC materials purchases and partially divert labor resources to other projects which delayed completion of the SDC Segments.

365. ETC was also required to reserve space on its manufacturing floor for an extended period of time for the expected start-up and completion of work on the SDC Segments.

366. As a result, ETC has incurred **$935,182.00** in costs covering the extended manufacturing period that would be required to complete the SDC Segments and the period of time during which ETC was required to reserve manufacturing floor space for the anticipated start-up and completion of work on the SDC Segments.

## XIII. Liquidated Damages

367. Stricken

368. Stricken

369. Stricken

370. Stricken

371. Stricken

372. Stricken

373. Stricken

374. Stricken

## XIV. Claim Preparation Costs

375. On May 6, 2003, and thereafter amended on August 7, 2003 and April 24, 2004, ETC submitted a certified CDA claim to Defendant wherein Plaintiff sought an equitable adjustment compensating ETC for additional costs incurred by ETC as a result of certain events or conditions which are more fully set forth above.

376. As a consequence of having to file a certified CDA claim, ETC has incurred **$100,030.00** in costs.

**COUNT I**

**CONTRACT REFORMATION - MUTUAL MISTAKE**

377. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through three hundred seventy six (376) as though fully set forth at length herein.

378. Both the Government and ETC were mistaken in their belief that this was a Fixed Priced Supply Contract as opposed to a Cost-Reimbursement Research and Development Contract effort.

379. All of the changes in the drawings, designs and/or specifications of the Contract as set forth above and below constitute a Cost-Reimbursement Research and Development Contract.

380. All of the changes in the drawings, designs and/or specifications of the Contract as set forth above and below caused an increase in the estimated cost of and the time required for performance of the Contract, and therefore, constitutes a Cost-Reimbursement Research and Development Contract.

381. The above facts existed at the time of the Contract.

382. Neither ETC or the Government were aware of the above mistaken belief at the time of the Contract.

383. The above mistaken belief of both ETC and the Government constituted a basic assumption underlying the Contract.

384. The above mistaken belief of both ETC and the Government had a material effect on the Contract in that the Government received the benefit of a Fixed Priced Supply Contract.

385. The risk of the above mistake was not assumed by ETC when it entered into the Contract with the Government.

386. Because of their mutual mistake of the above material existing fact, both ETC and the Government entered into a Contract which they would not have entered into but for their mutual mistake.

387. Due to the above mutual mistake of ETC and the Government, ETC is entitled to contract reformation.

388. Reformation of the within Contract would bring the Contract in accord with both ETC and the Government's intentions.

389. Reformation requires that the within Contract be considered a Cost-Reimbursement Research and Development Contract.

390. Under a Cost-Reimbursement Research and Development Contract, the Government is required to make an equitable adjustment in the estimated cost, delivery or completion schedule, or both, the amount of any fee, and other affected terms and the Contract should be modified accordingly.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant and find that this is a Cost-Reimbursement Research and Development Contract. Plaintiff further requests an equitable adjustment to the Contract in the amount of not less than **$7,995,398.00**, together with interest from and after June 30,2005. Plaintiff further requests that this Court award Plaintiff its costs in this action. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

**COUNT II**

**CONTRACT REFORMATION - MUTUAL MISTAKE**

391. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through three hundred ninety (390) as though fully set forth at length herein.

392. Both the Government and ETC were mistaken in their beliefs regarding the following facts:

(a) that the weight limitations for each SDC Segment would not change;

(b) that any change in the weight limitations would not affect the cost of performance of the Contract; and/or

(c) that only one SDC Segments was needed to be designed to meet the Contract's performance requirements.

393. The above facts existed at the time of the Contract.

394. Neither ETC or the Government were aware of the above at the time of the Contract.

395. The above mistaken beliefs of both ETC and the Government constituted a basic assumption underlying the Contract.

396. The above mistaken beliefs of both ETC and the Government had a material effect on the Contract in that the Government received the benefit of ETC's additional engineering and manufacturing efforts.

