IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENVIRONMENTAL TECTONICS CORPORATION,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant | ) | No. 05-746C<br>(Judge Susan G. Braden) |

DEFENDANT'S PROPOSED FINDINGS OF FACT
AND DEFENDANT'S PROPOSED CONCLUSIONS OF LAW

## DEFENDANT'S PROPOSED FINDINGS OF FACT

### Background

1. On November 19, 1997, the United States Navy issued a solicitation requesting proposals ("RFP") for the design, fabrication, assembly, testing, and delivery of a pair of submarine decompression chambers ("SDCs"). The final due date for the submission of proposals was March 25, 1998.

2. Environmental Tectonics Corporation ("ETC") ETC submitted a proposal on March 24, 1998, and a "best and final offer" on September 25, 1998.

3. On September 25, 1998, the Navy awarded the contract to ETC. The contract was funded in phases: contract line item numbers ("CLINs") 0001-0007, relating to the preliminary design, were awarded for a total of $839,536.58; and contract modification P00004 exercised CLIN's 0008-0032, relating to the final design and manufacturing, for an additional amount of $2,401,807.00.

4. The contract incorporated ETC's original technical and cost proposals dated March 24, 1998, and all subsequent revisions through September 25, 1998, including ETC's best and final

offer in the amount of $3,241,343.58.

5. The contract required final delivery within two years after contract award. Contract modifications increased the contract by $189,960.58 to $3,431,304.16, and extended the completion date to August 31, 2003. As of May 30, 2007, testing of the SDC segments was nearing completion.

6. The SDC segments are part of a Submarine Decompression System ("SDS"), which is part of the Submarine Rescue Diving and Recompression System ("SRDRS"). The SRDRS is designed to rescue submariners from disabled submarines, and to provide decompression treatment if needed. Because the system must be able to quickly respond to a disabled submarine anywhere in the world, its components must be transportable by air, land, and sea.

7. The SDC segments provide recompression and hyperbaric treatment to rescued submariners exposed to pressures greater than atmospheric in the disabled submarine or during rescue. Up to 31 rescued personnel and two attendants can be accommodated in the closely monitored environment of each SDC chamber until hyperbaric treatment is complete.

8. Each SDC consists of the following major elements: a pressure vessel for human occupancy ("PVHO"), the chamber where hyperbaric treatment takes place; a control room for monitoring and control of various SDC systems; a van that supports and houses the PVHO, control room, and other internal components of the system; primary and secondary pressure control assemblies to regulate pressure in the PVHO; a built-in breathing system ("BIBS") to provide oxygen for decompression treatment and emergency breathing air; PVHO environmental control assemblies to condition the chamber's air; PVHO gas analysis assemblies to monitor the atmosphere in the PVHO; potable water and sanitary assemblies; fire safety equipment; SDC

lighting system; supplemental van HVAC assemblies; furniture assemblies; and a communication system. Because the SDC segments are integrated into the SDS and SRDRS, there are tight mating tolerances on the connections to other SDS and SRDRS system components that must be carefully considered during design and construction.

The Contract

9. Contract Section 1.1.2 DESCRIPTION OF WORK, provides as follows:

> The contractor shall provide all labor and materials for the design, procurement, fabrication, assembly, test, and delivery of the described SDC Segments. Further, the contractor shall prepare and submit all documents, records, and manuals specified herein. The work consists of:
>
> a. Provision of SDC Segments as described herein.
>
> b. Provision of SDC Segment system manuals.
>
> c. Submission of the design, fabrication, and test documents.

10. Contract Section 1.2.2 CONTRACTOR'S TECHNICAL RESPONSIBILITY, provides as follows:

> This statement of work contains technical requirements to which the contractor must adhere; however, it is the contractor's responsibility to confirm by engineering analysis that component sizes cited herein are adequate to perform the "Operational and Performance Requirements" cited in Part C2. Typical of such items are piping, ventilation, and atmospheric controls. Data has been provided herein to demonstrate the conceptual feasibility of such an item. Other technical issues that are not specified herein are at the discretion of the contractor. The contractor shall cite its

intentions in these areas in the preliminary design.

11. Contract Section 1.2.3 CONFORMANCE REQUIREMENTS, provides as follows:

> Omission from the drawings or specifications or the misdescription of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed, shall not relieve the contractor from performing such omitted or misdescribed details of the work, but they shall be performed as if fully and correctly set forth and described in the drawings and specifications.

12. Contract Section 1.2.4 CONTRACTOR'S SPECIFICATION CHECK, provides as follows:

> The contractor shall check all drawings and specifications furnished to him upon their receipt and shall promptly notify the Contracting Officer of any discrepancies. Numbers marked on drawings shall in general be followed in preference to scale measurements. Large scale drawings shall, in general, govern small scale drawings. The contractor shall compare all drawings and verify the data before laying out the work and will be responsible for any errors which might have been avoided thereby.

13. Contract Section 2.2.2.2 SDC Vans Operational Requirements, specifically 2.2.2.2 (b), Dimensions and Weights, required that each of the SDCs, including its van, have a maximum weight of no more than 39,000 pounds.

14. The contract required ETC to both design and build the SDCs. The technical requirements of the contract are identified in drawings and specifications.

15. The RFP drawing package contained three types of drawings: interface control drawings ("ICDs"), schematics, and guidance drawings. The ICDs provide the dimensions and tolerances

of the interfaces between the SDC segments and other parts of the SDS. The schematics describe the life support and electrical systems. The guidance drawings show the general arrangement of equipment and provide design concepts for some components.

16. The following specification sections define the differences between the three types of drawings:

A. Section 1.2.7 provides as follows:

> "The contractor's designs and all other work provided under this contract must assure in all instances that the finished hyperbaric facility conforms to the codes and standards listed below. Areas of conflict shall be brought to the attention of the Contracting Officer."

B. The ICDs and schematics are listed in Section 1.2.7.b and "form a part of this specification to the extent specified herein." Exh. 1-2.

C. The ICDs are RFP drawings numbered 7268140-7268148. Exh. 1-1.

D. The schematics are RFP drawings numbered 7268122-7268129. Exh. 1-1.

E. Section 1.2.11 provides as follows:

> "The contractor shall not make changes to the Interface Control Drawings (ICDs) or the drawings issued as part of the contract information package." Exh. 1-2.

F. Section 1.2.12 provides as follows:

> “The final design shall reflect the operational and component arrangements depicted in the piping and electrical schematics issued in the contract information package. The contractor shall not make changes to the piping and electrical design without the consent of the Contracting Officer." Exh. 1-2.

G. Section 1.2.8 provides as follows:

> "The following codes and standards are cited in this SOW

[statement of work] but are presented for guidance only." Exh. 1-2..

H. Section 1.2.8.b.2 includes RFP drawings numbered 7268115-7268121, 7268130-7268139, and 7268149, as the guidance drawings. Exh. 1-1.

17. The ICDs and schematics are part of the specification with which ETC was required to comply. Changes to those drawings required the approval of the contracting officer ("CO").

18. The guidance drawings are conceptual in nature and can be used for reference. The contractor is not limited to the concepts depicted therein.

19. Section 1.2.5 provides as follows:

> STANDARD PRODUCTS: Whenever practical, use will be made of materials and equipment that are standard catalog products of manufacturers regularly engaged in the production of such materials and equipment and shall be the manufacturer's latest standard design that complies with the specification requirements. Where two or more products of similar type are used, they will be products of the same manufacturer. Where two or more products are of a similar type that the same manufacturer's model number can be used, all of the products shall be identical. Where standard products are available which have been proven successful for hyperbaric application, they shall be used. Each component used in this item will be clearly marked so that the manufacturer, model, serial number, and the principal characteristics of the item can be readily determined.

20. FAR 52.215-33, incorporated by reference into the contract, provides as follows:

> Any inconsistency in this solicitation or contract shall be resolved by giving precedence in the following order: (a) the Schedule (excluding the specifications); (b) representations and other instructions; (c) contract clauses; (d) other documents, exhibits, and attachments; and (e) the specifications.

21. The drawings are part of the specifications with no defined order of precedence between the specifications and the drawings except as defined by specification Section 1.2.4 (line 12).

22. ICD and schematic drawings have more weight than guidance drawings.

Modification P00001

23. ETC, in Section 1.2.2 of its March 24, 1998 proposal submitted in response to the RFP, demonstrated that the weight of the chamber and van system could vary from a baseline of 27,754 pounds to as little as 18,845 pounds, for a total of 8,909 pounds, by use of Division II design and construction criteria and by the use of lightweight metals.

24. ETC described the following four design approaches:

> 1) PVHO, Section VIII, Division 1 with steel SDC Van 27,754 pounds;
>
> 2) PVHO, Section VIII, Division 2 with steel SDC Van 26,044 pounds;
>
> 3) PVHO, Section VIII, Division 1 with aluminum SDC Van 20,554 pounds;
>
> 4) PVHO, Section VIII, Division 2 with aluminum SDC Van 18,845 pounds.

25. Further, ETC provided, in Section 2.5.1.14(f) of its Technical Proposal, an engineering evaluation demonstrating the feasibility of using a ¼ inch hull thickness as a viable option with ASME Section VIII, Division 2.

26. During the October 23, 1998, post-award meeting, the Navy informed ETC that it would send ETC a request for proposals for the following five changes to the contract:

> 1. Reduce overall SDC weight from 39,000 pounds to 35,600 pounds. This adjustment is due to the need to account for the weight of the aircraft loading pallets in the overall aircraft payload limit.
>
> 2. Wave slap: increase from 200 pounds per square foot to 500 pounds per square foot, which could also have weight implications.

> 3. Interface pins/wiring: called for 18-22 gage, but will go to 22 gage; also change from a 37-pin nonstandard connector (hard to get) to a more standard 54-pin connector.
>
> 4. Navy will have some "template" changes (van), as they now know more exactly what they need.
>
> 5. Interface controls: Navy now has the exact type of connectors and will provide the information to ETC.

27. During the October 1998, meeting, the Navy, in response to a point raised by Frank Gorman of ETC, stated that it would entertain a proposal from ETC to go from a maximum allowable working pressure ("MAWP") of 100 psi to 82 psi. This change would allow some weight savings by permitting use of 1/4 inch plate instead of 5/16 inch plate.

28. On November 2, 1998, Rita Palmore, the CO sent a letter to ETC requesting a detailed price proposal for the following changes:

> 1) ICD Electrical Wires/pin Connectors – In accordance with enclosure (1), make the following changes to the ICD Drawings.
>
> 2) Revised SDC Deck Template – In accordance with enclosure (2), replace the existing SDC Deck Template drawings with the drawings shown in enclosure (2).
>
> 3) Wave Slap – Change Contract Paragraph 2.2.2.2. – SDC Vans Operational Requirements, para a – Maximum Wave Slap Loading from "200 psf" to "500 psf".
>
> 4) Specific Interconnect Fluid Penetrators – In accordance with enclosure (3), change the specific interconnect fluid penetrators.

> 5) SDC Van Weight – Change Contract Paragraph 2.2.2.2 – SDC Vans Operational Requirements, para b- Dimensions and Weights – Change maximum weight from "39,000 lbs" to "35,600 lbs."

