IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENVIRONMENTAL TECTONICS CORPORATION, | : | |
| Plaintiff, | : | |
| v. | : | No. 05-746C |
| THE UNITED STATES, | : | |
| Defendant. | : | |

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

## I. BACKGROUND FACTS

1. On December 19, 1997, the United States Navy (the "Government") issued Solicitation #N47408-97-R-1861 (the "Solicitation"), which concerned the procurement of two Submarine Decompression Chamber segments ("SDCs").

2. The SDCs were to be a component of a Submarine Rescue Diving and Recompression System ("Submarine Rescue System"), which was designed to rescue submariners on disabled submarines.

3. Each of the two SDCs were intended to provide recompression and hyperbaric treatment to up to 31 rescued submariners living in the closely monitored environment of each SDC until the completion of hyperbaric treatment. Each SDC was to consist of the following major elements:

- A "Pressure Vessel for Human Occupancy," the cylindrical chamber ("Chamber") where hyperbaric treatment takes place.
- A control station ("Control Station") outside the Chamber for monitoring and control of various SDC systems.
- A metal box-like van ("Van") that houses the Chamber, Control Station, and other internal components of the system.

- Primary and secondary pressure control assemblies to regulate pressure in the Chamber.
- "Built-In Breathing System" (BIBS) assemblies to provide oxygen for decompression treatments and emergency breathing air.
- Environmental control assemblies to condition Chamber air.
- Gas analysis assemblies to monitor the Chamber atmosphere.
- Potable water sanitary assemblies.
- Fire safety equipment.
- A lighting system.
- Supplemental HVAC assemblies.
- Furniture assemblies.
- A communication system.

4. Potential offerors for the SDCs were required to submit proposals within 60 days of the Solicitation issuance.

5. The Solicitation contained Specifications ("Specifications"), which included over 140 sheets of Drawings (the "Drawings"). The Specifications and the Drawings were prepared for the Government by Oceaneering International, Inc. ("Oceaneering"), which designed the Submarine Rescue System under Contract No. N00014-90-D4024 for over $7 Million.

6. When the Solicitation was issued, Oceaneering wanted to submit an offer but, because it had prepared the Specifications and the incorporated Drawings, Oceaneering was not permitted to do so. Instead, Oceaneering remained involved in the project by continuing as a consultant to the Government on technical issues raised by the contractor.

7. On September 24, 1998, plaintiff, Environmental Tectonics Corporation ("ETC"), a very experienced manufacturer of hyperbaric systems for both commercial and military clientele, submitted its final offer (the "Proposal") in response to the Solicitation. After deeming

ETC to be a responsible offeror with a reasonable offer, on September 25, 1998, the Government awarded ETC contract No. N47408-98-C-2103 ("the Contract").

8. Although the initial Contract completion date was March 8, 1999, this was subsequently changed on four occasions. The project is ongoing, and substantially completed, and the Government has never sought to terminate ETC.

9. ETC's offer price was $3,298,750, which was very similar in amount to the Government's independent estimate of $3,464,000 and the offer prices of two of the three other offerers: $3,298,986.20 by an entity identified as "Tecnico" and $2,685,542 by "Cowan." The other bidder, "Ceanic," offered $5,944,372. ETC's price was adjusted during Contract performance by an additional $189,960.58.

10. Unfortunately, ETC has suffered a devastating loss on the project because its offer price, as adjusted, was substantially less than the approximately $7 Million in costs ETC has expended on the project.

11. The primary reason for this devastating financial loss to ETC was the huge discrepancy between ETC's reasonable understanding of the Specifications, including the Drawings, during the offer process and the interpretation of these documents imposed upon ETC by the Government during the project.

12. During the offer process, ETC understood the Drawings and remainder of the Specifications to be sufficiently engineered and mature to require minimal further engineering work and to be essentially "build to print" documents.

13. The reasons for this understanding included, but were not limited to, the following:

a. The number of sheets of Drawings was substantial, over 140, many of which were mature enough that they even included bills of materials.

b. While the Specifications expressly provided that certain codes and standards were "for guidance only," see Section 1.2.8, it never did so regarding the Drawings, rendering compliance with them mandatory. Indeed, Sections 1.2.7 and 1.2.8 of the Specifications specifically identified each Drawing and said that they "form a part of this specification." The fact that compliance with the Drawings was mandatory indicated that the Government considered the Drawings to be mature and highly engineered and that the Drawings were consistent with the remainder of the Specifications.

c. The Contract itself assumed the consistency between the Drawings and remainder of the Specifications by not distinguishing between the Drawings and Specifications in the "order of precedence provision." Section I2 of the Contract incorporates FAR 52.215-33, Order of Precedence (JAN 1986), which provides: "Any inconsistency in this solicitation or contract shall be resolved by giving precedence in the following order: (a) the Schedule (excluding the specifications); (b) representations and other instructions; (c) contract clauses; (d) other documents, exhibits, and attachments; and (e) the specifications." The regulation does not identify "drawings" as being a document that might conflict with the Specifications.

d. Section 1.2.11 of the Specifications provided that "[t]he contractor shall not make changes to the Interface Control Drawings (ICDs) or the Drawings issued as part of the contract information package." This further indicated that the Drawings reflected a final engineering determination by the Government as to how the SDCs should be configured.

e. Section 1.2.12 of the Specification provided that "[t]he contractor shall not make changes to the piping and electrical design without the consent of the Contracting Officer."

f. Section 1.2.2 of the Specification also referred to "this statement of work" and provided that "technical issues that are not specified herein are at the discretion of the contractor." Section C1 of the Contract provides that the "statement of work" includes the "drawings" and so the contractor lacked the discretion to deviate from any of the Drawings.

g. While the Specifications required the contractor to confirm by engineering analysis that certain component sizes (and other items) were adequate, it did not impose upon the contractor the duty to engage in wholesale re-engineering and correction of problems in the Government's Drawings that the contractor identified.

h. Several Drawings contained the following note: "shown reflect a weight optimized approach . . . final size, locations, and configuration to be determined during Detailed Design." (Dwg Nos: 7268130, 7268131, 7268132, 7268133, 7268134). This notation indicated that weight was considered when preparing the package, that alternate design approaches were considered and that the optimized solution was selected, and that all that was left was for the contractor to confirm and finalize the approach depicted.

i. Some Drawings contained specific manufacturer and part numbers, which is a final design type detail.

j. The lettering on the Drawing of the control panel in the Control Station indicated that the lettering was scaled to view, indicating that the details of the package had gotten to the point of sizing the letters, a final design type detail.

k. Drawing No. 7268140 showed the exact "Pins" to be used for electrical signals.

l. Drawings Nos. 7268142 and 7268143 provided the sizes for all piping systems and showed where the pipes were to run and told exactly the sequence of the components.

m. Drawing No. 7268135 dedicated seven drawing sheets to depict significant detail for the mechanical and electrical penetrators.

n. Drawing No. 7268134 provided eight sheets of detail on the medlock door assembly, the transfer point for items such as food to and from the SDC and Control Station. The Drawing included such detail as the exact configuration of the dowel pin, hinge, and bushing.

