IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENVIRONMENTAL TECTONICS CORPORATION, | ) | |
| | ) | No. 05-746C |
| Plaintiff, | ) | (Judge Susan G. Braden) |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant | ) | |

# DEFENDANT'S MOTION FOR LEAVE TO AMEND ITS ANSWER TO ASSERT AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

FRANKLIN E. WHITE, JR.
Assistant Director

LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch, Civil Division
Department of Justice
1100 L Street, NW
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
202-307-0252
202-307-0972 (Fax)

Attorneys for Defendant

OF COUNSEL:
DAVID L. KOMAN
Senior Trial Attorney
Litigation Office
Office of the General Counsel
720 Kennon Street, S.E., Bldg. 36
Washington Navy Yard, DC 20374
202-685-6984
202-685-7036 (Fax)

June 4, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . i

DEFENDANT'S BRIEF . . . . . . . . . . 1

STATEMENT OF THE ISSUE . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . 1

I. Nature Of The Case . . . . . . . . . . 1

II. Statement Of The Facts . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . 10

I. By Certifying A Claim For Costs That Are Unsupported, Were Not Incurred As The Result Of The Acts Of The Government, Were Already Paid, And That Have No Legal Or Factual Bases, ETC Violated The Anti-fraud Provision Of The CDA, The Special Plea In Fraud Statute And The False Claims Act . . . . . . . . . . 10

II. The Government Should Be Permitted To Amend Its Answer To Assert Affirmative Defenses And Counterclaims Pursuant To The Anti-fraud Provision Of The CDA, The False Claims Act, And The Special Pleas In Fraud Statute . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . 16

# TABLE OF AUTHORITIES

## CASES

Ab-Tech Construction, Inc. v. United States,
31 Fed. Cl. 429 (1994) . . . . . . . . . . 14

Al Munford v. United States,
34 Fed. Cl. 62 (1995) . . . . . . . . . . 11, 12

Brown v. United States,
524 F.2d 693 (Ct. Cl. 1975) . . . . . . . . . . 10

Brown Construction Trades, Inc. v. United States,
23 Cl. Ct. 214, 216 (1991) . . . . . . . . . . 13

Daff v. United States,
31 Fed. Cl. 682 (1994) . . . . . . . . . . 12

First Nationwide Bank v. United States,
48 Fed. Cl. 248 (2000) . . . . . . . . . . 15

Foman v. Davis,
371 U.S. 178 (1962) . . . . . . . . . . 15

Grogan v. Garner,
498 U.S. 279 (1991) . . . . . . . . . . 11

Little v. United States,
138 Ct. Cl. 773, 152 F. Supp. 84 (1957) . . . . . . . . . . 13

Martin J. Simko Constr., Inc. v. United States,
852 F.2d 540 (Fed. Cir. 1988) . . . . . . . . . . 10

McCarthy v. United States,
670 F.2d 996, 229 Cl. Ct. (1982) . . . . . . . . . . 11

New York Mkt. Gardeners' Ass'n v. United States,
43 Ct. Cl. 114, 136 (1908) . . . . . . . . . . 13

St. Paul Fire & Marine Ins. Co. v United States,
24 Cl. Ct. 518, 520 (1991) . . . . . . . . . . 15

Supermex, Inc. v. United States,
35 Fed. Cl. 29 (1996) . . . . . . . . . . 12, 13

UMC Electronics v. United States,
43 Fed. Cl. 776 (1999) . . . . . . . . . . 11

Young-Montenay, Inc. v. United States,
15 F.3d 1040 (Fed. Cir. 1994) . . . . . . . . . . 11

