IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENVIRONMENTAL TECTONICS CORPORATION, | ) | |
| Plaintiff, | ) | No. 05-746C (Judge Susan G. Braden) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant | ) | |

DEFENDANT'S ADDITIONAL PROPOSED FINDINGS OF FACT AND DEFENDANT'S ADDITIONAL PROPOSED CONCLUSIONS OF LAW

## DEFENDANT'S ADDITIONAL PROPOSED FINDINGS OF FACT

ETC's Fraudulent Claim

179. From the outset, as the internal ETC documents make clear, ETC intended to attempt to recoup all incurred costs, plus 30 percent profit, from the Navy.

180. In effect, ETC calculated its damages as though it were a total cost claim, that is, by adding all labor, material, and indirect costs incurred, and the estimated costs to complete, and then subtracting the contract price.

181. Instead of submitting a total cost claim, however, ETC arbitrarily allocated those costs to the 24 technical issues.

182. In generating its claim, ETC made no attempt to deduct for its own deficiencies such as lack of manpower, lack of qualified personnel, poor management, and technical problems for which ETC was solely responsible.

183. In addition to the extensive documentary evidence that supports the Government's contention that ETC submitted a false and fraudulent claim to the Navy, which evidence is discussed below, the testimony of former ETC employees, who held key positions at ETC in

connection with the SDC project, provides corroborating evidence.

184. According to former ETC employees, William Mitchell. Sr., ETC's chief executive officer, directed employees to create a claim that would ensure that ETC could recoup all costs incurred in connection with the SDC project.

Robert Reed's Testimony

185. According to Robert Reed, he was employed by ETC from January 1999 to December 2004.

186. According to Mr. Reed, he was involved in the performance of the contract the Navy awarded to ETC to design, fabricate, assemble, test, and deliver a pair of SDCs.

187. According to Mr. Reed, ETC's lead engineer on the project, he oversaw the engineering and design effort for the SDCs, directed all piping design, managed other engineering design and testing efforts, and provided support to the manufacturing effort.

188. According to Mr. Reed, he was intimately involved with the writing of RFIs, the technical submittals, and correspondence with the Navy about technical issues.

189. According to Mr. Reed, he was ETC's representative at the construction review board ("CRB") meetings at which the Navy and ETC discussed all pending technical and scheduling issues.

190. According to Mr. Reed, he was also a member of the claim committee, as were Gregory Daub, who was responsible for contract administration, Robert Rubeo, the project manager, and Michael Allen, director of the hyperbaric division.

191. According to Mr. Reed, the claim committee was responsible for putting together ETC's request for equitable adjustment and claim.

192. According to Mr. Reed, from the time he became involved in the claims process, it was his impression that ETC intended to attempt to recoup from the Navy all incurred costs, plus 30 percent G&A and 10 percent profit.

193. According to Mr. Reed, at the meetings of the claim committee, the focus was on how to achieve the highest possible claim amount.

194. According to Mr. Reed, after the committee developed the claim methodology, Robert Rubeo or Gregory Daub would go to accounting to determine how to assign specific amounts to the specific claim items.

195. According to Mr. Reed, at a meeting following the meeting at which the first claim amount was designated by the claim committee, Mr. Daub stated that the first claim amount was too low, and that the claim committee had to find more claim items.

196. According to Mr. Reed, at a subsequent meeting, Mr. Daub stated that the second claim amount was still not high enough.

197. According to Mr. Reed, he believed that Mr. Daub was taking his direction from William Mitchell, Sr., ETC's chief executive officer.

198. According to Mr. Reed, the third claim amount was twice the second claim amount, that is, $7.2M.

199. According to Mr. Reed, while in the beginning the claim committee attempted to determine the appropriate methodology in good faith, that changed to whatever method would result in the pre-determined number.

200. According to Mr. Reed, the original claim methodology of developing estimates from interviewing employees and separating claim items from ETC's own problems was abandoned.

201. According to Mr. Reed, the methodology ultimately used consisted of arbitrarily assigning labor hours to the claim items.

202. According to Mr. Reed, the members of the claim committee were directed by William Mitchell, Sr., ETC's chief executive officer, to create a claim that would ensure that ETC would recoup all costs incurred in connection with the SDC project.

203. According to Mr. Reed, Mr. Mitchell, Sr. directed the members of the claim committee to inflate the amount of the claim; originally he told them to generate a claim that amounted to $3.6 million, and later told them to double that amount to $7.2 million.

204. Mr. Reed provided a spreadsheet to the Government. According to Mr. Reed, he e-mailed the spreadsheet to his home when he left his employment with ETC. According to Mr. Reed, that spreadsheet corroborates his testimony that the claim "goal" was initially $3.6 million, and that the goal was then doubled to $7.2 million.

205. According to Mr. Reed, at one point, he told Mr. Mitchell, Sr., that the claim process would be easier with detailed records.

206. According to Mr. Reed, during another meeting with himself, Mr. Allen, and Mr. Monesmith, Mr. Mitchell, Jr. asked if anyone had any moral problems with the claim. In response, Mr. Reed stated that ETC had a good relationship with the Navy, why ruin it.

207. According to Mr. Reed, he also commented that Mr. Mitchell, Jr., should have told them earlier that ETC was planning to submit a claim so that ETC could have kept better records. Mr. Mitchell, Jr., responded that ETC couldn't let on until a certain point that ETC was going to make a claim, or ETC might not get to make the claim, because you can't go into a project thinking you are going to submit a claim and you are obligated to disclose your intentions as soon

as you have them.