397. The risks of the additional engineering and manufacturing efforts caused by the reduction on maximum allowable weight, the impact of the reduction on maximum allowable weight or the need to build two separate and unique SDC segments were not assumed by ETC when it entered into the Contract with the Government.

398. In accepting Modification P00001, ETC could not have forseen the complications inherent in the reduction of the weight constraints.

399. Likewise, in seeking a Contract modification to the existing Contract, the Government was indicating its own determination that the risks were relatively minor and reasonably quantifiable.

400. Because of their mutual mistake of the above material existing facts, both ETC and the Government entered into a Contract which they would not have entered into but for their mutual mistake.

401. Due to the mutual mistake of ETC and the Government, ETC is entitled to contract reformation.

402. Reformation of the within Contract would bring the Contract in accord with both ETC and the Government's intentions.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$7,995,398.00**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT III

## CONTRACT REFORMATION - MISREPRESENTATION AND UNILATERAL MISTAKE

403. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through four hundred two (402) as though fully set forth at length herein.

404. ETC made a mistake regarding a basic and material assumption underlying the contract price that the SDC Segments required under the Contract were watercraft.

405. The SDC Segments required under the Contract are in fact aircraft with all the additional requirements thereof.

406. ETC's mistake as set forth above was made at the time of the Contract.

407. ETC's mistake as set forth above was based on a reading of certain specifications in the solicitation package drawings and Contract.

408. ETC's mistake was induced by the Governments' affirmative misrepresentations in the Contract that:

> Submarine Rescue Systems (SRS): Consists of a Submarine Decompression System (SDS) and a Submarine Hyperbaric Occupant Transfer System (SHOTS). SDS is composed of two large Submarine Decompression Chambers and auxiliary equipment used to support disabled submarine (DISSUB) rescue operations. SDS provides recompression and hyperbaric treatment to rescuees who have been evacuated from the DISSUB via the Hyperbaric Transfer Capsule (HTC), a tethered rescue vehicle which can perform Transfer Under Pressure. The HTC is part of SHOTS, which also includes HTC support equipment. The SDS may be used alone without SHOTS if the personnel may escape the submarine via free ascent, or to support other fleet rescue assets or perform training exercises.

[See Exhibit "A" at paragraph 1.1.3.a.1.].

409. ETC's mistake as set forth above concerned a basic assumption of the Contract in that ETC based their offer on this mistake and the Government's misrepresentations.

410. ETC would not have entered into this Contract at its offered price and delivery had it known of its mistake.

411. ETC did not assume risk of this mistake.

412. The effect of ETC's mistake makes enforcement of this Contract without reformation unconscionable.

413. The Government knew or should have known of ETC's mistake at the time it accepted ETC's offer based on the bid price as compared to the engineering and manufacturing efforts necessary to build specification compliant SDC Segments.

414. Due to the unilateral mistake of ETC which was based on the Government's misrepresentations, ETC is entitled to contract reformation.

415. Reformation of the within Contract would bring the Contract in accord with both ETC and the Government's intentions.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$7,995,398.00**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT IV

## CONTRACT REFORMATION - MISREPRESENTATION AND UNILATERAL MISTAKE

416. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through four hundred fifteen (415) as though fully set forth at length herein.

417. ETC made a mistake regarding a basic and material assumption underlying the contract price that the amount of engineering and manufacturing effort required to build the SDC Segments as set forth in the solicitation package drawings and contract would be much less than the effort that was ultimately required.

418. ETC's mistake as set forth above was made at the time of the Contract.

419. ETC's mistake as set forth above was based on a misreading of certain specifications in the solicitation package drawings and Contract.

420. ETC's mistake was induced by the Governments' affirmative misrepresentations as follows:

(a) That the weight limitation in the Solicitation Package Drawings was accurate;

(b) That SDC Segment #1 and SDC Segment #2 in the Solicitation Package Drawings and Contract had essentially identical designs;

(c) That the necessary equipment, piping valves and accessories set forth in the Solicitation Package Drawings and the Contract, as well as the amount of space in the chambers in which to place such piping, valves and accessories, were accurate.