29. On or about November 9, 1998, ETC submitted five requests for information ("RFIs") based upon action items raised in the October 23, 1998, post-award meeting. Included in these RFIs was a request to delete the corrosion allowance, and reduce the design pressure from 100 psig to 81 psig. Both changes, ETC claimed, would allow ETC to use a thinner plate thickness (1/4 inch plate instead of a 5/16 inch plate), which would assist ETC in meeting the changed weight requirement.

30. ETC indicated that none of the five RFIs submitted on or about November 9, 1998 would have either a cost or time impact.

31. On February 4, 1999, ETC stated during a weekly phone meeting that it had made significant progress with the weight issue, and would be prepared to present the final opinions on Monday, February 8, 1999.

32. On February 16, 1999, ETC stated during a weekly phone meeting that it could meet the lower weight requirement "with the reduction of corrosion allowance and battery size."

33. In its March 1999, Monthly Report, ETC reported that weight reduction issue was resolved.

34. On March 22, 1999, at a construction review board (“CRB”) meeting, ETC put on a slide presentation that contained an SDC weight comparison sheet. ETC stated "Target – 35,600 lbs @ 500 lbs/ft2 = Yes, we can make it."

35. On March 29, 1999, David DeAngelis, the Navy's Project Manager, sent a memorandum

to Ms. Palmore, requesting her to initiate a contract change – changing Contract Section C Paragraph 2.2.2.2. SDC, PVHO, (a), reducing the pressure requirement from "6.8 atm (100 psig)" to "5.44 atm (80 psig);" eliminating the corrosion allowance in Contract Section C, Paragraph 4.1.6; and reducing the "Maximum Weight" under Contract Section C, Paragraph 2.2.2.2, SDC Vans Operation Requirements from 17,706 kg (39,000 lbs) to 16,581 kg (36,532 lbs). The weight reduction represented 6.36% of the original weight. By reducing the pressure requirements and eliminating the corrosion allowance, the change was to be at no cost to the Government.

36. On April 6, 1999, ETC and the Navy executed bilateral modification P00001, which incorporated the following relevant changes:

> SECTION C DESCRIPTION/SPECIFICATIONS
> C.1 Statement of Work:
>
> 1. Change Specification Paragraph 2.2.2.1.1 SDC, PVHO, (a), from "6.8 atm (100 psig)" to "5.44 atm (80 psig)."
>
> 2. Change Specification paragraph 4.1.6, CORROSION ALLOWANCE, to read "No corrosion allowance shall be included in the design."
>
> 3. Change Specification paragraph 2.2.2.2, SDC VANS OPERATION REQUIREMENTS, from "Maximum Weight: 17,706 kg (39,000 lbs)" to "Maximum Weight: 16,581 kg (36,523 lbs)."

37. In addition, bilateral modification P00001 also stated that the changes were no cost changes "within the provisions of the contact as cited in FAR Part 43," and that "[a]cceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money and for any and all costs, impact, effect, and for delays and

disruptions arising out of, or incidental to the work as herein revised."

38. Richard E. McAdams, Executive Vice President for ETC, signed bilateral modification P00001.

39. The bilateral modification was issued before ETC delivered the final design as per the instructions of contract section 1.2.6.

Bilateral Modification P00002

40. The contract required that the SDCs meet a 200 pounds per square foot wave slap, representing the force of waves that the SDC be could be subjected to upon the deck of the vessel during their use.

41. The Navy requested ETC to submit a proposal for the cost of increasing the wave slap requirement to 500 pounds per square foot.

42. ETC submitted a proposal in the amount of approximately $800,000.

43. On or about March 22, 1999, the Navy concluded that it no longer wanted ETC to pursue a 500 pounds per square foot wave slap because the projected cost was to high; instead ETC was to proceed on the design based upon a 200 pounds per square foot wave slap.

44. On April 5, 1999, Mr. McAdams sent a request for equitable adjustment to Ms. Palmore. In the letter Mr. McAdams stated that ETC was "unable to propose alternate and cheaper method of meeting the wave slap change." ETC, however, sought $37,291 for the amount it cost ETC to prepare the 500 ft/lbs wave slap estimate, as well as a time extension of 60 days for completion of Phases I and II in addition to a previously requested extension of 120 days.

45. On April 13, 1999, the parties executed bilateral modification P00002. The modification was to compensate ETC for preparing the cost estimate for the wave-slap loading. The contract

price was increased by $37,291, the amount requested by ETC; and the contract completion date was extended by more than 180 days, the total amount requested by ETC, from a completion date of April 8, 1999, to October 13, 1999.

46. Bilateral Modification P00002 contained the following statement:

> Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money and for any and all costs, impact, effect, and for delays and disruptions arising out of, or incidental to the work as herein revised.

Bilateral Modification P00005

47. On or about November 5, 1999, ETC submitted RFI Nos. 75, 76, and 77.

48. RFI No. 75 was an ETC proposal to use composite type, corrosion resistant panels, on the exterior of the vans. ETC claimed there was both a cost and time impact for this requested change.

49. RFI No. 76 was an ETC proposal to revise the aft end of the van and chamber. ETC claimed there was a cost impact (a decrease in cost) but no time impact for this requested change.

50. RFI No. 77 was an ETC proposal to add a potable water supply system instead of using the bottled water method depicted in contract Section C3.3.5(b). ETC claimed there was both a cost and time impact for this requested change.

51. On December 30, 1999, ETC and the Navy executed bilateral modification P00005.

52. Bilateral modification P00005 incorporated RFI Nos. 75, 76, and 77, regarding Corrosion allowances on the SDC Van, Aft End Revision, and Potable & Waste System Design. The contract amount was increased by $75,852, and the contract completion date was extended to May 31, 2001.

Bilateral Modification P00006

53. On June 14, 2000, ETC submitted RFI No. 84A (Rev.) requesting to change the specified internal Scrubber and Environmental Control System to an external one. ETC claimed there was both a cost and time impact for this requested change.

54. On August 15, 2000, ETC and the Navy executed bilateral modification P00006, which incorporated RFI No. 84, increased the contract value by $26,820 and extended the contract completion date to May 15, 2002.

Bilateral Modification P00009

55. On September 17, 2002, ETC submitted RFI No. 157 for revisions to the Van Air Conditioning Assemblies; Van Handrail; and Fore End Ladder. ETC requested a cost increase of $49,997.58 for the work, and a four-week time extension.

56. On February 20, 2003, the parties executed bilateral modification P00009, which incorporated RFI No. 157, increased the contract value by $49,997.58 and extended the contract completion date to August 31, 2003.

ETC's Claim

57. ETC submitted a draft request for equitable adjustment ("REA") on November 7, 2002, in the amount of $3,668,554. On May 6, 2003, the CO requested that ETC formalize the REA. ETC responded on the same date by submitting a certified claim in the amount of $5,166,401. ETC submitted claim amendments on August 6, 2003, January 6, 2004, and April 28, 2004, increasing the total of the claim to $6,028,093. All of ETC's claim amounts included an estimate of the cost to complete the project.

58. The CO denied ETC's claim in full on July 22, 2004.

59. ETC filed a complaint in the United States Court of Federal Claims on July 11, 2005, seeking $9,109,617.50. Following the filing of the Government's motion to dismiss elements of ETC's complaint, ETC filed an amended complaint on May 16, 2006, seeking $7,995,398.00.

Technical Issues

60. The Government retained Simpson, Gumpertz and Heger ("SGH"), a Boston consulting firm, as its technical expert. In reaching its opinions in this matter, SGH reviewed the RFP, including the specifications and drawings, ETC's proposal, the contract, including all modifications, project documents, including meeting notes, RFIs, correspondence, and ETC designs, analyses, and reports.

61. In addition to reviewing approximately 400,000 pages of project documents, SGH interviewed Jack Maison, a finite element specialist hired as a consultant by Oceaneering International Inc. ("OII") during the project to assist ETC, several fabricators, key Navy personnel, and consulted with Phil Nuytten, a design-build contractor of undersea equipment. SGH personnel also visited the ETC facility to inspect the SDCs on February 17, 2006, and again on February 9, 2007, with Phil Nuytten.

62. As part of its analyses, SGH performed an independent finite element analysis ("FEA") of the SDC-1 chamber and van, the medical/supply lock door, and the manway door.

63. Of the 24 technical issues raised by ETC in its complaint, SGH is of the opinion that three of the issues have full or partial technical merit.

64. SGH is of the opinion that there is technical merit for the portion of claim I.3, weight constraint - manway door that is related to the Navy's direction, and subsequent abandonment of that direction, to ETC to perform a "3D" contact analysis.

65. SGH is of the opinion that there is partial technical merit for claim IV.2, out-of-scope-work - review of FEA load cases.

66. SGH is of the opinion that there is technical merit for the claim IV.6, out-of-scope-work - performance of light study.

Technical Issue: Complaint I.1, Weight Constraint-Thin Walled Chamber: $428,820.00

67. ETC claims that the reduction in maximum allowable weight of the SDC segments, and the decision to use a ¼ inch thick shell, caused design and manufacturing problems. Regarding design, ETC claims that it was forced to add top saddles and belly bands to maintain the roundness of the SDCs and to mitigate stress concentrations. ETC claims that the addition of the top saddles complicated the FEA by requiring the SDC and van to be analyzed together; required creating and analyzing sub-models; and required additional design effort. ETC also claims that the bunk design needed to be modified as a result of using a ¼ inch thick shell. Regarding manufacturing, ETC claims that the use of the ¼ inch thick shell caused out-of-roundness problems, and the solution to these problems required ETC to re-examine the FEA. ETC also claims that the changes in bunk design caused additional procurement costs. ETC's claim implies that a post contract airplane-transport load criterion was related to the weight reduction. ETC claims that the reduction in weight and the decision to use a ¼ inch thick shell made the SDC segments the first chambers of such large size to be built with a thin wall.

68. SGH's analyses of this issue included reviewing the relevant documents and standards; performing FEA modeling; performing design calculations; and interviews. SGH analyzed five different FEA models, each representing a different SDC design, to study the effect of the shell thickness, top saddles, and belly bands on the SDC design. SGH calculated the strength of the

bunk supports. SGH interviewed pressure vessel manufacturers to determine how a change in shell thickness would affect the manufacturing process.

69. Based on its analyses, SGH is of the opinion that ETC's claim for this issue has no technical merit for the following reasons:

A. ETC failed to demonstrate that the weight reduction and use of ¼ inch thick shell caused design changes, such as the top saddles and belly bands, or that such changes would not have been necessary if ETC had used the 5/16 inch thick shell described in ETC's proposal. Moreover, prior to the change in hull thickness, ETC had not yet designed the SDCs with a 5/16 inch thick shell, so there was no design to modify.

B. SGH's calculations demonstrate that changing from the originally contemplated 5/16 inch thick shell to a ¼ inch thick shell should not have required ETC to make "significant" design modifications to the chamber.

C. The addition of top saddles and belly bands did not "drastically" increase the complexity of the FEA; in fact, the more complicated FEA model was required to accurately model the interaction of the van and SDC. Additional sub-models were not necessary.
The addition of top saddles was also used by ETC to strengthen the van. Therefore, even if top saddles were not necessary to support the SDC, ETC might still have used them to support the van.

D. SGH's calculations demonstrate that the bunk design did not require modifications as claimed as a result of using the ¼ inch thick shell.