14. ETC's offer reflected the small amount of engineering work that the Drawings and the remainder of the Specifications represented was left to do. The Government, Tecnico, and Cowan's estimates also reflect an understanding that there was little engineering work for the contractor to do. Oceaneering itself shared the view that its Drawings and Specifications were fully mature and that only detail design work remained to be performed. This view is reflected in a June 1997 letter sent by Oceaneering to Victoria Machine Works, Inc. Moreover, prior to award, the Government never communicated to ETC that the level of engineering effort ETC anticipated in its proposal was inadequate.

15. After contract award, however, the Government took the new and unfounded position that many of the Drawings were for "guidance" or "reference" only and did not represent highly engineered configurations, thus leaving ETC in the unexpected position of having to conduct substantial engineering and of having to determine which aspects of the Drawings the Government believed were mandatory. The extent of this problem continually increased throughout the project.

16. As a result, ETC was required, among other things, to issue over two hundred written Requests for Information ("RFIs") to the Government. The reasons for the RFIs included, among other things, confusion over the Drawings and remaining Specifications and conflicts between various requirements, problems that the Government further exacerbated by failing to acknowledge that its Specifications and Drawings were defective and failing to provide ETC with reasonable and timely guidance to complete the Contract. The Government's failure to cooperate with ETC had a negative ripple effect on the overall Contract performance by ETC.

17. Thus, ETC incurred overall costs for the project far exceeding its offer price, as adjusted.

18. Some of these costs are allocable to specific constructive changes (discussed in detail below), including those related to the required use of top saddles, the complication of the piping and Control Station layout, and others. These specific items are discussed in Section III.A below.

19. Other costs are recoverable by ETC from the Government because of the ripple effect of the defective Drawings and remaining Specifications on the overall project. The right to recover these costs is discussed in Section III.B below and the method of calculation of the damages and the specific items is discussed in Section IV below.

20. On November 7, 2002, at the Government's request, ETC submitted a "talking paper" to the Contracting Officer seeking reimbursement for certain claims. The Government characterized this as a "draft claim."

21. On May 6, 2003, ETC converted the November 7, 2002, request into a "Certified Claim" and amended it on August 7, 2003, January 6, 2004, and April 28, 2004. The Government itself, in response to the claim, stated in a letter to the Defense Contract Audit

Agency ("DCAA") that there were a myriad of engineering design changes in the contract and approximately 190 engineering changes that were requested to be incorporated into the contract. The Government stated that a DCAA audit should be conducted in order to negotiate a final settlement.

22. However, on July 22, 2004, the Contracting Officer issued a Final Decision denying all of ETC's claims.

23. On July 11, 2005, ETC filed a Complaint in the United States Court of Federal Claims appealing the Contracting Officer's July 22, 2004 Final Decision and, on November 7, 2005, the Government filed an Answer.

24. On May 16, 2006, ETC filed an Amended Complaint reducing its claim from $9,109,617.50 to $7,995,398.00 and, on May 16, 2006, the Government filed an Answer to the Amended Complaint.

## II. ETC IS ENTITLED TO AN EQUITABLE ADJUSTMENT TO THE CONTRACT

25. ETC is entitled to an equitable adjustment. To receive an equitable adjustment, ETC must show: (i) wrongful conduct by the Government; (ii) that such conduct caused some or all of the increased costs; and (iii) that ETC suffered injury as a result. Servidone Const. Corp. v. U.S., 931 F.2d 860, 861 (Fed. Cir. 1991); George Sollitt Const. Co. v. U.S., 64 Fed. Cl. 229, 236 (Fed. Cl. 2005).

> To prevail on its claim for equitable adjustment(s), plaintiff must demonstrate first that any increased costs arose from conditions differing materially from those indicated in the bid documents, and that such conditions were reasonably unforeseeable in the light of all the information available to the contractor. Plaintiff must also show that its contract costs actually increased, and that the cost increases were the direct and necessary result of the change.

Cavalier Clothes, Inc. v. U.S., 51 Fed. Cl. 399, 411 (Fed. Cl. 2001).

26. As between the Government and its contractor, the law requires a fair allocation of post-award changes in the costs and burden of performance through equitable adjustment. C. Sanchez & Son, Inc. v. U.S., 6 F.3d 1539, 1544 (Fed. Cir. 1993).

27. An "extraordinary cost increase" on the contractor—such as the one suffered here—is one of the primary factors that should be taken into account when determining entitlement to an equitable adjustment. Ralph L. Jones Co., Inc. v. U.S., 33 Fed. Cl. 327, 334-35 (Fed. Cl. 1995). "The ultimate goal of an equitable adjustment is to do equity." Id. at 331.

28. The burden is on the contractor to establish the amount of its claimed equitable adjustment by a preponderance of the evidence. ACE Const., Inc. v. U.S., 70 Fed. Cl. 253, 274 (Fed. Cl. 2006). However, a contractor need not prove its damages with absolute certainty or mathematical exactitude. Id. It is sufficient if a contractor furnishes the Court with a reasonable basis for computation, even though the result is only approximate. Id.; Ralph L. Jones Co., 33 Fed. Cl. at 336.

**A. From The Outset Of The Project, The Government Provided ETC With Defective, Incomplete And Immature Design Specifications And Drawings In Breach Of The Implied Warranty**

**Applicability Of The Implied Warranty Of The Specifications And Drawings**

29. The type of wrongful conduct that provides a right to an equitable adjustment includes breach of an implied warranty. Hol-Gar Mfg. Corp., v. U.S., 175 Cl. Ct. 676 (Cl. Ct. 1964); George Sollitt, 64 Fed. Cl. at 296.

30. The Government impliedly warrants drawings and specifications that are reasonably construed as "design" in nature.

31. "Design" specifications are those that require a contractor adhere to them with little deviation or modification. C.H. Guernsey & Co. v. U.S., 65 Fed. Cl. 582, 605 (Fed. Cl. 2005). They describe in detail the materials to be employed and the manner in which the work is

to be performed. Id. Performance specifications, by contrast, merely set forth an objective for the contractor to meet, but do not specify the method that must be followed to attain it. Id.