STATUTES

28 U.S.C. § 1503 . . . . . . . . . . 10

28 U.S.C. § 2514 . . . . . . . . . . 1, 10, 12, 13

28 U.S.C. § 2508 . . . . . . . . . . 10

28 U.S.C. § 2514 . . . . . . . . . . 11

31 U.S.C. § 3729 . . . . . . . . . . 1, 10, 14

41 U.S.C. § 604 . . . . . . . . . . 10, 14

RULES

RCFC 1(a) . . . . . . . . . . 1

RCFC 7(b) . . . . . . . . . . 1

RCFC 8(c) . . . . . . . . . . 1

RCFC 13(e) . . . . . . . . . . 1

MISCELLANEOUS

S. Rep. No. 95-1118, 95th Cong., 2d Sess. 20 (1978), reprinted in
1978 U.S.C.C.A.N. 5235 . . . . . . . . . . 10

S. Rep. No. 1118, 95th Cong., 2d Sess. 20 (1978), reprinted in,
1978 U.S.C.C.A.N. 5235, 5254 . . . . . . . . . . 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENVIRONMENTAL TECTONICS CORPORATION, | ) | |
| | ) | No. 05-746C |
| Plaintiff, | ) | (Judge Susan G. Braden) |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant | ) | |

DEFENDANT'S MOTION FOR LEAVE TO AMEND ITS ANSWER
TO ASSERT AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Pursuant to Rules 1(a), 7(b), 8(c), 13(e) and (f), and 15(a) and (d) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant respectfully requests leave of the Court to amend its answer in this case to assert affirmative defenses and counterclaims based upon the False Claims Act, 31. U.S. C. § 3729 et seq., the anti-fraud provision of the Contract Disputes Act ("CDA"), 41 U.S.C. § 604, and the Special Pleas in Fraud, pursuant to 28 U.S.C. § 2514. This is the Government's first request for leave to amend its answer. Our proposed amended pleading is attached to this motion.

DEFENDANT'S BRIEF

STATEMENT OF THE ISSUE

Whether leave to amend the defendant's answer to assert an affirmative defense and counterclaims is appropriate under the circumstances of this case.

STATEMENT OF THE CASE

I. Nature Of The Case

The case arises out of a Navy contract to design, fabricate, assemble, test, and deliver a pair of submarine decompression chambers ("SDCs"). The gravamen of the compliant filed by

Environmental Tectonics Corporation ("ETC") is that the solicitation was defective.

II. Statement Of The Facts

In 1998, the U.S. Navy awarded a contract to ETC to design, fabricate, assemble, test, and deliver a pair of submarine decompression chambers ("SDCs"), in the amount of $3,241,343.58. The contract required final delivery within two years after contract award. Contract modifications increased the contract price by $189,960.58 to $3,431,304.16, and extended the completion date to August 31, 2003. As of May 1, 2007, fabrication of the SDC segments was nearing completion. The delivery date is unknown at this time.

The SDC segments are part of a Submarine Decompression System ("SDS"), which is part of the Submarine Rescue Diving and Recompression System ("SRDRS"). The SRDRS is designed to rescue submariners from disabled submarines, and to provide decompression treatment if needed. Because the system must be able to quickly respond to a disabled submarine anywhere in the world, its components must be transportable by air, land, and sea.

On November 7, 2002, ETC submitted a draft request for equitable adjustment ("REA") in the amount of $3,668,554. ETC later submitted claim amendments that increased the total of the claim to $6,028,093. The contracting officer denied ETC's claim in full on July 22, 2004. 492. On July 11, 2005, ETC filed a complaint in the United States Court of Federal Claims that sought $9,109,617.50. On May 16, 2006, ETC filed an amended complaint that sought $7,995,398.00.

From the outset, ETC intended to attempt to recoup all incurred costs, plus 30 percent profit, from the Navy. In effect, ETC calculated its damages as though it were a total cost claim, that is, by adding all labor, material, and indirect costs incurred, and the estimated costs to

complete, and then subtracting the contract price. Instead of submitting a total cost claim, however, ETC arbitrarily allocated those costs to the various technical issues that ETC claimed were the fault of the Government.

According to a former ETC employee, William Mitchell, Sr., ETC's chief executive officer, directed employees to create a claim that would ensure that ETC would recoup all costs incurred in connection with the SDC project. Mr. Mitchell, Sr. directed the members of ETC's claim committee to inflate the amount of the claim; originally he told them to generate a claim that amounted to $3.6 million, and later told them to double that amount to $7.2 million. The final methodology utilized by ETC in generating its claim was to come up with 23 technical areas in which ETC experienced cost over-runs, irrespective of whether the Navy was responsible for the cost over-runs, and then arbitrarily assign labor hours to the claim items. ETC was aware when it certified its claim to the Navy that the claim included costs, relating to technical issues, that were not the responsibility of the Navy. In generating its claim, ETC made no attempt to deduct for its own deficiencies, such as lack of manpower, lack of qualified personnel, poor management, and technical problems for which ETC was solely responsible.