208. According to Mr. Reed, based upon his observations while employed at ETC, it is his opinion that the estimates of labor hours that were assigned to each technical issue, after the fact, are flawed because no records existed upon which such estimates could be based.

209. According to Mr. Reed, he would have been the most knowledgeable person to do any estimate regarding the labor hours expended for the piping issue (the single biggest technical issue in the claim), and he did not make the estimates.

210. According to Mr. Reed, with respect to ETC's $1.7 million claim relating to the piping and control panel, the single biggest claim amount, it is his opinion that the time and dollar amounts are greatly inflated.

211. According to Mr. Reed, as the person in charge of the piping design, he knew all of the people who worked on the piping and, thus, was able to identify those whose time is being claimed who in fact were not involved with the piping.

212. According to Mr. Reed, based upon his observations while employed at ETC, it is his opinion that the following claim items were not only the responsibility of ETC, but that ETC recognized that ETC was so responsible:

> (1) The second time the piping design had to be scrapped was due to ETC's incompetence because it was laid out without regard to other aspects of the design; it conflicted with other areas of the design; and the human factors requirements were not met; those hours, however, are included in the claim.
>
> (2) All of the FEA work done by the first three FEA analysts used by ETC was scrapped; those hours, however, are included in the claim.
>
> (3) ETC accomplished no useful designs during the first three

> to four months of the contract; those hours, however, are included in the claim.
>
> (4) ETC's staff for both manufacturing and engineering were pulled off the SDCs to work on other projects; the impact in terms of loss of productivity was not considered.
>
> (5) The issue pertaining to the manway rings was due to ETC improperly welding it; those hours, however, are included in the claim.

213. According to Mr. Reed, he is unaware of any effort that ETC made in generating its claim to deduct for its own deficiencies, such as lack of manpower, lack of qualified personnel, poor management, and technical problems for which ETC was solely responsible.

214. According to Mr. Reed, based upon his observations while employed at ETC, it is his opinion that the project was underbid; that ETC planned to make a claim all along; and that the attitude was that whatever ETC spent would go into the claim so that there was no need to cut or control costs.

215. According to Mr. Reed, based upon his observations while employed at ETC, it is his opinion that ETC's <u>overall</u> claim was intentionally and fraudulently inflated.

216. According to Mr. Reed, it is also his opinion that with respect to some of the technical issues, the Navy is either solely or partly responsible for ETC's cost overruns.

217. According to Mr. Reed, he met with Brian Bannon and Alan Freidman, two of ETC's attorneys, in the fall of 2006 and answered all of Mr. Bannon's and Mr. Friedman's questions about ETC's performance of the contract and ETC's claim, and offered them his opinions regarding the falsity of much of that claim.

Testimony of Michael Allen

218. Michael Allen was formerly employed at ETC.

219. According to Mr. Allen, he joined ETC in February 1998 as the director of the hyperbaric division, and left in February 2004.

220. According to Mr. Allen, he was involved in the performance of the contract that the Navy awarded to ETC to design, fabricate, assemble, test, and deliver a pair of SDCs.

221. According to Mr. Allen, he, Gregory Daub, an attorney who was responsible for contract administration, Robert Rubeo, the project manager, and Robert Reed, were members of the claim committee, that was responsible for putting together ETC's request for equitable adjustment and certified claim.

222. According to Mr. Allen, he is of the opinion, based upon his observations while employed at ETC, that ETC underbid the project.

223. According to Mr. Allen, based upon his observations while employed at ETC, it is his opinion that ETC initially did not have personnel who were capable of performing the contractually required FEA analysis.

224. According to Mr. Allen, based upon his observations while employed at ETC, it is his opinion that ETC diverted personnel from the SDC project to other projects.

225. According to Mr. Allen, based upon his observations while employed at ETC, it is his opinion that difficulties that ETC encountered in connection with the fabrication of the SDCs' vans were in part due to ETC's subcontractor, PennFab.

226. According to Mr. Allen, based upon his observations while employed at ETC, it is his opinion that the SDC project was understaffed.

227. According to Mr. Allen, it was his understanding that William Mitchell, Sr. approach to the claim was to look for ETC's increase in costs for the entire project and not to look for any credits.

228. According to Mr. Allen, the March 4, 1999, e-mail reflects ETC's methodology of adjusting the labor hours for project change orders.

229. According to Mr. Allen, in a December 20, 2002 e-mail sent to himself and others, William Mitchell, Sr. asked the claim committee whether the amount of the claim reflected what ETC estimates will be the final cost to complete the contract.

230. According to Mr. Allen, in his January 6, 2003 e-mail response, he stated that the current claim value was $3,668,554.

231. According to Mr. Allen, William Mitchell, Sr. sent an e-mail response the following day to the claim committee members in which he stated: "Your claim is way understated. What are your plans to correct the claim?"

232. According to Mr. Allen, it is his understanding that Mr. Mitchell was not satisfied with the amount of the claim and wanted the claim committee to fix the problem by increasing the amount of the claim.

233. According to Mr. Allen, in a September 10, 2002 e-mail from William Mitchell, Sr. to himself, Duane Deaner, and Robert Rubeo, Mr. Mitchell stated: "You will need to ask for a great deal more if you expect to get $2.8 mil. We must assume: 1. Our cost to complete is always 50% low. 2. The time to complete is always at least twice as long. 3. The Navy will want to settle at 45 cents on the dollar. Please note the big picture. The original contract was a build to print. The present contract is a development contract."