421. ETC's mistake as set forth above concerned a basic assumption of the Contract in that ETC based their offered price on this mistake and the Government's misrepresentations.

422. ETC would not have entered into this Contract at its offered price had it known of its mistake.

423. ETC did not assume risk of this mistake.

424. The effect of ETC's mistake makes enforcement of this Contract without reformation unconscionable.

425. The Government knew or should have known of ETC's mistake at the time it accepted ETC's offer based on the bid price as compared to the engineering and manufacturing efforts necessary build specification compliant SDC Segments.

426. Due to the unilateral mistake of ETC which was based on the Government's misrepresentations, ETC is entitled to contract reformation.

427. Reformation of the within Contract would bring the Contract in accord with both ETC and the Government's intentions.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$7,995,398.00**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

**COUNT V**

**BREACH OF CONTRACT - CONSTRUCTIVE CHANGE**

428. Plaintiff incorporates by reference the allegations of paragraphs one (1) through four hundred twenty-seven (427) as though fully set forth at length herein.

429. After Contract award in the within matter, the Government has required ETC to perform additional work beyond the Contract requirements either by informal order of the Government or by fault of the Government.

430. Specifically, ETC has been required by the Government to perform additional work beyond the Contract requirements, including but not limited to, the following:

(a) the fabrication of thin-walled chambers;

(b) more expensive manway doors;

(c) a new Van design;

(d) changes to the forging ring nozzle;

(e) a second design for SDC Segment 2;

(f) more expensive Environmental Control System;

(g) a second Forced Air Convection Flow Analysis;

(h) more complex piping and control panel layout;

(i) supply of gauges;

(j) supply of gauge calibration valves;

(k) additional FEA load cases;

(l) more complex flexibility analysis;

(m) additional work on Medical Supply/Lock Door;

(n) additional communications systems;

(o) performance of Light Study;

(p) re-design of Primary/Secondary Air Pressurization System;

(q) additional production drawings;

(r) preparation of additional RFIs;

(s) submission of design for additional review; and

(t) provision of van access panels.

431. ETC believes, and therefore avers, that it was required to perform the additional work beyond the Contract requirement in order to complete the SDC Segments.

432. The person who ordered the above changes had the requisite authority and/or full authority and concurrence of the Contracting Officer to order such changes.

433. Thus, the Government has made constructive changes to the Contract which constitutes a breach of contract.

434. As a result of the Government's constructive changes, ETC has incurred significant increased costs as set forth more fully above.

435. The increased costs incurred by ETC were not foreseeable in light of the information available to ETC at the time of Contract award.

436. The increased costs incurred by ETC as set forth more fully above were the direct and necessary result of the constructive changes to the Contract made by the Government.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$7,995,398.00**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT VI

## BREACH OF CONTRACT - CARDINAL CHANGE

437. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through four hundred thirty-six (436) as though fully set forth at length herein.

438. The Government has made changes in the Contract of such magnitude and content that they fall outside the scope of the Contract.

439. The SDC Segments which ETC contracted to design and build in September 1998 and the SDC Segments that were actually designed and built by ETC are substantially and/or materially and/or completely different.

440. ETC was required to perform duties materially different from those bargained for under the Contract.

441. As such, the Government has breached the Contract with ETC for the SDC Segments.

442. As previously described above, as a result of the combined effect of: (1) the reduced weight requirement; (2)) the duplicative design requirement, and (3) the Government's solicitation package deficiencies, the engineering and manufacturing efforts required to design and build the SDC Segments have far exceeded the engineering and manufacturing efforts which would have been required with a design similar to that depicted in the original Contract.

443. Furthermore, the totality of the changes to the design which have resulted from the above issues are significant in terms of magnitude and quality, such that the effect of design issues with respect to one area (e.g., space constraints) had follow-on impacts in regard to other design issues (e.g., weight constraint) and thereby necessitate that the overall net affect of all the changes be considered as a whole, rather than in separate and distinct categories.