E. ETC failed to demonstrate that manufacturing problems that ETC experienced were a result of the ¼ inch thick shell. Manufacturing problems with out-of-roundness were

most likely caused by ETC's failure to use the appropriate measures for preventing shell distortion that would have also been required if 5/16 inch thick plate was used.

F. The RFP clearly indicated that the SDCs were intended to be transported by air. The airplane-transport criterion was not added as a change to the contract.

G. The SDC are not unique. Large thin-walled cylinders are used in general industry and as part of other submarine rescue systems.

Complaint I.2, Weight Constraint-Support Structures: $13,607.00

70. ETC claims that the use of the 1/4 inch thick shell led it to believe that filling the chambers with water for contract required hydrotesting would deform the chambers. ETC claims that it incurred additional costs and experienced delays in the design, fabrication, and installation of temporary support structures to prevent deformations during hydrotesting.

71. SGH's analyses of this issue consisted of the review of relevant documents.

72. Based on its review and analyses, SGH is of the opinion that ETC's claim for this issue has no technical merit for the following reasons:

A. The RFP makes the contractor responsible for safety measures during testing. ETC used the temporary support structures at its own discretion despite ETC's calculations that indicated that no additional support was necessary.

B. ETC failed to demonstrate the relationship between the weight reduction, or SDC shell thickness reduction, and its decision to use temporary supports.

Complaint I.3, Weight Constraint-Manway Door: $54,573.00

73. ETC claims that the reduction in the maximum allowable weight of the SDCs required ETC to design and manufacture a "lightweight, stamped Manway door" with a domed shape.

ETC claims that the lightweight door was more expensive to design and manufacture than the one it intended to use, and that because it could not locate a vendor able to supply the door, ETC was forced to develop contingency plans. ETC claims that the manway door needed to be reworked twice. ETC claims that the Navy required it to perform a contact analysis of the manway door, and then questioned ETC's modeling approach, insisting upon a more complex procedure. When ETC was unable to implement the Navy's more complex, ETC claims the Navy then agreed with ETC's original procedure.

74. SGH's analyses of this issue included a review of relevant documents, and the analysis of the effects of different contact analysis modeling procedures.

75. Based upon its review and analyses, SGH is of the opinion that ETC's claim for this issue, with the exception of the contact analysis claim, has no technical merit for the following reasons:

A. The RFP and ETC's proposal both describe a domed, lightweight manway door.

B. The RFP emphasized the need for weight control of the SDCs (even before P00001), and included a note about the importance of a minimum-weight door.

C. There were weight restrictions in the contract prior to P000001 that required ETC to optimize the weight of the SDC components. The weight reduction required by P000001 did not create the need for a lightweight door, and did not change the design concept of the door described in the RFP and ETC's proposal.

D. The RFP drawings depicting the manway door are guidance drawings. ETC was free to prose other “lightweight” door concepts.

E. The need for rework was necessitated by distortion due to ETC's welding of the door.

F. Based on its analyses, SGH is of the opinion that ETC's claim for the issue regarding the contact analysis has technical merit because the more complex contact analysis modeling approach was not necessary and not reasonably anticipated from the RFP documents. The Government's direction to perform a more complex analysis was therefore not justified.

Complaint I.4, Weight Constraint-Van: $339,749.00

76. ETC claims that it interpreted the RFP to require a standard ISO container with wall and floor reinforcements to support the SDC components. ETC claims it was required to design custom van frames after determining that a reinforced ISO container would not be adequate, and that the weight reduction made the design more complex. As in Complaint I.1, ETC claims that the connection of the chamber to the van via top saddles complicated the FEA effort, and that the connection required ETC to strengthen the van, adding weight and cost. ETC claims that the Navy decided to assist it by completing the van design, and that the Navy’s assistance was motivated by its need for a van that exceeded the performance requirements of the RFP regarding wave slap.

77. SGH's analyses of this issue included a review of the relevant documents.

78. Based upon its review and analyses, SGH is of the opinion that ETC's claim regarding this issue has no technical merit for the following reasons:

A. ETC's claim that it planned upon using a standard ISO container is not consistent with its proposal, which indicates that the van would be built around the chamber, as opposed to the chamber being inserted into a fully constructed or partially disassembled van. Weight estimates provided in ETC's proposal contain information indicating the use of custom frame members and skin panels, the use of which is not consistent with the use of a standard ISO

container.

B. The RFP clearly indicated that a structural frame for the van, different than the structure of a typical ISO container, was required.

C. The RFP clearly indicated that ETC was required to design a van, whether made of custom van frames or a reinforced ISO container. The need for a van design did not result because modification of a standard ISO container was not practical.

D. The design concept to connect the top of the of the SDC to the van (ultimately via top saddles) was first made to control stresses in the van. The connection results in reduced stresses in the van, contrary to ETC's claims.

E. ETC failed to demonstrate that the connection of the SDC to the van or the weight-reduction effort made the van design more difficult or added cost to the van.

F. ETC requested assistance with the design of the van from the Navy. The Navy did not impose its suggested van design upon ETC.

Complaint I.5, Weight Constraint-Manway Forging Ring Nozzles: $213,067.00

79. ETC claims that the weight reduction required it to modify the design of the manway forging ring nozzles by making them thinner and more lightweight. ETC also implies that more design effort was required. ETC claims that when the nozzles were installed in the SDCs, the nozzles deformed, and ETC was required to remove the nozzles, design a new means of installation, and purchase and install new nozzles. ETC claims that the deformation of the nozzles and associated rework was a result of the decreased nozzle thickness and reduced weight limit.

80. SGH's analyses of this issue included a review of relevant documents.

81. Based upon its review and analyses, SGH is of the opinion ETC's claim with regard to this issue has no technical merit for the following reasons:

A. ETC failed to provide any technical support for the claim that the nozzle deformations were caused by the thinner nozzle design.

B. ETC's design and installation contributed to the distortions.

C. ETC successfully installed a thin replacement nozzle similar to the first without distortions.

D. The RFP required that ETC design the nozzles.

E. The weight reduction did not create additional design effort for ETC because ETC had not designed the nozzle prior to the weight reduction, ETC, therefore, did not have a design to "modify."

Complaint II, Duplicative Design Effort: $331,488.00

82. ETC claims that the RFP drawings and specifications gave the impression that the pair of SDCs were "virtually identical to one another" and, therefore, did not require separate design packages. ETC claims that it reasonably believed that SDC 1 and SDC 2 were basically identical (with the exception of the MTL and DTL flanges and their associated piping), and that only one design and one set of drawings were required. ETC claims that it was required to prepare and submit separate design packages for SDC 1 and SDC 2, along with detailed layout and piping drawings, and a piping and tubing flexibility analysis, for each segment. In addition, ETC claims it had to review and approve the purchase of piping components for two SDC segments.
When ETC submitted its SDC 2 design package, ETC claims it included only the worst case load combinations as determined from the SDC 1 design. ETC claims that a limited analysis of SDC

2 was justified, but that the Navy demanded a full design package. ETC also claims that it was required to perform strain gauge analysis and testing twice, when such testing and analysis of SDC 1 had fulfilled the contract requirements.

83. SGH's analyses of this issue included a review of relevant documents.

84. Based upon its review and analyses, SGH is of the opinion that ETC's claim regarding this issue has no technical merit for the following reasons:

A. The RFP drawings show major differences between the two SDC segments. It is apparent from the drawings that the SDCs are neither identical nor mirror images of each other.

B. In addition to the fact that the RFP drawings showed major differences between SDC 1 and SDC 2, the RFP indicated that the van, chambers, and piping would require separate designs.

C. The differences in the SDC assemblies are too great to allow them to be designed as one.

D. The RFP contained many unique drawings for SDC 1 and SDC 2. The unique drawing sets indicate that separate designs are necessary.

E. The RFP drawings show major differences in piping and component locations between SDC 1 and SDC 2 that are too great to allow the use of a common layout.

<u>Complaint III.1, Space Constraint-Environmental Control System: $79,611.00</u>

85. ETC claims that its analyses indicated that more environmental control units and scrubbers than depicted in the RFP drawings were required to meet the performance requirements of the contract. ETC acknowledges that contract modification P00006 replaced the internal environmental control system ("ECS") depicted in the RFP drawings with an external

ECS, and that the modification compensated ETC for its re-engineering effort. ETC claims that it has incurred additional material costs associated with the new ECS, and that the new ECS is heavier than that depicted in the RFP drawings.

86. SGH's analyses of this issue included a review of the relevant documents.

87. Based upon its review and analyses, SGH has no technical opinion regarding this issue.

88. ETC overstates the weight increase associated with the new ECS by using an outdated weight increase estimate of 435 pounds in its amended their complaint. The updated weight increase estimate included with RFI 084 shows a weight change of 251 lbs.

89. An internal ETC e-mail indicates that ETC anticipated a savings in material costs as a result of the ECS design changes. In the April 2, 2000 email from Michael Allen to William Mitchell, Sr., Russell Peterson and Gene Davis, Mr. Allen writes:

> The RFI process has be a very positive process during this effort. The Navy has in many cases lowered their requirements, which I am happy to say has or will save ETC a lot of money in engineering but mainly in production and purchasing. In one such development we have successfully demonstrated that a different ECU system would be more capable and safer. We have just submitted the final ECU RFI for approval and this is expected to bring an additional $26K in revenue and at the same time save ETC approximately 30 to 40K in purchased components.

90. In addition, ETC agreed to changes in the ECS in contract modification P00006 without a request for additional material costs.

<u>Complaint III.2, Space Constraint-Forced Convection Flow Analysis: $1,780.00</u>

91. ETC claims that it determined that more environmental control units and scrubbers than depicted in the RFP were required to meet the ECS performance requirements of the contract. ETC claims that after contract modification P00006 was executed, thereby allowing the change

in the design of the ECS, ETC was required to perform a second forced convection flow analysis ("FCFA").

92. SGH's analyses of this issue included a review of relevant documents.

93. Based upon its review and analyses, SGH is of the opinion that ETC's claim with regard to this issue has no technical merit for the following reasons:

A. The RFP and contract require that the FCFA be updated if the initial analysis indicates that ducting is required. ETC recognized this requirement in its proposal.

B. The new ECS allowed by contract modification P00006 includes ducting. The contract required ETC to update the FCFA to reflect the new design.

94. In addition, regardless of the original requirements, contract modification P00006 implements the new ECS design and requires the associated analyses to be performed.

Complaint III.3, Space Constraint-Piping and Control Panel Layout: $1,761,822.00

95. ETC claims that the RFP drawings "misrepresented the amount and size of piping, valves, accessories and other equipment" required in the SDC segments. Specifically, ETC claims that the drawings showed that all required piping and components would fit on the control panel, but ETC claims it found this to be impossible after spending months trying to develop a layout. ETC claims that the drawings misrepresent the "complexity of the piping and accessories" in the control room and claims that the representations in the drawings were inconsistent with specification requirements regarding human factors. ETC claims that the amount of piping and components increased, but the available space in which to mount it decreased.

96. SGH's analyses of this issue included a review of relevant documents, standards, and photographs of the control room and control panel.

97. Based upon its analyses, SGH is of the opinion that ETC's claim regarding this issue has no technical merit for the following reasons:

A. The RFP clearly indicated that many systems and pieces of equipment needed to be closely coordinated and distributed into tight spaces, including a densely packed control room.