32. Where the Government furnishes specifications and drawings that are fairly susceptible to a certain interpretation, and the contractor actually and reasonably so construes them, justice and equity require that the contractor's construction be adopted. C. Sanchez, 6 F.3d at 1544. See also White v. Edsall Const. Co, Inc., 296 F.3d 1081, 1085 (Fed. Cir. 2002) (contractors are not expected to exercise clairvoyance in spotting hidden ambiguities or defects in the bid documents, and they are protected if they innocently construe the bid documents in their own favor, because all such ambiguities are construed against the Government); H.B. Mac, Inc. v. U.S., 153 F.3d 1338, 1345 (Fed. Cir. 1998) (the proper technique for the interpretation of a government contract is for the Court "to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents"). In fact, "[a] government contractor does not bear the burden of interpreting a contract correctly, only of interpreting it reasonably." Delcon Const. Corp. v. U.S., 27 Fed. Cl. 634, 637 (Fed. Cl. 1993).

33. Here, the Government furnished detailed technical Specifications and Drawings that, for the reasons discussed in Section I above, ETC reasonably believed had been thoroughly researched, designed, and engineered and enabled the SDCs to be ready to build. Thus, ETC reasonably believed the Drawings and remaining Specifications to be "design" in nature.

34. The Government's post-award labeling of the Drawings that Oceaneering had prepared for millions of dollars as mere "cartoons" and for "guidance only" did not remove the Government's inherent obligations regarding the specifications furnished to its contractors. C.H. Guernsey, 65 Fed. Cl. at 605. The Court does not blindly follow mere labeling in determining

the issue. Rather, the Court first inquires into how much discretion the contractor actually has in deciding how best to complete the work; the less discretion the contractor has, the more likely it is a design specification. See id. at 605-607. See also Fru-Con Const. Corp. v. U.S., 42 Fed. Cl. 94, 96 (Fed. Cl. 1998) (the distinction between design and performance specifications is not absolute; a contract may contain both design and performance specifications; the touchstone for distinguishing between the two is the level of discretion provided to the contractor by each discrete specification); Dillingham Const., N.A., Inc. v. U.S., 33 Fed. Cl. 495, 501 (Fed. Cl. 1995), aff'd, 91 F.3d 167 (Fed. Cir. 1996) (specifications were design specifications, regardless of how they were labeled in the contract, because they were "extremely detailed"); Apollo Sheet Metal, Inc. v. U.S., 44 Fed. Cl. 210, 213 (Fed. Cl. 1999) (drawings were design specifications rather than mere "conceptual drawings" because they were "precisely detailed" and set forth elements such as location, height, slope, size and types of materials to be used); Hawaiian Bitumuls & Paving v. U.S., 26 Cl. Ct. 1234, 1240 (Cl. Ct. 1992) (where specifications contain detailed measurements, tolerances and types of materials to be used, they are design specifications, even if the contractor is allowed to use discretion in some aspects of the job).

35. Importantly, the fact that a specification "cannot be followed precisely" does not, in and of itself, indicate that it is a performance specification. Blake Const. Co., Inc. v. U.S., 987 F.2d 743, 746 (Fed. Cir. 1993). This is to prevent the Government from unfairly transforming a design specification into a performance specification for the purpose of avoiding liability for defects in the specification. See id.

36. Here, the Court is faced with a textbook example of the Government attempting to avoid responsibility by referring to their multi-million dollar Specifications and Drawings as mere "cartoons." Such self-serving labeling of detailed Specifications and Drawings was

rejected by the Court in Underground Const. Co., Inc. v. U.S., 16 Cl. Ct. 60, 63 (Cl. Ct. 1988). In Underground Const., the Government provided a contractor with a detailed drawing that was labeled "for information only;" during the course of the work, it was revealed that some of the necessary details on the drawing were incorrect or, in some cases, omitted. The Government argued that the contractor had no right to rely on the drawing because of the "for information only" label. Id. The Court rejected this argument, holding that to accept the Government's assertion would mean that the contractor "had no right to rely on the drawing at all." Id.

37. Here, if the Specifications and Drawings were truly "cartoons," as the Government asserts, logic dictates that they would have been created much more inexpensively, and would have been painted in much broader brushstrokes, than the detailed Specifications and Drawings actually provided as part of the Solicitation.

38. The Specifications and Drawings provided in the Solicitation were design in nature and thus the Government impliedly warranted them.

**Scope of the Implied Warranty**

39. The scope of the implied warranty of design drawings and specifications was first addressed in Spearin v. United States, 248 U.S. 132, 136 (1918), where the Court held that a contractor is not responsible for defects in the item constructed if he strictly follows the design specifications given to him by the government. See also White v. Edsall Constr. Co., Inc., 296 F.3d 1081, 1084-85 (Fed. Cir. 2002); Hercules, Inc. v. United States, 24 F.3d 188, 197 (Fed. Cir. 1994); Ordnance Research, Inc. v. United States, 221 Ct. Cl. 641, 670 (1979); Hol-Gar, 175 Ct. Cl. at 525. As the Supreme Court explained:

> If the contractor is bound to build according to plans and Specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and Specifications. This responsibility of the owner is not overcome by

> the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work.

Spearin, 248 U.S. at 136 (internal citations omitted). In Spearin, the Supreme Court held that contract provisions "prescribing the character, dimensions and location of" a structure to be constructed "imported a warranty that, if the specifications were complied with, the [structure] would be adequate." Id. at 137.

40. The implied warranty regarding Government-furnished design specifications and drawings is an assurance by the Government of the existence of facts upon which the contractor may rely; "it is intended precisely to relieve the promissee of any duty to ascertain the facts for himself." Oman-Fishbach Int'l (JV) v. Pirie, 276 F.3d 1380, 1383 (Fed. Cir. 2002).

41. Contractors are not required to ferret out "hidden or subtle errors in the specifications." White, 296 F.3d at 1085. Being one of the few protections afforded to contractors, the implied warranty cannot be overcome by the customary self-protective clauses that the government inserts in its contracts. Id. Quite simply, it is the Government, and not the contractor, that assumes the risk that design specifications and drawings may ultimately prove defective during the construction phase. In fact, courts have long ruled that whenever the government uses design specifications and drawings in a contract, there is an accompanying warranty that these specifications and drawings are free from error. Turner Const. Co. v. U.S., 367 F.3d 1319, 1324 (Fed. Cir. 2004); White, 296 F.3d at 1084.

42. Thus, it is well-settled that when the Government includes design specifications and drawings in a contract, it impliedly warrants that: (i) if the contractor follows those specifications and drawings, the resultant product will not be defective; and (ii) if the resultant product proves defective, the contractor will not be liable for the consequences. Hercules, Inc. v. U.S., 24 F.3d 188, 197 (Fed. Cir. 1994), aff'd, 516 U.S. 417 (1996). The implied warranty

applies to design defects that come to light both during and after the performance of the contract work. Id. at 197. Again, because the purpose of the implied warranty is to protect a contractor who complies with the design specifications and drawings, it is the Government—not the contractor—that bears the risk of the defects and the resulting harm arising out of those defects. See White, 296 F.3d at 1084-85.