According to a former employee, the following claim items were not only the responsibility of ETC, but that ETC recognized that ETC was so responsible: (1) The second time the piping design had to be scrapped was due to ETC's incompetence because it was laid out without regard to other aspects of the design; it conflicted with other areas of the design; and the human factors requirements were not met; those hours, however, are included in the claim. (2) All of the FEA work done by the first three FEA analysts used by ETC was scrapped; those hours, however, are included in the claim. (3) ETC accomplished no useful designs during the

first three to four months of the contract; those hours, however, are included in the claim. (4) ETC's staff for both manufacturing and engineering were pulled off the SDC project to work on other projects; the impact in terms of loss of productivity was not considered. (5) The issue pertaining to the manway rings was due to ETC improperly welding it; those hours, however, are included in the claim.

Numerous internal ETC e-mails and other ETC documents demonstrate that ETC knowingly submitted a certified claim to the Navy that was false and fraudulent. These documents demonstrate that: (1) ETC set the amount of the claim before performing an analysis. (2) ETC included amounts for technical issues for which ETC knew it was responsible. (3) ETC deliberately and arbitrarily moved labor hours from the indirect cost category to the direct cost category so that those hours could be included in its claim. (4) ETC deliberately and arbitrarily assigned a percentage of each ETC's employee's time to the SDC project; (5) ETC knowingly used incorrect overhead and G&A rates in its claim. (6) ETC included costs for technical issues that it knew were covered by bilateral contract modifications. (7) ETC included costs for months of FEA analyses that ETC knew was a wasted effort because of the incompetence of the FEA analysts. (8) ETC included amounts in its certified claim and complaint that are wholly unsupported.

In a September 10, 2002 e-mail to members of the claim committee, William Mitchell, Sr. wrote: "You will need to ask for a great deal more if you expect to get $2.8 mil. We must assume: 1. Our cost to complete is always at least 50% low. 2. The time to complete is always at least twice as long. The Navy will want to settle at 45 cents on the dollar. Please note the big picture. The original contract was a build to print. The present contract is a development

contract."

In a September 27, 2002 email to in-house counsel, a member of the claims committee wrote:

> "In terms of Mechanical Engineering, Mechanical Design and Drafting hours, we are approximately 23,300 hours over budget. In past meetings we have attributed 13,000 hours of the overrun to the piping and control panel layout. (NOTE- I believe Rob Reed has a problem with ETC claiming all 13,000 hours are attributable to the Govt. He blames much of the overrun on ETC's own inefficiencies. Despite my explanation that the Govt takes the efficient workers along with the inefficient workers and that the solution always seems clear in hindsight, he remains unconvinced.) In yesterday's meeting I convinced the group that we should start by attempting to figure out where the remaining 10,300 hours of overrun went. They then listed categories and attempted to put estimated hours into those categories. Thus, there is now a preliminary spreadsheet which lists estimated overruns in various areas of the design, some of which are claimable. Note that the quantum effort is further complicated by the fact that some of the work ETC cites in the REA (such as complications in the FEA analysis, Pipe and Tubing Flexibility Analysis, etc.) cannot be claimed from a quantum standpoint because they were done by Onur when he was charging indirect to training. I have left them in the REA for delay purposes."

In his September 28, 2002 email response, in-house counsel wrote:

> "you are generally approaching this correctly, except that, for purposes of an REA anyway, we may want to claim Onur's FEA etc. time if it's a lot. How much is it? (I'm still ticked off if someone has been playing games and hiding project costs this way. You are correct to dismiss Rob Reed's reservations. Engineers are always looking at things in hindsight, and thinking they always knew what they know now because the "truth" lies in some Platonic plane unaffected by time and history. They also tend to be quite critical of the work of others in the same discipline. They do have an ego problem (unlike us lawyers). We will not involve him in any presentations regarding the REA, will muzzle him insofar as any other discussions about it with the Navy are concerned, and if we have to use him in some later proceeding will whip him into

shape before we do."