234. According to Mr. Allen, it is his understanding that in this email Mr. Mitchell was stating that he wanted to recover $2.8 million from the Navy, and that based upon Mr. Mitchell's assumption that the government would pay 45 cents on the dollar, the claim amount had to be approximately $5.6 million.

235. According to Mr. Allen, William Mitchell, Sr., the chief executive officer of ETC, stated in his presence that the claim had to total around $8 million.

Testimony of Gary Monesmith

236. Gary Monesmith was one project managers on the SDC project.

237. Mr. Monesmith was employed by ETC for approximately 24 years on all ETC products.

238. Mr. Monesmith became SDC project manager soon after ETC was awarded the contract in 1998. Mr. Monesmith left ETC in July 2001.

239. At the time Mr. Monesmith left ETC, the structural manufacturing of the SDCs was underway and the piping was still in the design phase. Mr. Monesmith was replaced by Robert Rubeo as project manager.

240. According to Mr. Monesmith , at the time he became involved in the SDC project, he was of the opinion that the budget was off by a factor of two; that ETC must have rushed its proposal based upon ETC's assumption that ETC's prior experience in designing and fabricating hyperbaric chambers (primarily for medical uses) and centrifuges was an adequate and sufficient experience base to enable ETC to design and fabricate the SDCs; that the project was understaffed initially; and that a lot of the effort that went into the FEA analyses was wasted.

<u>ETC's Internal E-Mails</u>

241. ETC's e-mails establish the following facts: ETC set the amount of the claim before doing an analysis; ETC included amounts for technical issues for which ETC knew it was responsible; ETC knowingly used incorrect overhead and G&A rates in its certified claim; ETC, in fact, used the overhead rate and the G&A rate that served to increase the amount of the claim, that is, the rate for the 1999 to 2001 time period, when the more appropriate rate was the rate for the 1999 to 2003 time period that corresponded to the period of performance under the contract; ETC included costs for technical issues that were covered by bilateral contract modifications; and ETC included amounts that are wholly unsupported.

242. In a March 4, 1999 email from Gary Monesmith to William Mitchell, Sr., Richard McAdams, and Michael Allen, Mr. Monesmith wrote:

> At this time 25% of the contract value is $810336. This spreadsheet represents approx. 20%. We need to &^*&%* 5% somewhere. At least with the spreadsheet we can bounce numbers around to see the effect. Per telecon w/WFM this am our approach should be this is our increase in cost for the entire project and should not look at any credits.

243. In a January 12, 2000 email from Gary Monesmith to Bernard Richter and William Mitchell, Jr., Mr. Monesmith wrote:

> As Augustin lead us down a prem-rose [sic] path to nowhere, a fairly large portion of the FEA work needs to be re-done. Dr. Rob [Henstenberg] is in process of learning the ANSYS program and starting to re-model some of the major components.

244. In a February 9, 2000 email from William Mitchell, Sr. to Michael Allen, Mr. Mitchell wrote:

> I would rather put Onur [Coskun] to work with Rob [Henstenberg] as an assistant until we finish the Navy design stage. This will lift some of the load away from Rob, give Onur the chance to learn in a situation that will not threaten our progress and still leave Rob as our front runner as far as the Navy is concerned.

245. In an April 4, 2000 email from Gary Monesmith to Michael Allen, Mr. Monesmith wrote:

> The design is progressing. Our biggest difficulty has been to overcome the gap in FEA development coinciding with design. Rob H. has been working hard to develop the models but has had some major software crashes, which has been very painful. The Navy has actually been very supportive and is trying to aid and offer comments and suggestions as much as possible to get him back on line. I think this is helping him a lot. The RFI process has been a very positive process during this effort. The Navy has in many cases lowered their requirements, which I am happy to say has or will save ETC a lot of money in engineering but mainly in production and purchasing. One such development was we have successfully proven that a different ECU system would be more capable, safer, while at the same time saving ETC approximately 30 to 40K in purchased components.

246. In a May 11, 2000 email from Gary Monesmith to William Mitchell, Sr., Mr. Monesmith wrote:

> As you are aware the FEA effort required to perform the USN SDC project has fallen severely short of its goals. We have now exhausted over 10-mos. worth of effort and have little or nothing to show which is now greatly impacting the successful completion of the Final Design effort.

247. In a May 12, 2000 email from Duane Deaner to John Stasi and Gary Monesmith, Mr. Deaner wrote:

> This job is going south in three ways. 1. They are not paying old invoices. 2. We are not buying materials to generate new billing. 3. The budget has slipped. What is your action plan?

248. In his May 12, 2000 email response to Mr. Deaner's May 12, 2000 email, Gary Monesmith wrote:

> One of those issues is the lack of FEA support which you are aware of our plans there. This issue alone is the most direct influence to items 2 & 3 of your e-mail.

249. In a July 26, 2000 email from Duane Deaner to Richard McAdams and Gary Monesmith, Mr. Deaner wrote:

> We want to verify that FEA is required to the extent that we have performed it. Also, Gary said the FEA issue was the cause for the budget slipping $350,000, so we want to pass this cost back to the Navy if at all appropriate.

250. In his July 27, 2000 email response Duane Deaner, Richard McAdams, and William Mitchell, Sr., Mr. Monesmith wrote:

> It was not the volume of the FEA required by contract but rather the non-availability of qualified ETC personnel to carry out the work required.