444. In terms of the reduced weight requirement, each SDC Segment was required to be reduced more than 6% of its weight.

445. From both an engineering and manufacturing standpoint, the weight reduction had the following affects:

(a) requirement of thin-walled chambers;

(b) more expensive Manway door;

(c) design of custom van frames; and

(d) changes to the forging ring nozzle.

446. ETC was required by the Government to design two SDC Segments.

447. There were multiple deficiencies in the Government's solicitation package.

448. The Government's solicitation package deficiencies related to both the inadequate depiction of the quantity and size of piping and related equipment and accessories resulted in an increase in engineering, material and installation costs and increased the SDC Segments' weight further complicating the engineering effort to reduce the SDC Segments' weight.

449. From an engineering and manufacturing standpoint, the Government's solicitation package deficiencies had the following effects:

(a) more expensive Environmental Control System;

(b) a second Forced Air Convection Flow Analysis;

(c) more complex piping and control panel layout;

(d) supply of gauges;

(e) supply of gauge calibration valves;

(f) additional FEA load cases;

(g) more complex flexibility analysis;

(h) additional work on Medical Supply/Lock Door;

(i) additional communications systems;

(j) performance of Light Study;

(k) re-design of Primary/Secondary Air Pressurization System;

(l) additional production drawings;

(m) preparation of additional RFIs;

(n) submission of design for additional review; and

(o) provision of van access panels.

450. As a combined result of the above, there was a significant change in the magnitude of work to be performed by ETC.

451. As a combined result of the above ETC was required to design a totally different and/or drastically altered product under the Contract.

452. The costs incurred by ETC as a result of the above greatly exceeds the original Contract price.

453. A cardinal change(s) has occurred in the within Contract.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$7,995,398.00**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT VII

## BREACH OF DUTY - GOOD FAITH AND FAIR DEALING

454. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through four hundred fifty-three (453) as though fully set forth at length herein..

455. Under the implied duty of good faith and fair dealing in every contract, the Government had an implied duty to disclose to ETC the information fundamental to the preparation of ETC's estimates and contract performance.

456. This implied duty includes the duty to fashion material estimates with reasonable care.

457. The Governmental failed to disclose the following information to ETC which was fundamental to the preparation of ETC's estimates in their bid:

(a) the weight constraints;

(b) the duplicative design effort;

(c) the space constraints;

(d) the work that would be required which was outside of the scope of the Contract.

458. The Government failed to disclose the following information which was fundamental to contract performance:

(a) the weight constraints'

(b) the duplicative design effort;

(c) the space constraints;

(d) the work that would be required which was outside of the scope of the Contract.

459. This information was fundamental to the preparation of estimates and/or contract performance in that it was necessary for ETC to prepare its bid with a reasonable estimate of the amount of engineering and manufacturing effort required to build specification compliant SDC Segments.

460. As a result of the Governments' failure to disclose this information, ETC incurred additional engineering and manufacturing costs as set forth in more detail above.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$7,995,398.00**, together with interest from and after June

30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT VIII

## BREACH OF DUTY - DISCLOSURE OF SUPERIOR KNOWLEDGE

461. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through four hundred sixty (460) as though fully set forth at length herein..

462. The Government had a duty to disclose any superior knowledge it had which is vital to the performance of the Contract.

463. The Government had superior knowledge in its possession at the time of the Contract that the SDC Segments required under the Contract were aircraft.

464. The above superior knowledge was not shared with ETC and ETC could not have been expected to seek and obtain this knowledge elsewhere.

465. The Government did not disclose the above superior knowledge at the time of the Contract.

466. ETC undertook to perform the requirements of the Contract without knowledge of the above which affected both performance costs and/or duration of the project.

467. The above superior knowledge was vital to the performance of the Contract in that it was necessary for ETC to prepare its bid with a reasonable estimate of the amount of engineering and manufacturing effort required to build specification compliant SDC Segments which were aircraft.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant

in the amount of not less than **$7,995,398.00**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

**COUNT VIII**

**BREACH OF DUTY - DISCLOSURE OF SUPERIOR KNOWLEDGE**

468. Plaintiff incorporates by reference the allegations of Paragraphs one (1) through four hundred sixty-seven (467) as though fully set forth at length herein..