B. The fact that ETC understood the requirements of the RFP in this regard is clearly reflected in ETC's proposal that included labor for coordination and integrated design and construction, including computer modeling and physical mockups.

C. ETC implies that the RFP drawings depicting the control panel layout were intended to show a final design. In fact, the drawings were guidance drawings intended to convey a design concept. The RFP required ETC to develop the final design, including piping and component sizes.

D. ETC in its discretion made a design decision to locate the ECS equipment in the control room that further crowded the control panel and control room.

E. The Navy allowed ETC to use three walls of the control room for piping and component support, expanding the space available from that depicted in the guidance drawings.

F. ETC failed to demonstrate that ETC's claimed difficulties in designing the control panel occurred or were a result of the alleged RFP misrepresentations.

Complaint III.4, Space Constraint-Required Gauges on Regulator Inlets/Outlets: $24,102.00

98. ETC claims that the solicitation drawings did not depict gauges on regulator inlets and outlets as required by the Specifications. ETC claims that it requested to omit the gauges, but that the Government directed ETC to supply them.

99. SGH's analyses of this issue included a review of relevant documents and standards.

SGH has no technical opinion regarding this issue.

100. Although the RFP drawings do not show all required gauges, specification section 1.2.3 puts the risk of RFP errors on the contractor. ETC acknowledged that it was aware of specification Section 1.2.3 in its proposal.

Complaint III.5, Space Constraint-Gauge Calibration Valves: $18,475.00

101. ETC claims that the contract required a gauge calibration valve with each gauge, "except when otherwise specified." Because the RFP drawings did not depict all of the gauge calibration valves, ETC claims that it believed that the "except when otherwise specified" provision applied. ETC claims that the Navy directed it to supply gauge calibration valves that were not shown on the RFP drawings.

102. SGH's analyses of this issue included a review of relevant documents. SGH has no technical opinion regarding this issue.

103. Although the RFP drawings do not show all required gauge calibration valves, specification section 1.2.3 puts the risk of RFP errors on the contractor. Moreover, ETC acknowledged that it was aware of specification section 1.2.3 in its proposal and stated that it would perform the necessary work as it was fully and correctly listed and described in the drawings..

Complaint IV.1, Out-of-Scope Work-Review of FEA Load Cases: $10,373.00

104. ETC claims that the Navy approved the load cases it intended to analyze with the FEA models. ETC claims that the Navy later changed its position, and ETC spent significant time in discussions regarding the load cases.

105. SGH's analyses of this issue included the review of relevant documents and standards.

106. Based upon its review and analyses, SGH is of the opinion that ETC's claim regarding this issue has partial technical merit for the following reasons:

A. Both ETC and the Navy contributed to the difficulty in establishing the FEA load cases.

B. The turnover of ETC's FEA staff, and that staff's inexperience, contributed to the difficulties experienced by ETC.

C. The Navy’s poor definition of load cases in the RFP, the Navy’s initial acceptance of ETC’s load cases that did not meet the specifications, and the Navy’s comments regarding the load cases contributed to the difficulties experienced by ETC.

Complaint IV.2, Out-of-Scope Work-FEA Modeling Demands: $38,211.00

107. ETC claims that the Navy rejected its FEA model and required ETC to repeat the FEA because it contained a small error in the diameter of the chamber.

108. SGH's analyses of this issue included the review of the relevant documents.

109. Based upon its review and analyses, SGH is of the opinion that ETC's claim regarding this issue has no technical merit for the following reasons:

A. The Navy's comment regarding ETC’s error in using the incorrect diameter of the chamber was one of several legitimate criticisms that as a whole required substantial refinement and correction of the FEA model. Given the other necessary corrections, and given that the changes were to an early (PDR) computer model, the change in chamber diameter is trivial.

B. The RFP and contract required that ETC provide the Navy with an accurate FEA. The Navy’s comment regarding the SDC diameter did not create design effort beyond that required by the contract.

Complaint IV.3, Out-of-Scope Work-Pipe and Tubing Flexibility Analysis: $22,914.00

110. ETC claims that the RFP required a pipe and tubing flexibility analysis in accordance with ASME B31.1. ETC claims that ASME B31.1 requires only hand calculations to perform the analysis, and that the Navy required ETC to perform the analysis using FEA. In addition, ETC claims that the Navy required ETC to integrate the pipe and tubing flexibility analysis in the FEA models of the chamber and van structures.

111. SGH's analyses of this issue included the review of the relevant documents and standards.

112. Based upon its review and analyses, SGH is of the opinion that ETC's claim regarding this issue has no technical merit for the following reasons:

A. The language of ASME B31.1 does not support ETC's position. On the contrary, ASME B31.1, in fact, limits the use of hand calculations to specific cases.

B. ETC states in its proposal and preliminary design package that FEA will be used to perform the analysis.

C. ETC failed to demonstrate that the Navy directed ETC to use FEA to perform the analysis; in fact, ETC, in its pdr report, noted its inability to generate simple calculations, to evaluate the piping, and indicated it would use fea in the final work.

Complaint IV.4, Out-of-Scope Work-SDC Medical/Supply Lock Door: $66,848.00

113. ETC claims that it believed that the medical/supply lock door shown in the RFP drawings was a functional design, but that ETC's analyses showed the design was insufficient. ETC claims that after several attempts to redesign the door, ETC determined that the Navy's overall design concept was inadequate. ETC claims that the Navy then recommended that a commercial

off-the-shelf product be substituted for the design depicted in the RFP drawings.

114. SGH's analyses of this issue included the review of the relevant documents and a preliminary design of the medical/supply lock door.

115. Based upon its review and analyses, SGH is of the opinion that ETC's claim regarding this issue has no technical merit for the following reasons:

A. SGH’s calculations demonstrate that the medical/supply lock door design concept depicted in the RFP drawings is feasible.

B. ETC's failure to produce a competent design was not caused by a deficient design concept in the RFP drawings.

C. ETC explored an off-the-shelf product months before encountering problems with its design effort.

Complaint IV.5, Out-of-Scope Work-Communication System: $4,863.00

116. ETC claims that the RFP required four communication stations, but the RFP drawings depicted five. ETC claims that it sought clarification, and the Navy required ETC to supply the additional communication station. ETC also claims that the Navy required the supply of additional equipment and capabilities regarding the communication system.

117. SGH's analyses of this issue included the a review of the relevant documents.

118. Based upon its review and analyses, SGH is of the opinion that ETC's claim regarding this issue has no technical merit for the following reasons:

A. The RFP provided conflicting information regarding the communication system, but the issue was clarified by an RFI early in the design process with no apparent cost or time impact.

B. ETC failed to demonstrate that the Navy required ETC to provide equipment or capabilities not included in the RFP.

Complaint IV.6, Out-of-Scope Work-Performance of Light Study: $16,494.00

119. ETC claims that the RFP required a minimum illumination level within the SDC, and the RFP drawings showed a specific number of lights inside each SDC. ETC claims that it determined that there was no basis to believe that the number of lights depicted would meet the minimum illumination level specified. ETC claims that it was required to conduct an analysis to resolve this issue.

120. SGH's analyses of this issue included the review of the relevant documents.

121. Based upon its review and analyses, SGH is of the opinion that ETC's claim regarding this issue has technical merit for the following reasons:

A. The RFP contains both prescriptive and performance language that is in conflict.

B. ETC was required to use engineering effort to resolve this conflict.

C. The amount of engineering effort required could not be reasonably determined from the RFP.

D. The Navy relaxed the illumination level requirements.

Complaint IV.7, Out-of-Scope Work-Primary/Secondary Air Pressurization System: $6,169.00

122. ETC claims that the noise reduction equipment shown on the RFP drawings was not sufficient to maintain noise levels below the specified limit. ETC claims that it was required to redesign the pressurization systems and provide noise reduction equipment beyond that shown on the RFP drawings in order to meet the applicable specifications.

123. SGH's analyses of this issue included the review of the relevant documents.

124. Based upon its review and analyses, SGH is of the opinion that ETC's claim regarding this issue has no technical merit for the following reasons:

A. The RFP drawings depicting the noise reduction equipment do not show the size, model, or type of equipment and, therefore, cannot be considered prescriptive.

B. The RFP contains a performance specification that clearly defines noise-level limits.

C. The RFP performance specification pertaining to noise levels explicitly required that ETC design the equipment required to meet the noise level specification.

D. ETC's proposal acknowledges its noise-control design responsibility.

<u>Complaint IV.8, Out-of-Scope Work-Government Demand for Production Drawings: $0.00</u>

125. ETC claims that it provided all of the drawings required by the specifications with its final design package. ETC claims that the Navy required it to produce and submit production drawings that show a level of detail in excess of the detail required by the specifications.

126. SGH's analyses of this issue included the review of the relevant documents and standards.

127. Based upon its review and analyses, SGH is of the opinion that ETC's claim regarding this issue has no technical merit because ETC presented sample drawings for the Navy's review showing the level of detail ETC proposed to provide on all drawings. The sample drawings had a level of detail consistent with production drawings.

<u>Complaint IV.9, Out-of-Scope Work-Excessive RFIs: $37,216.00</u>

128. ETC claims that it was forced to submit an excessive number of RFIs as "a consequence of the defects, ambiguities and shortcomings" in the contract. ETC claims that 70 per cent of the

RFIs were a result of conflicts between the specifications and drawings, information missing from the contract, and ambiguities in the specification. ETC also claims that the Navy's response time often exceeded the agreed 15 day period.

129. SGH's analyses of this issue included the review of the relevant documents.

130. Based upon its review and analyses, SGH is of the opinion that ETC's claim regarding this issue has no technical merit for the following reasons:

A. ETC and the Navy agreed to use RFIs for many purposes beyond simple information requests, including transmittal of submissions, confirmation of CRB discussions, and initiation of contract modifications, thereby creating more RFIs than if their purpose was limited to simple information requests.

B. The number, reasons, and subjects of the RFIs are consistent with the expectations of a design-build project of this complexity and duration.

C. ETC failed to demonstrate that the RFI process in general, or any specific RFI, had a significant impact upon ETC's costs and schedule.

D. ETC failed to demonstrate that the Navy agreed to respond to RFIs within 15 days. In fact, the Navy asked ETC to remove a clause requesting a response within 15 days from RFIs early in the project.

Complaint IV.10, Out-of-Scope Work-Additional Design Submittal Review: $35,355.00

131. ETC claims that it was required to prepare and submit an additional design package beyond the two design submittals that the specifications required. ETC claims that is was also required to respond to additional Navy comments resulting from the extra design submittal.

132. SGH's analyses of this issue included the review of the relevant documents.

133. Based upon its review and analyses, SGH has no technical opinion regarding ETC's claim on this issue.

134. Bilateral modification P00005 required the submittal of additional design packages for review.

135. The requirement for additional design submittal and review is repeatedly mentioned in meeting notes and correspondence.

136. ETC never claimed the requirement for the additional design submittals constituted out-of-scope work.

<u>Complaint IV.11, Out-of-Scope Work-Internal NAVSEA/NAVSEA Disagreement(s): $773.00</u>

137. ETC claims that it received several different directives regarding ball valves in a pressurization line as a result of disagreements between NAVSEA and NAVSEA CERT. ETC claims that the directives required it to repeatedly modify design drawings and a component database.