43. When the Government provides a contractor with defective specifications and drawings, the Government is deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications. ACE Const., 70 Fed. Cl. at 284. To recover for a breach of the implied warranty, the contractor must demonstrate, first, that the specification was a design specification and, second, that the specification was defective or impossible to perform. Big Chief Drilling Co. v. U.S., 26 Cl. Ct. 1276, 1294 (Cl. Ct. 1992). These elements are met here.

44. If the Government breaches the implied warranty, the contractor is entitled to recover all monies expended in trying to comply with the defective specifications. Id. at 1304. In short, defective design specifications entitle a contractor to an equitable adjustment of the contract price for all reparative work required to build a satisfactory end-model. George Sollitt, 64 Fed. Cl. at 296.

45. These compensable costs include those attributable to any period of delay that results from the defective specifications. ACE Const., 70 Fed. Cl. at 284. Unlike some situations where the Government is allowed a reasonable time to make changes to the work before it becomes liable for the delay, all delay due to defective or erroneous Government specifications are per se unreasonable and, thus, compensable. Essex Electro Engineers, Inc. v.

Danzig, 224 F.3d 1283, 1289 (Fed. Cir. 2000); ACE Const., 70 Fed. Cl. at 284; Big Chief, 26 Cl. Ct. at 1304.

46. The basic test for recovery based on inaccurate specifications and drawings is whether the contractor was misled by the errors. E.L. Hamm & Assocs., Inc. v. England, 379 F. 3d 1334, 1338 (Fed. Cir. 2004); Turner Const., 367 F.3d at 1324; Robins Maintenance, Inc. v. U.S., 265 F.3d 1254, 1257 (Fed. Cir. 2001); Southern Comfort Bldrs., Inc. v. U.S., 67 Fed. Cl. 124, 133 (Fed. Cl. 2005). The Government is liable when its specifications and drawings create problems that a contractor could not reasonably foresee. W.G. Yates & Sons Const. Co., Inc. v. U.S., 53 Fed. Cl. 83, 84 (Fed. Cl. 2002). Although government-furnished plans need not be perfect, they must be adequate for the task at hand and reasonably accurate. Id.

47. The design Specifications and Drawings furnished by the Government to ETC fall well short of these basic standards.

48. Two cases, White, supra, and Neal & Co., Inc. v. U.S., 945 F.2d 385 (Fed. Cir. 1991), illustrate the operation of the implied warranty.

49. In White, the Army provided the contractor with a detailed design to build a facility to house helicopters under a fixed-price contract. The specifications and drawings were provided to the Army by an architectural and engineering firm, and were then passed on by the Army to the bidding construction contractor. Among other things, the specifications and drawings called for building and installing "tilt-up canopy doors," the design of which was contained in the detailed drawings provided. The drawings also contained a disclaimer stating:

> Canopy Door Details. Arrangements, loads, attachments, supports, brackets, hardware etc. must be verified by the contractors prior to bidding. Any conditions that will require changes from the plans must be communicated to the architect for his approval prior to bidding and all costs of those changes must be included in the bid price.

White, 296 F.3d at 1083.

50. The architect testified that he added this disclaimer as an "informational flag" to bidders that they should verify the design. Id. The contractor testified that he read the disclaimer as a "heads up that there may be problems with the drawings" but that "when he looked at the drawings, he saw nothing obviously wrong, and the drawings appeared pretty well-engineered." Id. at 1083-84. Thus, he did not communicate any proposed changes to the Government prior to bidding.

51. After commencing construction, the contractor determined that the design was unworkable and submitted an alternate design, along with a claim for increased costs. The Army accepted the design change but refused the contractor's claim for increased costs on the ground that the contractor had not requested the design change before bidding. Ultimately, the Court found in favor of the contractor. The Court held that, under the circumstances, the Army had impliedly warranted the accuracy, feasibility and workability of the design and, therefore, was responsible for the increased costs incurred by the contractor, despite any disclaimer that may have been on the Drawings.

52. In Neal, supra, the contractor claimed increased costs after steel panels installed during the construction of fuel storage tanks bowed and deformed. The contractor had designed, measured, manufactured and installed the panels according to the contract specifications. The contractor argued that the measuring and installation of the panels required far more precision throughout the process than that contemplated by the specifications. Neal, 945 F.2d at 389. Further, the specifications omitted certain necessary structural supports that later had to be installed by the contractor. Id. at 390. Under these facts, the court awarded increased costs to the contractor.

53. White and Neal illustrate several important themes: first, a contractor is entitled to rely on Government-furnished specifications and drawings in bidding, planning and performing the work; second, plans that appear to all parties to be well-designed and adequately engineered at the bidding stage may turn out to be defective, impractical or unworkable once construction has commenced; and, third, when such an unforeseen contingency occurs, the contractor is not required to shoulder the entire burden of the increased cost of performance, even if it is operating under a fixed-price contract.

54. Here, the Government-furnished Specifications and Drawings were highly detailed. They purported to describe and depict the SDCs as having been thoroughly researched, designed and engineered—in other words, as being ready to build prior to being bid out for construction. This turned out to be false.

55. The Government breached the implied warranty that the Drawings and Specifications would be free from errors, as evidenced by the defects that are more fully discussed in Section III below.

56. As a result, ETC has been forced to engage in unplanned and substantial design and engineering efforts to correct the defects. The Government has willingly accepted the fruits of ETC's efforts and ingenuity. It is only fair that the Government also be required to shoulder an equitable portion of the increased costs.

**B. From The Outset Of The Project, The Government And ETC Mistakenly Believed That The SDCs Could Be Built Without Additional Costly Design And Engineering Effort Beyond That Which Was Included In ETC's Bid**

57. Even if the Drawings and Specifications had been "performance" in nature or a combination of performance and design, ETC would still be entitled to an equitable adjustment based on the theory of mutual mistake.

58. This Court has recognized the need to provide a contractor with an equitable adjustment where both the contractor and the Government have labored under a mistaken belief. Here, as evidenced by ETC's proposal and the Government's independent estimate, neither party believed that ETC would be required to incur costly design and engineering effort beyond that contained in its proposal.

59. To recover for a mutual mistake of fact, the contractor must establish that: (i) the contracting parties were mistaken in their belief regarding a fact; (ii) that mistaken belief constituted a basic assumption underlying the contract; (iii) the mistake had a material effect on the bargain; and (iv) the contract did not put the risk of the mistake on the party seeking reformation. Smelser v. U.S., 53 Fed. Cl. 530, 545 (Fed. Cl. 2002), aff'd, 69 Fed. Appx. 466 (Fed. Cir. 2003). For the reasons discussed above, these elements are met here.

60. This case is similar to both Nat'l Presto Indus., Inc. v. U.S., 338 F.2d 99 (Ct. Cl. 1964) and George Sollitt, supra. In Nat'l Presto, the contractor made two claims for recovery: breach of warranty (which was rejected by the Court) and mutual mistake of fact. The precise issue before the Court was whether the contractor was entitled to relief where a mutual mistake as to a material fact resulted in a large loss to the contractor during its performance of the contract. Nat'l Presto, 338 F.2d at 106-07.