In an October 28, 2002 memo, an ETC officer stated that the accounting adjustments involving moving indirect labor charges to the direct labor charges to the project "will impact overall job costs as well as the Navy claim numbers."

In a November 5, 2002 email, a member of the claims committee wrote: "here are the total hours and time frame of indirect charges that need to be transferred to the USN project."

In a November 5, 2002 email a member of the accounting department wrote: "I was going to use this e-mail to make a one time adjustment to the cost records. Do we need to go back and have each relevant time sheet corrected and initialed by the PM [project manager]?"

In a November 20, 2002 email, a member of the claims committee indicated that ETC had moved thousands of hours from indirect charge numbers to the SDC contract.

In a January 6, 2003 email, a member of the claims committee stated: "Our latest projected total manufacturing cost to complete the whole contract is now estimated at $4,780,987.00. If we add 30% G&A and 10.0% profit (per the original contract) we come out to a total estimated contract value of $6,836,811.00. If we add the current claim value $3,668,554.00 to the original contract value of $3,241,343.00 then then (sic) number is $6,909,897.00."

In a January 7, 2003 e-mail, William Mitchell, Sr. responded: "Your claim is way understated. What are your plans to correct the claim?"

A January 16, 2003 e-mail to a member of the claims committee stated that in the attached spreadsheet was the calculation of "the amount ETC need to get from the claim in order to make 30% gross." The spreadsheet attached to the e-mail states: "Claim - Must Get to make

30% 3,441,758."

In a February 3, 2003 email to a member of the claims committee, in-house counsel wrote: "Apart from recharacterizing indirect labor which should have been direct-charged, and assuming the going forward estimates are realistic in the sense of taking account of inefficiencies associated with doing this work on such a delayed and stretched-out basis, it seems to me this pretty much taps us out on the number of claimable hours associated with the categories you describe."

In a September 10, 2003 email to a member of the claims committee, an ETC officer wrote: "My suggestion: Give him [Steve Simon, the DCAA auditor] the 1st quarter rates and mention that they are subject to adjustment when 2nd quarter rates are determined. By the time we get the audit report to comment on, you will have the 2nd quarter rates & we can go for the adjustment, if necessary (of course, it could work both ways- the adjustment could be downward- in which case we'll be silent)."

In a September 10, 2003 email a member of the claims committee wrote: "The target number is $76,000. How about: 320 welds @ $65 = $20,800, 3680 welds @ $15 = $55,200."

In a February 10, 2004 memorandum from DCAA to the Naval Criminal Investigation Service ("NCIS"), DCAA reported that ETC had mis-charged costs and that ETC's mis-charging served to increase the value of ETC's certified claim. In the memo, DCAA provided "information which suggests a reasonable basis for suspicion of fraud, corruption, or other unlawful activity affecting Government contracts." It was DCAA's opinion that the following accounting practices that ETC used in developing its certified claim should be further investigated by NCIS: accounting mis-charging, as a possible violation of FAR 31; accounting

mis-charging - Improper Transfer; False Claims/Certifications - Equitable Adjustment Claim; and materials - claimed costs that have already been paid.

ETC has claimed amounts due to technical issues that were the subject matter of bilateral modifications. For example, in contract modification P00001, the Navy decreased the maximum weight of the SDCs. In exchange the Navy agreed that the anti-corrosion specification would be waived, and that the internal pressure of the SDCs would be reduced. There is no documentary or testimonial evidence that ETC's execution of this modification, for which no time extension or additional funds were sought or included, and in which ETC released its claims, was anything but knowing and voluntary. Yet, in its complaint, ETC is claiming a total of approximately $1 million for issues relating to the Navy's decrease in the maximum allowable weight of the SDCs. In addition, bilateral modification P00006 compensated ETC for the engineering effort involved in moving the environmental control unit to the exterior of the SDC. ETC, in its complaint, is seeking an additional $79,611 for this change. Finally, bilateral modification P00005 compensated ETC for having to provide additional design submittals. ETC is claiming an additional $35,355 for this issue.