251. In an August 18, 2000 email from Duane Deaner to Gary Monesmith and Art Worley, Mr. Deaner wrote:

> . . . action plan as to how we can recoup the $450,000 Navy budget increase.

252. In a December 5, 2000 email from Duane Deaner to Michael Allen, Gary Monesmith, and John Stasi, Mr. Deaner wrote:

> Given the large budget slip, I feel we should prepare an analysis of the current costing by major component or activity versus the original cost estimate.
> We need to understand where and why we underbid. Although a lot of theories have been forwarded, from my viewpoint

> I see a job that has been continuously delayed in time and
> whose budget slips each quarter.

253. In a December 8, 2000 email from William Mitchell, Sr. to Duane Deaner, Michael Allen, Gary Monesmith, and John Stasi, Mr. Mitchell wrote:

> I do not feel the job was so under bid as
> compared to an increase in scope that we
> have not controlled or recognized. It is always
> easy to say a job was underbid. How old is that
> story? You have a claim for increased scope and
> no ones to say it and do something about it.

254. On August 22, 2002, ETC first notified the Navy that ETC was experiencing financial trouble on the project. Richard McAdams, the Vice-President of ETC, stated that the project would cost ETC about twice the $3.2 million contract value.

255. In a September 5, 2002 email from Gregory Daub to Richard McAdams, Mr. Daub wrote:

> Some of the preliminary questions that I have are as follows:
> Should we take a "bottoms up" approach or a "top down" approach?
> Should we exclude Augustin Pendus's time?
> How should we approach the overruns on materials?

256. In an October 1, 2002 email from William Mitchell, Sr. to Michael Allen, Robert Rubeo, and Richard McAdams, Mr. Mitchell wrote

> Have you spoken to Dave DeAngelis re how we
> are to proceed on getting a revised contract price?
> We must get discussions going ASAP.
> 1. Status of the project? What problems exist?
> When will they be solved?
> 2. When can we reduce the engineering staff?

257. In a September 10, 2002 e-mail, from William Mitchell, Sr. To Duane Deaner, Michael Allen, and Robert rubeo, stated:

> You will need to ask for a great deal more if you expect to get $2.8 mil. We must assume:
> 1. Our cost to complete is always at least 50% low.
> 2. The time to complete is always at least twice as long.
> 3. The Navy will want to settle at 45 cents on the dollar.
> Please note the big picture. The original contract was a build to print.[1] The present contract is a development contract.

258. In a September 19, 2002 email from Robert Reed to Gregory Daub, Mr. Reed wrote:

> Our lack of timesheet detail has hurt us in some areas. Here it will help us since we spent more time on the work than the estimate.

259. In a September 27, 2002 email from Gregory Daub to Cliff Russell, Mr. Daub wrote:

> In terms of Mechanical Engineering, Mechanical Design and Drafting hours, we are approximately23,300 hours over budget. In past meetings we have attributed 13,000 hours of the overrun to the piping and control panel layout. (NOTE- I believe Rob Reed has a problem with ETC claiming all 13,000hours are attributable to the Govt. He blames much of the overrun on ETC's own inefficiencies. Despite my explanation that the Govt takes the efficient workers along with the inefficient workers and that the solution always seems clear in hindsight, he remains unconvinced.) In yesterday's meeting I convinced the group that we should start by attempting to figure out where the remaining 10,300 hours of overrun went. They then listed categories and attempted to put estimated hours into those categories. Thus, there is now a preliminary spreadsheet which lists estimated overruns in various areas of the design, some of which are claimable. Note that the quantum effort is further complicated by the fact that some of the work ETC cites in the REA (such as complications in the FEA analysis, Pipe and Tubing Flexibility Analysis, etc.) cannot be claimed from a quantum standpoint because they were

[1] Mr. Mitchell was clearly aware when he wrote this email that ETC's contract was not a "build to print" contract; it was a design-build contract. The specifications clearly stated the requirements were for the design and analysis of the SDC, which were required before fabricating it could begin. Significantly, the specifications also required both a preliminary design package and a final design package.

> done by Onur when he was charging indirect to training. I have left them in the REA for delay purposes.

260. In his September 28, 2002 email response to Gregory Daub, Cliff Russell wrote:

> you are generally approaching this correctly, except that, for purposes of an REA anyway, we may want to claim Onur's FEA etc. time if it's a lot. How much is it? (I'm still ticked off if someone has been playing games and hiding project costs this way. You are correct to dismiss Rob Reed's reservations. Engineers are always looking at things in hindsight, and thinking they always knew what they know now because the "truth" lies in some Platonic plane unaffected by time and history. They also tend to be quite critical of the work of others in the same discipline. They do have an ego problem (unlike us lawyers). We will not involve him in any presentations regarding the REA, will muzzle him insofar as any other discussions about it with the Navy are concerned, and if we have to use him in some later proceeding will whip him into shape before we do.

261. In an October 28, 2002 memo, Richard McAdams stated that the accounting adjustments involving moving indirect labor charges to the direct labor charges to the project "will impact overall job costs as well as the Navy claim numbers."

262. In a November 5, 2002 email from Robert Rubeo to John Stasi and Tom Loughlin, Mr. Rubeo wrote:

> here are the total hours and time frame of indirect charges that need to be transferred to the USN project.

263. In his November 5, 2002 email response to Robert Rubeo's November 5, 2002 email, Mr. Stasi wrote:

> I was going to use this e-mail to make a one time adjustment to the cost records. Do we need to go back and have each relevant time sheet corrected and initialed by the PM?