469. The Government had a duty to disclose any superior knowledge it had which is vital to the performance of the Contract.

470. The Government had the following superior knowledge in its possession at the time of the Contract:

(a) the weight limitations; and

(b) the need for separate designs for SDC Segment 1 and SDC Segment 2;

471. The above superior knowledge was not shared by ETC and ETC could not have been expected to seek and obtain this knowledge elsewhere.

472. The Government did not disclose the above superior knowledge at the time of the Contract.

473. ETC undertook to perform the requirements of the Contract without knowledge of the above which affected both performance costs and/or duration of the project.

474. The above superior knowledge was vital to the performance of the Contract in that it was necessary for ETC to prepare its bid with a reasonable estimate of the amount

of engineering and manufacturing effort required to build specification compliant SDC Segments.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$7,995,398.00**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT IX

## BREACH OF CONTRACT - RESTITUTION

475. Plaintiff incorporates by reference the allegations of paragraphs one (1) through four hundred seventy-four (474) as though fully set forth at length herein.

476. The Government's actions and/or inactions as set forth above constitute fundamental and material breaches of the Contract between the Government and ETC.

477. As such, ETC is entitled to restitution of all benefits conferred upon the Government pursuant to the Contract, including, but not limited to, the following:.

(a) additional, unanticipated labor and material costs as more fully set forth above;

(b) extended project management costs as more fully set forth above;

(c) loss of efficiency costs;

(d) loss profits;

(e) unabsorbed/unrecovered overhead costs;

(f) contract financing costs;

(g) rental costs;

(h) [stricken]; and

(i) claim preparation costs.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$7,995,398.00**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

**COUNT X**

**BREACH OF CONTRACT - GOVERNMENT DELAY OF WORK**

478. Plaintiff incorporates by reference the allegations of paragraphs one (1) through four hundred seventy-seven (477) as though fully set forth at length herein.

479. The Contract sets forth as follows, in relevant part:

> If the performance of all or any part of the work of this Contract is delayed or interrupted (1) by an act of the Contracting Officer in the administration of this contract that is not expressly or impliedly authorized by the contract, or (2) by a failure of the Contracting Office to action within the time specified in the contract, or within a reasonable time if not specified, and adjustment (excluding profit) shall be made for any increase in the cost of performance of this contract caused by the delay or interruption and the contract shall be modified in writing accordingly. Adjustment shall also be made in the deliver or performance dates and any other contractual term or condition affected by the delay or interruption.

[See Exhibit "A" at F9.].

480. The Government's actions and/or inactions as set forth above constitute fundamental and material breaches of the Contract between the Government and ETC.

481. As such, ETC is entitled to adjust for the additional costs of the performance of this Contract as set forth above.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$7,995,398.00**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

## COUNT XI

## COSTS

482. Plaintiff incorporates by reference the allegations of paragraphs one (1) through four hundred eighty-one (481) as though fully set forth at length herein.

483. The Government's actions and/or inactions as set forth above constitute fundamental and material breaches of the Contract between the Government and ETC.

484. As a result of that above breaches of the Contract, ETC is entitled to recovery of costs.

WHEREFORE, Plaintiff, Environmental Tectonics Corporation, respectfully requests that this Court enter judgment in Plaintiff, ETC's favor, and against Defendant in the amount of not less than **$7,995,398.00**, together with interest from and after June 30, 2005. Plaintiff further requests that this Court award Plaintiff its costs in this action. Finally, Plaintiff requests such other and further relief as the Court determines to be just and proper.

Respectfully submitted this 15th day of May, 2006.

_____s/Brian A. Bannon_______

Brian A. Bannon
Blank Rome LLP
600 New Hampshire Ave, NW
Washington, D.C. 20037
(202) 772-5905 (phone)
(202) 572-8355 (fax)
Bannon-b@blankrome.com

*Counsel for Environmental Tectonics Corporation*