138. SGH's analyses of this issue included the review of the relevant documents and standards.

139. Based upon its review and analyses, SGH has no technical opinion regarding this claim.

140. ETC failed to demonstrate that the Navy gave directives to ETC regarding ball valves or required additional work beyond that required by the contract.

<u>Complaint IV.12, Out-of-Scope Work-Van Access Panels: $23,630.00</u>

141. ETC claims that the solicitation package drawings depict a van frame with no skin and did not depict supplementary access panels. ETC claims that the Government directed ETC to add supplementary access panels.

142. SGH's analyses of this issue included a review of relevant documents.

143. Based upon its review and analyses, SGH is of the opinion that ETC's claim regarding this issue has no technical merit for the following reasons:

A. The RFP drawings clearly required each van to have an outer skin and access panels in the skin to allow access to the space between the van and chamber.

B. ETC's proposal includes a preliminary design of van skin and provides access panels.

Complaint V, Improper Specifications of Components: $10,019.00

144. ETC claims that the specifications require pressure gauges with helical coil or bourdon tube sensing elements, and claims that a helical coil sensing device does not exist. ETC also claims that only one company manufactures gauges with helical coil bourdon tube sensing elements and that the contract, therefore, requires a sole source of supply.

145. SGH's analyses of this issue included the review of the relevant documents and interviews with pressure gauge manufacturers.

146. Based upon its review and analyses, SGH has no technical opinion regarding this claim.

147. The claim that the specified gauges do not exist is based upon a small typographical error in the RFP. The same error occurs in ETC's proposal.

148. The RFP places the risk of the mis-description of details of the work upon the contractor.

149. ETC failed to demonstrate that the required gauges are available from only one manufacturer.

150. ETC contends that it incurred additional costs because the RFP did not adequately apprise ETC that the SDCs were required to withstand transport loads.

151. The RFP made it clear that the SDCs would be transported by air.

A. Section 1.1.3 provides as follows: SDS [submarine decompression system] is design to response to worldwide emergency DISSUB [disabled submarine] alerts. SDS is to be air and road transportable.

B. Section 2.1.2.1 provides as follows: Transportation Mode: SDC Segments are non-operational, disassembled, and placed in a configuration for road, or air transportation.

C. Section 2.2.1 provides maximum aircraft load dimensions.

D. Section 3.2.14 provides as follows: As a minimum, each SDC Segment shall be designed to be transported via C-5, C-141, C-17, and/or C-130. Components shall be able to fit in and be flown in all of the aircraft.

E. Section 3.3.2 provides as follows: The system components shall be capable of being loaded onto the aircraft via the use of a standard 40K loader.

F. Section 5.1.14.c.8 provides as follows: Van Analysis: An [sic] complete structural calculation analysis package shall be prepared establishing the conformance of the design to the SOW requirements. This analysis shall be established and reviewed in an analytical form. This analysis shall draw together many of the previously listed analyses and some additional analyses and shall include the following: (a) Structural loading of the vans in all modes of transportation and operational use; (b) Transient loading of the van structure due to worst case conditions as created from air and ground transportation, shipping and rigging, placement, sea state conditions on the VOO [vessel of opportunity] with the structured [sic] burdened by the Spares and Control Vans where appropriate."

152. To the extent that ETC maintains that because of the thin shell, it had to address unforeseen manufacturing problems, ETC is mistaken.

153. According to SGH, the large ovaling of the thin shells resting upon the shop floor would have been noticeable during fabrication and that means, such as spiders, for keeping the shells circular, were required during fabrication.

Scheduling Issues

154. ETC is seeking damages for delay in association with all counts dealing with technical issues.

155. While ETC's complaint makes reference to "delays in completion" and to "the delay period," it does not quantify the duration of each alleged delay.

156. ETC is seeking $595,354.00 "materials and labor cost escalation" due to delays, $638,789.00 for extended project management, $725,826.00 for lost profits due to delays, $298,004.00 for "cumulative delay impacts - unabsorbed / unrecovered overhead, and $935,182.00 in rental costs of manufacturing floor space due to delays. ETC, thus, is seeking at least $3M for costs allegedly attributable to Navy caused delays during the performance of the contract.

157. The Government retained Contract Solutions LLC to perform a critical path method ("CPM") analysis of this contract.

158. According to Contract Solutions, ETC submitted a late and incomplete preliminary design that caused a 7.5 month critical path delay.

159. According to Contract Solutions, the reasons that the preliminary design was late and incomplete include the following: ETC's failure to complete the required FEA structural analysis; the failure to complete a project schedule and update it for progress during the preliminary design phase; the failure to complete a drawing package as required by

specifications; the failure to submit a complete weight analysis for review; the failure to complete the carbon dioxide air flow analysis; the failure to submit any preliminary design elements for SDC-2; time spent performing wave-slap design analysis; and the weight reduction effort.

160. According to Contract Solutions, all of the factors that contributed to this preliminary delay were the responsibility of ETC except for the factors relating to the wave slap design analysis and the weight reduction effort, and the resulting impacts to the FEA structural analysis and weight analysis.

161. The factors relating to the wave slap design analysis and the weight reduction effort were the subject of bilateral modifications.

162. According to Contract Solutions, ETC submitted a late and incomplete final design for SDC-1 that caused a critical path delay of twelve months. According to Contract Solutions, the final design submittal was delayed because of ETC's failure to include the Critical Design Review ("CDR") elements for SDC-2 in the December 7, 2000 final design submittal; the failure to meet specifications regarding FEA structural analyses; the fact that ETC made "piece meal" submittals of final design elements, which resulted in multiple iterations of submittals prior to completing a final design package; the failure to complete the Functional Test Plan for the final design submittal; ETC's proposed design changes for an external carbon dioxide scrubber system; and the failure to complete a van design that met specifications. According to Contract Solutions several of the factors causing this delay were the sole responsibility of ETC.

163. According to Contract Solution, ETC's final design and manufacturing work was delayed by 10.2 months because of ETC's failure to include a complete final design package in its

submittal; ETC's failure to include a Quality Assurance Plan, a Manufacturing Plan, a Hydro-Test Plan, and Cleaning Plan in its submittal; the fact that ETC received three CRB citations for weld seams, chamber out-of-roundness, and penetrator locations; ETC's failure to begin purchasing long-lead material items; ETC's failure to install the DTL and MTL in the sequence shown in the original manufacturing plan; ETC's failure to begin van-frame manufacturing; and ETC's failure to begin saddle fabrication. In addition, the Navy's failure to answer RFI 126 contributed to the delay.

164. According to Contract Solutions, the final design and manufacturing work was delayed by an additional 6.1 months because of the following factors: ETC's failure to submit a complete final design package to allow component material purchasing; the failure to begin purchasing component material items; the failure to complete the SDC 2 van frame manufacturing; the failure to begin general assembly; the failure to install the manway-doors; the failure to resolve final design comments from the government; and the failure to complete the manufacturing plan. In addition, the Navy's slow response to RFI 157 contributed to the delay. This issue, however, was addressed in a bilateral modification.

165. According to Contract Solutions, ETC's work was delayed by three months during the manufacturing process. Factors that contributed to the delay are the following: ETC's failure to install the manway doors; the failure to resolve the manway door welding issues; the failure to order and complete piping assemblies; the failure to resolve the chamber out-of-roundness issue; the failure to resolve the final design comments from the Navy; and the failure to complete the manufacturing plan and cleaning plan. In addition, the Navy's slow answer to RFI 179 contributed to the delay.

166. According to Contract Solutions, ETC's final design and manufacturing work was delayed by an additional 11.5 months of delay during the final design and manufacturing period because of the following factors: ETC's failure to resolve the manway welding issues; the failure to complete the piping assemblies and pipe installations; the fact that ETC received three CRB citations for upper saddle repair, heater/scrubber design calculations, and hull gouges needing repair; the failure to resolve final design comments from the Navy due to lack of resources; the failure to complete the manufacturing plan and cleaning plan; the failure to provide approved plans to the shop floor and the failure to follow the drawings; the failure to provide a schedule to manage the project and schedule Navy inspections; and the failure to complete the top saddle FEA for hydro-testing. According to Contract Solutions several of the factors causing this delay were the sole responsibility of ETC.

167. According to Contract Solutions, ETC caused a further delay of 7.7 months to its final design and manufacturing work. The factors that contributed to this delay are as follows: the hydro-test failure on SDC-1; the failure to perform the hydro-test on SDC-2; the failure to plan and complete the oxygen cleaning of the piping; the failure to complete the top saddle FEA needed before the hydro-test; and the failure to resolve the final design comments from the Navy.

168. According to Contract Solutions, ETC caused the final design and manufacturing process to be delayed by an additional 5.8 months for the following reasons: ETC's failure to complete oxygen cleaning of the piping; the failure to complete painting the vans and SDCs according to the schedule; the failure to complete the post-cleaning assembly according to the schedule; and the failure to resolve the final design comments from the Navy.

169. According to Contract Solutions, the completion of ETC the final design and

manufacturing has been delayed 13.4 months for the following reasons: functional testing failures; the failure to complete the post-cleaning assembly according to the schedule; the failure to resolve the final design comments from the Navy; and the heating and cooling issue. The last factor is the primary cause of delay and requires an entitlement decision. The current delay in delivering the SDCs to the Navy is due to the heating and cooling issue. ETC, however, has not filed a claim seeking damages due to this issue.

170. ETC is claiming over $3M in delay damages without any analysis whatsoever to support its claim from a scheduling standpoint.

171. ETC has not identified a scheduling expert to testify at trial.

Damages Issues

172. The Government retained LitCon Group LLC as our damages expert.

173. According to LitCon, ETC did not adequately document or support any of its claimed damages.

174. According to LitCon, ETC failed to provide the worksheets and source documents that typically are presented in support of claimed amounts; no orderly presentation of claim quantification or other supporting source documents was provided; few documents were located that presented any calculations that supported costs allegedly associated with the claim issues.

175. After reviewing the entire population of documents provided by ETC, LitCon found virtually no support for the majority of the amounts claimed.

176. Furthermore, according to LitCon, for those elements for which ETC did provide some calculations, the level of detail is inadequate for assessing reasonableness. DCAA agreed, stating that the cost and pricing data was not adequate.

177. According to LitCon, despite reviewing an overwhelming number of worksheets, LitCon was unable to locate any worksheets that adequately detailed the particular costs for which ETC is seeking recovery, or that were reconcilable to the amounts in the REA, claims, or amended complaint.

178. According to LitCon, moreover, multiple, conflicting worksheets exist for several of the issues. LitCon, in its expert report, questioned all of ETC's claimed amounts. DCAA agreed, questioning virtually all claimed costs.

## DEFENDANT'S PROPOSED CONCLUSIONS OF LAW

### The Contract Documents Were Not Defective

1. Issues involving contract interpretation present questions of law to be decided by this Court. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 997-98 (Fed. Cir.1996).

2. The language of the contract must be given its plain meaning, and the contract "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts. Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed .Cir.2003) (en banc).

3. An interpretation giving rise to reasonable meaning to all parts of a contract will be endorsed over one that leaves portions of the contract meaningless. Gresham, Smith & Partners v. United States, 24 Cl. Ct. 796, 802 (1991); see also Nielsen-Dillingham Builders, J.V. v. United States, 43 Fed. Cl. 5, 11 (1999) ("[P]ermitting [the contractor's interpretation] to govern would render considerable portions of the [contract] useless, meaningless, or otherwise surplusage. The court is precluded from entertaining such an interpretation.").