61. During contract performance, both the Government and the contractor labored under a mutual mistake as to how best to manufacture artillery shells without wasting excessive steel; the mistake was not understood by either the Government or the contractor until the contractor had tried various methods to manufacture the shells. Id. at 108. The crucial error was as to the amount of work and types of equipment required to satisfactorily complete the contract. Id. at 109.

62. The mistake was eventually overcome by the contractor's ingenuity. Id. However, at the end of the contract, the Government paid only the contract price for the shells, leaving the contractor with a large uncompensated loss. Id. The Court characterized the situation as a case where a contractor "which has received the stated consideration asks for greater compensation, over and above the contract price, because of the mistake." Id. The Court then set forth the following well-reasoned framework for determining whether such claims by contractors were compensable:

- A mutual mistake will not support recovery if the contract unequivocally places the risk of such a mistake on the contractor. But if the contract contains no express and clearly worded disclaimers in favor of the Government, then the contract is more in the nature of a joint enterprise between the Government and the contractor, especially if the contract involves a new process or new piece of equipment. Here, ETC's contract contains no relevant express and clearly worded disclaimers in favor of the Government. Moreover, there is no dispute that the SDCs were a new—indeed, a unique—system that had never before been built. Finally, in this case, unlike in Nat'l Presto, the design Specifications and Drawings provided by the Government were defective. All these factors weigh in favor of putting the risk on the Government, not ETC.

- While the fact that the contractor enters into a fixed-price contract, as opposed to a cost-plus contract, may indicate that the contractor assumed the risk of a mutual mistake, this is not true in the case where the mutual mistake results in the contractor having to engage in an unanticipated and lengthy period of design and testing entailing a very large expense. In such cases, it can be said that neither the government nor the contractor assumed the risk of the mistake. This is the exact situation present in this case.

- Further, in such a case, with respect to determining what the parties would have agreed to had they been aware of all the facts, it must be presumed that they would have agreed to a reasonable allocation of the costs that would have to be incurred, i.e., that neither side would have agreed to bear all of the extra costs, but that some fair and equitable allocation of the extra costs would have been made. See also Axion Corp. v. U.S., 68 Fed. Cl. 468, 479 (Fed. Cl. 2005) (allowing a contractor's claim of mistake to proceed past summary judgment and to trial, because it was not reasonable to presume that the contractor would have knowingly and willingly

entered into a contract that could ultimately have a financially devastating effect on its business).

- An allocation of costs between the Government and the contractor is particularly appropriate where an unexpected occurrence or condition led to the loss, and where the extra work will not be useless to the Government because, eventually, the Government will get the equipment it contracted for. Here, neither party reasonably could have anticipated the problems that arose during the construction phase of the project. Further, the contract is substantially complete and the Government will have the benefit of the SDCs. ETC should not be left to bear all of the increased costs by itself.

- Above all, in cases involving mutual mistake, the Court must seek "just solutions." Thus, it is equitable to reform the contract so that "each side bears a share of the unexpected costs, instead of permitting the whole loss to remain with the party on whom it chanced to light." Under the circumstances, the "solution" proposed here by the Government—that ETC bear all of the extra costs—is patently unjust.

- "Reformation, as the child of equity, can mold its relief to attain any fair result within the broadest perimeter of the charter the parties have established for themselves." This rule is appropriately applied in this case.

See Nat'l Presto, 338 F.2d at 109-112

63. In light of the foregoing factors, the Court decided to equitably allocate the increased costs of performing the contract between the Government and the contractor. Id. at 112. Because it could not determine an easy, practical and precise formula by which to apportion the actual increased costs between the parties, the Court allocated half of the increased costs to the contractor and the other half to the Government. Id. at 112.

64. Although Nat'l Presto was decided in 1964, its principles, reasoning and results were reaffirmed as recently as 2005 in George Sollitt, supra. George Sollitt involved Specifications and Drawings that, although "complex and subject to multiple interpretations," more resembled "a typical performance specification, where the government specified only the result," leaving discretion as to how best to accomplish that result to the contractor. George Sollitt, 64 Fed. Cl. at 297. Notably, the Court found that the contractor had failed to prove that

the Specifications were defective. Id. However, the contractor did prove that it suffered a certain amount of aggregate increased costs in performing the work. Id. The Court allowed the contractor an equitable adjustment pursuant to a mutual mistake theory holding that, under the circumstances, it was reluctant "to absolve the Navy from all responsibility" and place the sole burden of the aggregate increased cost of performance on the contractor. Id.

65. Essentially, the Court found that both parties neglected their duties to some extent: the Navy failed to provide the contractor with a completely workable design while the contractor failed to identify all of the defects in the Navy's design prior to bidding and commencing the work. Id. Recognizing that the dispute did "not fit neatly into liability under a particular contract clause" the Court, rather than blithely imposing all of the increased costs upon the contractor—the Government's urged "solution" here—decided to take a more reasoned and balanced approach. Id. The Court was guided by the principle that "when a misunderstanding results from carelessness by both parties to a contract, neither should benefit at the expense of the other." Id. As stated by the Court:

> When this principle has been applied in the context of mutual mistakes concerning facts underlying contract performance, one potential remedy is reformation of the contract to share the added costs encountered by the contractor. This equitable remedy was used in National Presto Industries, Inc. v. United States, 167 Cl. Ct. 749, 338 F.2d 99 (1966). The Court of Claims commented that it felt 'impelled' to consider an equitable solution because 'an innocent mistake apparently led the contractor, without fault, to a large loss.' Id. at 107. In that case both parties joined in an erroneous assumption, so the court 'divided the cost between the two parties, neither of whom could be properly charged with the whole.' Id. at 111. Although here it is not so much mistake as inadvertence, because both parties shared in causing the added costs, the only just solution is to have both parties bear the burden of their carelessness. Therefore, the court finds the Navy liable for half of the reasonable costs.

Id at 297-98.

66. In both Nat'l Presto and George Sollitt, the Court recognized that designs conceived on paper by the Government do not always translate into an actual working model during construction by the contractor. Consequently, the construction contractor — ETC in this case — is forced to engage in unanticipated and costly design and engineering efforts before a working model can be built.

67. The Court further recognized that, in such circumstances, some reasonable, fair and equitable allocation of these increased costs should be made between the Government and the contractor.

68. Finally, the Court recognized that while the contractor may be able to prove its losses or increased cost of performance in the aggregate, it cannot always demonstrate each constituent detail of its aggregate loss with mathematical precision. Thus, in Nat'l Presto and George Sollitt, the Court allocated the increased costs based on its view of the relative liability of the parties—in those cases, 50/50 between the Government and the contractor.