ETC is seeking at least $3.4 million for costs allegedly attributable to Navy-caused delays during performance of the contract. ETC, however, has produced no contemporaneously generated documents, such as a critical path method (CPM") analysis, to support its allegation that the government caused a quantifiable delay during the performance of the contract; has not retained a scheduling expert to perform a CPM analysis to support its delay claim; and none of the witnesses who were deposed in this matter have performed any analysis in support of ETC's delay claim. Moreover, during performance of the contract, ETC never requested time

extensions for the delays that it now claims were the responsibility of the government. According to our expert, there is no period of critical path delay for which the Navy is solely responsible. In short, ETC is claiming over $3 million in delay damages without any analysis whatsoever to support its claim, from either a scheduling or from a technical standpoint. Moreover, ETC does not intend to present a scheduling expert at trial.

According to the Government's damages expert, ETC did not adequately document or support any of its claimed damages. Based upon its review of the entire population of documents provided by ETC, the expert concluded that ETC had virtually no support for the majority of the amounts claimed. Furthermore, for those elements for which ETC did provide some calculations, the level of detail was inadequate for assessing reasonableness. The expert questioned all of ETC's claimed amounts, as did the Defense Contract Audit Agency.

In October 2006, Government counsel, during a conference in chambers regarding discovery issues, raised the possibility with counsel for ETC that ETC's claim might be false. In addition, a former employee, who was a member of the claims committee, met with ETC's counsel in the fall of 2006, and answered all of their questions about ETC's performance of the contract, and ETC's claim, and offered them his opinions regarding the falsity of much of that claim.

## ARGUMENT

### I. By Certifying A Claim For Costs That Are Unsupported, Were Not Incurred As The Result Of The Acts Of The Government, Were Already Paid, And That Have No Legal Or Factual Bases, ETC Violated The Anti-fraud Provision Of The CDA, The Special Plea In Fraud Statute And The False Claims Act.

The facts described above support counterclaims based upon the antifraud provision of

the CDA, the special plea in fraud statute, 28 U.S.C. § 2514, and the False Claims Act, 31 U.S.C. § 3729 et seq. This Court possesses jurisdiction pursuant to 28 U.S.C. §§ 1503 and 2508 to adjudicate counterclaims raised by the United States, including those arising pursuant to the False Claims Act and for fraud. Brown v. United States, 524 F.2d 693, 703 (Ct. Cl. 1975). Such counterclaims need not be the subject of a contracting officer's final decision to serve as a basis for a Government claim. Martin J. Simko Constr., Inc. v. United States, 852 F.2d 540, 543-45 (Fed. Cir. 1988).

A. The Anti-fraud Provision Of The CDA Applies To ETC's Claim

The anti-fraud section of the Contract Disputes Act, 41 U.S.C. § 604, provides, in pertinent part:

> If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim in addition to all costs to the Government attributable to the cost of reviewing said part of his claim.

Pursuant to the anti-fraud section of the CDA, the Government is entitled to recover the total amount of a fraudulent claim submitted to the Government regardless of whether payment of the claim was made, in addition to the costs incurred in investigating the false claim.[1] Although the CDA does not prescribe a standard of proof, the preponderance of the evidence standard has been applied by this Court. See e.g. UMC Electronics v. United States, 43 Fed. Cl. 776, 795 (1999)(citing Grogan v. Garner, 498 U.S. 279, 287-91 (1991) (establishing

[1] The CDA anti-fraud section remedy was enacted to complement False Claims Act recovery to provide for affirmative recovery of amounts claimed in addition to the False Claims Act civil penalty in situations where no Government payment was made. See S. Rep. No. 1118, 95th Cong., 2d Sess. 20 (1978), reprinted in, 1978 U.S C.C.A.N. 5235, 5254.

the preponderance standard in bankruptcy fraud cases)); Al Munford v. United States, 34 Fed. Cl. 62, 67 (1995). Here, ETC submitted a certified claim for $6,028,093, and an amended complaint seeking $7,995,398.00, alleging entitlement to costs that ETC was aware it was not entitled to. Accordingly, pursuant to the CDA, the United States is entitled to recover $7,995,398.00, plus the Government cost of reviewing the claim.