264. In his November 5, 2002 email response to Mr. Stasis November 5, 2002 email, Richard McAdams wrote to Cliff Russell:

> I would think so, in view of a potential audit some day.

265. In his November 6, 2002 email response to Richard McAdams' November 5, 2002 email, Cliff Russell wrote:

> Unfortunately (because it's going to be a bear), I'm afraid I have to agree with you. (One side benefit may be that we'll actually be able to determine, if they put anything useful in the "description of work performed" column, specifically what they were working on.)

266. In a November 12, 2002 email to Richard McAdams, Mr. DeAngelis wrote:

> Not very good news to hear Bob Meilke was let go. Although he was kind of behind the scenes, his job was crucial. His loss I feel will be a severe detriment and impact on the successful completion of the project. He was the only one that had a real handle on the part of our project where engineering interfaces with production. Most of the other people who were somewhat involved now are working on other project, very disheartening…. This is a devastating loss. My QA was just saying how a lot of people were laid off who had an impact on this project and they hoped to God Mielke was not one of them, because they really felt there was no one who knew the project and had the conviction like Bob Mielke.

267. In a November 20, 2002 email from Robert Mr. Rubeo to Richard McAdams and Gregory Daub, Mr. Rubeo indicated that ETC had moved thousands of hours from indirect charge numbers to the SDC contract.

268. In a December 20, 2002, email from William Mitchell, Sr. to Robert Rubeo and Michael Allen, Mr. Mitchell posed the following questions:

> Are there any outstanding problems or risk areas ahead?
> Does the claim cost reflect what we now estimate the final cost?
> Do we need to update the claim?

269. In a January 6, 2003 email from Michel Allen to William Mitchell, Sr. and Robert Rubeo, Mr. Allen stated:

> Our latest projected total manufacturing cost to complete
> the whole contract is now estimated at $4,780,987.00.
> If we add 30% G&A and 10.0% profit (per the original contract)
> we come out to a total estimated contract value of $6,836,811.00.
> If we add the current claim value $3,668,554.00 to the original
> contract value of $3,241,343.00 then then (sic) number is
> $6,909,897.00.

271. In a January 7, 2003 e-mail, William Mitchell, Sr. responded:

> Your claim is way understated. What are your plans
> to correct the claim?

272. In response to William Mitchell's January 7, 2003 e-mail, a week later ETC initiated a "Navy claim re-look." In a January 13, 2003 e-mail, Richard McAdams listed 15 "suggested areas to re-look at to determine if additional hours . . . may be included" in the claim.

273. In a January 13, 2003 email from Richard McAdams to Michael Allen, Robert Rubeo, and Gregory Daub, Mr. McAdams stated as follows:

> Suggested areas to re-look at to determine if additional hours
> that may be included:
>
> Engineering (Mech/Elect)
> Design
> Drafting
> Tech Pubs
> QC*
> Purchasing*
> Proj Mgr.
> Shop:
> Weld
> Machining
> Sh. Metal
> Painting
> Assembly (mech'l, electrical, piping
> Mfg. Engineering

> Test
> Claim prep time (meetings, reviews, writing/re-writing, re-reviews, etc.) (Greg D, MWA, RR, Rob R, etc.)

274. In a January 13, 2003 email from Robert Rubeo to Richard McAdams, Michael Allen, Robert Rubeo and Gregory Daub, Mr. Rubeo wrote:

> We need to start meeting again to determine what additional monies can be applied to the REA.

275. In a January 16, 2003 e-mail, John Stasi sent a spreadsheet to Duane Deaner that "calculates the amount we need to get in order to make 30% gross." The spreadsheet attached to the e-mail indicates: "Claim - Must Get to make 30% 3,441,758."

276. In a January 27, 2003 email from Gregory Daub to Richard McAdams, Mr. Daub wrote:

> Per RR [Robert Reed], the only other item that needs to be completed in regard to the Final Design are several Plans (sic). ETC did work on completing some plans during November and December 2002. However, according to RR, there is nobody currently working on completing the plans. Rob Reed was working on supporting the manufacturing floor (working on ECNs), but was recently reassigned to another project. Given ETC's lack of current effort at completing the outstanding plans, I thought perhaps it was best not to mention the plans at all in the report.

277. In a February 3, 2003 email from Gregory Daub to Cliff Russell, Mr. Daub wrote:

> Actual Hours 34,035
> Less (Budgeted hrs + hrs previously compensated for)- 7,504
> Equals Total (Engr) Claim Hours 26,531
> My question is whether ETC can claim any more than this amount in terms of Mechanical Engineering, Design, Drafting, and FEA hours?

278. In a February 3, 2003 email from Cliff Russell to Gregory Daub, Mr. Russell wrote:

> apart from recharacterizing indirect labor which should have been direct-charged, and assuming the going forward estimates are realistic in the sense of taking account of inefficiencies associated with doing this work on such a delayed and stretched-out basis, it seems to me this pretty much taps us out on the number of claimable hours associated with the categories you describe.