Contract interpretation begins by looking to the plain language of the agreement. Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991); Cray Research, Inc. v. United States, 44

Fed. Cl. 327, 329 (1999).

4. The Court's first responsibility when construing a disputed contractual provision is to ascertain analytically whether the meaning of the disputed contract provision is plain from the language or whether an ambiguity exists. McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996) ("We begin with the plain language . . . ."); accord Gresham, Smith & Partners v. United States, 24 Cl. Ct. 796, 802 (1991).

5. When the provisions of a contract are clear, "the court may not resort to extrinsic evidence to interpret them." HRE, Inc. v. United States, 142 F.3d 1274, 1276 (Fed. Cir. 1998) (quoting McAbee Constr., 97 F.3d at 1435).

6. Contract provisions must be construed so as to effectuate the spirit and purpose of the contract. Smelser, 53 Fed. Cl. at 539 (citing Gould, Inc., 935 F.2d at 1274). This is accomplished by construing a contract "as a whole" to harmonize all its provisions; an interpretation that would isolate a term from the balance of the contract is not preferred. Smelser, 53 Fed. Cl. at 539; Gaston & Assocs., Inc. v. United States, 27 Fed. Cl. 243, 249, n.7 (1992) (citing Unicon Mgmt. Corp. v. United States, 179 Ct. Cl. 534, 537-38 (1967)).

7. An interpretation of a contract that "gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." Arizona v. United States, 216 Ct. Cl. 221, 235-36, 575 F.2d 855, 863 (1978).

8. Contract interpretation calls for an objective test, with the standard being what a similarly situated, reasonably prudent contractor would have understood the contract language to mean, not what the drafter or any other party subjectively intended the contract to mean. City of

Tacoma v. United States, 38 Fed. Cl. 582, 588 (1997) (citing City of Oxnard v. United States, 851 F.2d 344, 347 (Fed. Cir. 1988)).

9. A specific contract provision will control over a general contract provision. See Hometown Fin., Inc. v. United States, 409 F.3d 1360, 1369 (Fed. Cir .2005) (citing Hol-Gar Mfg. v. United States, 351 F.2d 972, 980 (Ct. Cl.1965).

10. FAR 52.215-33 Order of Precedence provides that "[a]ny inconsistency in this solicitation or contract shall be resolved by giving precedence in the following order: (a) the Schedule (excluding the specifications); (b) representation and other instructions; (c) contract clauses; (d) other documents, exhibits, and attachments; and (e) the specifications."

11. In order to recover for damages attributable to defective Government specifications, the contractor must prove: (1) that the specifications were defective **or** impossible to perform; (2) that it complied with the applicable specifications; and (3) that the damage was directly attributable to the contractor's performance of the defective specifications. United Construction Co., Inc. v. United States, 10 Cl. Ct. 257, at 270 (1986) citing Ordinance Research, 221 Ct. Cl. At 670, 609 F.2d at 479; Hol-gar Manufacturing Corp. V. United States, 175 Ct. Cl. 518, 525, 360 F.2d 634, 638 (1966**).**

12. A contractor's claims must be proven by a preponderance of the evidence, and must demonstrate liability, causation, and injury. Delco Electronics Corp. v. United States, 17 Cl. Ct. 302, at 319 (1989); Renda Marine, Inc. v. United States, 66 Fed. Cl. 639 Fed Cl, 2005 (contractor bears the burden of proving by preponderant evidence the fundamental facts of liability and damages de novo); Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir.1994).("[W]hen the claim being asserted by the contractor is based upon alleged government-caused delay, the

contractor has the burden of proving the extent of the delay, that the delay was proximately caused by government action, and that the delay harmed the contractor.”)."

13. ETC failed to establish by preponderant evidence that the contract documents were defective.

14. ETC failed to establish by preponderant evidence that any alleged defect was the cause of ETC’s damages.

ETC Is Not Entitled To Damages Due To Defective Specifications

15. The changes clause provides that in the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the contractor in attempting to comply with the defective specifications.

16. The contract is a design / build contract containing many performance specifications.

17. Only a design specification produces the implied warranty. Daewoo Engineering & Const. Co,, LTD v. United States, 73 Fed Cl. 547, 567 (2006), citing Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed. Cir.1987) (“Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results obtained, and leave it to the contractor to determine how to achieve those results.”).

18. The Government is held liable for defective specifications when it mandates adherence to specific means and methods of construction and does not allow the contractor to use its discretion in choosing procedures to accomplish the work. Daewoo Engineering & Const. Co,, LTD v. United States, 73 Fed Cl. 547, 567 (2006).

19. When the Government issues a design specification, it is bound to accept the result that it

produces. Daewoo Engineering & Const. Co,, LTD v. United States, 73 Fed Cl. 547, 567 (2006).

20. The difference between performance and design specifications in summary is that performance specifications, "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." Daewoo Engineering & Const. Co,, LTD v. United States, 73 Fed Cl. 547, 567 (2006).

21. Design specifications, on the other hand, describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications, but is required to follow them as a road map. Daewoo Engineering & Const. Co,, LTD v. United States, 73 Fed Cl. 547, 567 (2006),citing Blake Constr. Co. v. United States, 987 F.2d 743, 745 (Fed. Cir.1993).

22. The amount of discretion provided in the contract to choose means and methods determines whether a particular specification is for design or performance. Daewoo Engineering & Const. Co,, LTD v. United States, 73 Fed Cl. 547, 567 (2006), citing Blake Constr., 987 F.2d at 746.

23. However, the Government can provide some details and directions concerning the performance of work without its necessarily being deemed a design specification. Daewoo Engineering & Const. Co,, LTD v. United States, 73 Fed Cl. 547, 567 (2006), citing PCL Constr. Services, Inc. v. United States, 47 Fed. Cl. 745, 796 (2000).

24. Strict applications of the Spearin Doctrine do not apply to performance specifications. The contractor is free to employ its own means and methods to achieve an end product that is

acceptable to the Government, as in this case. Daewoo Engineering & Const. Co,, LTD v. United States, 73 Fed Cl. 547, 567 (2006).

25. The Government warrants design specifications, and if such specifications are deficient, the government bears the risk. Neal & Co. v. United States, 19 Cl. Ct. 463, 467-68 (1990), aff'd, 945 F.2d 385 (Fed. Cir.1991). The theory of implied warranty for government design specifications was recognized early by the United States Supreme Court in United States v. Spearin, 248 U.S. 132 (1918). In Spearin, the Court upheld a judgment against the United States noting that: "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." Id. at 136, 39 S. Ct. at 61.

26. A plaintiff must prove that damages allegedly resulting from the Government's breach of a contract "was attributable solely to, and was therefore directly caused by, the [breach]." J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 456 F.2d 1315, 1330 (1972)

27. ETC failed to establish by preponderant evidence that any defect in the contract documents caused ETC's damages.

The Government Did Not Breach Its Duty To Act In Good Faith And To Cooperate

28. The law is well settled that Government officials are presumed to act in good faith. This strong presumption cannot be overcome easily. In order to prove that the Government acted in bad faith, it must do so by clear and convincing evidence. Am-Pro Protective Agency, Inc., 281 F.2d 1234, 1239 (Fed. Cir. 2002). See also Tecom, Inc. v. United States, 66 Fed. Cl. 736 (2005).

29. The implied duty to cooperate and the implied duty not to hinder performance of

contracts (both being subspecies of the implied duty of good faith) are present in all Government contracts. Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 76 (2001).

30. ETC failed to establish by preponderant evidence that the Government failed to cooperate or hindered ETC's performance under the contract.

31. ETC failed to establish by preponderant evidence that any alleged failure to cooperate was the cause of ETC's damages.

Review of the Contracting Officer's Final Decision

32. The Contract Disputes Act requires a contracting officer to act upon a properly certified contractor claim. In particular, the contracting officer must, within a reasonable period of time, issue a "final decision" on the claim. Among other things, the final decision must state the reasons for the Contracting Officer's decision. 41 U.S.C. §605(a).

33. A contracting officer's final decision is final and conclusive unless an appeal or suit is timely commenced. 41 U.S.C. § 605(b). Once a suit is commenced in this Court and the Court exercises jurisdiction over the claim, the contracting officer's final decision is reviewed de novo. 41 U.S.C. § 609(a)(3); Information Systems & Networks, Corp. v. United States, 64 Fed. Cl. 599, 604 (2005).

34. Under this de novo review, the contracting officer's final decision does not limit the Court's consideration of the underlying facts and evidence. The Court may determine that the contractor is not entitled to relief based upon any rationale supported by the evidence, even where that rationale was not articulated by the contracting officer. McDonnell Douglas Corp., et al. v. United States, 323 F.3d 1006, 1018 n.3 (Fed. Cir. 2003); Wilner v. United States, 24 F.3d 1397 (Fed. Cir. 1994).

ETC's Claims Relating To Weight Are Barred By Accord And Satisfaction

35. Accord and satisfaction is an affirmative defense for which the defendant holds the burden of persuasion. RCFC 8(c); W & F Bldg. Maint. Co. v. United States, 56 Fed. Cl. 62, 66 (2003).

36. Claims are discharged by accord and satisfaction when "some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim." Community Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1581 (Fed. Cir. 1993) (citing Brock & Blevins Co. v. United States, 170 Ct. Cl. 52, 58-59, 343 F.2d 951, 955 (1965)).

37. For the Government to prove that a modification is an accord, and that the subsequent performance was the satisfaction, the Court must find four essential elements: 1) proper subject matter; 2) competent parties; 3) a meeting of the minds; and 4) consideration. Kanag'Iq Constr. Co. v. United States, 51 Fed. Cl. 38, 46 (2001) (quoting Brock & Blevins, 170 Ct. Cl. at 59, 343 F.2d at 955); Safeco Credit v. United States, 44 Fed. Cl. 406, 419 (1999).

38. The intention of the parties is a particularly important element of an accord and satisfaction. W & F Bldg. Maint. Co., 56 Fed. Cl. at 66 (citing Tri-O, Inc. v. United States, 28 Fed. Cl. 463, 470 (1993)).

39. The general rule is that an executed bilateral modification with no reservation of rights qualifies as an accord and satisfaction. Starflight Boats v. United States, 48 Fed. Cl. 592, 602 (2001) (quoting C & H Commercial Contractors, Inc. v. United States, 35 Fed. Cl. 246, 252 (1996)).

40. The modification does not have to contain a release clause to be an accord and

satisfaction. Jackson Constr. Co. v. United States, 62 Fed. Cl. 84, 92-93 (2004) ((“a release constitutes no condition precedent to discharge by accord and satisfaction.”) (quoting McLain Plumbing & Elec. Serv., Inc., 30 Fed. Cl. 70, 79 (1993))).

41. When the bilateral modification does contain a release provision, it will usually be enforced as an accord and satisfaction unless the release is ambiguous or limited. Jackson Constr. Co., 62 Fed. Cl. at 92.

42. A bilateral contract modification should not be interpreted to reserve rights or claims for damages in connection with the contract modification unless the reservation is precisely expressed in the contract modification. Starflight Boats, 48 Fed. Cl. at 602.