69. Here, the Government should bear a substantial portion of the burden for the increased costs.

## III. IMPACT OF THE GOVERNMENT'S WRONGFUL CONDUCT

### A. Specific Design Defects Leading to Constructive Changes

70. The constructive change doctrine is one in which the government is deemed to be liable for additional work caused by a constructive change to the contract. Aydin Corp. v. Widnall, 61 F.3d 1571, 1577 (Fed. Cir. 1995) ("Where it requires a constructive change in a contract, the Government must fairly compensate the contractor for the costs of the change.") (citing J.B. Williams Co. v. United States, 450 F.2d 1379, 1394 (Ct. Cl. 1971)).

71. Several categories of constructive changes have been recognized by the Court: "(i) disputes over contract interpretation during performance; (ii) Government interference or

failure to cooperate; (iii) defective specifications; (iv) misrepresentation and nondisclosure of superior knowledge; and (v) acceleration." Miller Elevator Co., v. United States, 30 Fed. Cl. 662, 678 (1994).

72. Where a constructive change exists, the government must fairly compensate the contractor for the costs of the change. Aydin at 1577.

73. To identify a constructive change, the court consults the language of the contract to determine whether the work required to complete the contract is beyond the original anticipated scope of the contractual undertaking. Id.

74. ETC encountered the below listed constructive changes during this project.

75. The method for calculating the damages for each of these constructive changes from which a "jury verdict" should be rendered is set forth in Section IV below.[1]

**Top Saddles**

76. Each of the two SDCs consists primarily of a Chamber contained within a Van.

77. The Drawings represented to ETC that the Chamber/Van assembly had been engineered so that the Chamber was connected to the Van at the bottom only with three saddles, sitting flat at the bottom onto the Van floor and curved at the top to hold the rounded Chamber above it.

78. However, the Government constructively instructed ETC to connect each Van to the Chamber at the top also. The Government did this by, among things, insisting that the Van could not pass FEA analysis of the loads unless this top connection was made. ETC made this

[1] Although ETC suggests that the "jury verdict" method may be the most appropriate method to be used in this matter, ETC is not waiving its right to request that the Court use some other method such as the "modified total cost" method.

connection by adding top saddles, connecting the bottom surface of the top of the Van to the top of the Chamber.

79. The top saddles were not required by the Drawings, which ETC had the right to assume were consistent with the remainder of the Specifications and, indeed, were not necessary.

80. The use of the top saddles substantially and unnecessarily complicated ETC's FEA analysis of the loading conditions on the Van and Chamber and required ETC to bulk up the Vans to handle the additional stresses that the Vans had to bear because of the top saddles.

81. ETC has suffered damages for adding the top saddles and increasing the FEA requirements in the sum of $428,820 and for bulking up the Vans to handle the additional work in the sum of $339,749.

82. Further, ETC's use of top saddles added unnecessary weight that ETC had to reduce proportionately elsewhere in the SDCs in order to meet the contractual weight limitations.

83. ETC reasonably chose to reduce the weight by thinning the manway door ring nozzles. On each SDC, there are two manway doors, which permit human entry into, and exit from, the SDCs. The ring nozzles serve as a type of circular door frame for the doors.

84. Handling the design and manufacturing difficulties of thinning the ring nozzles, which was necessary to offset the added weight from the use of top saddles, cost ETC $213,067, which represents additional damages for the Government's requirement that ETC add a top connection between the Chamber and Van.

**Piping and Control Station Layout**

85. Each SDC has a Control Station located outside the Chamber but within the Van at one end. The Control Station includes monitoring and control for various systems, including,

among other things, life support, gas analysis, electrical systems, and power distribution. In order to monitor and control these systems, piping and tubing runs through the Control Station.

86. Drawing Nos. 7268136 (for SDC1) and 7268138 (for SDC2) of the Specifications show details of the control panel within the Control Station for each SDC. The Drawings greatly understate the amount and size of piping, valves, accessories and other equipment which ultimately needed to be placed within the Control Station.

87. After contract award, however, the Government for the first time advised ETC that the Drawings were for guidance or reference only and that ETC was required to look solely to the written portion of the Specifications for the requirements for the Control Station and piping layouts. Those requirements were far more complex than the work represented to be done on the Drawings.

88. ETC has suffered damages related to this issue in the sum of $1,761,822, representing the additional costs needed to design and manufacture a Control Station and piping layout inconsistent with the Drawings.

**Gauge on Regulation Inlets/Outlets**

89. When submitting its proposal, ETC reasonably relied upon the accuracy of Drawing Nos. 7268122, 7268123, 7268124, 7268125, 7268126, and 7268127, which did not include six required gauges, for each SDC on regulator inlets and outlets.

90. After ETC informed the Government of its defective design, the Government directed ETC to purchase and install the additional gauges, resulting in damages to ETC in the amount of $24,102.

**Gauge Calibration Valves**

91. When submitting its proposal, ETC reasonably relied upon the accuracy of Drawings 7397890-95 and 7397898-03268122, which did not include thirteen required gauges for each SDC to be included on inlets and outlets.

92. After ETC informed the Government of its defective design, the Government directed ETC to purchase and install the referenced gauges, resulting in damages to ETC in the amount of $18,475.

**Review of FEA Load Cases**

93. The load cases for use in the FEA analyses were not understandable from the Specifications.

94. As a result, ETC spent significant time over a period of months in discussions with the Government regarding the revisions to the load cases for the FEA analyses.

95. As a consequence of the Government's failure to agree to the load cases that were to be analyzed, ETC incurred $10,373 in damages.

**Performance of Light Study**

96. Specification Section 3.2.10 required that the light level within the Chamber be a minimum of 50-foot candles.

97. Drawing No. 7268128 depicted a total quantity of 22 lights inside each Chamber.

98. After contract award, the Government supplied ETC with a "Recommended Deviation" in regard to an acceptable model of light for use in the SDCs.

99. After further inquiry as to how the Government arrived at a quantity of 22 lights, ETC determined that there was no basis to believe that the lighting arrangement the Government had specified would actually meet the Specifications' design and performance requirements.

100. ETC was required to conduct a lighting analysis to establish that the lighting arrangement set forth in Drawing No. 7268128 would not produce the illumination required by the Specifications.

101. As a consequence of having to perform a Lighting Study, ETC has suffered $16,494 in damages.

**Total of Specific Claim Items**

102. In total, ETC is seeking its fair portion of $2,535,015 of compensable damages for the above described specific constructive changes. Generally, these damages are comprised of labor hours and direct other and material costs, both of which are burdened with overhead and general and administrative expenses. The method used to calculate these damages is more fully set forth in Section IV. Moreover, ETC seeks its profit (calculated at 15%) on these specific claim items, which totals $380,252.