B. The Special Plea In Fraud Statute Applies To ETC's Claim

Section 2514, title 28, United States Code, provides:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.
>
> In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

The Federal Circuit has held that, to prevail pursuant to this statute, the Government must prove by clear and convincing evidence that the "claimant (1) knew the claim was false and (2) intended to deceive the government by submitting it." Young-Montenay, Inc. v. United States, 15 F.3d 1040, 1042 (Fed. Cir. 1994) (citing McCarthy v. United States, 670 F.2d 996, 1004, 229 Ct. Cl. 361 (1982)). Fraud pursuant to 28 U.S.C. § 2514 consists of "knowingly or recklessly making false statements with intent to deceive." Daff v. United States, 31 Fed. Cl. 682, 688 (1994), aff'd, 78 F.3d 1566 (1996) (citing Ingalls Shipbuilding, Inc. v. United States, 21 Cl. Ct. 117, 122 (1990)).

Here, ETC submitted a certified claim for $6,028,093, and an amended complaint seeking $7,995,398.00, alleging entitlement to costs that ETC was aware it was not entitled to.

Mistaken false statements do not warrant relief pursuant to the statute. Where a claimant, such as ETC here, however, persists in pursuing a claim it knows to be false, the defense of mistake is unfounded and the claimant's intent to deceive is established. See Al Munford, Inc. v. United States, 34 Fed. Cl. 62, 67 (1995), vacated on other grounds, 86 F.3d 1178 (Fed. Cir. 1996) (rejecting summary judgment because "plaintiff's subsequent admissions that it made a mistake and that the amounts contained in its claim were no longer valid provided some minimal evidence . . . that plaintiff did not actually intend to deceive the government"). ETC continues to pursue its claim even though it was advised eight months ago that its claim included costs that were in no way related to the allegations in its complaint. From such conduct, it can be inferred that ETC knowingly made or recklessly made false statement with the intent to deceive.

Even if ETC can establish at trial that part of its claimed amount is valid, ETC's entire claim is subject to forfeiture pursuant to the special plea in fraud statute, 28 U.S.C. § 2514. As this Court held in Supermex, Inc. v. United States, 35 Fed. Cl. 29, 40 (1996):

> There is no suggestion in the statute that a contract can be divided up into performance sectors to allow payment of some claims on a corrupted contract while other claims on the same contract are forfeited.

The rule is set forth fully in Brown Construction Trades, Inc. v. United States, 23 Cl. Ct. 214, 216 (1991):

> The Court of Claims has ruled that where fraud is committed in the course of a contract to which the suit pertains, it may not isolate the affected part and allow suit to proceed on the remainder. The practice of a fraud on part of a contract condemns the whole. The rule is set out in Little v. United States, 138 Ct. Cl. 773, 778, 152 F. Supp. 84, 87-88 (1957):

> It is true that the forfeiture statute [28 U.S.C. § 2514] was not intended to forfeit an otherwise valid claim of a claimant merely because, in some other unrelated transaction, he had defrauded the Government. But where, as in the present case, fraud was committed in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it. Since plaintiff's claims are based entirely upon contract V3020V-241, a contract under which he practiced fraud against the Government, all of his claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514.
>
> Thus, 28 U.S.C. § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the Government. See also New York Mkt. Gardeners' Ass'n v. United States, 43 Ct. Cl. 114, 136 (1908).

Quoted in Supermex, 35 Fed. Cl. at 40. See Ab-Tech Construction, Inc. v. United States, 31 Fed. Cl. 429, 435-36 (1994), aff'd, 57 F.3d 1084 (Fed. Cir. 1995).

Here, ETC submitted a claim in the approximate amount of $6 million and an amended complaint seeking approximately $8 million for costs.. Accordingly, forfeiture of ETC's entire claim is clearly warranted.

C. ETC's Conduct Constitutes A False Claim

The False Claims Act, as amended in 1999, provides for civil penalties of $5,500 to $11,000 for each false claim submitted to the Government, regardless of whether payment was made. The False Claims Act, 31 U.S.C. § 3729(a), requires that the Government prove that the claimant defendant knowingly presented a false or fraudulent claim for approval; or that the claimant knowingly makes or uses a false record or statement to get a false or fraudulent claim paid or approved. 31 U.S.C. § 3729 et seq., as amended by Debt Collection and Improvement Act of 1996, Pub. L. 104-134, Title 3, Ch. 10, Section 31001(s), April 26, 1996, 110 Stat. 1321-358, (effective September 29, 1999 for violations occurring after that date).