279. In a May 6, 2003 email from Gregory Daub to Richard McAdam, Mr. Daub provided the following information:

| | | FY '99 – '01<br>(Adj. OH 180.8%)<br>(Adj. G&A 33.2%) | FY '99 – '03<br>(Adj. OH 172.5%)<br>(Adj. G&A 30.7%) |
|---|---|---|---|
| | Layered Rates | Average Rates | Average Rates |
| Hard Cost Subtotal | $3,126,592 | $3,324,150 | $3,195,428 |
| Eichleay | $567,025 | $373,508 | $ 465,174 |
| Claim Total | $5,128,908 | $5,166,401 | $5,106,205 |

280. In a memo to file date June 5, 2003 titled "Subject: Navy SDC Claim" it is stated:

> They [DCAA] believe there may be a discrepancy in the figures, for instance:
> Total Cost to date per DCAA audit: $6.0 M
> Contract Price: (3.4) M
> Difference: 2.6 M
> But the claim total is: 5.1 M
> Where is the other cost?
> Answer: We said there are projected costs included in the claim that would not show up in the total cost audit; also, profit must be added. He [DCAA auditor] then asked under what SOR nos. the claimed costs were captured. I said they were under these (aforementioned) SOR's. He asked why we did not assign discrete SOR's to the claimed items. I said that because this was a typical case of where we did not realize the full impact of most of the changes until later in the performance period, when it was too late to identify & segment the items into separate SOR's (i.e., a constructive changes situation) and we had to utilize the best

estimates of the individuals involved.

281. In a September 10, 2003 email from Richard McAdams to John Stasi and Gregory Daub, Mr. McAdams wrote:

> My suggestion: Give him [Steve Simon, DCAA Auditor] the 1st quarter rates and mention that they are subject to adjustment when 2nd quarter rates are determined. By the time we get the audit report to comment on, you will have the 2nd quarter rates & we can go for the adjustment, if necessary (of course, it could work both ways- the adjustment could be downward- in which case we'll be silent).

282. In a September 10, 2003 email from Michael Quiring to Gregory Daub, Mr. Quiring wrote:

> 2 chambers x 2000 welds per = 4000 welds
> approx. 250 welds are radiographed at $65 per shot = $16,250
> the balance or 3750 welds are PT'd at $15 per shot = $56,250
> the total being $72,500

283. In his September 10, 2003 response to Michael Quiring's email, Gregory Daub wrote:

> The target number is $76,000
> How about:
> 320 welds @ $65 = $20,800
> 3680 welds @ $15 = $55,200

284. In an email dated October 24, 2003 from Robert Rubeo to Michael Allen, Michael Quiring, Gregory Daub, and Fran Kenney, Mr. Rubeo wrote:

> Michael Q. we will probably have to get the skids of materials off the tops of the vans to make them appear like something other than a storage shelf.

285. In an email response dated October 27, 2003, to Mr. Rubeo's October 24, 2003 email, Mr. McAdams wrote:

> We should definitely move the mat'ls off the skids as Bob suggests. Can Bob get some more activity started on the project, just to show some progress?...Maybe put the meeting off for a week (i.e., to 10 Nov) if Bob needs it to get some more work done.

286. In a November 6, 2003 email from Richard McAdams to Michael Allen, Gregory Daub, William Mitchell, Sr., and Duane Deaner, Mr. McAdams wrote:

> My recommendation is to continue with CRB's & other project business; however, if Navy question or complains about our progress, explain that due to the tremendous cost overrun, the Navy's delay in dealing with the claim issues - particularly, their apparent determination that all of our claims are "in scope" work per the auditor's input, and their decision to stop further payments, we were forced to reduce effort on the project and are proceeding as well as we can under the circumstances.

287. In a November 13, 2003 email from Gregory Daub to Richard McAdams and John Stasi, Mr. Daub wrote:

> We only have a total of $76,039 in claimed material and DO costs going forward and none of the going forward material costs claimed ($21,691) were questioned by DCAA. Therefore I think we will have to modify our argument.

288. In a February 10, 2004 memorandum from DCAA to the Naval Criminal Investigation Service ("NCIS"), DCAA reported that ETC had mis-charged costs and that ETC's mis-charging served to increase the value of ETC's certified claim. In the memo, DCAA provided "information which suggests a reasonable basis for suspicion of fraud, corruption, or other unlawful activity affecting Government contracts." It was DCAA's opinion that the following accounting practices that ETC used in developing its certified claim should be further

investigated by NCIS: accounting mis-charging, as a possible violation of FAR 31; accounting mis-charging - Improper Transfer; False Claims/Certifications - Equitable Adjustment Claim; and materials - claimed costs that have already been paid.

289. In a March 1, 2004 email from Robert Rubeo to Gregory Daub, Mr. Rubeo wrote:

> Unless otherwise directed, if the subject of schedule comes up during this meeting I will continue to inform the USN that due to the tremendous cost overrun, the Navy's delay in dealing with the claim issues- particularly, their apparent determination that all of our claims are "in scope" work per the auditor's input, and their decision to stop further payments, we were forced to reduce effort on the project and are proceeding as well as we can under the circumstances.

290. In a March 1, 2004 response to Mr. Rubeo's March 1, 2004 email, Gregory Daub wrote:

> But make it clear that we are continuing with work (as best we can) under the contract.

291. In an email dated March 14, 2003, from Robert Rubeo to Richard McAdams, Mr. Rubeo wrote:

> I have completed the USN schedule and the output indicates that we will ship the SDC's on August 28, 2003. However, in order to make this delivery date certain resource commitments will need to be put into place immediately…. If we continue to miss our projected schedule we will again be susceptible to the USN's negative criticism of company commitment…. My goal and passion more than anything else is to get this job completed so that we all can move on to more productive work.