43. According to the parol evidence rule, a party is not permitted to introduce extrinsic evidence to change the terms of an unambiguous contract. Kanag’Iq Constr. Co., 51 Fed. Cl. at 47.

44. When a bilateral modification includes an express release provision, the contractor is barred from introducing other evidence to try to narrow the scope of the release. Id. As this Court has made clear, “[a] contractor who executes an unconditional general release and fails to exercise his right to reserve claims is barred from maintaining a suit for damages or additional compensation under the contract based on events that occurred prior to the execution of the release.” Abatement Contracting Corp. v. United States, 58 Fed. Cl. 594, 611 (2003).

45. A plaintiff’s allegation that it did not intend to waive claims in signing the modification is not sufficient to stave off summary judgment for the government. Safeco Credit, 44 Fed. Cl. at 420.

46. The intent of the parties is decisive upon the question of whether or not there was a

meeting of the minds, with the modification itself being the best evidence of intent. Safeco Credit, 44 Fed Cl. at 419.

47. The behavior of the parties after signing the modification can be relevant to determining intent. For example, if the Government continues to consider, negotiate, and audit the plaintiff's claim for years after the execution of the contract modification, the Government's conduct may undermine the inference that the parties intended for the modification to be an accord and satisfaction. See Community Heating, 987 F.2d at 1581.

48. Not all post-modification discussions of the claim will defeat the assertion of the accord and satisfaction defense; the relevance of the discussions depends on what they show about the parties' intent at the time of entering the modifications. National Steel & Shipbuilding Co. v. United States, 49 Fed. Cl. 579, 594 (2001).

49. If the parties sign several bilateral modifications containing release clauses, and the plaintiff waits until a later modification to start challenging the release language, then this makes it more likely that the parties had a meeting of the minds on the release language of the earlier modifications. See John Massman Contracting Co. v. United States, 23 Cl. Ct. 24, 29 (1991); cf. Jackson Constr. Co., 62 Fed. Cl. at 93-94.

50. The bilateral contract modifications in this case contain the following release provision:

> Acceptance of this modification by the contractor constitutes an accord and satisfaction and represents payment in full for both time and money and for any and all costs, impact effect, and for delays and disruptions arising out of, or incidental to, the work as herein revised.

51. The Court in R. P. Richards Constr. Co, 51 Fed. Cl. 116 (2001), held that a modification, containing the same release language as do the modifications in this case, constituted a valid accord and satisfaction. The Court further held that although the modification's reference to "quantities" was ambiguous, the contractor's claim was covered by the modification and the Government was released from liability for any increased costs incurred by the plaintiff. Id. at 123.

52. An accord and satisfaction, like other contracts, may be set aside in whole or in part by the Court in the event of mutual mistake, supervening illegality, frustration of purpose, or other similar contract exceptions. C. H. Robinson Int'l v. United States, 64 Fed. Cl. 651, 660 (2005); see also Jackson Constr. Co., 62 Fed. Cl. at 93.

53. ETC has failed to demonstrate that the bilateral modifications should be set aside based upon a mutual mistake, supervening illegality, frustration of purpose, or other similar contract.

54. ETC's claims involving all weight constraint issues are barred by accord and satisfaction based upon the fact that ETC executed bilateral modification P00001.

ETC Failed To Establish It Is Entitled To Contract Reformation Based On Mutual Mistake

55. To establish the existence of a mutual mistake, plaintiff must show four things:

1) At the time of contract formation, both plaintiff and the Government were mistaken in their belief regarding a fact;
2.) that this mistake was a basic assumption upon which the contract was based;
3) that it had a "material effect" on performance; and
4) that plaintiff did not assume the risk for this mistake.

Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing Atlas Corp. v. United States, 895 F.2d 745, 750 (1990)).

56. With respect to the nature of the contract, ETC failed to demonstrate by preponderant evidence that at the time of contract formation, both ETC and the Government were mistaken in their belief regarding a fact; that this mistake was a basic assumption upon which the contract was based; that it had a material effect on performance; and that ETC did not assume the risk for this mistake.

57. ETC's claim that ETC and the Government were mistaken in treating the contract as a fixed price supply contract rather than a cost-reimbursement research and development contract has no merit.

58. The evidence establishes that given the nature of the product that the Government sought to procure, there would have been no factual or legal bases upon which to award a cost-reimbursement research and development contract.

59. ETC has failed to prove by preponderant evidence that a fixed price contract, given the nature of the product being sought by the Government in the solicitation, was contrary to law or in any way otherwise inappropriate.

60. ETC has failed to prove by preponderant evidence that the Government was mistaken in its position that the contract was properly solicited as a fixed price contract.

61. ETC has failed to prove by preponderant evidence that ETC was mistaken that the contract was a fixed price contract.

62. The evidence established that ETC's inability to perform its obligations under the financial constraints of the fixed-price contract was due to a number of factors, including the fact that ETC underbid the project, because ETC failed to understand the design requirements of the solicitation, and ETC lacked the engineering, management, and manufacturing expertise and

experience to meet he technical and time constraints contained in the contract.

63. A contractor assumes the risk of pricing the project accurately when submitting its bid. Petersson Builders, Inc. v. United States, 34 Fed. Cl. 182 (1995), aff'd without published opinion 155 F.3d 566 (1998).

64. "Absent unusual circumstances, a government contractor who enters a fixed-price contract shoulders the responsibility for unexpected losses, as well as for his failure to appreciate the problems of the undertaking." Short Bros., PLC v. U.S., 65 Fed. Cl. 695, 775 (2005) (quoting Sperry Rand Corp. v. United States , 201 Ct. Cl. 169, 475 F.2d. 1168, 1175 (1973)). ETC by entering into a fixed-price contract, assumed the risk of cost overruns incurred during the period of performance. See L.W. Matteson, Inc. v. U.S., 61 Fed. Cl. 296, 316 (2004), American Tel. and Tel Co. v. United States, 177 F.3d 1368, 1383-84 (Fed. Cir.1999).

65. With respect to the impact of the weight specification, ETC failed to demonstrate by preponderant evidence that, at the time of contract formation, both ETC and the Government were mistaken in their belief regarding a fact; that this mistake was a basic assumption upon which the contract was based; that it had a material effect on performance; and that ETC did not assume the risk for this mistake.

66. With respect to the fact that the SDCs were not identical, ETC failed to demonstrate by preponderant evidence that at the time of contract formation, both ETC and the Government were mistaken in their belief regarding a fact; that this mistake was a basic assumption upon which the contract was based; that it had a material effect on performance; and that ETC did not assume the risk for this mistake.

67. To the extent that ETC perceived any ambiguity in the design specifications for the SDC

chambers, ETC had the duty to inquire about it prior to the submission of its bid. See Connor Brothers Const. Co., Inc. v. U.S., 65 Fed. Cl. 657 (2005).

68. A contracting party bears the risk of mistake when it is aware at the time the contract is made that it has only limited knowledge about the facts surrounding the mistake but treats its own limited knowledge as sufficient. Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20 (2000). Failure to inquire therefore places the assumption of risk directly on ETC, precluding recovery under mutual mistake doctrine.

ETC Failed To Establish That The Government Misrepresented The Nature Of the SDCs

69. In order to demonstrate misrepresentation, ETC must establish the following: That the Government made repeated representations regarding the design of the SCDs; that these misrepresentations were material; that ETC relied on these representations in assenting to the agreements, and that its reliance upon these representations was justified. See C & H Commercial Contractors, Inc. v. United States, 35 Fed. Cl. 246, 257 (1996).

70. ETC failed to establish that the Government represented that the design of the SDCs involved either the design of a "watercraft" or of an "aircraft".

71. To the extent that ETC thought that the Government's specifications were ambiguous, ETC had the duty to inquire before bidding, and its failure to do so creates an assumption of risk. Rotech Healthcare Inc. v. United Stes, 71 Fed. Cl. 393 (2006).

72. ETC failed to establish by preponderant evidence that the Government misrepresented the SDC design to be the construction of "watercraft", rather than "aircraft."

ETC Failed To Establish It Is Entitled To Contract Reformation Based On Unilateral Mistake

73. In order to prove unilateral mistake, ETC must prove that the asserted error is

compensable, and that the contracting officer knew or should have know about the mistake at the time the bid was accepted. Bromley Contracting Co., Inc, v. United States, 794 F.2d 669, 672 (Fed. Cir. 1986).

74. The mistake in question must involve an error in arithmetic or a misreading of a specification, not an error in judgment. Id.

75. ETC claim that it made a unilateral mistake when it was proposing to design a water-craft rather than an aircraft has no merit.

ETC Failed To Establish Unilateral Mistake Or Misrepresentation Regarding Design Complexity

76. ETC's claim that it was unilaterally mistaken about the amount of engineering and manufacturing effort that would be necessary to complete the project according to specifications because of affirmative misrepresentations by the Government is without legal merit.

77. ETC failed to prove by preponderant evidence that Government made representations regarding the complexity of the design in the solicitation, that even if there were misrepresentations that they were material; that ETC relied on these representations in assenting to the agreements, and that its reliance upon these representations was justified. See C & H Commercial Contractors, Inc. v. United States, 35 Fed. Cl. 246, 257 (1996).

ETC Failed To Demonstrate That The Government Had Or Withheld Superior Knowledge

78. The doctrine of superior knowledge imposes upon the Government a duty to disclose to a contractor "otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance." Giesler v. United States, 232 F.3d 864, 876 (Fed. Cir. 2000).

79. The doctrine applies where: "(1) a contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration; (2) the Government was aware

the contractor had no knowledge of and had no reason to obtain such information; (3) a contract specification supplied misled the contractor or did not put it on notice to inquire; and (4) the Government failed to provide the relevant information." Id. (citing Hercules Inc. v. United States, 24 F.3d 188, 196 (Fed. Cir. 1994)).

80. The Government is not liable for non-disclosure of information which the contractor could or should have known, such as information based on the contractor's experience or known in the contractor's particular industry. See GAF Corp. v. United States, 932 F.2d 947, 949 (Fed. Cir. 1991) ("The Government had no reason to believe experienced asbestos producers lacked knowledge of the product's risks."); Lopez v. United States, 858 F.2d 712, 717 (Fed. Cir. 1988) (rejecting plaintiff's argument that "the government is supposed to know the supplier of asbestos needs information about asbestos it does not have"); Leal v. United States, 276 F.2d 378, 384-85 (Ct. Cl. 1960) ("[Plaintiff] simply miscalculated and did not heed the warning signs in the specifications and drawings furnished, which information was sufficient to inform an experienced contractor that water would be encountered."); Granite Constr. Co. v. United States, 24 Cl. Ct. 735, 751-53 (1991) (holding that the contractor, who was experienced in concrete drilling, should have known that drilling into concrete without knowing how much aggregate it contained would be risky and "experimental").

81. The Government is not liable for the contractor's own unreasonable assumptions. See GAF Corp. v. United States, 932 F.2d 947, 949 (Fed. Cir. 1991) ("[T]he doctrine does not impose on a buyer an affirmative duty to inquire into the knowledge of an experienced seller."); Granite Constr., 24 Cl. Ct. at 753 ("[I]n the absence of affirmative misrepresentations, the Government is not a guarantor against poor judgment with respect to methodologies selected by

the contractor."); McCormick, 18 Cl. Ct. at 267 (any "misleading that occurred was due to plaintiff's own unreasonable assumptions") (quoting Mojave Enters. v. United States, 3 Cl. Ct. 353, 358 (1983)).