**B. Overall Constructive Change Resulting From Delays And Disruptions By The Government In Addressing Design Defects**

103. The aforementioned specific constructive changes illustrate significant, and clearly identifiable, events that occurred during the project that impacted ETC's performance. ETC is also entitled to cumulative impact damages of $1,846,957 because there were numerous other events that occurred (separate from the specified claims) on a daily or a weekly basis that also had a detrimental impact on ETC's performance.

104. A cumulative impact claim, also known as a "ripple effect," "loss of labor efficiency," or "loss of productivity" claim, is based upon the theory that individual compensable changes to a contract, taken as a whole, can have such a disruptive effect on the contractor's performance that the contractor has a compensable claim for costs in addition to the costs attributed to the individual changes. Southern Comfort, 67 Fed. Cl. at 143-44; Jackson Const.

Co. v. U.S., 62 Fed. Cl. 84, 103-04. See also Electronic & Missile Facilities, Inc. v. U.S., 416 F.2d 1345, 1361 (Ct. Cl. 1969) (a contractor is entitled to equitable adjustment "to cover increased costs which were the direct and necessary result of the change or changed conditions, where the condition or the change directly leads to disruption, extra work or new procedures").

105. In Luria Bros. & Co., Inc. v. U.S., 369 F.2d 701 (Ct. Cl. 1966), the Government had furnished the contractor with defective specifications and, after notice from the contractor, failed to promptly take the appropriate and required corrective actions. The Court held that the Government thereby wrongfully subjected the contractor to an "unreasonable trial and error method" of performing the work and that the Government further breached its implied obligation to the contractor through its "extremely slow recognition and correction of the defective plans." Id. at 708. The Court concluded that the contractor was entitled to recover damages on account of the Government's wrongful conduct. See id. at 709 (held: where the change in the work is necessitated by defective plans and specifications, the Government must pay the entire resulting damage, the same as if the redesign were necessitated by a changed condition or the like).

106. Similar to Luria, ETC was forced to engage in a massive design effort with very little direction or guidance provided by the government. This process of "designing" the SDCs was very different from the simple, straightline manufacturing process envisioned by ETC when it bid on the Project.

107. The result of the newly imposed approach to the project on ETC was a significant disruption in ETC's performance as evidenced by, among other things, the content and huge quantity (over 200) of RFIs submitted by ETC to the Government throughout the project as well as the enormous differential in time and labor hours planned versus those incurred.

108. During the preliminary design period, for example, the Government directed that ETC investigate the feasibility and constructability of various design changes and ETC submitted 70 RFIs. ETC intended to complete the preliminary design by March 8, 1999 (150 days after the start work date of October 10, 1998), and to use only 3,335.78 labor hours for engineering tasks. Because of the Government's conduct, ETC could not complete the preliminary design until September 7, 1999, and expended 3,905 labor hours for engineering.

109. During the final design period, the Government, among other things, directed that ETC investigate the feasibility and constructability of various design details, along with cost estimates for the various designs and ETC submitted 49 RFIs. ETC intended to complete the final design by July 6, 1999, and to use only 3,134.09 in labor hours for engineering tasks. Because of the Government's conduct, ETC could not complete the final design until December 7, 2000, and expended 16,699.94 labor hours for engineering tasks.

110. During the manufacturing period, the Government, among other things, advised ETC that significant changes in the SDCs' FEA analysis and testing would be necessary, that ETC needed to investigate feasibility and constructability of various design changes and that ETC should prepare cost estimates for various design changes. ETC has needed to submit 75 RFIs during this period. ETC intended to complete the manufacturing by September 24, 2000, and to use only 12,764.22 labor hours. Because of the Government's conduct, ETC has not completed manufacturing and has expended over 44,396.5 manufacturing labor hours.

111. Thus, while ETC planned to design, manufacture, test, and deliver the SDCs within the contract performance period of 730 calendar days, it has, through September 2006, been engaged in designing, re-designing, manufacturing, and re-manufacturing the SDCs for over 2,920 calendar days. The original contract duration was 730 days and 1,071 days of

extensions were granted. As a result, ETC has provided services for a total of 1,119 days beyond the adjusted contract time.

112. Also, while ETC planned to expend a total of 33,544 labor hours, it has expended 96,643 labor hours through September 2006, resulting in 63,099 labor hours beyond its contractual obligations.

113. Here, the aggregate effect of the issues raised in the over 200 RFI's had such a disruptive effect on ETC's performance, as seen by the enormous increase in the period of performance and labor hours incurred, that ETC is entitled to be compensated for its costs in addition to the costs for the specific claim items set forth in Section II. See Southern Comfort, 67 Fed. Cl. at 143-44. Specifically, ETC is entitled to recover a fair portion, in the nature of a "jury verdict," of its labor, material, other direct costs (collectively, $682,869), material and labor escalation costs ($595,354), extended project management ($531,518), which total $1,809,741. The method used to calculate these items of damages from which a "jury verdict" should be rendered is set forth in Section IV below.

## IV. CALCULATION OF DAMAGES[2]

114. The preferred method for calculating an equitable adjustment is the "actual cost method." Ryco, 55 Fed. Cl. at 199. Where, as here, the nature of the Government's wrong in light of the surrounding circumstances works to preclude the ascertainment of the amount of damages with precise certainty, "it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amends for his acts." Luria, 369 F.2d at 713, quoting Story Parchment Co. v. Paterson Parchment Paper Co, 282 U.S. 555, 562-63 (1931).

---

2 The methods described in this section apply to all sums sought by ETC.

115. When damages cannot be ascertained with certainty, one appropriate alternative method of proving damages is the "jury verdict" method. Orlosky, Inc. v. U.S., 68 Fed. Cl. 296, 319 (Fed. Cl. 2005). This method is "most often employed when damages cannot be ascertained by any reasonable computation from actual figures." Id. Hence, it may be used by the Court when other, more exact methods cannot be applied. Id. The jury verdict method for calculating damages is used if the Court finds that: (i) clear proof of the injury exists; (ii) there is no more reliable method of computing damages; and (iii) the evidence is sufficient for the Court to make "a fair and reasonable approximation of damages." Id. See also White Buffalo Const., Inc. v. U.S., 52 Fed. Cl. 1, 11 (Fed. Cl. 2002) (under the jury verdict method, in estimating damages "the Court of Federal Claims occupies the position of a jury under like circumstances…all that the litigants have any right to expect is the exercise of the court's best judgment upon the basis of the evidence provided by the parties").

116. Here, fairness compels the use of the jury verdict method, so that ETC is not saddled with the entire impact of this project, which is 1,119 days beyond the adjusted contract period and 63,099 labor hours over budget. These facts, together with the fact that the Government never sought to terminate ETC, supports the conclusion that clear proof of injury to ETC exists.

117. Moreover, despite using an acceptable and appropriate bookkeeping and accounting system (as verified by DCAA), ETC's process of recording costs prohibits it from exactly segregating those costs on a claim by claim basis. This is not due to the fault of ETC; rather, it is the natural consequence of performing services on a firm fixed-price contract and the ripple effect that the constructive changes had on ETC's performance (each event not necessarily appearing monumental in and of itself, but rather becoming crucial as each event accumulates).