Pursuant to the False Claims Act, the filing of a false claim must have been "knowing." For purposes of the Act, "knowing" or "knowingly" means that a person (1) has actual knowledge of the information, (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). The statute expressly provides that the Government need not prove specific intent to defraud.

While it is clear that ETC's false claims were made "knowingly," at a minimum ETC deliberately ignored the truth or it recklessly disregarded the truth.

D. Recovery Based Upon All Three Statutes Is Cumulative

The legislative history of the CDA makes clear that the Government's remedies pursuant to the Special Plea in Fraud, the False Claims Act, and the anti-fraud provision of the CDA are cumulative and not in the alternative. Specifically, the Senate report explaining the anti-fraud provision states:

> This provision is intended to be separate and distinct from the rights now possessed by the Government in legislation such as the False Claims Act . . . or the Forfeiture Statute . . . . That is, section 4(b) [the antifraud provision, codified at 41 U.S.C. § 604] is not intended in any way to diminish the rights now afforded to the Government under current legislation. . . . Section 4(b) will afford the Government a separate and additional remedy of recovering an amount equal to the fraudulent or misrepresented amount.

S. Rep. No. 95-1118, 95th Cong., 2d Sess. 20 (1978), reprinted in 1978 U.S.C.C.A.N. 5235 (emphasis added).

II. The Government Should Be Permitted To Amend Its Answer To Assert Affirmative Defenses And Counterclaims Pursuant To The Anti-fraud Provision Of The CDA, The False Claims Act, And The Special Pleas In Fraud Statute,

In order to assert affirmative defenses and a counterclaim pursuant to the anti-fraud

provision of the CDA, the special plea in fraud statute, and the False Claims Act, the Government must amend its answer. RCFC 13(e) and (f). An amendment is permitted pursuant to RCFC 15(a), which provides that a party may amend its own pleading more than 20 days after it was served only by leave of the court or by written consent of the adverse party and that "leave shall be freely given when justice so requires." RCFC 15(a); accord First Nationwide Bank v. United States, 48 Fed. Cl. 248, 254 (2000). The determination of whether to grant a motion for leave to amend a pleading is within the discretion of the Court, but outright refusal to grant leave without any reason to justify the denial is not an exercise of discretion. Foman v. Davis, 371 U.S. 178, 182 (1962). Applying this test, this Court should "deny a motion to amend . . . only for substantial and legally sufficient reasons." St. Paul Fire & Marine Ins. Co. v United States, 24 Cl. Ct. 518, 520 (1991).

Following the October 2006 conversations between Government counsel and counsel for ETC, and between the former ETC employee and counsel for ETC, the Government expected that ETC would amend its complaint to accurately reflect the costs it incurred as the result of the alleged acts of the Government as set forth in its claim. This ETC has failed to do. Moreover, it was only after Government counsel took the deposition of Gregory Daub, an attorney employed by ETC and a member of ETC's claim committee, in November 2006,that counsel for ETC provided the Government with a number of documents. Those documents had been withheld based upon ETC's assertion that such documents were protected from disclosure based upon the attorney-client privilege. Those documents, produced in February and March 2007 showed the extent of the fraud perpetrated upon the Government by ETC. Accordingly, pursuant to the facts of this case, the Government should be permitted to amend its answer to assert counterclaims

pursuant to the Anti-fraud Provision of the CDA, the False Claims Act, and the Special Pleas In Fraud Statute.

CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court grant our motion for leave to amend its answer in this case to assert an affirmative defense and counterclaims based upon the Anti-fraud Provision of the CDA, the False Claims Act, and the Special Pleas In Fraud Statute.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/ Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch, Civil Division
Department of Justice
1100 L Street NW
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
202-307-0252
202-307-0972 (Fax)

Attorneys for Defendant

OF COUNSEL:

DAVID L. KOMAN
Senior Trial Attorney
Litigation Office
Office of the General Counsel
720 Kennon Street, S.E., Bldg. 36
Washington Navy Yard, DC 20374-5013
202-685-6984
202-685-7036 (Fax)

June 4, 2007