292. In a June 1, 2005 email from Gregory Daub to William Mitchell, Sr. and Duane Deaner, Mr. Daub wrote:

> Per BFM's direction, I am forwarding the below e-mail to provide the addressees a summary of approximately where we currently stand with the quantum update. WFM [William Mitchell, Sr.] has indicated that we will have a meeting next week regarding the Navy claim quantum.

293. Finally, in an undated document captioned "Questions and Comments Regarding REA," the following comments were made:

> Referring to the Forced Convection Flow Analysis issue: "Mod 06 paid ETC for addil. engr hrs to change from an internal ECS to an external ECS. ETC might (should) have included the cost to re-do the FCFA within its cost estimate. Should this be removed?"
>
> Referring to the unreasonable review of the FEA load cases issue: "This was when ETC's FEA analysis efforts were in 'transition' from Augustin Pendus to Rob H. I believe the discussion is broad enough to avoid any problems (fraud). I do know a number of RFIs went back and forth but Rob H. said there was no MAJOR change in load cases, just refinement of them."
>
> Referring to the manway door issue: "ETC's 3-D modeling problems were the result of a glitch in the ANSYS program."

<u>ETC Contract Documents</u>

294. In contract modification P00001, the Navy decreased the maximum weight of the SDCs. In exchange the Navy agreed that the anti-corrosion specification would be waived, and that the internal pressure of the SDCs would be reduced.

295. There is no documentary or testimonial evidence that ETC's execution of this modification, for which no time extension or additional funds were sought or included, was

anything but knowing and voluntary.

296. In its complaint, ETC is claiming a total of approximately $1M for issues relating to the Navy's decrease in the maximum allowable weight of the SDCs.

297. Bilateral modification P00006 compensated ETC for the engineering effort involved in moving the environmental control system ("ECS") to the exterior of the SDC.

298. ETC, in its complaint, is seeking an additional $79,611 for this change.

299. Bilateral modification P00005 compensated ETC for having to provide additional design submittals.

300. ETC in its complaint is claiming an additional $35,355 for this issue.

## DEFENDANT'S ADDITIONAL PROPOSED CONCLUSIONS OF LAW

118. The United States is entitled to judgement under the Anti-Fraud Section of the CDA.

119. The anti-fraud section of the Contract Disputes Act, 41 U.S.C. § 604, provides, in pertinent part:

> If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim in addition to all costs to the Government attributable to the cost of reviewing said part of his claim.

120. Pursuant to the anti-fraud section, the Government is entitled to recover the total amount of fraudulent claims submitted regardless of whether payment was made, in addition to the costs incurred in investigating the false claims.

121. Although the CDA does not prescribe a standard of proof, the preponderance of the evidence standard has been applied by this Court. See UMC Electronics v. United States, 43 Fed. Cl. 776, 795 (1999)(citing Grogan v. Garner, 498 U.S. 279, 287-91 (1991) (establishing the preponderance standard in bankruptcy fraud cases)); Al Munford v. United States, 34 Fed. Cl. 62, 67 (1995).

122. The CDA anti-fraud section remedy was enacted to complement the False Claims Act recovery to provide for affirmative recovery of amounts claimed in addition to the False Claims Act civil penalty in situations where no Government payment was made. See S. Rep. No. 1118, 95th Cong., 2d Sess. 20 (1978), reprinted in, 1978 U.S.C.C.A.N. 5235, 5254.

123. The Government has proved by preponderant evidence that pursuant to the CDA it is entitled to recover $7,995,398, that is, the full amount of ETC's claim, plus the Government's cost of reviewing the claim.

124. The United States is entitled to judgement under the Special Plea in Fraud.

125. Section 2514 of title 28, United States Code, provides:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.
>
> In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

126. To prevail pursuant to this statute, the Government must prove by clear and convincing evidence that the "claimant (1) knew the claim was false and (2) intended to deceive the government by submitting it." Young-Montenay, Inc. v. United States, 15 F.3d 1040, 1042 (Fed.

Cir. 1994) (citing McCarthy v. United States, 670 F.2d 996, 1004 (Ct. Cl. 1982)).

127. Fraud pursuant to 28 U.S.C. § 2514 consists of "knowingly or recklessly making false statements with intent to deceive." Daff v. United States, 31 Fed. Cl. 682, 688 (1994), aff'd, 78 F.3d 1566 (1996) (citing Ingalls Shipbuilding, Inc. v. United States, 21 Cl. Ct. 117, 122 (1990)).

128. Although the clear and convincing standard is the rule of the Federal Circuit, the Supreme Court's rulings in Grogan v. Garner, 498 U.S. at 286, and Huddleston v. Herman & MacLean, 459 U.S. 375, 387-90 (1983), suggest that the proper standard is preponderance of the evidence. In these cases, the Court "decline[d] to depart from the preponderance-of-the-evidence standard generally applicable in civil actions," 459 U.S. at 390, in the context of the fraud provisions in the federal bankruptcy (Grogan) and securities (Huddleston) laws. "[I]mposition of even severe civil sanctions that do not implicate such interests [individual rights and liberties] has been permitted after proof by a preponderance of the evidence." 459 U.S. at 389.

129. Mistaken false statements do not warrant relief pursuant to the statute. However, a claimant's persistence in pursuing a claim it knows to be false removes any question of mistake and exposes the claimant's intent to deceive the Government. See Al Munford, Inc. v. United States, 34 Fed. Cl. 62, 67 (1995), vacated upon other grounds, 86 F.3d 1178 (Fed. Cir. 1996) (rejecting summary judgment because "plaintiff's subsequent admissions that it made a mistake and that the amounts contained in its claim were no longer valid provided some minimal evidence . . . that plaintiff did not actually intend to deceive the government").