82. It is "reasonable for the Government to assume that a contractor is the best judge of its competency and will exercise good judgment in deciding to bid on a contract." American Ship Bldg. Co. v. United States, 654 F.2d 75, 79 (Ct. Cl. 1981); see also Lopez, 858 F.2d at 717 ("[T]he government is entitled to presume that one who bids on a government invitation knows his own capabilities and has ascertained he will be able to produce, and at what cost."). Thus,"it would be up to the contractor, complaining of a breach by non-disclosure, to produce specific information to back up his contention." Lopez, 858 F.2d at 717.

83. The doctrine of superior knowledge is simply not available for a contractors to, in effect, re-bid on a contract when it failed to conduct a careful assessment of the original solicitation in the first place.

84. The "bare withholding" of superior knowledge is not enough to make out a claim; the contractor must have been misled by the withholding. See Leal, 276 F.2d at 384-85; McCormick, 18 Cl. Ct. at 267.

85. ETC failed to prove by preponderant evidence that the Government had superior knowledge regarding the design and fabrication of the SDCs.

86. ETC failed to prove by preponderant evidence that the Government had any information that was in the sole possession of the Government and that such information was vital to ETC's performance of the contract.

87. ETC failed to prove by preponderant evidence that the Government knew that ETC was

unaware of the knowledge it claims was "superior."

88. To the extent that ETC contends that the Government had "superior knowledge" regarding the solicitation drawings, ETC's contention has no merit. The guidance drawings were conceptual in nature; they were not meant to, and were never represented by the Government to be, anything else.

89. To the extent that ETC contends that the Government had "superior knowledge" regarding the fact that the two SDCs were not identical, ETC's contention has no merit. A reasonable contractor would have known from examining the specifications and drawings that the SDCs while similar, were not identical, and therefore would require separate designs and analyses.

90. To the extent that ETC contends that the Government had "superior knowledge" regarding the impact of the reduction in weight, ETC's contention has no merit. A reasonable contractor would have performed the requisite analyses to determine the cost impact, if any, of the weight change, before executing a bilateral modification.

91. To the extent that ETC contends that the Government had "superior knowledge" regarding the dynamic loads that the SDCs were required to sustain because they were intended to be transported by air, ETC's contention has no merit. The RFP contained many references to the fact that the SDCs would be transported by road, air, and water, and must be designed and fabricated to withstand the concomitant stresses.

ETC Failed To Demonstrate That It Is Entitled To Interest Paid to Finance Its Performance

92. The no-interest rule is an "ancient doctrine disallowing interest against the Government, in the absence of an express statute or contractual provision." Singer Company, Librascope

Division v. United States, 215 Ct. Cl. 281, 568 F.2d 695 (1977).

93. The doctrine, recognized for well over a century, arose as a result of the "basic rule of sovereign immunity, in conjunction with the [separate] requirement of an agreement to pay interest . . . ." Library of Congress v. Shaw, 478 U.S. 310, 315-16 (1986); see, e.g., United States v. N.Y. Rayon Importing Co., 329 U.S. 654, 658-59 (1947); United States v. Bayard, 127 U.S. 251, 260 (1888).

94. The purpose of the rule was to permit the Government to "occupy an apparently favored position" by protecting it from claims for interest that would prevail against private parties." Shaw, 478 U.S. at 315-16 (quoting Verdier v. United States, 164 U.S. 213, 219 (1896)). In creating the Court of Claims, Congress retained the Government's immunity against interest and codified the no-interest rule. Id. at 317.

95. Courts have consistently refused to allow recovery of interest on borrowed money incurred as a result of the Government's breach of contract. See England v. Contel Advanced Systems, 384 F.3d 1372 (Fed. Cir. 2004); J.D. Hedin Construction Co. v. United States, 456 F.2d 1315 (Ct. Cl. 1972); Ramsey v. United States, 101 F. Supp. 353 (Ct. Cl. 1951); David Myerle v. United States, 33 Ct. Cl. 1 (1897); see also Bluebonnet Savings Bank v. United States, 266 F.3d 1348 (Fed. Cir. 2001) ("The law of this circuit prohibits plaintiffs from recovering interest paid on money borrowed as a result of defendant's breach")

96. To the extent that ETC claims costs incurred during performance of the contract for financing costs, recovery is legally barred. See Wickham Contracting Co. v. Fischer, 12 F.3d 1574 (Fed. Cir. 1994). The no-interest rule set forth in 28 U.S.C. § 2516(a) bars the recovery of interest cost to a Government contractor for the use of equity capital to finance expenses due to

Government delays. Wickham, 12 F.3d at 1582 (quoting Gevyn Constr. Corp. v. United States, 827 F.2d 752, 754 (Fed. Cir. 1987) ("Even assuming, arguendo, that Gevyn had used equity capital to fund some or all of the changed work, 28 U.S.C. § 2516(a) (1982) generally prohibits the award of interest against the federal government, except where allowed by contract or statute."))

97. Moreover, to the extent that ETC claims the interest it paid for funds borrowed to finance its performance of the contract, ETC has failed to sustain its burden of proof that the Government delayed its performance under the contract, and thus is not entitled to recover the cost of its borrowed funds. See Wickham, 12 F.3d at 1583. ETC's failure to establish a causal link between the interest costs sought to be recovered and the project costs resulting from the actions of the Government bars its recovery of interest costs.

98. The interest cost of capital explicitly borrowed to finance changed work can be an allowable cost element of an equitable adjustment unless the contract provides to the contrary.

99. Section 13 of the contract specifically incorporated by reference DFARS 252.243-7001 Pricing of Contract Modifications (DEC 1991).

100. DFARS 252.243-7001 invokes the cost principles and procedures in FAR Part 31 and DFARS Part 231 for equitable adjustments.

101. FAR 31.205 20, "Interest and other financial costs," is thus incorporated by reference.

102. FAR 31.205 20 provides as follows:

> Interest on borrowings (however represented), bond discounts, costs of financing and refinancing capital (net worth plus long-term liabilities), legal and professional fees paid in connection with preparing prospectuses, costs of preparing and issuing stock rights, and directly associated costs are unallowable except for interest

> assessed by State or local taxing authorities under the conditions specified in 31.205-41 (but see 31.205-28).

103. FAR 31.205 20 makes interest on borrowings unallowable.

104. Since the contract expressly forbids interest on borrowings, Bell v. United States, 404 F.2d 975, 984 (Ct. Cl. 1968), and its progeny are not applicable. See Chem-Care Company, Inc., ASBCA No. 53614, 04-1 BCA ¶ 32, 593 at 161,254-5, 2004 ASBCA LEXIS 28 (claim for interest on borrowings denied because contract incorporated by reference DFARS 252.243-7001).

105. The decision in Bell v. United States, 186 Ct. Cl. 189; 404 F.2d 975 (1968), rests entirely upon the language of the changes clause, which allows an equitable adjustment in the event of a change, and holds that what it is allowing is interest on borrowings incurred specifically to finance the changed work. 186 Ct. Cl. at 205, 404 F.2d at 984.

106. The court in Bell considered a claim for costs incurred under the contract, not for interest on the "breach" of delayed payment. See also Framlau Corp. v. United States, 215 Ct. Cl. 185, 197, 568 F.2d 687, 694 (1977).

107. FAR § 31.205-10 provides as follows:

> 31.205-10 Cost of money.
>
> (a) General. Cost of money --
>
> (1) Is an imputed cost that is not a form of interest on borrowings (see 31.205-20);
>
> (2) Is an "incurred cost" for cost-reimbursement purposes under applicable cost-reimbursement contracts and for progress payment purposes under fixed-price contracts; and

(3) Refers to --

(i) Facilities capital cost of money (48 CFR 9904.414); and

(ii) Cost of money as an element of the cost of capital assets under construction (48 CFR 9904.417).

(b) Cost of money is allowable, provided

(1) It is measured, assigned, and allocated to contracts in accordance with 48 CFR 9904.414 or measured and added to the cost of capital assets under construction in accordance with 48 CFR 9904.417, as applicable;

(2) The requirements of 31.205-52, which limit the allowability of cost of money, are followed; and

(3) The estimated facilities capital cost of money is specifically identified and proposed in cost proposals relating to the contract under which the cost is to be claimed.

(c) Actual interest cost in lieu of the calculated imputed cost of money is unallowable.

108. The cost of money allowable under this regulation is not a form of interest on borrowings.

109. ETC failed to demonstrate that it complied with the provision relating to Cost Accounting Standards of 48 CFR 9904.

110. ETC failed to prove by preponderant evidence that it borrowed funds to finance its performance under the contract.

Lost Profits

111. There is no authority for the proposition that ETC is entitled to lost profits.

112. Even under the Winstar line of cases, speculative expectancy damages may not be awarded against the United States. Wells Fargo Bank N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir.1996) ("remote and consequential damages are not recoverable in a common-law suit

for breach of contract ... especially ... in suits against the United States for the recovery of common-law damages.").

113. According to the Court in Wells Fargo,

> [i]f the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement.... But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

88 F.3d 1012, 1022-23 (Fed. Cir.1996) (quoting Ramsey v. United States, 101 F. Supp. 353, 121 Ct. Cl. 426 (1951)).

114. It is well established that claims for lost profits must be certain and not speculative to warrant a remedy in this Court. See Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996) (rejecting claim for lost profits resulting from a reduction of a bank's regulatory capital); San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("contract law precludes recovery for speculative damages").

115. Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." Restatement (Second) of Contracts § 352 (1981).

116. Damages may not be determined by "mere speculation or guess;" evidence showing the extent of the damages as a matter of "just and reasonable inference" is required. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931); see also Hi-Shear Tech. Corp.

v. United States, 53 Fed. Cl. 420, 437 (2002), quoting Miller Elevator Co. v. United States, 30 Fed. Cl. 662 , 702 (1994) (Any "leniency as to the actual mechanics of computation does not relieve a contractor of its basic and essential burden of establishing the fundamental fact[] of . . . resultant injury.")

117. Damages claims for loss of anticipated profits are generally "too remote, consequential and speculative" from any breach that may have occurred to be recoverable as a matter of law. Essen Mall Properties v. United States, 21 Cl. Ct. 430, 447 (1990) (citations omitted) (lost profits not available as a matter of law even though the mall was already built and ready to be leased at the time of the alleged breach); Rhen v. United States, 17 Cl. Ct. 140, 143-144 (1989) (lost profits not available as a matter of law even where the plaintiff was an operating business); Neely v. United States, 152 Ct. Cl. 137, 146-47, 285 F.2d 438, 433 (1961)(fledgling strip mining operation); accord Navajo Tribe of Indians v. United States, 9 Cl. Ct. 639, 646 (1986) (sawmills); White Mountain Apache Tribe v. United States, 10 Cl. Ct. 115, 118-19 (1986) (ranching).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

DAVID L. KOMAN
Senior Trial Attorney
Litigation Office
Office of the General Counsel
720 Kennon Street, S.E., Bldg. 36
Washington Navy Yard, DC 20374-5013
202-685-6984
202-685-7036 (Fax)

s/ Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch, Civil Division
Department of Justice
1100 L Street NW
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
202-307-0252
202-307-0972 (Fax)

May 30, 2007

Attorneys for Defendant