118. As set forth below, the method used by ETC to estimate its damages provides a fair and reasonable approximation which the Court can use to render a "jury verdict."

A. **Non-Manufacturing Labor Hours**

119. ETC used a job cost accounting methodology in tracking all expenditures. At the time of contract award, ETC issued a Sales Order Number (SOR) for the contract, and all subsequent documentation used this number.

120. ETC also used a computerized cost accounting system (AFTEC) to track expenditures.

121. The labor costs were recorded by employees on timesheets on either a daily or weekly basis and then transferred into the AFTEC system.

122. SOR numbers sometimes are issued for an entire job or for major, separable portions or larger portions.

123. ETC for the most part, did not assign SORs to individual claim items, since at the time the claim issue arose, ETC did not reasonably expect it to form the basis for a claim. Hence, costs are not segregated exactly per claim item.

124. In preparing its claim, ETC analyzed the labor hours maintained in the AFTEC System that had been assigned to the relevant SORs.

125. The labor costs captured by the AFTEC system were transferred to working Excel spreadsheets and regular meetings were held by ETC management to attempt to (1) identify the reasons why costs were incurred, and (2) where appropriate, allocate those costs to claim items. ETC's contract administrator handled this. After obtaining the necessary raw data, numerous meetings were held, wherein entitlement issues were discussed. Following entitlement decisions, allocation of costs were made to specific claim items. These meetings included ETC personnel that the company believed had the most knowledge about performance on the contract as well as

the best knowledge of specific areas of work (engineering, manufacturing, management and documentation).

126. Yet, during this process, much of which was documented in contemporaneous meeting minutes and e-mails, ETC encountered problems that made an exact calculation of its damages difficult to impossible. First, ETC does not, and is not required to, possess as a small business a change order accounting system. Second, many personnel that worked on the project had left ETC. Third, SORs were not assigned to all claim items, because many of the items had not been identified as potential "claim" items until months or years after it first arose. Finally, ETC identified some hours that were incorrectly recorded as indirect.

127. In order to address these issues, ETC met with the personnel that remained employed at ETC and reviewed all costs charged to the relevant SORs.

128. ETC then allocated from these files the costs it felt were attributable to specific claim issues. Great care was taken to ensure that both the original budget and total actual expenditures were not forgotten or exceeded, respectively. ETC also took great care to ensure no specific discipline, department or individual's time was over-allocated. This was accomplished through review of each calendar week's total changes and percentage allocation.

129. Importantly, ETC has determined that nearly 35% ($1.9 Million) of its incurred costs have not been included in the original budget or claim.

**B. Manufacturing Labor Hours**

130. Regarding manufacturing labor hours, which accrued much later in the project, ETC had the benefit of identifying these hours as they were being incurred. Moreover, these hours were more easily identifiable as the manufacturing process was independently verifiable by weld logs and other contemporaneous documents.

131. Therefore, while the method of recording hours was the same as that used to track non-manufacturing labor hours, the process used to allocate the costs to claim items was more straightforward.

**C. Material and Direct Other Costs**

132. Similar to the recording of labor hours, the AFTEC system tracks material purchases from requisition to payment to third parties. ETC's accounting department maintains job cost reports that track "material and direct other charges" against project SORs.

133. As with the labor category discussed above, ETC personnel familiar with the Contract reviewed these material reports and compared them to the bill of materials.

134. For the calculation of subcontractor engineering labor hours, ETC followed the same procedure that it used in analyzing its own direct labor hours.

**D. Overhead and General and Administration Costs**

135. The non-manufacturing labor hours, manufacturing labor hours and the material and direct other costs are burdened by overhead (OH) and general and administrative expenses (G&A), respectively.

136. These indirect rates were calculated using the total OH pool and G&A pool and deducting costs considered to be unallowable, by the Federal Acquisition Regulation.

**E. Escalation Costs**

137. A labor escalation adjustment was applied only to manufacturing labor.

138. The ETC accounting department periodically publishes departmental average unburdened labor rates.

139. For manufacturing, ETC compared the "as bid" versus the "as built" project schedule and concluded that much of the project phases were substantially performed in periods three years beyond their planned expenditure.

140. ETC then added all applicable shop labor rates, which totaled $176.94 (as of August 1999) and $198.70 (as of June 2002).

141. ETC concluded that there was an approximately 12.3% increase or 4.1% increase per year during the extended project completion period.

142. Manufacturing labor costs that were included in the specific claim items were not included in the labor escalation costs.

143. Overhead was applied to the labor escalation.

144. As for material escalation, ETC estimated an annual increase of 5% for material costs.

145. Material costs that were included in specific claim items were not included in the material escalation costs.

146. A blended G&A rate was applied to the material escalation calculation.

147. In total, ETC is entitled to $595,354 for labor and material escalation during the extended project performance period.

**F. <u>Extended Project Management</u>**

148. A comparison was done of the total budgeted hours to actual hours on project management. Project management is not captured in any other labor category by ETC, but is a distinct charge to the project.

149. ETC incurred extended project management damages of $638,789.

G. **Summary of Claimed Damages**

150. ETC seeks its fair share of labor hours, direct other and material costs, burdened by overhead and general administrative expenses for the specific claim items set forth in Section II above, totaling $2,535,015. ETC also seeks its profits of 15% ($380,252) on this claimed amount. The total for the claimed items is $2,915,267.

151. ETC seeks its fair share of the labor hours, direct other and material costs, burdened by overhead and general administrative expenses, incurred by way of the Government's disruption, as set forth in Section III, in the sum of $682,869. ETC also seeks its labor and material escalation of $595,354 and extended project management of $531,518 for the extended disruption period ($682,869 + $595,354 + $531,518 = $1,809,741).

152. Taking into account the above paragraphs, ETC's total claim (absent any entitlement to interest, from the date of the certified claim, for the award of damages sought herein) totals $4,725,008. Notably, ETC estimates that at least $1,900,000 of costs have been incurred on this project, until the date of the filing of the Complaint, that are not included in its claim.

Respectfully submitted,

KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP

By: [signature] 5/30/07

Paul G. Nofer
William R. Hinchman
260 South Broad Street, Suite 400
Philadelphia, PA 19102
(215) 568-6060

Attorneys for Plaintiff,
Environmental Tectonics
Corporation

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 30th day of May, 2007, I caused to be served a copy of Plaintiff's Memorandum of Contentions of Fact and Law by e-mail and regular mail, addressed as follows:

Leslie Cayer Ohta
Commercial Litigation Branch, Civil Division
Department of Justice
1100 L Street NW
Attn: Classification Unit, 8th Floor
Washington, DC 20530

William R. Hinchman