130. The Federal Circuit in Long Island Savings Bank, FSB v. United States, 476 F.3d 917 (Fed. Cir. 2007), held that, under the special plea in frauds statute, 28 U.S.C. 2514, the

Government needs to prove only that the contractor submitted claims that were false, and that the contractor intended to defraud the Government by submitting those claims, in order to prevail.

131. The fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing an adverse inference that there was a fraudulent intent; thus circumstantial evidence may permit an inference of intent. Id.

132. Even if the costs in question do not amount to the total of ETC's certified claim, 28 U.S.C. § 2514 requires that the entire claim be forfeited.

133. As the Court of Federal Claims held in Supermex, Inc. v. United States, 35 Fed. Cl. 29, 40 (1996), there is no suggestion in the statute that a contract can be divided up into performance sectors to allow payment of some claims on a corrupted contract while other claims on the same contract are forfeited.

134. The rule is set forth fully in Brown Construction Trades, Inc. v. United States, 23 Cl. Ct. 214, 216 (1991):

> The Court of Claims has ruled that where fraud is committed in the course of a contract to which the suit pertains, it may not isolate the affected part and allow suit to proceed on the remainder. The practice of a fraud on part of a contract condemns the whole. The rule is set out in Little v. United States, 138 Ct. Cl. 773, 778, 152 F. Supp. 84, 87-88 (1957): It is true that the forfeiture statute [28 U.S.C. § 2514] was not intended to forfeit an otherwise valid claim of a claimant merely because, in some other unrelated transaction, he had defrauded the Government. But where, as in the present case, fraud was committed in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract and allow recovery on part of it. Since plaintiff's claims are based entirely upon contract V3020V-

> 241, a contract under which he practiced fraud against the Government, all of his claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514. Thus, 28 U.S.C. § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the Government. See also New York Mkt. Gardeners' Ass'n v. United States, 43 Ct. Cl. 114, 136 (1908).

Id., quoted in Supermex, 35 Fed. Cl. at 40. See also Ab-Tech Construction, Inc. v. United States, 31 Fed. Cl. 429, 435-36 (1994), aff'd, 57 F.3d 1084 (Fed. Cir. 1995).

135. The Government has proved by preponderant evidence that pursuant to the Special Plea In Fraud statute it is entitled to the forfeiture of 7,995,398, that is, the full amount of ETC's claim.

136. The United States Is entitled to judgement under the False Claims Act.

137. The False Claims Act, as amended in 1999, provides civil penalties for each false claim submitted to the government, regardless of whether payment was made. The penalty amounts were increased from $5,000 to $10,000 to $5,500 to $11,000 pursuant to the Federal Civil Penalties Inflation Act of 1996, Pub. L. No. 104-410, as amended by the Debt Collection Improvement Act of 1996, Pub. L. No. 104-134. See also 28 CFR § 85.3(a)(9).

138. The False Claims Act, 31 U.S.C. § 3729(a), requires that the Government prove that ETC knowingly presented a false or fraudulent claim for approval. See 31 U.S.C. § 3729 et seq., as amended by Debt Collection and Improvement Act of 1996, Pub. L. No. 104-134, Title 3, Ch. 10, Section 31001(s), April 26, 1996, 110 Stat. 1321-358 (effective September 29, 1999 for violations occurring after that date).

139. Pursuant to the False Claims Act, the filing of a false claim must have been "knowing."

For purposes of the Act, "knowing" or "knowingly" means that a person (1) has actual knowledge of the information, (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b).

140. The False Claims Act expressly provides that the Government need not prove specific intent to defraud. Pursuant to the False Claims Act, proof by a preponderance of the evidence is sufficient for the government to prevail. 31 U.S.C. §§ 3729, 3731.

141. The Government has proved by preponderant evidence that pursuant to the False Claims Act it is entitled to $11,000.

142. Recovery based upon all three statutes is cumulative.

143. The legislative history of the CDA makes clear that the Government's remedies pursuant to the Special Plea in Fraud, the False Claims Act, and the anti-fraud provision of the CDA are cumulative and not in the alternative. Specifically, the Senate report explaining the anti-fraud provision states:

> This provision is intended to be separate and distinct from the rights now possessed by the Government in legislation such as the False Claims Act . . . or the Forfeiture Statute . . . . That is, section 4(b) [the anti-fraud provision, codified at 41 U.S.C. § 604] is not intended in any way to diminish the rights now afforded to the Government under current legislation. . . . Section 4(b) will afford the Government a separate and additional remedy of recovering an amount equal to the fraudulent or misrepresented amount.

S. Rep. No. 95-1118, 95th Cong., 2d Sess. 20 (1978), reprinted in 1978 U.S.C.C.A.N. 5235, 5254

(emphasis added).

144. The Government is entitled to relief under all three statutes.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/ Leslie Cayer Ohta
LESLIE CAYER OHTA
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street NW
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
202-307-0252
202-307-0972 (Fax)

OF COUNSEL:

DAVID L. KOMAN
Senior Trial Attorney
Litigation Office
Office of the General Counsel
720 Kennon Street, S.E., Bldg. 36
Washington Navy Yard, DC 20374-5013
202-685-6984
202-685-7036 (Fax)

June 14, 2007

Attorneys for Defendant